IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
WACO DIVISION

```
CADDO SYSTEMS, INC.,      *
511 TECHNOLOGIES, INC.    *
                          *     June 8, 2022
VS.                       *
                          * CIVIL ACTION NO. W-20-CV-245
                          *
MICROCHIP TECHNOLOGY      *
  INCORPORATED            *
```

BEFORE THE HONORABLE ALAN D ALBRIGHT
TRIAL PROCEEDINGS
Volume 3 of 5

APPEARANCES:

For the Plaintiffs:   Timothy Devlin, Esq.
                      Alex Chan, Esq.
                      Veronica McCarty, Esq.
                      James Lennon, Esq.
                      Devlin Law Firm, LLC
                      1526 Gilpin Avenue
                      Wilmington, DE 19806

For the Defendant:    Travis Jensen, Esq.
                      Jason K. Yu, Esq.
                      Evan Brewer, Esq.
                      Orrick, Herrington & Sutcliffe LLP
                      1000 Marsh Road
                      Menlo Park, CA 94025-1015

                      Claudia Wilson Frost, Esq.
                      Orrick, Herrington & Sutcliffe LLP
                      609 Main, 40th Floor
                      Houston, TX 77002

                      Jeff Quilici, Esq.
                      Orrick, Herrington & Sutcliffe LLP
                      300 West 6th Street, Suite 1850
                      Austin, TX 78701

                      Darryl Adams, Esq.
                      Brian Banner, Esq.
                      Slayden Grubert Beard PLLC
                      401 Congress Ave., Ste. 1650
                      Austin, TX 78701

—721—

```
       1
               Court Reporter:      Kristie M. Davis, CRR, RMR
       2                            PO Box 20994
                                    Waco, Texas 76702-0994
       3                            (254) 340-6114

       4       Proceedings recorded by mechanical stenography;
01:27  5   transcript produced by computer-aided transcription.

01:27  6                     (Hearing begins.)

08:28  7                     THE BAILIFF:  All rise.

08:28  8                     THE COURT:  Good morning, everyone.  You

08:28  9   may be seated.

08:28  10                    My understanding is there's an issue to

08:28  11  take up.

08:28  12                    Mr. Adams?

08:28  13                    MR. ADAMS:  Your Honor, I think we have

08:28  14  one or several pieces of good news for you this

08:28  15  morning, Your Honor.  You maybe could use some good

08:29  16  news on a -- is it Wednesday?  I'm not even sure.

08:29  17                    THE COURT:  It's sort of like telling a

08:29  18  prisoner who's being beaten --

08:29  19                    (Laughter.)

08:29  20                    THE COURT:  -- good news.  We're going to

08:29  21  stop beating you in 15 minutes.

08:29  22                    MR. ADAMS:  There you go.  And it's

08:29  23  probably a very good analogy, Your Honor.

08:29  24                    THE COURT:  Thank you so much for

08:29  25  stopping.
```

08:29   1                    (Laughter.)

08:29   2                    MR. ADAMS:  So, Your Honor, Microchip has

08:29   3    decided that it is not going to put on an invalidity

08:29   4    case.  And so in consideration of the jurors and

08:29   5    Kristie, we are not going to read 17 substantially

08:29   6    similar claims into the record a second time.

08:29   7                    So the beating is stopping, Your Honor.

08:29   8    At least with respect to 17 claims.

08:29   9                    THE COURT:  Listen.  I feel badly now

08:29   10   about joking because what you just said brought a

08:29   11   little tear to my eye.  And so it's -- which means

08:29   12   we'll finish more quickly as well.  So that's a good

08:29   13   thing.

08:30   14                    MR. ADAMS:  That's correct, Your Honor.

08:30   15                    And the second piece of good news, which

08:30   16   your clerk may have passed on, is we don't have any

08:30   17   evidentiary or demonstrative objections to address this

08:30   18   morning.

08:30   19                    There is an issue that just came up about

08:30   20   an exhibit getting into evidence, and we're going to --

08:30   21   it just came up.  We're going to meet and confer about

08:30   22   that.  So possibly later in the day we'll try to iron

08:30   23   that out.

08:30   24                    But for now you can bring the jury in, as

08:30   25   far as we're concerned, Your Honor.

08:30   1              MR. DEVLIN:  So on -- I totally agree

08:30   2    with everything we just heard.

08:30   3              On that piece of evidence coming in, we

08:30   4    will be resting our case after Mr. Blok.  And so we

08:30   5    would just request that once we get that worked out,

08:30   6    we'd be able to then --

08:30   7              THE COURT:  Sure.

08:30   8              MR. DEVLIN:  -- insert that evidence by

08:30   9    motion.

08:30   10             There's another very small issue, Your

08:30   11   Honor, but it -- one of those things that I feel

08:30   12   obligated to raise.

08:30   13             This has to do with timekeeping.  And

08:30   14   there's going to be a video that they're going to play

08:31   15   today of some deposition testimony.  These videos are

08:31   16   cut and kind of prepared a couple days before.  And --

08:31   17             THE COURT:  Let me interrupt you to say

08:31   18   this.

08:31   19             MR. DEVLIN:  Yeah.

08:31   20             THE COURT:  My sense is if the

08:31   21   defendant -- you all are dropping your invalidity case?

08:31   22   Did I understand that correctly?  Because I -- I don't

08:31   23   want to say it out loud because I'm afraid I

08:31   24   misunderstood you.

08:31   25             (Laughter.)

08:31   1                    THE COURT:  But if that's true, we are
08:31   2    going to substantially shorten the trial, correct?
08:31   3                    MR. ADAMS:  Correct, Your Honor.
08:31   4                    THE COURT:  If we are going to -- with
08:31   5    that being said, I'm -- you all should not be nearly as
08:31   6    worried about the time.
08:31   7                    If your concern, Mr. Devlin, is timing,
08:31   8    you all have given me back probably four hours -- two
08:31   9    hours minimum, maybe more, without an invalidity case.
08:31  10                    So we'll be fine in getting the case
08:31  11    finished.
08:31  12                    MR. DEVLIN:  Okay.  Thank you, Your
08:31  13    Honor.
08:31  14                    THE COURT:  And so...
08:31  15                    I don't know if y'all had the good
08:31  16    fortune to ever try anything in front of Paul Luckern,
08:32  17    who was an ITC judge, who was a legend.  He was a
08:32  18    million years old when I was in front of him, and
08:32  19    he'd been on -- and he was cantankerous.  He would get
08:32  20    angry at things, and he would give the lawyers a really
08:32  21    hard time.
08:32  22                    But then realizing he was on the record,
08:32  23    he would finish after everything by saying, but I just
08:32  24    want the record to be clear, you're all doing a great
08:32  25    job.  You're great lawyers.  You're all doing a great

725

| | | |
|---|---|---|
| 08:32 | 1 | job, and I can't thank you enough. |
| 08:32 | 2 | And so he would be slamming the bench and |
| 08:32 | 3 | screaming at us, but he would -- on the record it would |
| 08:32 | 4 | say, but you're all doing a great job.  And he was a |
| 08:32 | 5 | phenomenally great -- I think I had three or four |
| 08:32 | 6 | trials in front of him.  He was just a phenomenal, |
| 08:32 | 7 | phenomenal ITC judge. |
| 08:32 | 8 | Well, that's great news.  I'll go out. |
| 08:32 | 9 | If you -- are you all ready to go right now?  Is your |
| 08:32 | 10 | witness ready to go?  And we're going to take him up on |
| 08:33 | 11 | cross? |
| 08:33 | 12 | MR. DEVLIN:  That's right, Your Honor. |
| 08:33 | 13 | MR. ADAMS:  Yes, Your Honor.  We're |
| 08:33 | 14 | prepared. |
| 08:33 | 15 | THE COURT:  Then I'm just going to walk |
| 08:33 | 16 | back.  If you'll bring him in, I'm just going to walk |
| 08:33 | 17 | back, line the jury up, and we'll come right back in. |
| 08:33 | 18 | THE BAILIFF:  All rise. |
| 08:33 | 19 | (Recess taken.) |
| 08:35 | 20 | THE BAILIFF:  All rise. |
| 08:35 | 21 | THE COURT:  Please remain standing for |
| 08:35 | 22 | the jury. |
| 08:35 | 23 | (Jury entered the courtroom.) |
| 08:35 | 24 | THE COURT:  Thank you.  You may be |
| 08:35 | 25 | seated. |

08:35  1            Ladies and gentlemen of the jury, I don't

08:35  2  think I thanked you all yesterday for coming back as

08:35  3  robustly as I should have.  So let me make up for that

08:35  4  this morning.  Welcome back.  And I look forward to the

08:35  5  third day of trial.

08:35  6            Counsel, if you wish to cross-examine

08:35  7  this gentleman.

08:35  8            CROSS-EXAMINATION

08:35  9  BY MR. BREWER:

08:36  10     Q.    Good morning, Mr. Blok.

08:36  11     A.    Good morning.

08:36  12     Q.    First question today:  You're being paid $520

08:36  13  an hour for your testimony; is that right?

08:36  14     A.    I believe that's right.

08:36  15     Q.    And in your role as a damages expert, you

08:36  16  assume that Microchip infringed these patents?

08:36  17     A.    That's correct.

08:36  18     Q.    But you have no competent opinion about

08:36  19  whether they actually infringed the patents, right?

08:36  20     A.    I'm not offering any opinion on infringement.

08:36  21     Q.    If there is no infringement, there's no

08:36  22  damages?

08:36  23     A.    That's correct.

08:36  24     Q.    The fact that Microchip later may call a

08:36  25  witness, or a damages expert I should say, to rebut

08:36   1   your testimony does not mean that Microchip believes

08:36   2   that it's infringed these patents, right?

08:36   3       A.   I understand that.

08:36   4       Q.   So your role as a damages expert is to attempt

08:36   5   to determine a reasonable royalty; is that fair?

08:36   6       A.   That's fair.

08:37   7       Q.   And a reasonable royalty must be closely tied

08:37   8   to the invention?

08:37   9       A.   I would agree with that.

08:37   10      Q.   When an accused product like microchip.com or

08:37   11  the Forum website has both patented and unpatented

08:37   12  features, Caddo only gets damages on the patented

08:37   13  features, right?

08:37   14      A.   It gets damages on the use made of the

08:37   15  invention.

08:37   16      Q.   And that's the patented features, right?

08:37   17      A.   That's correct.

08:37   18      Q.   And if a non-patented feature adds value to a

08:37   19  product or a website, you have to remove that from your

08:37   20  damages calculus?

08:37   21      A.   You have to take that into consideration.

08:37   22      Q.   When you say take that -- you -- is it

08:37   23  included?

08:37   24      A.   Well, every case is different.  And so if

08:37   25  you're talking about -- if there's a quantifiable

728

08:37   1   adjustment in every instance, then no, that's not

08:37   2   correct.

08:37   3       Q.   But generally speaking, you don't get damages

08:37   4   on a non-patented feature; is that right?

08:37   5       A.   I would say generally that's correct.

08:38   6       Q.   And would you agree that it would be wrong to

08:38   7   calculate a reasonable royalty based on infringement

08:38   8   that's outside the United States?

08:38   9       A.   I believe that's correct.

08:38   10      Q.   That means that products sold outside the

08:38   11  United States shouldn't be counted for damages?

08:38   12      A.   In some instances.  It depends on where the

08:38   13  infringement takes place.

08:38   14      Q.   And if the infringement is outside the United

08:38   15  States, there's no damages?

08:38   16      A.   If the infringement is outside of the U.S.,

08:38   17  for my purposes that's correct.

08:38   18      Q.   Okay.  And it's the burden of the plaintiff to

08:38   19  prove any damages it seeks by a reasonable certainty;

08:38   20  is that right?

08:38   21      A.   I believe that's correct.

08:38   22      Q.   And a plaintiff can't get damages on

08:38   23  speculative -- they can't get -- let me say that again.

08:38   24           A plaintiff can't get speculative damages,

08:39   25  right?

08:39  1          A.    For the most part, I would agree with that.

08:39  2          Q.    Now, you talked a little yesterday with

08:39  3    Mr. Lennon about this hypothetical negotiation.

08:39  4                 Do you recall that?

08:39  5          A.    I do.

08:39  6          Q.    And in this hypothetical negotiation, cards

08:39  7    are up, everybody knows what's going on, everyone has

08:39  8    full disclosure; is that accurate?

08:39  9          A.    That's correct.

08:39  10         Q.    And you consider at this hypothetical

08:39  11   negotiation what a patent owner would accept to grant a

08:39  12   license?

08:39  13         A.    That's correct.

08:39  14         Q.    And you also consider what Microchip would be

08:39  15   willing to pay to get the license?

08:39  16         A.    That's correct.

08:39  17         Q.    And unlike traditional arm's length

08:39  18   negotiation between, you know, unrelated parties

08:39  19   outside of this case -- outside of a case -- you assume

08:39  20   full disclosure in this hypothetical negotiation?

08:39  21         A.    You assume that all parties have perfect

08:39  22   information, is the way I put it.

08:40  23         Q.    So full disclosure here would include

08:40  24   knowledge of all of Caddo's licenses?

08:40  25         A.    That's correct.

08:40   1      Q.    And it would include the value that Caddo

08:40   2   placed on its patents, right?

08:40   3      A.    That's correct.

08:40   4      Q.    So we're talking about these licenses.

08:40   5            Just to be clear, at a high level, a license

08:40   6   gives permission for someone to use a patent; is that

08:40   7   right?

08:40   8      A.    I would agree with that.

08:40   9      Q.    And what a patent owner is willing to accept

08:40   10  in a license fee is a good indication of the value they

08:40   11  place on that patent; is that right?

08:40   12     A.    I would agree with that.  In some instances.

08:40   13  Yes.

08:40   14     Q.    We've heard a few times in this case already,

08:40   15  I think, that Caddo had already licensed these patents

08:40   16  to several other companies before it sued Microchip,

08:40   17  right?

08:40   18     A.    In regards to settlements of a litigation,

08:40   19  that's correct.

08:40   20     Q.    And you went through those yesterday with

08:41   21  Mr. Lennon?

08:41   22     A.    I did.

08:41   23     Q.    You talked about a license that Caddo gave to

08:41   24  ■

08:41   25     A.    I did.

08:41  1      Q.    A license that Caddo gave to ███████

08:41  2      A.    That's correct.

08:41  3      Q.    ████████████████

08:41  4            A license that Caddo gave to ████████

08:41  5      A.    I did.

08:41  6      Q.    "████████ however it's pronounced.

08:41  7            And then a license that Caddo gave to ██████

08:41  8      A.    That's correct.

08:41  9      Q.    And a license that Caddo gave to ████████

08:41  10     ██████

08:41  11     A.    That's correct.

08:41  12     Q.    And you concluded that only that ████████

08:41  13     ██████ was relevant here, right?

08:41  14     A.    Based on the information I reviewed, that's

08:41  15     correct.

08:41  16     Q.    And so when you calculated your damages for

08:41  17     this case, you only used the ███████████ license;

08:41  18     is that fair?

08:41  19     A.    To arrive at my royalty rate, that's correct.

08:41  20     Q.    Now, part of the reason for that is that you

08:41  21     say that the ██████████ license is different from

08:41  22     those other licenses; is that right?

08:41  23     A.    It's the only license in the record that I've

08:42  24     seen that gives any indication of a royalty rate.

08:42  25     Q.    One of the reasons I think you gave yesterday

08:42  1   for distinguishing the ████████████ license and all

08:42  2   those other licenses were these clauses denying

08:42  3   liability.

08:42  4           Do you recall that?

08:42  5       A.    I remember going through it.  Not necessarily

08:42  6   distinguishing between -- as far as the liability

08:42  7   aspect, but we did go through several clauses.

08:42  8       Q.    And you went through these clauses that said,

08:42  9   for example, ██ denies liability, right?

08:42 10       A.    That is correct.

08:42 11       Q.    And the fact that, in your view, ██████████

08:42 12   ████████ doesn't include that clause is relevant, right?

08:42 13       A.    No.  I believe that ██████████████ also

08:42 14   denied liability.  The issue goes to the assumption of

08:42 15   validity and infringement at the time of the

08:42 16   hypothetical negotiation.

08:42 17           And so as I stated before, the plaintiff would

08:42 18   be in a better bargaining position at the hypothetical

08:43 19   negotiation than an assumption -- or in a license that

08:43 20   was entered into where the parties are disputing

08:43 21   liability.

08:43 22       Q.    You didn't mention the no liability clause for

08:43 23   the ████████████ license yesterday, did you?

08:43 24       A.    I don't remember if we discussed that one or

08:43 25   not.

08:43   1       Q.    Let's take a look at the ████████████████

08:43   2   license, because I think there's a few things about it

08:43   3   you didn't tell the jury yesterday.

08:43   4       A.    Okay.

08:43   5              MR. BREWER:  Mr. Thompson, can you please

08:43   6   pull up JTX-18, Page 1?

08:43   7   BY MR. BREWER:

08:43   8       Q.    You see that there on the screen?

08:43   9       A.    I do.

08:43  10       Q.    This is the █████████████   license, isn't it?

08:43  11       A.    Yes.  It is.

08:43  12       Q.    And in that third clause there -- you see that

08:44  13   third "whereas" clause?

08:44  14       A.    I only see the first two.  Okay.

08:44  15       Q.    Oh, sorry about that.

08:44  16       A.    I see it.

08:44  17       Q.    It says:  Licensee has denied liability in the

08:44  18   litigation?

08:44  19       A.    That's correct.

08:44  20       Q.    That's the same clause that was in the

08:44  21   other --

08:44  22       A.    That's one of the clauses that was in the

08:44  23   others.

08:44  24       Q.    Right.  Right.  Right.

08:44  25              Now, the other reason you gave that the

─734─

08:44  1    ████████████████████ license is different and more probative

08:44  2    is that it contains a royalty rate, right?

08:44  3        A.    It provides an indication of how the

08:44  4    compensation was arrived at for this license.

08:44  5        Q.    A royalty rate and the extent of use, I think

08:44  6    is what you said?

08:44  7        A.    Well, that's correct.

08:44  8        Q.    And that, in your view, is damages in this

08:44  9    case, isn't it?

08:44  10       A.    Well, I think it's an important consideration

08:44  11   when trying to determine the royalty rate, that you

08:44  12   understand exactly how that lump-sum payment was

08:45  13   arrived at.

08:45  14       Q.    The royalty rate and the extent of use, so the

08:45  15   revenues, that is damages for infringement, right?

08:45  16   That's your opinion?

08:45  17       A.    Well, I think that that is how the parties

08:45  18   arrived at the amount under the ████████████████

08:45  19   agreement.  Yes.

08:45  20       Q.    And then you took that and you applied it

08:45  21   here, right?

08:45  22       A.    I utilized the █ percent.  That's correct.

08:45  23       Q.    That's really the linchpin of your analysis,

08:45  24   isn't it, the █ percent from this license times

08:45  25   revenues?

735

08:45  1        A.    I don't know if I would refer to it as the

08:45  2   linchpin, but it's a component of the formula that I

08:45  3   gave.

08:45  4        Q.    There's another provision in here that I think

08:45  5   you left out yesterday.

08:45  6              MR. BREWER:  Mr. Thompson, can you please

08:45  7   pull up Section 4.4 of this license?

08:45  8   BY MR. BREWER:

08:46  9        Q.    Can you read that second sentence to yourself,

08:46  10  please, starting with "the parties agree."

08:46  11             That sentence says that this agreement does

08:46  12  not represent a payment of damages for infringement; is

08:46  13  that right?

08:46  14       A.    That's correct.

08:46  15       Q.    It says the foregoing -- that there's "no

08:46  16  representation made that the foregoing consideration

08:46  17  represents a payment of damages for the infringement

08:46  18  alleged in the litigation"?

08:46  19       A.    I agree that that's what that says.

08:46  20       Q.    And you're asking this jury to award Caddo

08:46  21  $30 million based on this agreement, and you left out

08:46  22  yesterday the fact, clear as day, this says it does not

08:47  23  represent the payment of damages for infringement?

08:47  24       A.    Did we pull up this liability clause?  No.

08:47  25             But this is a very different liability clause

08:47  1    than the ones that we identified yesterday.

08:47  2         Q.    But it says it's not the payment for damages

08:47  3    of infringement.  And you're saying we should just take

08:47  4    this license, this one license, ignore all the others,

08:47  5    and use this to calculate a $30 million royalty?

08:47  6         A.    No.  What I'm saying is, is that the best

08:47  7    evidence that we have in our record of a royalty rate

08:47  8    is the royalty rate that was agreed to by parties that

08:47  9    are similarly situated.

08:47  10        Q.    Which they said was not representative of

08:47  11   payment of damages for infringement; is that right?

08:47  12        A.    That's correct.  But they did not say that

08:47  13   it's not representative of a reasonable royalty like

08:47  14   the other agreements do.

08:47  15        Q.    Didn't you testify earlier that damages for

08:47  16   infringement is a reasonable royalty?

08:47  17        A.    I think that I testified that damages for

08:48  18   infringement are a royalty.

08:48  19        Q.    It's got to be reasonable, right?

08:48  20        A.    That's correct.

08:48  21             MR. BREWER:  Now, let's -- Mr. Thompson,

08:48  22   please turn back to Section 3.1.

08:48  23   BY MR. BREWER:

08:48  24        Q.    Because I think you left something else out

08:48  25   important about this license.

—737—

08:48  1           You pointed out the █ percent, but you didn't

08:48  2   point out that ████████████ paid Caddo ███████ for

08:48  3   this license; is that right?

08:48  4       A.   I would agree that they paid ████████, but I

08:48  5   believe that we showed this entire paragraph.

08:48  6       Q.   But you didn't note that they paid ███████ to

08:48  7   use these patents, did you?

08:48  8       A.   I don't remember if we specifically mentioned

08:48  9   the ██████.

08:48  10      Q.   This license doesn't include any limitations

08:48  11  on the use of these patents, does it?

08:49  12      A.   It's limited to use by ███████████████.

08:49  13      Q.   Right.  But ████████████ can use these

08:49  14  patents as much as it pleases; is that fair?

08:49  15      A.   Through the expiration date of the patent.

08:49  16  That's correct.

08:49  17      Q.   And they paid for that -- for those rights,

08:49  18  they paid ████████ right?

08:49  19      A.   That's correct.

08:49  20      Q.   Are you aware that ██████████████████

08:49  21  ███████████████████████████████████

08:49  22      A.   I am.

08:49  23      Q.   It's fair to say that ████████████ is not a

08:49  24  small company; is that right?

08:49  25      A.   Well, it depends.  If you include their

738

08:49  1    affiliates, I would agree they're not a small company.

08:49  2        Q.   I mean, they bought WebMD for $2.8 billion.

08:49  3    They must be a pretty big company, right?

08:49  4        A.   Well, like I said, I think that there's a

08:49  5    difference between ███████████, the company, and

08:49  6    the affiliates that they purchased.

08:49  7             So if you're referring to ████████████ as a

08:49  8    company, then they're relatively small.

08:49  9        Q.   You're telling me a small company can afford

08:49  10   to buy another company for $2.8 billion?

08:49  11       A.   Well, it depends on the affiliates, and that's

08:50  12   what I'm saying.  If you're including their affiliates,

08:50  13   then I would agree with you.

08:50  14       Q.   At the end of the day, █████████████████

08:50  15   ████████ for these patents, correct?

08:50  16       A.   That's correct.

08:50  17       Q.   And you say Microchip owes 30 million, right?

08:50  18       A.   That's correct.

08:50  19       Q.   None of Caddo's fees for the licenses you

08:50  20   discussed yesterday come anywhere near 30 million, do

08:50  21   they?

08:50  22       A.   I would agree that they're not, you know,

08:50  23   close to $30 million.

08:50  24       Q.   And I think you discussed four more licenses

08:50  25   yesterday.  We talked about them a minute ago: ████

—739—

08:50  1      ████████████████████████ .

08:50  2              Does that sound right?

08:50  3      A.    That's correct.

08:50  4      Q.    And I didn't notice yesterday if you mentioned

08:50  5   how much each of those paid for these patents.

08:50  6      A.    I don't remember if we discussed that or not.

08:50  7      Q.    Why don't we take a quick look?

08:51  8              MR. BREWER:  Mr. Thompson, can you pull

08:51  9   up Joint Exhibit 17, please?

08:51  10             And turn to Section -- well, let's look

08:51  11  at the first page.

08:51  12  BY MR. BREWER:

08:51  13     Q.    This is the ██ license, isn't it?  See in that

08:51  14  first paragraph?

08:51  15     A.    That's correct.

08:51  16             MR. BREWER:  Can you turn to Section 3.1,

08:51  17  please?

08:51  18  BY MR. BREWER:

08:51  19     Q.    The amount of payment there is ███████ ; is

08:51  20  that right?

08:51  21     A.    I see that.

08:51  22     Q.    So ██████████████  for these patents?

08:51  23     A.    That's correct.  In the settlement.

08:51  24             MR. BREWER:  Can we please turn to

08:51  25  JTX-15, please?

*KRISTIE M. DAVIS, OFFICIAL COURT REPORTER*
*U.S. DISTRICT COURT, WESTERN DISTRICT OF TEXAS (WACO)*

740

```
08:51   1    BY MR. BREWER:

08:51   2         Q.    Now, this is the ████████ license, correct?

08:51   3         A.    That's correct.

08:51   4               MR. BREWER:  Section 3.1, please.

08:51   5    BY MR. BREWER:

08:51   6         Q.    Amount of payment, ████████

08:52   7               Does that sound right?

08:52   8         A.    That's correct.

08:52   9               MR. BREWER:  JTX-16, please.

08:52   10   BY MR. BREWER:

08:52   11        Q.    This is the ████████████     ████████████

08:52   12   ████████, right?

08:52   13        A.    Yes.  It is.

08:52   14               MR. BREWER:  Section 3.1, please.

08:52   15   BY MR. BREWER:

08:52   16        Q.    Amount of payment, ████████, correct?

08:52   17        A.    That's correct.

08:52   18               MR. BREWER:  JTX-21, please.

08:52   19   BY MR. BREWER:

08:52   20        Q.    This is the ██ license.

08:52   21               Does that look right?

08:52   22        A.    Yes.  It does.

08:52   23               MR. BREWER:  Now, can we turn to Section

08:52   24   1.1, please?

08:52   25   BY MR. BREWER:
```

—741—

| | | |
|---|---|---|
| 08:52 | 1 | Q.    Payment ███████ correct? |
| 08:52 | 2 | A.    That's correct. |
| 08:52 | 3 | Q.    We'll turn back to the ███ license in a |
| 08:53 | 4 | minute, but that's, what, ████████ less than the |
| 08:53 | 5 | 30 million that you say that Caddo owes -- that |
| 08:53 | 6 | Microchip owes Caddo? |
| 08:53 | 7 | A.    Approximately. |
| 08:53 | 8 | Q.    So what we have here is a record of Caddo |
| 08:53 | 9 | agreeing to license its patents in the real world for |
| 08:53 | 10 | much less than you say Caddo -- Microchip owes Caddo in |
| 08:53 | 11 | this case, correct? |
| 08:53 | 12 | A.    In the settlement of litigation, I would agree |
| 08:53 | 13 | with that. |
| 08:53 | 14 | Q.    I don't want to make you do the math, but if |
| 08:53 | 15 | you were to add up all those licenses, ████████████ |
| 08:53 | 16 | ████████████  ████████████ |
| 08:53 | 17 | ██  ██████████████ |
| 08:53 | 18 | ██  █████████████ |
| 08:53 | 19 | ██  ████████ |
| 08:53 | 20 | ██  ████████████████ |
| 08:53 | 21 | ████████████ |
| 08:53 | 22 | ██  █████████ |
| 08:53 | 23 | Q.    For these patents? |
| 08:54 | 24 | A.    That's correct. |
| 08:54 | 25 | Q.    And Microchip owes $30 million.  That's your |

08:54   1   opinion, right?

08:54   2       A.    Based on the hypothetical negotiation, that's

08:54   3   correct.

08:54   4       Q.    Let's talk about the idea of apportionment.

08:54   5   You mentioned that in your report, but I don't think

08:54   6   you used that word yesterday.  Apportionment means

08:54   7   really that in the hypothetical negotiation you have to

08:54   8   figure out what the patent adds and discard everything

08:54   9   else, right?

08:54  10       A.    And I believe we talked about it in the form

08:54  11   of incremental value yesterday.

08:54  12       Q.    Sure.  And you'd agree that it's particularly

08:54  13   important to do this apportionment when the patents

08:54  14   relate to one of many features incorporated into a

08:54  15   website?

08:54  16       A.    All cases are different, but I do believe

08:55  17   apportionment is important.

08:55  18       Q.    Particularly where the patents relate to only

08:55  19   one of many features on a website?

08:55  20       A.    I would agree that apportionment is important.

08:55  21       Q.    And the contribution of the patents, Caddo's

08:55  22   patents, has to be considered relative to all the other

08:55  23   features and all the other functionalities provided by

08:55  24   Microchip, right?

08:55  25       A.    They should be focused on the incremental

| | | |
|---|---|---|
| 08:55 | 1 | value provided by the patents. |
| 08:55 | 2 | Q.   Are you agreeing with what I was saying?  I'm |
| 08:55 | 3 | not sure. |
| 08:55 | 4 | A.   Yes.  But the way I discussed it yesterday was |
| 08:55 | 5 | based upon the incremental value. |
| 08:55 | 6 | Q.   Fair. |
| 08:55 | 7 | So is it fair to say that your analysis must |
| 08:55 | 8 | only consider the benefits from the patents? |
| 08:55 | 9 | A.   The benefits provided by the patents, yes.  I |
| 08:55 | 10 | would agree. |
| 08:55 | 11 | Q.   Now, no one in this case is claiming that the |
| 08:56 | 12 | patents are used in making Microchip's products, are |
| 08:56 | 13 | they? |
| 08:56 | 14 | A.   I would agree with that. |
| 08:56 | 15 | Q.   And your royalty analysis is based on the sale |
| 08:56 | 16 | of Microchip's products, correct? |
| 08:56 | 17 | A.   It's based upon the use made of the website |
| 08:56 | 18 | and the sale of its products. |
| 08:56 | 19 | Q.   But you don't have any damages based on the |
| 08:56 | 20 | use of a website.  You have damages based on the sale |
| 08:56 | 21 | of products, correct? |
| 08:56 | 22 | A.   That's the ultimate result of the use of the |
| 08:56 | 23 | website, based upon my understanding of the benefits. |
| 08:56 | 24 | Q.   You'd agree that you can use the Microchip |
| 08:56 | 25 | website without buying anything, correct? |

| | | |
|---|---|---|
| 08:56 | 1 | A.    I would agree with that. |
| 08:56 | 2 | Q.    And you'd agree that there's a lot that goes |
| 08:56 | 3 | into making a semiconductor, wouldn't you? |
| 08:56 | 4 | A.    I would agree with that. |
| 08:56 | 5 | Q.    And that's what Microchip makes, right? |
| 08:56 | 6 | A.    Amongst other products, but -- |
| 08:56 | 7 | Q.    Yeah.  Amongst other products.  That's right. |
| 08:57 | 8 | A.    -- generally. |
| 08:57 | 9 | Q.    So you'd agree that when you make a |
| 08:57 | 10 | semiconductor, there's design costs, right? |
| 08:57 | 11 | A.    I would agree. |
| 08:57 | 12 | Q.    There's manufacturing costs? |
| 08:57 | 13 | A.    I would agree. |
| 08:57 | 14 | Q.    Research costs? |
| 08:57 | 15 | A.    Yes. |
| 08:57 | 16 | Q.    Distribution costs? |
| 08:57 | 17 | A.    Yes. |
| 08:57 | 18 | Q.    Marketing costs? |
| 08:57 | 19 | A.    Yes. |
| 08:57 | 20 | Q.    Administrative costs? |
| 08:57 | 21 | A.    Yes. |
| 08:57 | 22 | Q.    And Microchip wants to make a profit on its |
| 08:57 | 23 | products, right? |
| 08:57 | 24 | A.    Yes. |
| 08:57 | 25 | Q.    They should make something, right? |

745

| | | |
|---|---|---|
| 08:57 | 1 | A.    That's correct. |
| 08:57 | 2 | Q.    It's not charity. |
| 08:57 | 3 | And so a reasonable royalty needs to be |
| 08:57 | 4 | focused on the incremental value the patents add. |
| 08:57 | 5 | That's what you said? |
| 08:57 | 6 | A.    That's correct. |
| 08:57 | 7 | Q.    If a patent incorporates some technology |
| 08:57 | 8 | that's licensed, you have to factor that out, right? |
| 08:57 | 9 | A.    In some instances.  Not all instances. |
| 08:57 | 10 | Q.    Well, in the hypothetical negotiation, the |
| 08:58 | 11 | party's not going to pay for something that's already |
| 08:58 | 12 | licensed; is that right? |
| 08:58 | 13 | A.    I would agree with that. |
| 08:58 | 14 | Q.    You don't expect them to pay twice? |
| 08:58 | 15 | A.    Again, every situation is different.  So I |
| 08:58 | 16 | wouldn't expect a company to pay twice for the same |
| 08:58 | 17 | technology. |
| 08:58 | 18 | Q.    You talked a little yesterday about foreign |
| 08:58 | 19 | sales.  And we talked a little earlier today too.  It's |
| 08:58 | 20 | your understanding that all the Microchip servers are |
| 08:58 | 21 | in the United States? |
| 08:58 | 22 | A.    That's my understanding. |
| 08:58 | 23 | Q.    So it doesn't matter if any of those sales are |
| 08:58 | 24 | to foreign customers for your analysis? |
| 08:58 | 25 | A.    Again, it's my understanding that the active |

08:58  1    infringement takes place in the U.S.

08:58  2        Q.    But if you're wrong and, in fact, those

08:59  3    Microchip servers are not in the United States, they're

08:59  4    outside the United States, your opinion's wrong, isn't

08:59  5    it?

08:59  6        A.    My royalty base would change, but I wouldn't

08:59  7    say my opinion is wrong.

08:59  8        Q.    Your numbers would be wrong?

08:59  9        A.    My numbers would have to change.  The royalty

08:59  10   base would have to change.  But my opinion of a royalty

08:59  11   rate in this matter would remain unchanged.

08:59  12       Q.    But your numbers would be -- the numbers that

08:59  13   you showed us yesterday, if you're wrong about where

08:59  14   the servers are, those numbers are wrong.  Those would

08:59  15   not represent a reasonable royalty in this case?

08:59  16       A.    I would agree that the total damages would

08:59  17   change.

08:59  18       Q.    Let's talk for a second about the Forum

08:59  19   website.  You understand the purpose of that Forum

08:59  20   website is so that customers can talk to each other?

08:59  21       A.    Amongst other things.

08:59  22       Q.    The Forum website doesn't sell anything, does

08:59  23   it?

08:59  24       A.    I'm not sure if it does, directly or not.

09:00  25       Q.    Do you know if you can purchase anything on

09:00   1    the Forum website?

09:00   2        A.    The Forum -- I'm sorry.  I thought you were

09:00   3    saying foreign.

09:00   4        Q.    I'm sorry.

09:00   5        A.    Sorry.  I don't believe that you can purchase

09:00   6    on the Forum website.

09:00   7        Q.    It's a discussion board, you'd say; is that

09:00   8    fair?

09:00   9        A.    That's correct.  About Microchip products.

09:00   10       Q.    And in your damages model, you've got this

09:00   11   $30 million, right?

09:00   12       A.    That's correct.

09:00   13       Q.    Only the Forum is accused from 2014 to 2018;

09:00   14   is that right?

09:00   15       A.    That's my understanding.

09:00   16       Q.    So if you break down your 30 million, is it

09:00   17   fair to say that about 17 million is attributable to

09:00   18   the Forum during 2014 to 2018?

09:00   19       A.    I don't know the exact number, but it would be

09:00   20   approximately half.

09:00   21       Q.    Okay.  Let me ask you a few questions about

09:00   22   noninfringing alternatives.

09:00   23            A noninfringing alternative is a, like,

09:01   24   substitute technology that the accused infringer, at

09:01   25   the hypothetical negotiation, could have used, and in

09:01    1   so doing would not have infringed, right?

09:01    2       A.    And provide the same or similar benefits to

09:01    3   that of the patents-in-suit.  That's correct.

09:01    4       Q.    And so the existence of a noninfringing

09:01    5   alternative affects the willingness of the accused

09:01    6   company to pay for a license, right?

09:01    7       A.    I think that it's a factor that would be

09:01    8   considered at the hypothetical negotiation.

09:01    9       Q.    Right.  And what this really means is that if

09:01   10   the accused infringer can switch to some other

09:01   11   alternative that doesn't infringe, they're not going to

09:01   12   pay very much for these patents?

09:01   13       A.    I'm not sure that you can generalize like

09:01   14   that.  It depends upon the availability of that

09:01   15   alternative.  It depends on the cost of that

09:01   16   alternative.  So there's a lot of factors that goes

09:02   17   into that noninfringing alternative analysis.

09:02   18       Q.    Sure.  That's fair.

09:02   19            But if you've got an available alternative,

09:02   20   say it's, you know, $1,000 a year, and Microchip could

09:02   21   switch to that, that would affect what they're going to

09:02   22   be willing to pay, right?

09:02   23       A.    I would agree with that.

09:02   24       Q.    In determining damages, in your opinion, you

09:02   25   assumed there were no noninfringing alternatives?

09:02   1        A.    Based upon my conversations with Mr. Sherwood,

09:02   2   I understand that there are no noninfringing

09:02   3   alternatives that would be acceptable that would

09:02   4   provide the same benefits.

09:02   5        Q.    But you have no independent opinion?

09:02   6        A.    I do not offer an independent opinion.  That's

09:02   7   correct.

09:02   8        Q.    So you just relied on Mr. Sherwood?

09:02   9        A.    That's correct.

09:02   10        Q.    Okay.  And your damages opinion would change

09:02   11   if Mr. Sherwood's wrong, wouldn't it?

09:02   12        A.    As I sit here today, I don't know if it would

09:03   13   or not.  Again, it depends upon the availability of

09:03   14   those noninfringing alternatives and how much it would

09:03   15   cost Microchip to switch to those alternatives.

09:03   16        Q.    Right.  But Mr. Sherwood told you that they

09:03   17   don't exist, so you didn't -- that didn't go into your

09:03   18   calculus?

09:03   19        A.    That's correct.

09:03   20        Q.    But if he's wrong and they do exist, your

09:03   21   calculus isn't right?

09:03   22        A.    Well, again, it may or may not be.  I don't

09:03   23   know.  It depends upon --

09:03   24        Q.    You don't know?

09:03   25        A.    -- how much it costs to implement those

750

09:03  1   alternatives.

09:03  2       Q.    You're aware that Mr. Tittel -- you haven't

09:03  3   heard from -- the jury hasn't heard from him yet.  But

09:03  4   you're aware that, in this case, Mr. Tittel, who's

09:03  5   Microchip's technical expert, disagrees with

09:03  6   Mr. Sherwood about noninfringing alternatives?

09:03  7       A.    I understand that.

09:03  8       Q.    Do you recall that one of those noninfringing

09:03  9   alternatives that Mr. Tittel opines about is the

09:03  10  redesigned microchip.com website?

09:04  11      A.    I believe that's correct.

09:04  12      Q.    You were here for Mr. Sherwood's testimony

09:04  13  yesterday?

09:04  14      A.    Yes.  I was.

09:04  15      Q.    And you recall that he put up -- I'm sure

09:04  16  everyone recalls -- a chart with two columns and some

09:04  17  checkmarks?

09:04  18      A.    I do.

09:04  19      Q.    One of those columns was the Forum website,

09:04  20  and one of those columns was the old website; is that

09:04  21  right?

09:04  22      A.    That's correct.

09:04  23      Q.    He didn't have a column on there for the

09:04  24  redesigned website, right?

09:04  25      A.    Not that I remember.

09:04   1          Q.   Let me turn back just for a moment to that

09:04   2     timeline we were talking about.  From 2014 to 2018,

09:04   3     only the Forum website's accused, correct?

09:04   4          A.   That's correct.

09:04   5          Q.   And given the fact that you've told the jury

09:04   6     that Microchip owes Caddo $30 million, it's fair to say

09:05   7     that you think that these patents are pretty valuable?

09:05   8          A.   Based upon my understanding of the benefits

09:05   9     provided by the patents-in-suit, that's correct.

09:05   10         Q.   They provide a lot of benefits.

09:05   11         A.   I'm sorry.

09:05   12         Q.   They provide a lot of benefits.  I'm sorry, I

09:05   13    interrupted you.

09:05   14         A.   Yes.

09:05   15         Q.   You listed them out on your slide?

09:05   16         A.   Yes.

09:05   17         Q.   Microchip Direct.  We talked about -- a little

09:05   18    bit about that.  Everyone's talked a little bit about

09:05   19    that.  That's the e-commerce website, correct?

09:05   20         A.   I think that's the actual portal to check out.

09:05   21    Yes.

09:05   22         Q.   That's where you buy Microchip products?

09:05   23         A.   That's where you actually complete a sale.

09:05   24    That's correct.

09:05   25         Q.   The Microchip Direct website has never been

―752―

```
09:05   1    accused; is that right?
09:05   2        A.    That's my understanding.
09:05   3        Q.    That doesn't have this Active Path; is that
09:05   4    right?
09:05   5        A.    That's my understanding.
09:05   6        Q.    So Microchip had, in plaintiffs' view, this
09:06   7    valuable technology back in 2014, correct?
09:06   8        A.    That's correct.
09:06   9        Q.    And they never put it on their e-commerce
09:06   10   website.  That's also correct?
09:06   11       A.    Are you referring to Microchip Direct?
09:06   12       Q.    Correct.
09:06   13       A.    That's correct.
09:06   14       Q.    We mentioned earlier that your $30 million
09:06   15   damages figure is about ███████████████████████
09:06   16   ████  -- the total of what Caddo's been paid for these
09:06   17   patents from other companies; is that right?
09:06   18       A.    I think you limited it to certain licenses
09:06   19   that we've discussed today.  I think that they've
09:06   20   collected more than you've mentioned.
09:06   21            So I wouldn't say it's ████
09:06   22   ████    ████   ██   that accurate?
09:06   23       A.    Somewhere in there.
09:06   24       Q.    And you agreed earlier that if you add up the
09:07   25   licenses that you considered:  ████████████████████
```

753

| 09:07 | 1 | ███████████████████████████████████████████ |
| 09:07 | 2 | ██████████████████████████ |

09:07   3      A.     That sounds about right.

09:07   4      Q.     Your reasonable royalty is built on two key

09:07   5  facts:  5 percent and the $215,000 a day; is that fair?

09:07   6      A.     That's correct.

09:07   7      Q.     If the jury were to determine that your use of

09:07   8  that $215,000-a-day figure was unreliable, that would

09:07   9  mean that your damages model is unreliable, right?

09:07  10      A.     I think that the jury, if they ultimately

09:07  11  decide that the royalty base is not correct, then they

09:07  12  can adjust the royalty base.

09:07  13      Q.     And the second fact is that 5 percent.  That's

09:08  14  the second part of your analysis, correct?

09:08  15      A.     That's correct.

09:08  16      Q.     If the jury determines that that 5 percent

09:08  17  doesn't reflect the value of these patents, your

09:08  18  damages model fails, doesn't it?

09:08  19      A.     Again, if the jury decides that the royalty

09:08  20  rate should be something different, then they have the

09:08  21  ability to make that determination.

09:08  22              MR. BREWER:  No further questions.

09:08  23                  REDIRECT EXAMINATION

09:08  24  BY MR. LENNON:

09:08  25      Q.     Good morning, Mr. Blok.

09:08  1      A.    Good morning.

09:08  2      Q.    I'm going to try and talk a little slower

09:08  3  today.  I apologize for the speed with which I spoke

09:08  4  yesterday.  I was a little nervous.

09:08  5            Where do you understand infringement to have

09:08  6  occurred in this case?

09:08  7      A.    It's my understanding that infringement occurs

09:09  8  in the U.S.

09:09  9      Q.    Okay.  Is it your understanding that the web

09:09  10  servers for the microchip.com website reside in the

09:09  11  United States?

09:09  12      A.    That's my understanding.

09:09  13      Q.    Okay.  And you recall the presentation that

09:09  14  referenced the $215,000, which I believe you just spoke

09:09  15  to Microchip's counsel about.  You recall that $215,000

09:09  16  number, right?

09:09  17      A.    I do.

09:09  18      Q.    Do you remember what currency symbol preceded

09:09  19  that 215 number?

09:09  20      A.    Dollar.

09:09  21      Q.    Okay.  Wasn't a foreign currency symbol?

09:09  22      A.    That's correct.

09:09  23      Q.    Okay.  For all the licenses that you

09:09  24  considered, do you have any idea of the extent of use

09:09  25  that was made of the accused features, other than in

09:09  1    the ▮▮▮▮▮ license?

09:09  2        A.    No.  And that's what we had discussed

09:09  3    yesterday.

09:09  4        Q.    Okay.  And in the ▮▮▮▮▮ license

09:09  5    example, your understanding is that by specifying a

09:10  6    royalty rate in that agreement, that it was indicating

09:10  7    an incremental value, or what we've also now heard

09:10  8    described as an apportionment, of the value of the

09:10  9    accused technology relative to other nonaccused

09:10  10   technology; is that right?

09:10  11       A.    That's correct.  Because that agreement was

09:10  12   focused on the specific patents and the value provided

09:10  13   to ▮▮▮▮▮, which is similar to what is alleged

09:10  14   for Microchip as well.

09:10  15       Q.    Okay.  And that -- so the percentages that are

09:10  16   in that ▮▮▮▮▮ agreement refer to that

09:10  17   incremental value; is that right?

09:10  18       A.    That's correct.

09:10  19       Q.    Okay.  Do you recall seeing in Mr. Jordan's

09:10  20   report a reference to there being 120,000 customers for

09:10  21   Microchip, roughly?

09:10  22       A.    I do.

09:10  23       Q.    Do you recall that Mr. Jordan's report

09:10  24   referenced that there were tens of thousands of posts

09:10  25   on the Forums page?

756

09:10   1       A.    I do.

09:10   2       Q.    Doesn't that indicate that the Forums pages

09:10   3   get a robust use from their $120,000 (sic) customer

09:11   4   base?

09:11   5       A.    I would say that that's evidence of robust

09:11   6   use.

09:11   7       Q.    You were asked just now about the redesigned

09:11   8   website.  And the statement, I believe, was that the

09:11   9   redesigned website is alleged to be a noninfringing

09:11   10  alternative, right?

09:11   11          Do you -- can you remind us what's the date at

09:11   12  which, in the hypothetical negotiation, you're supposed

09:11   13  to assess whether or not there are any available and

09:11   14  acceptable noninfringing alternatives?

09:11   15      A.    In March of 2014.

09:11   16      Q.    Okay.  There was also reference that the

09:11   17  microchipdirect.com website might be a noninfringing

09:11   18  alternative or doesn't include the accused features.

09:11   19          What's your understanding as to whether or not

09:11   20  the microchip.com website has the same information

09:11   21  that's on Microchip -- I'm sorry.  Let me rephrase that

09:11   22  question.

09:11   23          Is it your understanding that

09:12   24  microchipdirect.com does not have the same amount of

09:12   25  information, the same types of information about the

09:12    1    Microchip products as is on the microchip.com website?

09:12    2        A.    That's correct.  It's my understanding that

09:12    3    the microchip.com website does not have the same

09:12    4    information as Microchip Direct.

09:12    5        Q.    I think I mentioned $120,000 customer base.  I

09:12    6    think maybe you understood what I was getting at.  It's

09:12    7    120,000 customers, not $120,000 worth of customers,

09:12    8    right?

09:12    9        A.    That's correct.

09:12   10        Q.    Thank you for bearing with me on that

09:12   11    clarification.  For the record.

09:12   12              And so I believe part of this -- the Q&A that

09:12   13    you just went through, there was a suggestion that

09:12   14    maybe you've calculated the number improperly by

09:12   15    relying on the $215,000-a-day revenue number.

09:12   16              Do you recall that?

09:12   17        A.    I do.

09:13   18        Q.    Okay.  I want to step through some of the

09:13   19    things that we talked about yesterday in light of that

09:13   20    supposition and your statements yesterday that you

09:13   21    believe that your calculation was conservative.

09:13   22              Do you recall that?

09:13   23        A.    I do.

09:13   24        Q.    Okay.  So there were two reasonable royalty

09:13   25    rate percentages in the ███████████  agreement?

—758—

```
09:13    1                    MR. LENNON:  And, Mr. Gooden, could we
09:13    2    pull up J-18?
09:13    3                    I believe --
09:13    4    BY MR. LENNON:
09:13    5        Q.    So this is the ███████████ agreement,
09:13    6    right?
09:13    7        A.    Yes.  It is.
09:13    8        Q.    All right.
09:13    9                    MR. LENNON:  And if we could look at the
09:13   10    next page of this agreement.  The amount of payment.
09:13   11    BY MR. LENNON:
09:13   12        Q.    Can you just remind us what the two
09:13   13    percentages are that are specified here?
09:13   14        A.    Sure.  The parties agreed to a royalty rate of
09:13   15    ████████████████████████████████████████████████████
09:14   16    ██████████████████████████████████████████████
09:14   17    ███    ██████  ██████████████████████████████████
09:14   18    ██████████████████████████████████████; is that
09:14   19    right?
09:14   20        A.    That's correct.
09:14   21        Q.    And why did you do that?
09:14   22        A.    Because it's conservative.
09:14   23        Q.    Okay.  Now, also I believe yesterday we talked
09:14   24    about information that you received after you issued
09:14   25    your report.  And I believe --
```

759

09:14  1                    MR. LENNON:  If, Mr. Gooden, you could

09:14  2   pull up DTX-467.

09:14  3   BY MR. LENNON:

09:14  4       Q.    Do you recall looking at this document

09:14  5   yesterday, Mr. Blok?

09:14  6       A.    I do.

09:14  7       Q.    Okay.  And I offered that the total in here,

09:14  8   of sales, was 315.9 million.

09:14  9             Do you recall that discussion yesterday?

09:14  10      A.    That's correct.  For the first column -- or

09:15  11  the second column, microchip.com, source.

09:15  12      Q.    And based on knowing how many days that would

09:15  13  be covered by this period, 853 days, you would --

09:15  14  figured out how much that would be per day?

09:15  15      A.    It's approximately $370,000 a day.

09:15  16      Q.    And that -- in comparison to the $215,000 a

09:15  17  day, what does that tell you about your calculations?

09:15  18      A.    That the $215,000 a day is conservative.

09:15  19      Q.    Thank you.  So the --

09:15  20                    MR. LENNON:  I'm sorry to do this.  Could

09:15  21  you jump back to J-18 again real quick?

09:15  22  BY MR. LENNON:

09:15  23      Q.    Now, you were just asked about the liability

09:15  24  clause in here:  Whereas, licensee has denied liability

09:15  25  in the litigation.

09:15  1          So that's different than the context of this

09:15  2   case where you're asked to assume that patents are

09:16  3   valid and infringed, right?

09:16  4      A.   That's correct.

09:16  5      Q.   In the hypothetical negotiation.  Okay.

09:16  6          So what does this mean for Caddo's bargaining

09:16  7   position in the ███████████ agreement compared to

09:16  8   what it would be in the hypothetical negotiation?

09:16  9      A.   And this is what we were explaining yesterday.

09:16  10  In the hypothetical negotiation, that assumes that the

09:16  11  patents are valid and infringed.  That puts the

09:16  12  plaintiff or the licensor in a better position.

09:16  13         And so this would represent a conservative

09:16  14  royalty rate, if there is an -- or if there's no

09:16  15  assumption of liability.

09:16  16     Q.   So, again, what does that mean for your

09:16  17  calculation in this case?

09:16  18     A.   That it would be conservative.

09:16  19     Q.   Okay.

09:16  20          MR. LENNON:  And, Mr. Gooden, if you

09:16  21  could pull up the -- I believe it's the next one.

09:16  22  Section 4.4 of this agreement.

09:16  23  BY MR. LENNON:

09:16  24     Q.   So, again, this denial of liability, what does

09:16  25  this mean to you in terms of assessing the ██████

09:17    1    ████ agreement compared to the hypothetical

09:17    2    negotiation when you have a party who has denied

09:17    3    liability, yet specified a reasonable royalty rate

09:17    4    based on an extent of use?

09:17    5        A.    Well, as I stated yesterday, all settlement

09:17    6    agreements take into account litigation risks. And so

09:17    7    having this type of clause is not uncommon in these

09:17    8    types of settlement agreements. Which also means if

09:17    9    you're relying on those agreements, then they're a

09:17    10    conservative representation.

09:17    11        And if you have a royalty rate that the

09:17    12    parties agree to, then that tells you the extent of use

09:17    13    of -- that was considered by those parties at the time

09:17    14    that they entered into the agreement.

09:17    15        Q.    And if the jury gets to the damages part of

09:17    16    this case, would they have assumed that the patents

09:17    17    were valid and infringed in order to arrive at a

09:18    18    damages number in this case?

09:18    19        A.    Yes.

09:18    20        Q.    And is that what you're doing here with your

09:18    21    analysis?

09:18    22        A.    That's correct.

09:18    23        Q.    Okay.

09:18    24        MR. LENNON: Mr. Gooden, could we go back

09:18    25    to Clause 3.1 of this agreement?

762

09:18  1    BY MR. LENNON:

09:18  2        Q.    Inside here there's a reference after the

09:18  3    ███████████    ██████████    ████████████████████████

09:18  4    ████████████████████████████████████████████████████

09:18  5    ██████████████

09:18  6              Do you see that?

09:18  7        A.    I do.

09:18  8        Q.    Do you have any recollection as to what the

09:18  9    allegation of use was in the litigation that's in

09:18  10   this -- contemplated by this agreement?

09:18  11       A.    It's my understanding that the alleged use is

09:18  12   the same use that Microchip is alleged to have used the

09:18  13   patents-in-suit on their website to sell products.

09:18  14       Q.    This isn't -- this isn't -- this lawsuit

09:18  15   though -- well, just to be clear on the record, you're

09:18  16   not saying that this license agreement relates to the

09:18  17   microchip.com website, right?

09:19  18       A.    No.  I'm not.

09:19  19       Q.    You're saying it's a use of website

09:19  20   technology?

09:19  21       A.    That's correct.

09:19  22       Q.    Okay.  Do you know which website?

09:19  23       A.    I do not remember offhand.

09:19  24       Q.    Okay.  That's fine.

09:19  25              And then sticking with your points about your

09:19  1    conservative estimate here.  When you were calculating

09:19  2    your damages numbers, you were just looking at

09:19  3    e-commerce revenues, not total revenue of Microchip; is

09:19  4    that correct?

09:19  5        A.    That's correct.

09:19  6        Q.    Okay.  Do you recall seeing in Mr. Jordan's

09:19  7    report that the e-commerce revenues represented less

09:19  8    than 10 percent of Microchip's total sales?

09:19  9        A.    I believe that's correct.  But I'm -- I don't

09:19  10   remember if he was referring to U.S. sales or total

09:19  11   e-commerce sales.

09:19  12       Q.    Okay.  Nonetheless, you would acknowledge that

09:19  13   e-commerce sales is not the full universe of Microchip

09:20  14   sales, right?

09:20  15       A.    That's correct.

09:20  16       Q.    And in fact, you can make use of the accused

09:20  17   technology in this case without going to Microchip

09:20  18   Direct and purchasing a product; is that correct?

09:20  19       A.    That's correct.

09:20  20       Q.    So, for example, an engineer wants to purchase

09:20  21   something and they call their sales agent, purchasing

09:20  22   agent.  That's not covered in the e-commerce context,

09:20  23   right?

09:20  24       A.    That's correct.

09:20  25       Q.    So that engineer could be using the

09:20  1    microchip.com website to find information about the
09:20  2    product that they wanted to buy and then tell someone
09:20  3    else to purchase the product, either through a sales
09:20  4    rep over the phone or because they have a bulk
09:20  5    contract, right?  And that wouldn't be covered in your
09:20  6    damages calculation, would it?
09:20  7        A.    No.  It would not.
09:21  8        Q.    Even though that would be -- still be an
09:21  9    infringing use, using the microchip.com website?
09:21  10       A.    That's correct.
09:21  11       Q.    Are you aware of any printed catalogs?  Have
09:21  12   you seen any printed catalogs or any other way to look
09:21  13   up information about products of Microchip other than
09:21  14   the website?
09:21  15       A.    I have not seen any.
09:21  16       Q.    Okay.
09:21  17            MR. LENNON:  Your Honor, I have no
09:21  18   further questions.
09:21  19            MR. BREWER:  No further questions.
09:21  20            THE COURT:  You may step down, sir.
09:21  21   Thank you.
09:21  22            THE WITNESS:  Thank you.
09:21  23            THE COURT:  Could I have counsel up here
09:21  24   for just a second, one counsel per side?
09:21  25            (Bench conference.)

09:21  1                    THE COURT:  So you're done?

09:22  2                    MR. DEVLIN:  We're going to rest.

09:22  3                    THE COURT:  I'd like to keep going.  Can

09:22  4   you -- Mr. Devlin, will you agree at our break we'll

09:22  5   allow the defendants to make any motions they care to?

09:22  6                    MR. DEVLIN:  Of course.  Yeah.

09:22  7                    THE COURT:  And I --

09:22  8                    MR. DEVLIN:  For the record, Your Honor,

09:22  9   I think I mentioned this before, but just to get it on

09:22 10   the record, we have an agreement that the willfulness

09:22 11   case will be held open through Ms. Mahar.  So there'll

09:22 12   be no motion on that even at the break.  And that's

09:22 13   been agreed between the parties.

09:22 14                    And then we mentioned that exhibit --

09:22 15                    MR. JENSEN:  Yeah.  I think as long as we

09:22 16   just put that on the record, you rest your

09:22 17   case-in-chief except as to willfulness, that -- that's

09:22 18   fine.

09:22 19                    THE COURT:  Right now --

      20                    (Simultaneous speakers.)

      21                    MR. JENSEN:  Perfect.  Yeah.  We're in

      22   agreement.

      23                    MR. DEVLIN:  So when I say we rest, Your

      24   Honor, it's with that proviso.  I didn't want to say

      25   that in front of the jury.

766

09:22  1                          Thank you.

09:22  2                  THE COURT:  And then is your first

09:22  3  witness ready to go?

09:22  4                  MR. JENSEN:  Yeah.

09:22  5                  THE COURT:  That's what we're going to

09:22  6  do.

09:22  7                  MR. DEVLIN:  All right.  Thank you.

09:22  8                  THE COURT:  I'm going to ask you to call

09:22  9  your next witness, and you can announce.

09:22 10                  MR. DEVLIN:  Great.  Thank you.

09:22 11                  (Bench conference concludes.)

09:23 12                  THE COURT:  Mr. Devlin, would you call

09:23 13  your next witness?

09:23 14                  MR. DEVLIN:  Your Honor, plaintiff rests

09:23 15  its case-in-chief.  We do have a couple of exhibit

09:23 16  issues, which we're happy to deal with on the break, if

09:23 17  the Court will allow.

09:23 18                  THE COURT:  Let's do that.

09:23 19                  MR. DEVLIN:  Thank you, Your Honor.

09:23 20                  THE COURT:  Is the defendant ready to

09:23 21  call a witness?

09:23 22                  MR. JENSEN:  The defense is ready, Your

09:23 23  Honor.  We call Ms. Nanci Mahar as our first witness.

09:23 24                  (The witness was sworn.)

09:23 25                          DIRECT EXAMINATION

| | | |
|---|---|---|
| 09:23 | 1 | BY MR. JENSEN: |
| 09:24 | 2 | Q.   Good morning, Ms. Mahar. |
| 09:24 | 3 | A.   Good morning.  Is this volume okay? |
| 09:24 | 4 |      Thank you. |
| 09:24 | 5 | Q.   I got the head nod, so I believe so. |
| 09:24 | 6 |      Could you please state and spell your name? |
| 09:24 | 7 | A.   Nanci Mahar.  N-a-n-c-i M-a-h-a-r. |
| 09:24 | 8 | Q.   Have you ever testified in court before, |
| 09:24 | 9 | Ms. Mahar? |
| 09:24 | 10 | A.   No. |
| 09:24 | 11 | Q.   Are you nervous at all? |
| 09:24 | 12 | A.   A little bit. |
| 09:24 | 13 | Q.   Ms. Mahar, where do you work? |
| 09:24 | 14 | A.   Microchip Technology. |
| 09:24 | 15 | Q.   How long have you worked there? |
| 09:24 | 16 | A.   Since 2000. |
| 09:24 | 17 | Q.   And what is your current title? |
| 09:25 | 18 | A.   Senior marketing manager of the web team. |
| 09:25 | 19 | Q.   And what office -- or maybe I should say, |
| 09:25 | 20 | pre-coronavirus, what office did you work out of? |
| 09:25 | 21 | A.   Chandler, Arizona. |
| 09:25 | 22 | Q.   Is that where Microchip is headquartered? |
| 09:25 | 23 | A.   Yes.  It is. |
| 09:25 | 24 | Q.   So I'd like to learn a little bit more about |
| 09:25 | 25 | you, but before we do that, I want to ask some |

768

| | | |
|---|---|---|
| 09:25 | 1 | questions about Microchip as a company, all right? |
| 09:25 | 2 | When was Microchip founded? |
| 09:25 | 3 | A.    I believe Steve Sanghi, the former CEO, |
| 09:25 | 4 | started it up in the late 1980s with a couple other |
| 09:25 | 5 | guys and built it up from there. |
| 09:25 | 6 | Q.    Approximately how many people work in the |
| 09:25 | 7 | Chandler headquarters that you mentioned? |
| 09:25 | 8 | A.    About 5,000. |
| 09:25 | 9 | Q.    And company-wide, roughly, you know, how many |
| 09:25 | 10 | employees are there? |
| 09:25 | 11 | A.    Yeah.  We've grown to almost 20,000. |
| 09:25 | 12 | Q.    Does Microchip have a design center located in |
| 09:25 | 13 | Austin? |
| 09:25 | 14 | A.    Yes.  We do.  I believe there's one or 200 |
| 09:25 | 15 | people there. |
| 09:25 | 16 | Q.    What type of individuals work there, or what |
| 09:26 | 17 | type of work is done there? |
| 09:26 | 18 | A.    Yeah.  Engineering primarily. |
| 09:26 | 19 | Q.    On that topic, what is Microchip's line of |
| 09:26 | 20 | business?  What is it that you guys do? |
| 09:26 | 21 | A.    Semiconductors.  We make the little chips. |
| 09:26 | 22 | Q.    At a high level -- I think this was touched on |
| 09:26 | 23 | just a few minutes ago with Mr. Blok, but at a high |
| 09:26 | 24 | level, what goes into developing and manufacturing the |
| 09:26 | 25 | semiconductor products that Microchip makes? |

09:26   1        A.     So there's a lot of research and development.

09:26   2    We have a lot of engineering that goes into it, as you

09:26   3    might expect.  There's a lot of fabrication and

09:26   4    testing.  And, of course, there's marketing and

09:26   5    business administration, overhead, things like that.

09:26   6        Q.     What sorts of applications are Microchip's

09:26   7    products used in?

09:26   8        A.     Yeah.  We're in Keurig®.  Probably you guys

09:26   9    use that, right?  Dyson vacuum, Maytag®, GE

09:27   10   refrigerators, for example, Genie garage door openers,

09:27   11   that kind of stuff.

09:27   12       Q.     Is Microchip a website company?

09:27   13       A.     No.

09:27   14       Q.     Is Microchip in the business of designing and

09:27   15   developing websites?

09:27   16       A.     No.

09:27   17       Q.     But Microchip has some websites, correct, as

09:27   18   we've heard?

09:27   19       A.     Yes.  Yes.  Everybody does.

09:27   20       Q.     I think my grandmother launched her blog, so

09:27   21   you can subscribe.

09:27   22              Would it be fair to say that the Microchip

09:27   23   websites that we've been discussing are in service of

09:27   24   Microchip's broader semiconductor business?

09:27   25       A.     Yes.

—770—

09:27  1        Q.    Okay.  So you're not a company like Microsoft,

09:27  2   for example, that designs and develops software

09:27  3   applications?

09:27  4        A.    No.  Huh-uh.

09:27  5        Q.    What types of customers typically purchase

09:27  6   Microchip products?

09:27  7        A.    Other electronic companies, mostly

09:27  8   business-to-business.

09:27  9        Q.    Do those companies typically purchase just one

09:27  10  or two microchips?

09:27  11       A.    No.  Actually we have large purchases of our

09:28  12  products.

09:28  13       Q.    Can you give me an example of a company or two

09:28  14  that would be an example, kind of a representative

09:28  15  example, of someone who purchases from Microchip in,

09:28  16  let's say, I'll call it in bulk?

09:28  17       A.    Yeah, yeah.  So Honeywell would be one.  NEC,

09:28  18  those kind of big companies.

09:28  19       Q.    Are there any automotive companies that

09:28  20  purchase chips from Microchip?

09:28  21       A.    Oh, yeah.  And, you know, automotive is kind

09:28  22  of an interesting industry because there's a long -- we

09:28  23  call it a design in-time.  It can take up to 18 months

09:28  24  before our product gets put into one of their designs.

09:28  25  And when they put them into a design, then it's for a

—771—

| | | |
|---|---|---|
| 09:28 | 1 | long-term contract like five years.  So... |
| 09:28 | 2 | Q.    So taking that example you gave of, you know, |
| 09:28 | 3 | a car company, for example, that wants to put some |
| 09:28 | 4 | of -- Microchip chips in their vehicle, would they |
| 09:28 | 5 | typically just go to the website and place a $5 million |
| 09:28 | 6 | order? |
| 09:28 | 7 | A.    Oh, no.  They'd work with our field |
| 09:29 | 8 | salespeople, or they'd work with a distributor. |
| 09:29 | 9 | Q.    And why would they do that instead of just |
| 09:29 | 10 | going to the website and buying -- placing a bulk |
| 09:29 | 11 | order? |
| 09:29 | 12 | A.    They'd want to negotiate price, obviously. |
| 09:29 | 13 | But they also want to negotiate terms like delivery. |
| 09:29 | 14 | Q.    Is that an issue today with the supply chain |
| 09:29 | 15 | and the coronavirus? |
| 09:29 | 16 | A.    Yes.  We're part of the silicon chip shortage |
| 09:29 | 17 | for the vehicles.  So I apologize. |
| 09:29 | 18 | Q.    But Microchip does sell products online, to be |
| 09:29 | 19 | clear, correct? |
| 09:29 | 20 | A.    Yes. |
| 09:29 | 21 | Q.    Okay.  And how are those online sales made? |
| 09:29 | 22 | A.    Through Microchip Direct. |
| 09:29 | 23 | Q.    Okay.  And what is the URL for that website? |
| 09:29 | 24 | A.    Microchipdirect.com. |
| 09:29 | 25 | Q.    And is that a separate website from |

772

09:29   1    microchip.com?

09:29   2        A.    Yeah.  It's completely separate.  Separate

09:29   3    code, separate developers, separate management,

09:29   4    separate servers.

09:29   5        Q.    So I have some more questions about the

09:29   6    websites.  We'll get into that.

09:30   7              But I'd like to turn back now to your

09:30   8    background a little bit.

09:30   9              Oh, you know what?  One more small line of

09:30   10   questions I almost forgot.

09:30   11             How long have you been with Microchip?

09:30   12       A.    Since 2000.

09:30   13       Q.    Since 2000.  How big was Microchip back in

09:30   14   2000 when you joined?

09:30   15       A.    Oh, I think worldwide we had 3,000 employees

09:30   16   instead of the almost 20,000 we have now.  So it's

09:30   17   grown a lot.

09:30   18       Q.    And since the 2014 time frame, because that's

09:30   19   the relevant date in this case, how has Microchip

09:30   20   grown, if at all, since that time?

09:30   21       A.    Yeah.  During that time we had a strategy of

09:30   22   acquiring companies.  So we would acquire a company,

09:30   23   and then -- Microchip's the kind of company not to say

09:30   24   that we bought you, so you're coming over with us.  We

09:30   25   say, you know, we're merging with you.

09:30  1          So we have an inclusive kind of language we
09:30  2     use internally so that the people that are coming on
09:30  3     from the other company really feel welcomed in our
09:31  4     groups.
09:31  5          And so we had like -- as I recall, there were
09:31  6     many, many acquisitions during that time frame.
09:31  7     Q.   Could you mention maybe some of the, I don't
09:31  8     know, larger ones?  Or at least the ones that you
09:31  9     recall?
09:31 10     A.   Yeah.  We had one that was called Supertex.  I
09:31 11     believe they did a lot of analog products which is --
09:31 12     okay.  So you have microcontrollers and you have
09:31 13     analog, just another type of silicon chip.
09:31 14          And there were other acquisitions that were
09:31 15     kind of smaller.  IIS, they did some -- I believe some
09:31 16     more analog products, maybe some power management.
09:31 17          There were larger acquisitions like Micrel,
09:31 18     Atmel, Microsemi.  And those took a lot longer to
09:31 19     integrate, but they brought us complementary products
09:31 20     to what we already offer.
09:31 21     Q.   All right.  Just at a high level, how do
09:32 22     Microchip's revenues today compare with what they were
09:32 23     in 2014, before, you know, these various acquisitions
09:32 24     that you mentioned?
09:32 25     A.   Yeah.  They've almost tripled.  It's like

09:32   1   three times.  And I know that because I serve up the --

09:32   2   when you're a public company, you have to file

09:32   3   documents with the SEC about your earnings.  And so we

09:32   4   have these 10-Ks.  So I went and looked at those 10-Ks.

09:32   5   Just kind of as a normal course of business, I kind of

09:32   6   keep track of things.

09:32   7            And yeah, we've tripled.

09:32   8       Q.    And remind me, again, Ms. Mahar, what is your

09:32   9   current title?  Maybe I neglected to ask.  If I did, I

09:32   10  forgot.  What is your title?

09:32   11      A.    Senior marketing manager for the web team.

09:32   12      Q.    And how long have you been in that particular

09:32   13  role?

09:32   14      A.    Since April of 2018.

09:32   15      Q.    And I want to ask you about that role in a

09:32   16  minute.  But first let me get maybe kind of a thumbnail

09:32   17  sketch of the positions you have held since joining the

09:33   18  company.  I think you said that was back in the year

09:33   19  2000?

09:33   20      A.    2000.

09:33   21      Q.    Okay.  And have you been there ever since?

09:33   22  Were there any gaps where you went somewhere else?

09:33   23      A.    No.  I've worked at Microchip the entire time.

09:33   24      Q.    Okay.  Why have you stayed around so long?

09:33   25      A.    Well, a lot of it has to do with the culture.

09:33  1    The company's a really great place to work.

09:33  2        Q.    And during that, I guess, you know, roughly

09:33  3    22 years, what positions have you held?  And I don't --

09:33  4    if you were somewhere for a few months or something,

09:33  5    just kind of bigger picture.

09:33  6        A.    Yeah.  Yeah.  I started in promotions.  That

09:33  7    was my original bachelor's degree, was in marketing.

09:33  8    So I started in promotions.  And that led into making

09:33  9    wire diagrams, which is really just putting block

09:33  10   squares on a piece of paper and working with a

09:33  11   developer.

09:33  12         And then I moved into the web development

09:33  13   team.  I was there until about 2012.  And I ran

09:33  14   Internet projects and -- with, you know -- over time I

09:34  15   got to be on bigger and bigger projects, and I got to

09:34  16   be known as somebody who would deliver on time with my

09:34  17   projects.  So I had a pretty good reputation.

09:34  18         And then I moved over to the SharePoint site,

09:34  19   which is -- Microsoft SharePoint's another application

09:34  20   that companies use.  And I worked on that for a little

09:34  21   bit.  I really didn't like that technology.

09:34  22         So then I went over to the MarCom team.  I

09:34  23   write technical documents for them and made changes.

09:34  24         And then I came back to the web team.

09:34  25       Q.    So at a high level, the first, I think it was

776

09:34  1   10 or 12 years you said, that was kind of a website
09:34  2   role, some promotions-related stuff.  There was a
09:34  3   period of time where you were not working on
09:34  4   website-related projects.  And then rejoined, I think
09:34  5   you said, in April of 2019?
09:34  6        A.    2019.  Yes.
09:34  7        Q.    2019.
09:34  8        A.    2019.  Thank you.
09:34  9        Q.    Very good.
09:34 10            So you mentioned you were kind of working on a
09:35 11   website or part of a website team in those -- that
09:35 12   first decade or so.  What website was that?  Because
09:35 13   we've talked about several different websites.  What
09:35 14   website were you involved with?
09:35 15        A.    Microchip.com.
09:35 16        Q.    Microchip.com.  Okay.
09:35 17            When you kind of rejoined the web team in
09:35 18   2019, how did that come about?  Why did you come back?
09:35 19   Did you apply for that position?
09:35 20        A.    No.  Actually, my current boss, Ross Ayotte,
09:35 21   he approached me and asked me to come back.  And they
09:35 22   had this really big project to redesign the website and
09:35 23   wouldn't I please take that on?  And I did.
09:35 24        Q.    In your role as, I'll just call it the website
09:35 25   team lead, what are your primary responsibilities?

—777—

09:35   1        A.     Yeah.   I'm primarily responsible for the

09:35   2   function, the usability, the uptime of the website.

09:35   3        Q.     And I got the sense that there's a team of

09:36   4   people that work with you or -- I don't want to say

09:36   5   under you, but that are part of your team.   How big is

09:36   6   that team?

09:36   7        A.     We started out at about 20, 22 people.   And

09:36   8   I've grown it to 34 people.

09:36   9        Q.     And where are those team members located?

09:36   10       A.     You know, we're really all over the world.   We

09:36   11  have a large group in Chandler where I work.   And then

09:36   12  we have another large group in India.   And then there's

09:36   13  some other people throughout the world, in the

09:36   14  Philippines and Germany.

09:36   15       Q.     Which reminds me, I meant to ask.   Is the

09:36   16  microchip.com website available worldwide?

09:36   17       A.     Yes.   Actually it is.

09:36   18       Q.     Is there like a separate URL if you're, you

09:36   19  know, in Germany or, you know, Spain?

09:36   20       A.     No.   Actually not at this time.   Everything is

09:36   21  in English.   But we're working on a project to expand,

09:36   22  to translate the website into other languages to make

09:36   23  it easier for other people to read.

09:36   24       Q.     Do you have primary responsibility for the

09:37   25  microchipdirect.com website?

778

09:37   1       A.    No.

09:37   2       Q.    Do you work with people who are responsible

09:37   3   for the Microchip Direct website?

09:37   4       A.    Yes.  They're my colleagues.

09:37   5       Q.    And what -- kind of in your own words since

09:37   6   you're with the company, what is the

09:37   7   microchipdirect.com website?

09:37   8       A.    It's our e-commerce portal.  It's where people

09:37   9   go and purchase product.

09:37   10          MR. JENSEN:  Mr. Thompson, could you just

09:37   11   pull up the microchipdirect.com website?

09:37   12   BY MR. JENSEN:

09:37   13       Q.    And we're not going to spend much time on

09:37   14   this, but I do want to ask you a couple of questions

09:37   15   about it.

09:37   16          MR. JENSEN:  And let's go to the

09:37   17   microchipdirect.com website.

09:38   18          Okay.  Looks like it's up here.  All

09:38   19   right.  Very good.

09:38   20   BY MR. JENSEN:

09:38   21       Q.    All right.  Is this the microchipdirect.com

09:38   22   website, Ms. Mahar?

09:38   23       A.    Yes.  It is.

09:38   24       Q.    And this is where customers can come to buy

09:38   25   Microchip products?

779

09:38   1          A.    Yes.

09:38   2          Q.    If the Microchip Direct website crashed or was

09:38   3   offline for some reason, could customers purchase

09:38   4   products on microchip.com?

09:38   5          A.    No.

09:38   6          Q.    Conversely, if microchip.com crashed and

09:38   7   wasn't working, could customers still place an order on

09:38   8   Microchip Direct?

09:38   9          A.    Yes.

09:38   10         Q.    Okay.  And what do you see kind of at the top

09:38   11  of the page, underneath the URL?  And it has some text

09:38   12  there.  It says:  What can we help you find today?

09:38   13         A.    Yeah.  That's the search field where you can

09:38   14  type in a product name and search for a product.

09:38   15         Q.    Okay.

09:38   16              MR. JENSEN:  Mr. Thompson, could you type

09:38   17  in --

09:38   18  BY MR. JENSEN:

09:38   19         Q.    Or, Ms. Mahar, what's something that he could

09:39   20  type in there just so we can see how that --

09:39   21         A.    PIC10F200, it's P-I-C-1-0 --

09:39   22         Q.    Okay.  Just pause right there for a moment.

09:39   23              So what are we looking at here?  What

09:39   24  happened?

09:39   25         A.    So it's doing a look-ahead for products on the

780

09:39    1    website.

09:39    2         Q.    Okay.   Is that similar to functionality like

09:39    3    on Google's website, that it'll try to, you know,

09:39    4    predict or guess -- I don't want to say guess, but

09:39    5    predict what you're looking for?

09:39    6         A.    Yes.

09:39    7         Q.    Okay.   Very good.

09:39    8               And is that how customers can locate products

09:39    9    on the purchasing website?

09:39   10         A.    Yes.

09:39   11         Q.    Or I should say one way, not the only way?

09:39   12         A.    One way.

09:39   13         Q.    One way.   Okay.

09:39   14               And why is it that the search bar on this

09:39   15    website is sort of front and center, right?   It's the

09:39   16    top -- it's the very first thing on the purchasing

09:39   17    website.

09:39   18         A.    Right.   One of the things that we've learned

09:39   19    over time, especially over the pandemic, is that search

09:39   20    is very, very valuable.

09:39   21               And I don't know about you, but I go to

09:39   22    Amazon -- or I use a search engine like Google, but I

09:39   23    go to Amazon a lot, and I'll search to find a product

09:40   24    and then I would purchase it, right?   So...

09:40   25               MR. JENSEN:   And, Mr. Thompson, you can

09:40   1   take that down.

09:40   2   BY MR. JENSEN:

09:40   3       Q.   The first time I saw this, Ms. Mahar, it

09:40   4   struck me as a little bit odd that there were kind of

09:40   5   two different, you know, Microchip websites, right?

09:40   6            If I want to buy something from Apple, I might

09:40   7   go to apple.com and buy something there.

09:40   8            So why is it -- why does Microchip have these

09:40   9   two distinct websites?

09:40  10       A.   Right.  So we consider our online sales

09:40  11   another channel.  It's kind of like our distribution

09:40  12   channel.  And we don't want to compete with our

09:40  13   distributors on our main microchip.com website, so we

09:40  14   have a separate website for purchasing.

09:40  15       Q.   Do you know when the Microchip Direct website

09:40  16   was kind of implemented, or when did it get put on the

09:40  17   Internet?

09:40  18       A.   Yeah.  I believe it was back in 2005ish.

09:40  19       Q.   Okay.  But it certainly would have been there

09:40  20   in 2014?

09:40  21       A.   Yes.  Absolutely.

09:40  22       Q.   Okay.  And do you have primary responsibility

09:41  23   for the Forum website that we've heard about in this

09:41  24   case?

09:41  25       A.   No.  I don't.

782

09:41  1       Q.    Do you work with people who are responsible

09:41  2   for the Forum website?

09:41  3       A.    Yes.

09:41  4       Q.    And in your own words, what is the Forum

09:41  5   website?

09:41  6       A.    It's a discussion platform.  People can go

09:41  7   there and talk about our products.

09:41  8       Q.    And we'll come back and have some more

09:41  9   questions later on about the Forum website, but I'd

09:41  10  like to ask some questions about what's been referred

09:41  11  to throughout the trial as the old website or the

09:41  12  original website.

09:41  13        And you've been here the -- this whole week,

09:41  14  the entire time?

09:41  15      A.    Yes.

09:41  16      Q.    Okay.  What is the purpose of the

09:41  17  microchip.com website?

09:41  18      A.    It's informational, to share information about

09:41  19  our products.

09:41  20      Q.    Is the microchip.com website only available in

09:41  21  the United States?

09:41  22      A.    No.  It's not.

09:41  23      Q.    Is it available in Europe?

09:42  24      A.    Yes.

09:42  25      Q.    How about South America?

783

09:42  1      A.    Yes.

09:42  2      Q.    Mexico, Canada?

09:42  3      A.    Yes.  Yes.

09:42  4      Q.    Okay.  And perhaps there's, I don't know, some

09:42  5  one-off countries where it's not, you know --

09:42  6      A.    Yeah.

09:42  7      Q.    -- available for political reasons or

09:42  8  something.  But in general, it's a worldwide website?

09:42  9      A.    That's right.

09:42  10     Q.    Okay.  If someone in Europe, for example,

09:42  11  visited microchip.com, would their request to load the

09:42  12  website be serviced by a server in the United States or

09:42  13  a server in Europe?

09:42  14     A.    No.  If we had everybody come back to the

09:42  15  United States, it would take down the website.  So we

09:42  16  serve up our website international on servers all

09:42  17  around the world.

09:42  18          We go -- you -- if you were in Taiwan or

09:42  19  Norway, you would go to a server in that or near that

09:42  20  country.  It just makes the website load faster.  And

09:42  21  that was a big problem we had before.

09:42  22     Q.    Do you work with any other vendors or

09:42  23  companies to help provide these servers throughout the

09:43  24  world?

09:43  25     A.    Yeah.  We have a third party that does that.

09:43  1      Q.    Who is that third party?

09:43  2      A.    Akamai.

09:43  3      Q.    And do you have a sense of how many servers do

09:43  4  they have?  Is it one or two or...

09:43  5      A.    No.  I believe I read on their website that

09:43  6  it's over 200,000 servers worldwide.

09:43  7      Q.    And if somebody in Spain was loading the

09:43  8  website, would it load faster or slower if that website

09:43  9  used a server in Spain versus a server in the United

09:43  10  States?

09:43  11      A.    So if they went to a server in Spain, it would

09:43  12  load very quickly.  If they had to come back to the

09:43  13  United States, there would be several paths, and it

09:43  14  would take a lot longer to load the site if they came

09:43  15  back to the U.S.

09:43  16      Q.    Is that one reason why Microchip has

09:43  17  servers -- I call them Microchip's, but Akamai on

09:43  18  behalf of Microchip has servers located throughout the

09:43  19  world?

09:43  20      A.    Yes.

09:43  21      Q.    It increases the page load speed?

09:43  22      A.    Yes.

09:43  23      Q.    Makes it faster?

09:43  24      A.    Yes.

09:43  25      Q.    Are you -- do you have an understanding of the

09:44  1   difference between kind of hosting the website or a

09:44  2   server that hosts a website and what it would be to

09:44  3   maintain a website?

09:44  4        A.    Yes.

09:44  5        Q.    Okay.  Could you explain that, please?

09:44  6        A.    Yeah.  So we have servers in Chandler where we

09:44  7   maintain our source code, and then we copy it out to

09:44  8   Akamai's servers, and we host it out there so that it

09:44  9   goes faster to the user.

09:44  10       Q.    Okay.  And the latter of those two things,

09:44  11  where the code is maintained -- well, let me take a

09:44  12  step back.

09:44  13             Microchip has some servers in the United

09:44  14  States; is that correct?

09:44  15       A.    Yeah.  On the east coast, west coast.

09:44  16       Q.    Okay.  So somebody in the U.S. wanted to visit

09:44  17  microchip.com, that page would be served up by a server

09:44  18  in the U.S.?

09:44  19       A.    Yeah.

09:44  20       Q.    Okay.  So you're not saying that we don't have

09:44  21  servers in the U.S., correct?

09:44  22       A.    Correct.

09:44  23       Q.    You do?

09:44  24       A.    Yes.

09:44  25       Q.    But you also have servers outside of the U.S.

09:44   1   for other areas of the world?

09:44   2        A.     Yes.

09:44   3        Q.     Okay.  You mentioned, I think, someone by the

09:45   4   name -- and I may get the pronunciation off here, but

09:45   5   Ross Ayotte?

09:45   6        A.     Uh-huh.

09:45   7        Q.     Is that correct?

09:45   8        A.     Right.

09:45   9        Q.     Okay.  And he was the individual that

09:45  10   recruited you to lead the redesign?

09:45  11        A.     That's right.

09:45  12        Q.     Okay.  So I'd like to ask you some questions

09:45  13   about the microchip.com website as it existed prior to

09:45  14   the redesign.

09:45  15        A.     Okay.

09:45  16        Q.     And first off, what was the state of affairs

09:45  17   of the microchip.com website in the fall of 2018?

09:45  18        A.     Oh, it was in critical repair.  The code was

09:45  19   very fragile.  When we tried to put new code on the

09:45  20   site, the database would crash, meaning that the

09:45  21   website would not render properly on the Internet.

09:45  22            The page load speed was, you know, at that

09:45  23   time I believe it was about 12 seconds, you know, I

09:45  24   mean, really slow to load a page before you see

09:45  25   something.  And the Internet industry believes that 2

787

09:46  1   to 3 seconds is the right amount of time to load a

09:46  2   page.

09:46  3            So it was -- it was fragile.  It was horrible

09:46  4   to work on the system.  And it was really challenging

09:46  5   for our customers.

09:46  6       Q.   Okay.

09:46  7            MR. JENSEN:  Mr. Thompson, could you

09:46  8   bring up Joint Exhibit 104, please?

09:46  9   BY MR. JENSEN:

09:46  10      Q.   All right.  Ms. Mahar, do you recognize this

09:46  11  document?

09:46  12      A.   Yes.

09:46  13      Q.   What is it?

09:46  14      A.   It's a presentation that the person that had

09:46  15  my job before me, Grace Ramon -- she was my

09:46  16  predecessor -- she created a presentation on why we

09:46  17  needed to reengineer the website.

09:46  18      Q.   And why did you have a copy of this document

09:46  19  in your files?

09:46  20      A.   Ms. Ramon left the company in the spring of

09:47  21  2019, and we had a transition phase where she gave me

09:47  22  her documents, and we kind of went over everything.

09:47  23      Q.   Why did she prepare it?

09:47  24      A.   She prepared it in order to request funds for

09:47  25  redesigning the website from management.

—788—

09:47  1      Q.   And I meant to ask one more question when we

09:47  2  were talking about the worldwide operation of the

09:47  3  website, which is:  When, let's say, someone in Spain

09:47  4  wants to visit the website, the person that's

09:47  5  navigating that website would be in Spain?

09:47  6      A.   Yeah.

09:47  7      Q.   Okay.

09:47  8      A.   Yeah.

09:47  9      Q.   Very good.

09:47 10           Let's see.

09:47 11                MR. JENSEN:  Mr. Thompson, could you turn

09:47 12  to -- well, let me back up.

09:47 13  BY MR. JENSEN:

09:47 14      Q.   Let me ask one other question.  When was this

09:47 15  presentation prepared, just kind of rough time frame?

09:47 16      A.   I believe the fall of 2018.

09:47 17      Q.   Okay.

09:47 18                MR. JENSEN:  Could we go to Slide 14,

09:47 19  Mr. Thompson?

09:47 20  BY MR. JENSEN:

09:48 21      Q.   What is shown on this slide, Ms. Mahar?

09:48 22      A.   It's showing the -- on the image on the left,

09:48 23  it showed the existing website at the time, how fragile

09:48 24  and crumbling the website was.  Kind of depicts that

09:48 25  there was a lot of work.  And obviously, you can't

09:48   1    repair something that is that bad.

09:48   2              And then on the right side, it shows the

09:48   3    website as we would want it to be, modern, sleek, fast,

09:48   4    reliable, stable, all of those good things.

09:48   5        Q.   How much time would be required to build a new

09:48   6    website from the ground up?

09:48   7        A.   Well, it depends on the size of the website.

09:48   8    You know, smaller ones don't take that long, but this

09:48   9    is a huge website, has a lot of pages and a lot of

09:48   10   documents.  So it takes about a couple years.

09:48   11       Q.   Did Microchip ultimately redesign its website?

09:48   12       A.   Yes.

09:48   13              MR. JENSEN:  Mr. Thompson, you can take

09:48   14   that down.

09:48   15              And -- well, let me -- since there's been

09:49   16   some confusion about getting exhibits into evidence,

09:49   17   let me offer that into evidence.  That is Joint

09:49   18   Exhibit 104.

09:49   19              MR. DEVLIN:  No objection.

09:49   20              THE COURT:  It'll be admitted.

09:49   21              MR. JENSEN:  And, Mr. Thompson, could you

09:49   22   please pull up Joint Exhibit 101?

09:49   23   BY MR. JENSEN:

09:49   24       Q.   And, Ms. Mahar, do you recognize this

09:49   25   document?

790

09:49  1        A.    Yes.  I do.  It was a web proposal from DRL,

09:49  2   and it explains what we needed to do to fix the site.

09:49  3        Q.    And what is the date on this document?

09:49  4        A.    October 16, 2018.

09:49  5        Q.    And who prepared it?

09:49  6        A.    Cody Miller.

09:49  7        Q.    Okay.  And he's associated with what company?

09:49  8        A.    Dynamic Range Labs.  He's the CEO.  He doesn't

09:49  9   really get involved in the project or the day-to-day,

09:49  10  but he is the founder of that company.

09:50  11       Q.    And did Microchip solicit proposals or bids

09:50  12  from a number of different companies to assist with the

09:50  13  redesign?

09:50  14       A.    That's our typical practice.

09:50  15       Q.    Okay.  And DRL was the company that was

09:50  16  ultimately selected for this particular project?

09:50  17       A.    Yeah.

09:50  18       Q.    Okay.

09:50  19             MR. JENSEN:  All right.  Let me move that

09:50  20  into evidence as well, Joint Exhibit 101.

09:50  21             MR. DEVLIN:  No objection.

09:50  22             THE COURT:  It'll be admitted.

09:50  23  BY MR. JENSEN:

09:50  24       Q.    And one thing I'd like to do, Ms. Mahar, is to

09:50  25  try and help put kind of some of these events in the

09:50   1   context of a timeline --

09:50   2        A.    Yeah.

09:50   3        Q.    -- I think would be helpful.

09:50   4              Did you prepare a slide --

09:50   5        A.    I did.

09:50   6        Q.    -- to help with that?  Okay.

09:50   7              MR. JENSEN:  Mr. Thompson, could you

09:50   8   bring up the timeline slide?  And we'll place a couple

09:50   9   of these data points on the timeline.

09:50   10  BY MR. JENSEN:

09:50   11       Q.    So what time period are we looking at here on

09:50   12  your timeline, Ms. Mahar?

09:50   13       A.    2018 to 2020.

09:51   14       Q.    Okay.  And in roughly what time frame was the

09:51   15  decision made to redesign the website?  Or at least it

09:51   16  was under consideration?

09:51   17       A.    Right.  In order for Grace to have made the

09:51   18  presentation that she did, she had to have a lot of

09:51   19  discussions with business users, developers, managers,

09:51   20  and be able to pull all the information together.  So

09:51   21  it started sometime around the mid of 2018.

09:51   22       Q.    Okay.

09:51   23              MR. JENSEN:  And could we pull up the

09:51   24  first couple of points there?

09:51   25  BY MR. JENSEN:

—792—

09:51   1        Q.    So we just looked at this web proposal from

09:51   2   DRL, Joint Exhibit 101.  And that was in kind of late

09:51   3   2018, October time frame?

09:51   4        A.    Yes.

09:51   5        Q.    Okay.  And the other, the old house/new house

09:51   6   document we looked at, that was roughly what time

09:51   7   frame?

09:51   8        A.    Early in 2019.

09:51   9        Q.    Okay.  And that kind of old house/new house

09:51   10  image, was that the only presentation in which that

09:51   11  figure appeared?

09:51   12       A.    No.  It kind of resonates with you.

09:51   13       Q.    Okay.

09:51   14       A.    So it appeared a lot.

09:51   15       Q.    So it might have been used a little bit

09:52   16  earlier; it might have been used a little bit later as

09:52   17  well.  But certainly in that kind of rough late 2018,

09:52   18  early 2019 period?

09:52   19       A.    That's right.

09:52   20       Q.    Okay.  So let's stick with this -- kind of

09:52   21  this time frame we're looking at here, the fall of

09:52   22  2018.  You know, you mentioned that a redesign project

09:52   23  would take a significant amount of time?

09:52   24       A.    Yes.

09:52   25       Q.    Were there any changes that Microchip made to

09:52  1   the website, you know, maybe smaller changes or

09:52  2   quick-fix type changes in this fall 2018 time period?

09:52  3       A.   Yes.  We made some cosmetic changes to the

09:52  4   website.  We also made the change to get rid of a left

09:52  5   navigation.  So on web pages you might have a lot of

09:52  6   links on the left side.  We repurposed that to be a

09:52  7   horizontal format with some drop-downs.

09:52  8       Q.   Okay.  And prior to the fall of 2018 -- well,

09:52  9   let me follow up on that.  You said there's a left

09:52 10   navigation, and it was sort of repurposed, I think you

09:53 11   said, into a --

09:53 12       A.   Yes.

09:53 13       Q.   -- a different horizontal menu path; is that

09:53 14   correct?

09:53 15       A.   Yes.  That's right.

09:53 16       Q.   Okay.  And is that the feature that we've

09:53 17   heard about in this trial that's accused?

09:53 18       A.   Yes.

09:53 19       Q.   Okay.  So prior to fall of 2018, did the

09:53 20   microchip.com website even have the accused -- what's

09:53 21   been called the breadcrumb?

09:53 22       A.   No.  It did not.

09:53 23       Q.   Okay.  Very good.

09:53 24            Were any of the changes made in this kind of

09:53 25   fall 2018 time period intended to be permanent?  Or

—794—

09:53  1  were they more in the nature of a temporary fix?

09:53  2     A.   Yeah.  They were a temporary fix.  Very much a

09:53  3  Band-Aid until we could go through the process of

09:53  4  redesigning the website.  It takes a long time, so we

09:53  5  tried to give some changes that might hold us over for

09:53  6  a little while.

09:53  7     Q.   Okay.  So notwithstanding some of these, you

09:53  8  know, cosmetic changes that were implemented in the

09:53  9  fall of 2018, was it still necessary to undertake this

09:53  10  wholesale redesign project?

09:54  11     A.   Yes.  Absolutely.  I think you could tell from

09:54  12  those images that it needed to be rebuilt.

09:54  13     Q.   What was the -- well, let me ask you this:

09:54  14  Was there an internal kind of name -- I'll call it a

09:54  15  code name, but --

09:54  16     A.   Yeah.  We called it coat of paint.  Kind of

09:54  17  a -- just a way to kind of refer to the house.  You

09:54  18  know, sometimes you just put a little paint on it and

09:54  19  kind of make it feel and look a little better, but it

09:54  20  doesn't really address the underlying problems.

09:54  21     Q.   Okay.  So what were some of those fundamental

09:54  22  underlying problems that remained to be fixed?

09:54  23     A.   Yeah.  Every time we tried to move out a code

09:54  24  change to change or update a functionality, the code

09:54  25  would break.  The database would crash.  We'd have to

09:54  1    rebuild the database.  And we'd have to adjust all of

09:54  2    the code to kind of get it to work again.  So it was

09:54  3    very challenging.

09:55  4                    MR. JENSEN:  Mr. Thompson, why don't we

09:55  5    switch from the timeline and go back to Joint

09:55  6    Exhibit 104, Page 6, please?

09:55  7    BY MR. JENSEN:

09:55  8        Q.    And this is from that old house/new house

09:55  9    slide deck we were just looking at.  And what was the

09:55  10   time frame of this document again?

09:55  11       A.    The fall of 2018.

09:55  12       Q.    Okay.  Was this before or after these cosmetic

09:55  13   changes had been implemented?

09:55  14       A.    I believe after.

09:55  15       Q.    Okay.  And what is shown on this slide?  What

09:55  16   is this slide intended to convey?

09:55  17       A.    Yeah.  It shows the importance of having a

09:55  18   fast page load, the time it takes for a page to

09:55  19   display, for you to see it.  So it's really the

09:55  20   importance of that.

09:55  21       Q.    So this page load time problem and the other

09:55  22   issues you'd mentioned continued to exist after the

09:55  23   fall of 2018?

09:55  24       A.    Yes.  That's right.

09:55  25       Q.    So adding the accused breadcrumb feature did

09:56    1    not solve any of these problems we're looking at on

09:56    2    this slide?

09:56    3        A.    No.

09:56    4        Q.    Okay.  And so I think you mentioned that

09:56    5    Microchip retained DRL to assist with the website

09:56    6    redesign, correct?

09:56    7        A.    That's right.

09:56    8        Q.    Did they redesign the whole thing by

09:56    9    themselves?  Or did they work with Microchip?  What was

09:56   10    the -- was there a balance between the two?  How did

09:56   11    that relationship work?

09:56   12        A.    Yeah.  It was such a large project that they

09:56   13    retained people, but we also used our whole team to

09:56   14    rebuild the website.

09:56   15                MR. JENSEN:  Could we go back to the

09:56   16    timeline, please, Mr. Thompson?

09:56   17    BY MR. JENSEN:

09:56   18        Q.    So while he's pulling that up, everything

09:56   19    we've been talking about here so far, all the events,

09:56   20    the redesign proposal, the website problems, et cetera,

09:57   21    was that before or after Caddo filed the lawsuit that

09:57   22    brings us here?

09:57   23        A.    Oh, it was almost a year before.

09:57   24        Q.    Did Microchip's decision to redesign the

09:57   25    microchip.com website have anything whatsoever to do

09:57  1   with this lawsuit?

09:57  2      A.    No.  It did not.

09:57  3      Q.    Did DRL perform an assessment of the old

09:57  4   website -- I think you called it the coat of paint --

09:57  5   prior to undertaking the actual redesign work itself?

09:57  6      A.    Yeah.  They did.  They did a great analysis.

09:57  7   Typically we call it discovery period.  But yeah, they

09:57  8   did a great Phase 1.

09:57  9             MR. JENSEN:  Mr. Thompson, could you

09:57  10  bring up Joint Exhibit 105, please?

09:57  11  BY MR. JENSEN:

09:58  12     Q.    Do you recognize this document, Ms. Mahar?

09:58  13     A.    Yes.  I do.

09:58  14     Q.    What is it?

09:58  15     A.    It's the Phase 1 Deliverables from Dynamic

09:58  16  Range Labs.  And basically it's their assessment of all

09:58  17  of the problems that involved the microchip.com

09:58  18  website.  And it describes how we should address them.

09:58  19     Q.    Okay.  Do you know how long this document is?

09:58  20            MR. JENSEN:  And perhaps Mr. Thompson can

09:58  21  help us and just flip to the end.

09:58  22  BY MR. JENSEN:

09:58  23     Q.    We can see how many pages, since we don't have

09:58  24  the --

09:58  25     A.    Yeah.  I think it's a couple hundred pages.

09:58   1        Q.    A couple hundred pages of problems they

09:58   2    identified?

09:58   3        A.    Yeah.

09:58   4        Q.    Okay.  All right.  And who prepared this

09:58   5    document?

09:58   6        A.    Dynamic Range Labs, DRL.

09:58   7        Q.    And this was given to Microchip?

09:58   8        A.    That's right.

09:58   9        Q.    Were you in your current role at this time

09:58   10   when DRL provided this document?

09:58   11       A.    Yes.  This was right about the time that I

09:58   12   started managing the team.

09:58   13       Q.    And so did you receive and review this

09:58   14   document in the normal course of business?

09:58   15       A.    Yes.

09:58   16       Q.    All right.

09:59   17             MR. JENSEN:  And, Mr. Thompson, can you

09:59   18   turn to Page 50 of this document, please?

09:59   19   BY MR. JENSEN:

09:59   20       Q.    And I'd like to call your attention,

09:59   21   Ms. Mahar -- I'm going to have to zoom in, but it's

09:59   22   kind of the -- I think it's Item No. 3 in the little

09:59   23   yellow box there.

09:59   24       A.    Yes.

09:59   25       Q.    Let's go up a little bit to the text.  I think

799

| | | |
|---|---|---|
| 09:59 | 1 | there's two No. 3s, and they relate to each other. |
| 09:59 | 2 | A.   Okay. |
| 09:59 | 3 | Q.   Could you read -- just read the first sentence |
| 09:59 | 4 | of this paragraph? |
| 09:59 | 5 | A.   So often across the Microchip website, the |
| 09:59 | 6 | navigation on a page doesn't match the top navigation. |
| 09:59 | 7 | Q.   What does that mean?  What is that referring |
| 09:59 | 8 | to? |
| 09:59 | 9 | A.   It's referring to the secondary nav, what |
| 09:59 | 10 | we've been calling the breadcrumb, and how it relates |
| 09:59 | 11 | to the top navigation. |
| 09:59 | 12 | Q.   So on the microchip.com website, there's a top |
| 09:59 | 13 | navigation menu, and it's got some drop-downs that a |
| 09:59 | 14 | user can navigate and make a selection? |
| 09:59 | 15 | A.   That's correct. |
| 09:59 | 16 | Q.   And at that point a so-called breadcrumb or a |
| 10:00 | 17 | menu path will appear underneath? |
| 10:00 | 18 | A.   That's correct. |
| 10:00 | 19 | Q.   Okay.  And what is this observation saying |
| 10:00 | 20 | about the consistency of those two menus? |
| 10:00 | 21 | A.   It doesn't -- it doesn't match.  It's not |
| 10:00 | 22 | consistent.  So you can look at the top navigation |
| 10:00 | 23 | there, and it has Products, Application, Design, Sample |
| 10:00 | 24 | and Buy, and About. |
| 10:00 | 25 | And none of those words appear in that second |

```
10:00  1    level.  It says Home, Security ICs, Crypto, and
10:00  2    Authentication.  And so it doesn't match.
10:00  3        Q.    And did DRL view this as a good thing or a bad
10:00  4    thing?
10:00  5        A.    Bad thing.  It was very confusing for our
10:00  6    customers.  They didn't understand -- they didn't
10:00  7    understand it.
10:00  8        Q.    How frequently did this mismatch occur?
10:00  9        A.    On many pages.
10:00  10       Q.    Did you ever personally observe this mismatch
10:01  11   that DRL observed?
10:01  12       A.    Yes.
10:01  13                 MR. JENSEN:  You can take that down,
10:01  14   Mr. Thompson.
10:01  15   BY MR. JENSEN:
10:01  16       Q.    And I take it you've -- well, let me take a
10:01  17   step back.
10:01  18                 We've got a video, very short video, that I
10:01  19   would like to show for you.
10:01  20                 MR. JENSEN:  Could we pull up,
10:01  21   Mr. Thompson, Defendant's Exhibit 463?
10:01  22                 And why don't you pause it there for just
10:01  23   a moment, Mr. Thompson?
10:01  24                 So kind of maybe rewind it to the
10:01  25   beginning.
```

```
10:01    1    BY MR. JENSEN:
10:01    2        Q.   So what is it that's on the screen here?  What
10:01    3    are we looking at?
10:01    4        A.   The Google search engine.
10:01    5        Q.   Okay.  And what I'd like to do is just let's
10:01    6    watch this video all the way through.
10:01    7        A.   Okay.
10:01    8        Q.   All right.  And then I'll come back and ask
10:02    9    you a couple of questions about it.
10:02   10        A.   Sure.
10:02   11                 (Video played.)
10:02   12                 MR. JENSEN:  Okay.  Go ahead and you can
10:02   13    just hit pause there.  That's all there is to it.
10:02   14    BY MR. JENSEN:
10:02   15        Q.   So do you recognize the website that was shown
10:02   16    in this video?
10:02   17        A.   Yes.
10:02   18        Q.   Okay.  And what website was that?
10:02   19        A.   Microchip.com.
10:02   20        Q.   Microchip.com.
10:02   21             And you're familiar with that website?
10:02   22        A.   Very familiar.  I've gone to a lot of pages.
10:02   23        Q.   And what did we observe a user doing on the
10:02   24    website in this video?
10:02   25        A.   Sure.  They went to the top navigation and
```

—802—

10:02   1    selected Tools and something and then Encryption, and

10:02   2    then they went to MPLAB® Connect Configurator.

10:03   3        Q.    Okay.  And do you know if this video is from

10:03   4    the old website or the redesigned website?

10:03   5        A.    It's actually both.  We did a phased approach

10:03   6    in rolling out our website because it was so large.  We

10:03   7    wanted to make sure that we could roll out a phase,

10:03   8    make sure it worked right, and then do the next section

10:03   9    and then the next section.

10:03   10           So what you saw was the redesigned homepage,

10:03   11   and then this is from the old website.

10:03   12       Q.    And how do you know that this functionality

10:03   13   that we observed here was from the old website?

10:03   14       A.    You can tell because this -- you guys call it

10:03   15   a breadcrumb -- this breadcrumb is available, the

10:03   16   colors are a little different, that kind of thing.

10:03   17       Q.    Okay.

10:03   18           MR. JENSEN:  And let's -- if you could

10:03   19   play it one more time, Mr. Thompson, and I might ask

10:03   20   you to pause it along the way because I want to take

10:03   21   careful note of the selections that are being made by

10:03   22   the user from the top navigation.

10:04   23           (Video played.)

10:04   24           MR. JENSEN:  Just keep playing here.

10:04   25           (Video played.)

10:04  1        A.    So it's Tools and Software.

10:04  2    BY MR. JENSEN:

10:04  3        Q.    Tools and Software.

10:04  4        A.    And then Embedded Software Center.  And MPLAB®

10:04  5    Code -- Connect Configurator.  Sorry.

10:04  6        Q.    And in the resulting path, what are the links

10:04  7    in that -- the resulting path, Ms. Mahar?

10:04  8        A.    Home, Internet -- or Interface and

10:04  9    Connectivity, USB, and then MPLAB® Connect

10:04  10   Configurator.  It doesn't match the path that we just

10:04  11   took.

10:04  12       Q.    Was this a one-off example?

10:04  13       A.    No.  This was very common.

10:04  14       Q.    Why?

10:04  15       A.    Because we manually typed in those links that

10:04  16   you see in that breadcrumb.

10:04  17       Q.    And can you explain a little bit more, what do

10:04  18   you mean you "manually typed" them in?

10:05  19       A.    Right.  So I had a couple guys on my team,

10:05  20   Sean and Anthony.  They -- bless them.  They worked

10:05  21   really hard.  They spent lots and lots of hours typing

10:05  22   in those labels and those links on what you see here.

10:05  23   That was a fixed path on that breadcrumb.

10:05  24       Q.    And I think you said, you know, we implemented

10:05  25   these fixed paths.

10:05  1      A.    Oh, that's right.

10:05  2      Q.    And is that the royal "we," like when my dad

10:05  3  says, we need to reroof the house?

10:05  4      A.    Yeah.  I have limited resources, so sometimes

10:05  5  I had to go in and type in the links as well.

10:05  6      Q.    So you personally --

10:05  7      A.    Yes.

10:05  8      Q.    -- as the head of the website team, had to go

10:05  9  in and enter some of these fixed paths that resulted in

10:05  10  the mismatch?

10:05  11      A.    That's correct.

10:05  12      Q.    Okay.

10:05  13      A.    I -- you know, we wear lots of hats when we

10:05  14  work for a company that makes stuff.

10:05  15      Q.    And I think you mentioned earlier the website

10:05  16  has a lot of pages?

10:06  17      A.    Yeah.  We have, I don't know, 25,000 pages,

10:06  18  more or less.  It's huge.

10:06  19      Q.    And how much work was it to manually enter all

10:06  20  of these fixed paths that you mentioned?

10:06  21            Let's say a new link comes on and you need a

10:06  22  new fixed path.  How much work was this to do?

10:06  23      A.    A lot of work.  We would get requests from

10:06  24  business users to, say, add a new page, and we'd have

10:06  25  to go into the code and type in the new name and type

805

10:06    1    in the new link, and then it would go out to

10:06    2    production.  And if something changed, we'd have to go

10:06    3    back in and make the manual change.

10:06    4        Q.    Was that an efficient use of resources on your

10:06    5    team?

10:06    6        A.    No.  I was really -- I was really kind of mad

10:06    7    about it because it -- you know, developers, they

10:06    8    should be building stuff.  They should be working on

10:06    9    new functions, not putting links on pages.

10:06   10        Q.    And what was DRL's recommendation as it

10:06   11    related to using this fixed-path approach that you have

10:07   12    described?

10:07   13        A.    Yeah.  They recommended that we get rid of it.

10:07   14        Q.    Did Microchip follow DRL's recommendation?

10:07   15        A.    Yes.  We did.

10:07   16        Q.    And how long had this functionality been in

10:07   17    place when DRL came to you and said, essentially, this

10:07   18    is no good and let's change it; let's fix it; let's do

10:07   19    it right?

10:07   20        A.    Yeah.  It was only a couple of months before

10:07   21    they recommended that we get rid of it.

10:07   22        Q.    So this feature was implemented or added, I

10:07   23    think you said, in the fall of 2018.  And then again --

10:07   24              MR. JENSEN:  Maybe we can pull the

10:07   25    timeline up, please, Mr. Thompson.

BY MR. JENSEN:

Q.   So it was added late 2018.  And we have the document there where DRL said, hey, this is a problem. That's April.

Roughly how long was this even live on the Internet before the recommendation was made to take it down?

A.   Yeah.  Just several months.

Q.   Okay.  And was all of this done again before or after Caddo sued Microchip?

A.   I believe over a year before.

Q.   Okay.  So all of these recommendations and the decisions to replace this functionality were made more than a year before you were sued?

A.   That's right.

Q.   And when did Microchip first learn of the patents in this case?

A.   March of 2020.

Q.   Okay.

A.   Yeah.

Q.   And that's when the lawsuit was filed?

A.   That's right.

Q.   Did Caddo or 511 notify or provide any advanced warning to Microchip that they had patents and that they thought Microchip was using their patents?

―807―

10:08   1       A.    No.  I really wish they would have.

10:08   2       Q.    And you would have been made aware of that as

10:08   3  the head of the website team if there was a patent

10:08   4  laws- --

10:08   5       A.    Absolutely.

10:08   6       Q.    -- or a patent assertion of some kind?

10:08   7       A.    Yes.  Absolutely.

10:08   8       Q.    Okay.  So does the menu path that we saw in

10:08   9  the video for the old website depend on the selections

10:08   10 the user made to get to that web page?

10:09   11      A.    I'm sorry.  Could you --

10:09   12      Q.    Yeah.  We've got the wrong --

10:09   13            MR. JENSEN:  We can take the timeline

10:09   14 down.

10:09   15      A.    Thank you.

10:09   16 BY MR. JENSEN:

10:09   17      Q.    It probably throws you off a little bit.

10:09   18      A.    A little bit.

10:09   19      Q.    Yeah.

10:09   20            Yeah.  Does the menu path, the breadcrumb, so

10:09   21 to speak, on the old website depend on the specific

10:09   22 selections the user makes from the top navigation?

10:09   23      A.    No.  It doesn't.

10:09   24      Q.    Was fixing this kind of broken approach to the

10:09   25 secondary navigation menu the only recommendation that

—808—

10:09   1   DRL made to Microchip?

10:09   2       A.    Not by a long shot.

10:09   3       Q.    Okay.  And we saw -- we didn't go through it,

10:09   4   and we're not going to go through all 200 pages of the

10:09   5   recommendations.

10:09   6       A.    Thank you.

10:09   7       Q.    But I do want to ask about one other

10:09   8   recommendation that they had in particular.

10:10   9             MR. JENSEN:  And before I forget, let me

10:10   10  move Defendant's Exhibit 463 into evidence.

10:10   11            MR. DEVLIN:  No objection, Your Honor.

10:10   12            THE COURT:  Be admitted.

10:10   13            MR. JENSEN:  Mr. Thompson, could you

10:10   14  please pull up Defendant's Exhibit 430?

10:10   15  BY MR. JENSEN:

10:10   16      Q.    And while he's doing that -- well, it came up

10:10   17  very quick.

10:10   18            All right.  What are we looking at here,

10:10   19  Ms. Mahar?

10:10   20      A.    We're looking at our Phase 2 kickoff agenda,

10:10   21  and it talks about the items that we wanted to discuss

10:10   22  on making changes to the website.

10:10   23      Q.    And what's the date of this document?

10:10   24      A.    November 4 to 6 of 2019.

10:10   25      Q.    And it references basically a kickoff meeting?

809

10:10   1        A.    Yes.

10:10   2        Q.    Okay.  And this was preCOVID.  So did this

10:10   3   meeting happen in person?

10:10   4        A.    It did.

10:10   5        Q.    Okay.  And are you listed on the front page in

10:10   6   the first bullet as an attendee at this meeting?

10:10   7        A.    Yes.

10:10   8        Q.    Okay.  And what was the purpose of this

10:10   9   meeting?

10:10   10        A.    To discuss how we wanted to approach Phase 2

10:11   11   of making changes to the website, the microchip.com.

10:11   12        Q.    And let's see.

10:11   13              MR. JENSEN:  How long is this particular

10:11   14   document, Mr. Thompson?

10:11   15        A.    I think it's about ten pages, if I recall.

10:11   16   BY MR. JENSEN:

10:11   17        Q.    Okay.

10:11   18              MR. JENSEN:  I think we can just stick on

10:11   19   the first page.  Could you blow up for us, please,

10:11   20   the -- maybe those last two bullets at the bottom?

10:11   21   BY MR. JENSEN:

10:11   22        Q.    And before I ask about that, who prepared this

10:11   23   agenda?

10:11   24        A.    Dynamic Range Labs.

10:11   25        Q.    Okay.  And they provided it to you in

810

10:11  1    connection with the meeting?

10:11  2        A.    That's right.

10:11  3        Q.    Okay.  And it had some of their

10:11  4    recommendations and topics for discussion?

10:11  5        A.    Yes.

10:11  6        Q.    Okay.  And what is the recommendation or topic

10:11  7    that's here on the screen right now, the last bullet?

10:11  8        A.    To update the breadcrumb to not include

10:11  9    drop-downs.

10:11  10       Q.    So on the old website, I don't think it showed

10:11  11   it in the video, but if you had hovered over those kind

10:11  12   of menu links, what would have happened?

10:11  13       A.    It would have shown a drop-down menu.

10:11  14       Q.    Okay.  A drop-down menu.  Very good.

10:12  15             And what was DRL's recommendation -- in

10:12  16   addition to fixing the -- sort of the mismatch, what

10:12  17   was their recommendation as to having that drop-down

10:12  18   menu as part of the breadcrumb?

10:12  19       A.    To get rid of it.

10:12  20       Q.    Okay.  Why?

10:12  21       A.    Because it was a little confusing.  There

10:12  22   really wasn't a lot of value in it.  You have the top

10:12  23   navigation.  You have the links right there on every

10:12  24   page.  Why have a secondary one?  They can just use

10:12  25   what's already there.

10:12  1      Q.    And with that in mind, let me just ask:  Why
10:12  2   did Microchip kind of implement that feature in the
10:12  3   first instance, right?
10:12  4            In the fall of 2018, so as part of the coat of
10:12  5   paint, you said there was a left nav.  You kind of
10:12  6   repurposed it, switched it.  What was the reasoning
10:12  7   behind that?
10:12  8      A.    It was kind of -- it was happening on some
10:12  9   sites in the industry, and so we thought we'd try it
10:12 10   out.  It didn't end up to be very useful for us at all.
10:12 11      Q.    Okay.  Did Microchip implement this
10:13 12   recommendation to remove the drop-down menus --
10:13 13      A.    Yes.  We did.
10:13 14      Q.    -- as part of the redesign?
10:13 15      A.    Yes.
10:13 16      Q.    Okay.  Was that like a major part of the
10:13 17   redesign project?
10:13 18      A.    No.
10:13 19      Q.    Okay.  That was done kind of together with the
10:13 20   wholesale --
10:13 21      A.    Yes.
10:13 22      Q.    Okay.  The project as a whole?
10:13 23      A.    Yes.
10:13 24      Q.    All right.  And we saw this --
10:13 25            MR. JENSEN:  Could you pull up the

10:13  1  timeline slide once again?

10:13  2  BY MR. JENSEN:

10:13  3      Q.   Okay.  So now we've got the -- kind of the

10:13  4  kickoff meeting that happened here, the recommendation

10:13  5  to remove the drop-down functionality.

10:13  6           And was that recommendation made and adopted

10:13  7  by Microchip before or after Caddo filed this lawsuit?

10:13  8      A.   Before.

10:13  9      Q.   Okay.  The implementation of that -- when did

10:13  10 that start to occur?  Sort of the rollout, all the work

10:14  11 was done, and it was actually starting to go live on

10:14  12 the Internet?

10:14  13     A.   Right.  So I mentioned that we did this

10:14  14 project in phases.  So we had Phases 2, 3, and 4.  So

10:14  15 the pages started to roll out in June of 2020.

10:14  16           MR. JENSEN:  All right.  Mr. Thompson,

10:14  17 let's pull up, please, Defendant's Exhibit 344.

10:14  18 BY MR. JENSEN:

10:14  19     Q.   And what is Exhibit 344, Ms. Mahar?

10:14  20     A.   The User Interface Style Guide.  It tells our

10:14  21 developers how to create the interface itself.  It

10:14  22 talks about what fonts to use, what colors to use, how

10:14  23 to make buttons, what to put on the page itself as far

10:14  24 as a functionality.

10:14  25     Q.   And who prepares this, the UI Style Guide?

813

10:14  1          A.     DRL.

10:14  2          Q.     Okay.  And why -- did they prepare that at

10:14  3   your request?

10:14  4          A.     Yeah.  So what we do is, we give this to all

10:15  5   of our developers so that they're making all of the

10:15  6   same -- the code all of the same way.  So when we put,

10:15  7   you know, code from 20 or 30 different developers

10:15  8   together, it all looks the same.

10:15  9          Q.     And these are internal developers at the

10:15  10  company or third parties or both?

10:15  11         A.     Both DRL and Microchip developers.

10:15  12         Q.     Okay.

10:15  13                MR. JENSEN:  And before I forget, let me

10:15  14  move into evidence Defendant's Exhibit 430.

10:15  15                MR. DEVLIN:  No objection.

10:15  16                THE COURT:  It'll be admitted.

10:15  17                MR. JENSEN:  And likewise, let me move

10:15  18  into evidence Defendant's Exhibit 344 that we're

10:15  19  looking at now.

10:15  20                MR. DEVLIN:  No objection.

10:15  21                THE COURT:  It'll be admitted.

10:15  22                MR. JENSEN:  Mr. Thompson, please turn to

10:15  23  Page 7 of the style guide.  And I'd like to ask you to

10:15  24  zoom in.  I think it's on the lower left corner there.

10:15  25                Yeah.  Under the heading Breadcrumb.

10:15    1    Okay.

10:15    2    BY MR. JENSEN:

10:15    3        Q.    What are we looking at here, Ms. Mahar, in the

10:15    4    style guide?

10:15    5        A.    It tells the developers how to create the

10:15    6    breadcrumb.  In this case it says that no breadcrumb

10:16    7    hover or drilldown like on the current site.

10:16    8             And --

10:16    9        Q.    I'm sorry.  Go ahead.

10:16   10        A.    Sorry.  And the last breadcrumb item looks

10:16   11    like the same, even though it is not clickable.

10:16   12        Q.    I want to focus on the Item A there that says:

10:16   13    No breadcrumb hover drilldown like on current site.

10:16   14        A.    Uh-huh.

10:16   15        Q.    What was the current site at that time?

10:16   16        A.    That was the old website.

10:16   17        Q.    Okay.  That was the old website.  And what was

10:16   18    DRL saying here when they refer to this hover drilldown

10:16   19    capability?

10:16   20        A.    It's kind of like what you're talking about

10:16   21    with the breadcrumb in this case, the alleged hover

10:16   22    over a breadcrumb, and you get a drop-down menu.

10:16   23        Q.    Okay.  So the hover drilldown, that's just

10:16   24    another way to say a drop-down menu?

10:16   25        A.    Yes.

815

10:16  1        Q.    Okay.  And was this recommendation and these

10:16  2   instructions to the, you know, the hover drilldown, the

10:17  3   drop-down, was going to be gone, was this distributed

10:17  4   to the Microchip website developers?

10:17  5        A.    Yes.  To all of the developers on the project.

10:17  6        Q.    Okay.  So was Microchip instructing its

10:17  7   developers to remove the hover drilldown, or the

10:17  8   drop-down menu, prior to Caddo filing this lawsuit?

10:17  9        A.    Yes.

10:17 10        Q.    Okay.

10:17 11               THE COURT:  Counsel, about how much more

10:17 12   time do you have with her?

10:17 13               MR. JENSEN:  I'm probably halfway, maybe

10:17 14   two thirds.  If we -- to take a break?

10:17 15               THE COURT:  That's why I was asking.

10:17 16               MR. JENSEN:  You'll never get an

10:17 17   objection from me to that suggestion.

10:17 18               THE COURT:  Ladies and gentlemen of the

10:17 19   jury, we'll stand in recess for about ten minutes.

10:17 20   Please remember my instructions not to discuss the case

10:17 21   amongst yourselves.

10:17 22               (Jury exited the courtroom.)

10:17 23               THE COURT:  You may be seated.

10:18 24               Is there anything we need to take up?

10:18 25               MR. JENSEN:  Nothing from us, Your Honor.

816

| | | |
|---|---|---|
| 10:18 | 1 | THE COURT:  Okay.  Very good. |
| 10:18 | 2 | (Recess taken.) |
| 10:33 | 3 | THE BAILIFF:  All rise. |
| 10:33 | 4 | THE COURT:  Please remain standing for |
| 10:34 | 5 | the jury. |
| 10:34 | 6 | (Jury entered the courtroom.) |
| 10:34 | 7 | THE COURT:  Thank you.  You may be |
| 10:34 | 8 | seated. |
| 10:34 | 9 | BY MR. JENSEN: |
| 10:34 | 10 | Q.    Welcome back, Ms. Mahar. |
| 10:34 | 11 | A.    Thank you. |
| 10:34 | 12 | Q.    Before the break we were talking a little bit |
| 10:34 | 13 | about the redesigned website. |
| 10:34 | 14 | A.    Yes. |
| 10:34 | 15 | Q.    Okay.  And we looked at some documents that |
| 10:34 | 16 | indicated that as part of the redesign, Microchip was |
| 10:34 | 17 | removing this drop-down menu from the secondary |
| 10:34 | 18 | navigation bar -- |
| 10:34 | 19 | A.    Yes. |
| 10:34 | 20 | Q.    -- is that correct? |
| 10:34 | 21 | Did Microchip, in fact, remove that drop-down |
| 10:35 | 22 | menu? |
| 10:35 | 23 | A.    Yes.  We did. |
| 10:35 | 24 | Q.    Okay. |
| 10:35 | 25 | MR. JENSEN:  Mr. Thompson, could you |

—817—

10:35   1   bring up an Internet browser?  And let's just go to the

10:35   2   microchip.com website.

10:35   3   BY MR. JENSEN:

10:35   4       Q.   And is the current microchip.com website the

10:35   5   redesigned website?

10:35   6       A.   Yes.

10:35   7       Q.   Okay.  So across the top of the website --

10:35   8           MR. JENSEN:  And is this showing up for

10:35   9   the jury?  I don't see it on the monitor.

10:35  10           All right.  There we go.  Very good.

10:35  11   BY MR. JENSEN:

10:35  12       Q.   So what is it that we see across the top of

10:35  13   the website, kind of beneath the URL?  Kind of next to

10:35  14   the Microchip logo?

10:35  15       A.   Yeah.  It's the top navigation.

10:35  16       Q.   And that's the main menu?

10:36  17       A.   Yes.

10:36  18       Q.   Okay.

10:36  19           MR. JENSEN:  And, Mr. Thompson, let's

10:36  20   just go ahead and navigate a path on that menu.  We

10:36  21   could go to Products, Amplifiers and Linear, and

10:36  22   Comparator ICs, for example.

10:36  23   BY MR. JENSEN:

10:36  24       Q.   And that brings up a new web page when the

10:36  25   selection is made?

818

10:36  1       A.     Yes.

10:36  2       Q.     And can you read the path kind of that's

10:36  3  underneath the Microchip logo?

10:36  4       A.     Products, Amplifiers and Linear ICs, and

10:36  5  Comparator ICs.

10:36  6       Q.     Okay.  And in this instance, on the redesigned

10:36  7  website, does that match the path that was navigated?

10:36  8       A.     Yes.

10:36  9       Q.     Okay.

10:36  10           MR. JENSEN:  And let's -- Mr. Thompson,

10:36  11  if I could just ask you to hover the mouse over, let's

10:36  12  say, the Products item there.

10:36  13  BY MR. JENSEN:

10:36  14       Q.     What happens?

10:36  15       A.     There's no drop-down menu.

10:36  16           MR. JENSEN:  Likewise, let's go over the

10:36  17  Amplifiers and Linear ICs.

10:36  18       A.     No drop-down menu.

10:36  19  BY MR. JENSEN:

10:36  20       Q.     Okay.

10:36  21           MR. JENSEN:  Let's try another path,

10:36  22  maybe just one more example.  Go to Products, Analog.

10:37  23  Well, that one doesn't seem to have any other -- let's

10:37  24  do one that's got a few more links.  Go to Products,

10:37  25  Clock and Timing, and Atomic Clocks.

819

10:37   1    BY MR. JENSEN:

10:37   2        Q.    And the resulting path is Products, Clock and

10:37   3    Timing, Atomic Clocks; is that correct?

10:37   4        A.    Correct.

10:37   5        Q.    And that matches the selections that were

10:37   6    made?

10:37   7        A.    Yes.

10:37   8        Q.    Okay.  Is there a drop-down menu when he

10:37   9    hovers over those links?

10:37   10       A.    No.

10:37   11       Q.    Is there any type of menu functionality

10:37   12   whatsoever?

10:37   13       A.    No.

10:37   14       Q.    Okay.

10:37   15             MR. JENSEN:  Why don't you leave that

10:37   16   page up?  I want to look at kind of one or two other

10:37   17   things on this.  Let's -- why don't we just go back to

10:37   18   the home page?  So click on the Microchip logo there.

10:37   19   BY MR. JENSEN:

10:37   20       Q.    And let me ask you this:  So without the

10:37   21   drop-down menu on that breadcrumb, how can users find,

10:38   22   you know, information on the microchip.com website?

10:38   23       A.    Well, there's a couple mechanisms, but, you

10:38   24   know, there's the top navigation, the top menu.

10:38   25             But what we've learned over the pandemic is

10:38  1    that search is really important.  So you'll see that

10:38  2    little spyglass just to the right of -- yep.  That

10:38  3    opens up a search bar.

10:38  4           And like you guys, I'm sure, you go to Google

10:38  5    and you do a search on that search engine.  Or you go

10:38  6    to -- I go to Amazon and I search and I buy something,

10:38  7    right?  So...

10:38  8        Q.    Okay.

10:38  9             MR. JENSEN:  And let's see if we can just

10:38  10   exit out of the search window, please.

10:38  11   BY MR. JENSEN:

10:38  12      Q.    And I see just kind of in the maybe middle of

10:38  13   the page, some logos, Get Design Help, Events,

10:38  14   et cetera?

10:38  15      A.    Yes.

10:38  16      Q.    Are each of those links as well?

10:38  17      A.    Yes.

10:38  18      Q.    And those could be used to navigate or find

10:38  19   information on --

10:38  20      A.    Yes.

10:38  21      Q.    -- on the web page?

10:38  22             So when a user visits the microchip.com page,

10:38  23   just like we have here, before they've clicked on

10:38  24   anything else, is there a breadcrumb on this page?

10:39  25      A.    No.  They haven't gone anywhere yet.

—821—

10:39   1        Q.    Okay.  So that only exists if they navigate

10:39   2   the top menu?

10:39   3        A.    Yeah.  If they navigate through the site.

10:39   4        Q.    Okay.  And I see there's -- kind of looks like

10:39   5   a shopping cart there, kind of in the -- maybe the

10:39   6   middle, toward the right, where it says "Purchase

10:39   7   Products"?

10:39   8        A.    That's right.

10:39   9        Q.    So at this point there isn't even a breadcrumb

10:39  10   on the website, correct?

10:39  11        A.    Correct.

10:39  12        Q.    Okay.  And somebody could click on the

10:39  13   shopping cart.  And if they did, what would happen?

10:39  14        A.    They would go to microchipdirect.com.

10:39  15              MR. JENSEN:  Why don't we see if that's

10:39  16   the case, Mr. Thompson?  Just go ahead and click on

10:39  17   that link.

10:39  18   BY MR. JENSEN:

10:39  19        Q.    And it looks like it opened up a -- like a new

10:39  20   tab in the browser?

10:39  21        A.    Yes.

10:39  22        Q.    Okay.  So if somebody followed that path to

10:39  23   arrive at Microchip Direct, they would not have even

10:39  24   navigated the top navigation menu, and there would have

10:39  25   been no breadcrumb on the site at all?

822

| | | |
|---|---|---|
| 10:39 | 1 | A.    That's correct. |
| 10:39 | 2 | Q.    Okay. |
| 10:39 | 3 | MR. JENSEN:  Let's close out of this tab, |
| 10:39 | 4 | please, Mr. Thompson.  We'll go back to the main |
| 10:40 | 5 | Microchip site. |
| 10:40 | 6 | Or you can leave it up on the screen. |
| 10:40 | 7 | Just close the tab. |
| 10:40 | 8 | All right.  And I'm sorry.  I want to go |
| 10:40 | 9 | to the regular microchip.com site.  My apologies. |
| 10:40 | 10 | Okay.  And I see across that -- kind of |
| 10:40 | 11 | that top banner, there's on the far right side, looks |
| 10:40 | 12 | like -- I don't know if it's a link or not.  Why don't |
| 10:40 | 13 | you hover over it where it says "Order Now." |
| 10:40 | 14 | A.    Yes. |
| 10:40 | 15 | BY MR. JENSEN: |
| 10:40 | 16 | Q.    Okay.  And, again, at this point there's not |
| 10:40 | 17 | even a breadcrumb, let alone a breadcrumb with a |
| 10:40 | 18 | drop-down on the website? |
| 10:40 | 19 | A.    Correct. |
| 10:40 | 20 | Q.    Okay.  So somebody could click the Order Now |
| 10:40 | 21 | button, and what would happen? |
| 10:40 | 22 | A.    They would go to Microchip Direct. |
| 10:40 | 23 | Q.    Okay. |
| 10:40 | 24 | MR. JENSEN:  Let's just confirm that's |
| 10:40 | 25 | the case. |

823

| | |
|---|---|
| 10:40 | 1 |
| 10:41 | 2 |
| 10:41 | 3 |
| 10:41 | 4 |
| 10:41 | 5 |

10:40   1            Very good.  So you can go ahead and close

10:41   2   that -- the current tab, Mr. Thompson.

10:41   3            I got it wrong again.  Let's go back to

10:41   4   the regular Microchip site.

10:41   5   BY MR. JENSEN:

10:41   6      Q.    We'll just look at one more thing.  And in the

10:41   7   far top right corner of the page, what is the icon that

10:41   8   you see?

10:41   9      A.    Next to the search, the little spyglass, is a

10:41  10   person, and that's how you can log into your account

10:41  11   and then where you get information about our products.

10:41  12   And then you can go to the shopping cart, is the third

10:41  13   icon.

10:41  14      Q.    Okay.  And what would happen if you click on

10:41  15   the shopping cart?

10:41  16      A.    You'd go to Microchip Direct.

10:41  17      Q.    Okay.  I don't know that we need to do that

10:41  18   one.  I think we've seen that enough.

10:41  19            What if somebody clicked on --

10:41  20            MR. JENSEN:  Let's just scroll down in

10:41  21   the page a little bit, Mr. Thompson.  Maybe up just a

10:41  22   little bit, the first -- yeah.  AI is transforming

10:42  23   SSDs.  Let's go ahead and just click on that, see what

10:42  24   happens.

10:42  25   BY MR. JENSEN:

—824—

10:42  1     Q.    And in this instance, what appeared in that
10:42  2  secondary navigation path?
10:42  3     A.    It's taking you to a blog about -- with
10:42  4  information about how artificial intelligence is
10:42  5  transforming these products.
10:42  6     Q.    And is there something in that sort of
10:42  7  breadcrumb field where it says, I think, "About"?
10:42  8     A.    Yes.  It says "About" and then the name of the
10:42  9  article.
10:42 10     Q.    Did Mr. Thompson navigate a menu structure to
10:42 11  make that appear?
10:42 12     A.    No.
10:42 13     Q.    Okay.  He just clicked on a regular link on
10:42 14  the web page?
10:42 15     A.    Yes.
10:42 16     Q.    Okay.  Very good.
10:42 17           MR. JENSEN:  You can take that down,
10:42 18  Mr. Thompson.  Thank you very much.
10:42 19           Mr. Thompson, could you bring up Joint
10:43 20  Exhibit 104, please?
10:43 21           And let's go to Slide 6.
10:43 22           And let -- maybe let's zoom in a little
10:43 23  bit on that.
10:43 24  BY MR. JENSEN:
10:43 25     Q.    Have you seen this slide before, Ms. Mahar?

10:43   1       A.    Yes.  I have.  It's part of a presentation

10:43   2   that Grace made that talks about the changes that we

10:43   3   need to make on the website.

10:43   4       Q.    Okay.

10:43   5             MR. JENSEN:  And I'd like to zoom in -- I

10:43   6   mean, it's really, really tiny down there.  I think

10:43   7   it's the footnote in the bottom left of the slide, I

10:43   8   mean, in something like 2-point font.

10:43   9   BY MR. JENSEN:

10:43   10      Q.    Okay.  And what does this -- what does this

10:43   11  footnote say, Ms. Mahar?

10:43   12      A.    It says that microchip.com drives $215,000 of

10:44   13  revenue a day through the e-commerce portal.

10:44   14      Q.    Okay.  We can just pause there, I think.

10:44   15            And what is the e-commerce portal?

10:44   16      A.    Microchip Direct.

10:44   17      Q.    Okay.  So is this referring to instances where

10:44   18  somebody could be on the microchip.com website and then

10:44   19  be redirected, for example, as we just saw, to the

10:44   20  Microchip Direct site and make a purchase?

10:44   21      A.    Yes.

10:44   22      Q.    Okay.  Very good.

10:44   23            And I think we just looked at, you know,

10:44   24  several examples of how you could click on a link,

10:44   25  whether it's a shopping cart, the Order Now button,

—826—

10:44  1   various other things, and be redirected from the

10:44  2   microchip.com site to the microchipdirect.com site

10:44  3   without using a breadcrumb at all?

10:44  4        A.    That's right.

10:44  5        Q.    Okay.  Without using a drop-down breadcrumb?

10:44  6        A.    Yes.  That's right.

10:44  7        Q.    Do you have an understanding as to whether

10:44  8   this $215,000-a-day revenue number that's shown here

10:44  9   relates to the use of the accused breadcrumb in this

10:45  10  case?

10:45  11       A.    No.  There's no indication on this slide.

10:45  12       Q.    Okay.  Based on what you know about the usage

10:45  13  of the microchip.com website, is it your understanding

10:45  14  that all $215,000 a day of revenue would be driven from

10:45  15  somebody using a drop-down breadcrumb on the

10:45  16  microchip.com website?

10:45  17       A.    No.  It's highly suspect in my mind.  I think

10:45  18  that's not generally the case.

10:45  19       Q.    And, in fact, the redesigned website doesn't

10:45  20  even have a breadcrumb with a drop-down at all, does

10:45  21  it?

10:45  22       A.    No.  It doesn't.

10:45  23       Q.    And what has happened -- so this presentation,

10:45  24  what was the -- kind of the point in time for this one?

10:45  25       A.    Fall of 2018.

—827—

| | | |
|---|---|---|
| 10:45 | 1 | Q.    Okay.  Fall of 2018. |
| 10:45 | 2 | And you testified, I think, earlier before the |
| 10:45 | 3 | break that Microchip acquired a number of companies -- |
| 10:45 | 4 | A.    Yes. |
| 10:45 | 5 | Q.    -- in that 2014 to 2018 time frame? |
| 10:45 | 6 | A.    Yes. |
| 10:45 | 7 | Q.    Prior to all of those acquisitions, would this |
| 10:46 | 8 | $215,000-a-day number be higher or lower? |
| 10:46 | 9 | A.    I'm sorry.  Could you rephrase that question? |
| 10:46 | 10 | Q.    So yeah.  Sure.  And I'll slow down for the |
| 10:46 | 11 | court reporter.  She is giving me the signal. |
| 10:46 | 12 | So you mentioned earlier that Microchip |
| 10:46 | 13 | acquired a number of companies, some of them relatively |
| 10:46 | 14 | large, between 2014 and 2018? |
| 10:46 | 15 | A.    Yes. |
| 10:46 | 16 | Q.    Okay.  So if there were $215,000 a day of |
| 10:46 | 17 | sales in, you know, as shown on this slide in 2018 -- |
| 10:46 | 18 | A.    Uh-huh. |
| 10:46 | 19 | Q.    -- prior to those acquisitions, when the |
| 10:46 | 20 | company was smaller, would this number, 215,000 a day, |
| 10:46 | 21 | have been larger or smaller? |
| 10:46 | 22 | A.    Oh, this is definitely larger.  When you |
| 10:46 | 23 | acquire companies, you get bigger and bigger.  So it |
| 10:46 | 24 | would have been -- this is probably pretty high days, |
| 10:46 | 25 | where we made a lot of sales. |

```
10:46   1        Q.    And what has happened since the -- well, I
10:47   2    want to -- we'll get into this a little bit.  When did
10:47   3    the redesign start to be implemented?
10:47   4        A.    We started putting web pages on the site, on
10:47   5    the microchip.com website, in June, late June of 2020.
10:47   6        Q.    And I think you said that was -- you said you
10:47   7    started in June of 2020?
10:47   8        A.    Yes.  That's right.
10:47   9        Q.    And it was a phased approach?
10:47  10        A.    Yes.
10:47  11        Q.    It wasn't the flip-the-switch?
10:47  12        A.    No.
10:47  13        Q.    Okay.
10:47  14        A.    No.  There's too many risks with a
10:47  15    flip-the-switch, too many things could go wrong, too
10:47  16    much data could not get to the right spot.  It's just
10:47  17    too big of a risk to go with a flip-the-switch on such
10:47  18    a large website.
10:47  19        Q.    And do you know what has happened -- since
10:47  20    that time, since the -- kind of the release of the
10:47  21    redesigned website, right, without the drop-down
10:47  22    breadcrumb, what has happened to Microchip's kind of
10:48  23    online sales that come from microchip.com to Microchip
10:48  24    Direct?
10:48  25        A.    It's gone way up.
```

10:48    1          Q.    Okay.  So removing the feature that was

10:48    2    accused in this case resulted in an increase in online

10:48    3    sales from microchip.com to Microchip Direct?

10:48    4          A.    Yeah.

10:48    5          Q.    Okay.

10:48    6                MR. JENSEN:  Mr. Thompson, could you

10:48    7    bring up Joint Exhibit 115?

10:48    8    BY MR. JENSEN:

10:48    9          Q.    Do you recognize this exhibit, Ms. Mahar?

10:48   10          A.    Yes.  I do.  I wrote it.

10:48   11          Q.    And what is it?

10:48   12          A.    This is a presentation that I would have given

10:48   13    to my boss and my boss' boss talking about the items

10:48   14    that we completed as part of the first part of Phase 4.

10:48   15                So we had Phases 2, 3, and 4, and then within

10:48   16    that we had several parts.  So this is the end of the

10:48   17    first part of Phase 4.

10:48   18          Q.    And what was the purpose of preparing this

10:49   19    presentation?

10:49   20          A.    It is to describe the things that we achieved

10:49   21    during that time and to request funds to pay DRL for

10:49   22    their services.

10:49   23          Q.    Okay.

10:49   24                MR. JENSEN:  Could we go to the next

10:49   25    slide in the deck, please, Mr. Thompson?

830

| | | |
|---|---|---|
| 10:49 | 1 | BY MR. JENSEN: |
| 10:49 | 2 | Q.   And this slide is titled "Burndown Chart"; is |
| 10:49 | 3 | that correct? |
| 10:49 | 4 | A.   Yes. |
| 10:49 | 5 | Q.   Well, I'm unfamiliar with that phrase.  What |
| 10:49 | 6 | is a burndown chart? |
| 10:49 | 7 | A.   So when you work with engineers, they use the |
| 10:49 | 8 | term "burndown chart."  But basically what it means is |
| 10:49 | 9 | you have this amount of work and then you slowly |
| 10:49 | 10 | complete it over time.  So you're burning down the work |
| 10:49 | 11 | until you get to -- you know, get it done. |
| 10:49 | 12 | Q.   And it looks like there's a graph on this |
| 10:49 | 13 | slide; is that right? |
| 10:49 | 14 | A.   Yes.  So the green line represents what we had |
| 10:49 | 15 | planned to do.  And -- |
| 10:49 | 16 | Q.   Let me pause you there for just a minute. |
| 10:49 | 17 | What are the axes?  There's an X-axis and a Y-axis. |
| 10:49 | 18 | What are the axes here? |
| 10:49 | 19 | A.   Sure.  It's the percentage complete of the |
| 10:50 | 20 | tasks that we were going to do.  And it's across time |
| 10:50 | 21 | on the bottom. |
| 10:50 | 22 | Q.   Okay.  And the -- I'll call it the Y-axis, if |
| 10:50 | 23 | I can remember back to my math days, is zero to |
| 10:50 | 24 | 100 percent? |
| 10:50 | 25 | A.   Correct. |

10:50   1          Q.    Okay.  And then we'd have the time period on

10:50   2     the bottom.  What's the time period that's shown in

10:50   3     this particular slide?

10:50   4          A.    October 2020 to the end of April 2021.

10:50   5          Q.    So I think you mentioned that starting in kind

10:50   6     of June or the summertime of 2020, which was -- is not

10:50   7     shown on this graph, would be to the left.  That's when

10:50   8     the initial rollout of the redesigned website took

10:50   9     place?

10:50   10         A.    That's right.

10:50   11         Q.    And that's why the first data point on the

10:50   12    left of this graph is not starting at a -- sort of

10:50   13    100 percent.  There had already been some work done.

10:50   14    It looks like it's at, I don't know, 90 percent,

10:50   15    something like that?

10:50   16         A.    Yes.  That's right.

10:50   17         Q.    Okay.  And by 90 percent, that means there's

10:50   18    90 percent left to do or 90 percent has already been

10:50   19    completed?

10:50   20         A.    Left to do.  There's 90 percent of the work

10:51   21    still left to do.

10:51   22         Q.    Okay.  And at what point in time was this

10:51   23    burndown chart prepared?

10:51   24         A.    Right about -- right before October, I

10:51   25    believe.  No.  I'm sorry.  So it has a line, a vertical

832

| | | |
|---|---|---|
| 10:51 | 1 | line there, that says "today."  So this chart was |
| 10:51 | 2 | prepared around the beginning of February. |
| 10:51 | 3 | Q.    Okay.  So everything to the left of that chart |
| 10:51 | 4 | was actual data.  Redesigned pages that had actually |
| 10:51 | 5 | been implemented? |
| 10:51 | 6 | A.    That's right. |
| 10:51 | 7 | Q.    Okay.  And everything to the right of the |
| 10:51 | 8 | chart would be -- would be a forecast or a projection? |
| 10:51 | 9 | A.    That's right. |
| 10:51 | 10 | Q.    A target? |
| 10:51 | 11 | A.    Yes. |
| 10:51 | 12 | Q.    Okay.  Very good.  Did Microchip complete -- |
| 10:51 | 13 | did it meet the goal that was on here?  I think the |
| 10:51 | 14 | target, the green line? |
| 10:51 | 15 | A.    Yeah.  So the target was to be 90 percent |
| 10:51 | 16 | complete by April 1st.  And we met that. |
| 10:51 | 17 | Q.    Okay.  And you say 90 percent complete. |
| 10:51 | 18 | You're not saying it was 100 percent complete? |
| 10:52 | 19 | A.    No. |
| 10:52 | 20 | Q.    Okay. |
| 10:52 | 21 | A.    No.  That wasn't -- |
| 10:52 | 22 | Q.    And why is that? |
| 10:52 | 23 | A.    You know, with such a large website, there's |
| 10:52 | 24 | just a lot of work to do.  And you get through as much |
| 10:52 | 25 | as you can.  And then you put a line in the sand and |

10:52   1   you say you're there.  And then you have to go through

10:52   2   all of the cleanup and all of the peripheral

10:52   3   applications and kind of do the rest of the work.

10:52   4       Q.    Is it fair to say that's maybe kind of a

10:52   5   substantial completion --

10:52   6       A.    Yes.

10:52   7       Q.    -- date?  Not a 100 percent?

10:52   8       A.    Yes.

10:52   9       Q.    Okay.

10:52   10      A.    That's what I mean.

10:52   11      Q.    And even after this, I guess, maybe, you know,

10:52   12  May time frame here of 2021, did there continue to be

10:52   13  any kind of old website pages that were -- lingered

10:52   14  around?

10:52   15      A.    Yeah.  Absolutely.  There was like -- gosh, I

10:52   16  don't know, maybe a percent left of work to just kind

10:52   17  of go through and do.  And like I said, there's other

10:52   18  applications that are around the website, so

10:52   19  microchip.com, as that project was substantially

10:52   20  completed by that time.

10:52   21      Q.    And what would Microchip do as it came across

10:52   22  any of these kind of leftover old web pages?

10:53   23      A.    Oh, we decide if we needed to keep them or

10:53   24  not.  And then we would either redesign them, or we

10:53   25  would take them off of the Internet.

10:53  1       Q.    Okay.  And I think you were here during

10:53  2  Mr. Sherwood's testimony when we looked at some PDF

10:53  3  files that were available on the Microchip website?

10:53  4       A.    That's right.

10:53  5       Q.    Okay.  And just what is a PDF file?

10:53  6       A.    Yeah.  It's a document.  It's an electronic

10:53  7  document.

10:53  8       Q.    Okay.  And that could be like a datasheet or

10:53  9  something for a product?

10:53  10      A.    Yeah.  So for our products -- you guys aren't

10:53  11  familiar with the word "datasheet," so let me explain.

10:53  12      Q.    I'm sorry.

10:53  13      A.    That's okay.  So our silicon products have

10:53  14  to -- you have to tell the engineer how to use the

10:53  15  product, what's in it.  And so we have datasheets.  And

10:53  16  they're anywhere from 50 pages to hundreds of pages.

10:53  17  So those are substantial documents to us.

10:53  18      Q.    And that's like a document somebody could just

10:53  19  download onto their local computer and have a copy?

10:53  20      A.    That's right.

10:53  21      Q.    Okay.  And as part of the redesign project,

10:54  22  did Microchip redesign any of the, you know, PDF file

10:54  23  links?

10:54  24      A.    No.  No.

10:54  25      Q.    Why not?

10:54  1      A.     That's not what you do with the file.  It's

10:54  2  like having a book.  You know, you just -- you're

10:54  3  giving somebody a book.

10:54  4      Q.     Do the links to the PDF files have anything to

10:54  5  do with the, you know, the drop-down menu or the

10:54  6  breadcrumb?

10:54  7      A.     No.

10:54  8      Q.     Okay.  All right.

10:54  9             MR. JENSEN:  Mr. Thompson, you can take

10:54  10  this slide down.  And I'd like to go back to the

10:54  11  timeline again to just kind of, you know, reorient us

10:54  12  here.

10:54  13      A.     Sure.

10:54  14  BY MR. JENSEN:

10:54  15      Q.     So prior to the complaint being filed on

10:54  16  March 27, 2020, Microchip had made the decision to

10:54  17  remove the -- well, number one, to fix the broken

10:54  18  breadcrumb; and two, to remove the drop-down menu

10:54  19  feature --

10:54  20      A.     Yes.

10:54  21      Q.     -- is that correct?

10:54  22      A.     Uh-huh.

10:55  23      Q.     And then we saw, I think, on the burndown

10:55  24  slide, that the actual rollout or implementation of the

10:55  25  redesign took place a little while after the complaint

—836—

10:55   1    was filed?

10:55   2        A.    Uh-huh.

10:55   3        Q.    Okay.  Did the timing and rollout of that

10:55   4    implementation of the redesigned website result in any

10:55   5    way from the fact that a lawsuit was filed?

10:55   6        A.    No.

10:55   7        Q.    That had been in the works for some time

10:55   8    before?

10:55   9        A.    Yes.  Absolutely.

10:55   10       Q.    Okay.

10:55   11             MR. JENSEN:  You can take that down,

10:55   12   Mr. Thompson.

10:55   13   BY MR. JENSEN:

10:55   14       Q.    I want to switch gears just a little bit,

10:55   15   Ms. Mahar, and ask you a few questions about the Forum

10:56   16   website.

10:56   17       A.    Okay.

10:56   18       Q.    All right.  You have some familiarity with the

10:56   19   Forum website?

10:56   20       A.    Yes.

10:56   21       Q.    Okay.  All right.  Did Microchip write the

10:56   22   software that implements the Forum website?

10:56   23       A.    No.  We did not.

10:56   24       Q.    Who did?

10:56   25       A.    A company called ASP Playground.

10:56   1      Q.    And did Microchip, you know, license or

10:56   2  purchase the Forum software from ASP Playground?

10:56   3      A.    Yes.  We did.

10:56   4      Q.    How much did they charge?  How much did you

10:56   5  have to pay to get that software?

10:56   6      A.    $400 a year.

10:56   7      Q.    And that's regardless of how many users there

10:56   8  are on the Forum website?

10:56   9      A.    That's correct.

10:56   10     Q.    It's just a flat fee?

10:56   11     A.    Flat fee.

10:56   12     Q.    Okay.  And was it a one-time fee, or do you

10:56   13  have to pay it every year?

10:56   14     A.    I think we paid it every year.  We might have

10:56   15  gotten an every-other-year deal.  But it was pretty

10:56   16  much every year.

10:56   17     Q.    Okay.  What is the URL for the Forum website?

10:57   18     A.    Microchip.com/forums.

10:57   19            MR. JENSEN:  Could we go ahead and pull

10:57   20  that up, Mr. Thompson?  We'll go to the Forum website.

10:57   21  BY MR. JENSEN:

10:57   22     Q.    Is the fact that the Forum website has the

10:57   23  microchip.com URL -- or has microchip.com in the URL

10:57   24  mean that the Forum website is the same as the

10:57   25  microchip.com website?

838

10:57  1       A.    No.  It's completely different software.

10:57  2       Q.    Okay.  And you said you don't have

10:57  3  responsibility for -- or primary responsibility, I

10:57  4  should say, for this -- for the Forum site?

10:57  5       A.    Yes.  That's correct.

10:57  6       Q.    There's another person or team within the

10:57  7  company that is responsible for this?

10:57  8       A.    That's correct.

10:57  9       Q.    Okay.  Why didn't -- so we talked about kind

10:57  10  of this big redesign project.  And that was, you

10:57  11  know -- you were brought on to lead that effort.

10:57  12       A.    Uh-huh.

10:57  13       Q.    Why didn't you, you know, redesign the Forum

10:57  14  site as well?

10:57  15       A.    Right.  The -- you know, we have limited

10:57  16  resources, so we have to prioritize our work.  So we

10:58  17  decided to go with the website that was crumbling and

10:58  18  falling down and fix that first.  And then we look at

10:58  19  the peripheral products.

10:58  20              MR. JENSEN:  And let's just go ahead and

10:58  21  click on, you know, one of the -- let's go down.  Just

10:58  22  click on one of the links there.  It's a post, as it

10:58  23  were, on the Forum.

10:58  24  BY MR. JENSEN:

10:58  25       Q.    And I want to direct your attention,

10:58  1    Ms. Mahar, to the URL at the top there.  It says

10:58  2    microchip.com/forums, and it has a number followed with

10:58  3    a -- kind of an extension.  Can you see that?  Sort

10:58  4    of --

10:58  5        A.    Yes.

10:58  6        Q.    I don't know if I should call it a file

10:58  7    extension but it's a -- what is that extension?

10:58  8        A.    Do you want me to read it or just tell you

10:58  9    about it?

10:58  10       Q.    Just -- well --

10:58  11       A.    Yeah.  So at the very end it's .aspx, and

10:58  12   that's a file format that's used with the .net platform

10:58  13   for writing code for displaying pages.

10:58  14       Q.    And how is it that you're familiar with the

10:58  15   .net platform?

10:59  16       A.    Our website is on .net platforms that are on

10:59  17   Windows servers, Windows operating systems, and IIS.

10:59  18   It's Internet Information Services.

10:59  19       Q.    And who provides the -- kind of the .net

10:59  20   platform?  Is that something ASP Playground provides,

10:59  21   for example?  Because you get the software from them or

10:59  22   from somebody else?

10:59  23       A.    No.  It's Microsoft.

10:59  24       Q.    Microsoft.  Okay.  Right.  The one -- the

10:59  25   company that makes like the Windows OS?  Okay.

840

10:59  1      A.     Yeah.

10:59  2      Q.     Are you aware of any other companies that sell

10:59  3   software that can be used to host a discussion board or

10:59  4   a Forum site?

10:59  5      A.     Yes.

10:59  6      Q.     How are you aware of those?

10:59  7      A.     We've recently learned that ASP Playground as

10:59  8   a company is going out of business.  We cannot get

10:59  9   ahold of them.  Their website is down.  And so we're

10:59  10  looking for a replacement package.

10:59  11     Q.     Have you considered any replacements?

10:59  12     A.     Yes.  We've considered several of them.  One

11:00  13  of them happens to be Salesforce, another package that

11:00  14  we use.

11:00  15     Q.     And how is it that -- why is it that you were

11:00  16  looking at Salesforce in particular?

11:00  17     A.     Well, we already have it, and it's easier to

11:00  18  maintain one system rather than two separate systems.

11:00  19            So Salesforce has a -- comes along with what

11:00  20  they call a "Community."  And so Forums is the same

11:00  21  thing as Community.  They just started calling it a

11:00  22  different thing lately.  So they have an option that we

11:00  23  could use for going to Forums with that.

11:00  24     Q.     And how is it that Microchip already has some

11:00  25  access to the Salesforce Community software?

11:00  1      A.    Yeah.  We pay a license for using the

11:00  2   Salesforce platform.

11:00  3      Q.    Did -- I think you mentioned some companies

11:00  4   that you had acquired earlier?

11:00  5      A.    Uh-huh.

11:00  6      Q.    Did any of those companies use the Salesforce

11:00  7   Community platform?

11:00  8      A.    Yes.  Yes.  They did.

11:00  9      Q.    Okay.  Is that why it's sort of on your radar?

11:00  10     A.    Yeah.

11:01  11     Q.    Okay.  How much would it cost Microchip to

11:01  12  migrate from the existing ASP Forum platform and

11:01  13  implement that on the Salesforce platform?

11:01  14     A.    Well, the cost for using the Salesforce

11:01  15  Community is pretty much zero.  We already pay for the

11:01  16  licenses, so it's just a function that we can, you

11:01  17  know, use.

11:01  18     Q.    Do you know -- have you used the Salesforce

11:01  19  Community platform before?

11:01  20     A.    I personally have not.  It's managed by

11:01  21  another group.

11:01  22     Q.    Have you seen it in use?

11:01  23     A.    Uh-huh.  Yeah.

11:01  24     Q.    Okay.  Does it have a breadcrumb feature?

11:01  25     A.    No.  It doesn't.

—842—

11:01  1      Q.    In your role as the web development team lead,

11:01  2  Ms. Mahar, are you made aware of instances in which

11:01  3  Microchip has licensed patents related to its website

11:01  4  functionality?

11:01  5      A.    Yes.  I am.

11:02  6      Q.    Has Microchip ever licensed any

11:02  7  website-related patents before?

11:02  8      A.    Yes.  There's one in particular.  It's called

11:02  9  ███████  We licensed a group or a portfolio of patents

11:02  10 to use.  I think we spent about ████████  for it.

11:02  11             MR. JENSEN:  Mr. Thompson, could you

11:02  12 bring up Joint Exhibit 26, please?

11:02  13 BY MR. JENSEN:

11:02  14     Q.    Ms. Mahar, do you recognize this exhibit?

11:02  15     A.    Yes.  I do.

11:02  16     Q.    What is it?

11:02  17     A.    It is the agreement between Microchip and

11:02  18 ██████  for using these licenses, licensing these

11:02  19 patents.  Sorry.

11:02  20             MR. JENSEN:  I'd like to move the

11:02  21 admission of Joint Exhibit 26.

11:02  22             MR. DEVLIN:  No objection.

11:02  23             THE COURT:  It'll be admitted.

11:02  24 BY MR. JENSEN:

11:02  25     Q.    And who are the parties to this agreement,

| | | |
|---|---|---|
| 11:02 | 1 | Ms. Mahar? |
| 11:02 | 2 | A.     ███████████     and Microchip Technology. |
| 11:02 | 3 | Q.    And is this the final executed version of the |
| 11:02 | 4 | license agreement? |
| 11:03 | 5 | A.    I believe so.  Are there signatures on the |
| 11:03 | 6 | signature line? |
| 11:03 | 7 | Yes.  This is the signed agreement. |
| 11:03 | 8 | Q.    Okay.  To the best of your knowledge, |
| 11:03 | 9 | Ms. Mahar, did ████ sue Microchip before Microchip |
| 11:03 | 10 | took a license? |
| 11:03 | 11 | A.    No.  They did not. |
| 11:03 | 12 | Q.    So contrary to, I think, the experience that |
| 11:03 | 13 | Mr. Moehrle had that we heard about earlier, where he |
| 11:03 | 14 | sent a letter and nobody responded, is it the case that |
| 11:03 | 15 | Microchip has, in fact, responded to such letters and |
| 11:03 | 16 | taken licenses in the past? |
| 11:03 | 17 | A.    Yes.  We do. |
| 11:03 | 18 | Q.    Based on your 20-plus years of experience |
| 11:03 | 19 | working at Microchip, do you believe Microchip would |
| 11:03 | 20 | knowingly infringe on someone else's patents? |
| 11:03 | 21 | A.    No.  That's just not who we are. |
| 11:03 | 22 | Q.    Last question, Ms. Mahar:  Are you proud of |
| 11:03 | 23 | the work that you and your team have done to redesign |
| 11:03 | 24 | and launch Microchip's redesigned website? |
| 11:04 | 25 | A.    I am so proud of my team.  They work so hard. |

11:04  1    I'm really proud of them.

11:04  2                    MR. JENSEN:  I pass the witness.

11:04  3                         CROSS-EXAMINATION

11:04  4    BY MR. DEVLIN:

11:04  5        Q.    Good morning, Ms. Mahar.

11:04  6        A.    Good morning.

11:04  7        Q.    This is the first time you and I have ever

11:04  8    spoken; maybe have said pleasantries in the hall or

11:04  9    something?

11:04  10       A.    Yes.  That's right.

11:04  11       Q.    Right.

11:04  12             I understand it's your first time testifying.

11:05  13   Still a little nervous?

11:05  14       A.    Yes.  Yeah.

11:05  15       Q.    All right.  Let me tell you how this is going

11:05  16   to go.  I'm going to ask you some questions about some

11:05  17   topics.  You're going to agree with me sometimes and --

11:05  18   I hope you'll agree -- you're going to disagree with me

11:05  19   sometimes, and you're free to disagree, okay?

11:05  20       A.    Okay.

11:05  21       Q.    All right.  And what we're going to try to do

11:05  22   together is distill out what some of the real issues

11:05  23   may be for the jury or where we all agree.

11:05  24       A.    Okay.

11:05  25       Q.    And so the jury doesn't have to worry about

845

```
11:05   1    it.
11:05   2            Is that all right?
11:05   3       A.   That sounds good.
11:05   4       Q.   Okay.  There's not going to be any yelling, no
11:05   5    slamming, anything, all right?
11:05   6       A.   Thank you.
11:05   7       Q.   We're going to be just fine.  Thank you so
11:05   8    much for being here with us today.
11:05   9            So the first thing I want to do is I want to
11:05  10    work a little bit -- I know you're not managing the
11:05  11    Forum website, but you are familiar with how it
11:05  12    operates --
11:05  13       A.   Yes.
11:05  14       Q.   -- generally?
11:05  15            You've seen some of the things during this
11:05  16    trial?
11:05  17       A.   Yes.
11:05  18       Q.   Now, by the way, the person who manages that,
11:05  19    or the team, does that include Mr. Wolf, who we're
11:05  20    going to hear from?
11:05  21       A.   No.
11:05  22       Q.   Okay.  So someone -- that team was not
11:05  23    available to come here to trial and testify about the
11:05  24    Forum section?
11:05  25       A.   Yeah.  I don't know why they're not here.
```

| | | |
|---|---|---|
| 11:05 | 1 | Q.    Okay.   Thank you. |
| 11:05 | 2 | Well, let's do our best together. |
| 11:06 | 3 | A.    Okay. |
| 11:06 | 4 | Q.    We're going to -- |
| 11:06 | 5 | MR. DEVLIN:  Let's pull up the Forum |
| 11:06 | 6 | section, Mr. Gooden. |
| 11:06 | 7 | Thank you. |
| 11:06 | 8 | BY MR. DEVLIN: |
| 11:06 | 9 | Q.   So we're live on the Internet right now, |
| 11:06 | 10 | Ms. Mahar, and we'll go as fast or slow as you need. |
| 11:06 | 11 | But let me just try to confirm a few things |
| 11:06 | 12 | about how this Forum section works, make sure that what |
| 11:06 | 13 | the jury has been seeing isn't smoke and mirrors, |
| 11:06 | 14 | you'll -- you know, that we agree that what we're |
| 11:06 | 15 | looking at on the screen really is happening on the |
| 11:06 | 16 | web. |
| 11:06 | 17 | A.    Sure. |
| 11:06 | 18 | Q.    All right.   Thank you. |
| 11:06 | 19 | MR. DEVLIN:  So, Mr. Gooden, if you click |
| 11:06 | 20 | on that and just hold there.  All right. |
| 11:06 | 21 | Just pause there, please, Mr. Gooden. |
| 11:06 | 22 | BY MR. DEVLIN: |
| 11:06 | 23 | Q.    So when Mr. Gooden clicks on that Forums tab |
| 11:06 | 24 | on the Forums website, what happened was a drop-down |
| 11:06 | 25 | menu appeared, right? |

—847—

11:06   1        A.    Yeah.

11:06   2        Q.    Okay.  And this is part of a hierarchical

11:06   3    structure of drop-down menus on this Forums web page,

11:06   4    right?

11:06   5        A.    Yeah.  I call it a top nav, but it's really

11:06   6    different orientation.

11:06   7        Q.    Sure.  But the top nav is referencing the fact

11:06   8    that it starts up at the top heading area, right?

11:06   9        A.    Yeah.  Uh-huh.

11:06  10        Q.    But a lot of top navs have this drop-down

11:07  11    structure like this one we're looking at here?

11:07  12        A.    That's right.

11:07  13        Q.    Okay.  Great.

11:07  14              MR. DEVLIN:  And before you do it,

11:07  15    Mr. Gooden.

11:07  16    BY MR. DEVLIN:

11:07  17        Q.    You've seen this, when Mr. Gooden hovers over

11:07  18    one of these items, there's going to open up a

11:07  19    subordinate or second level of the hierarchical

11:07  20    structure, right?

11:07  21        A.    Yeah.  That's right.

11:07  22        Q.    Great.

11:07  23              MR. DEVLIN:  So let's go ahead and do

11:07  24    that, Mr. Gooden, that third one.

11:07  25              And just for the record, that's what's

11:07   1    happened.  Mr. Gooden is now hovering over something

11:07   2    called 8-Bit Microcontrollers, and it's pulled out a

11:07   3    subordinate menu subsidiary in the hierarchy on the

11:07   4    right.

11:07   5    BY MR. DEVLIN:

11:07   6        Q.    Did I get that right?

11:07   7        A.    Yes.

11:07   8        Q.    Okay.  Great.  Thank you.

11:07   9              And, again, if Mr. Gooden were to hover over

11:07   10   one of those items, we see another -- a third level in

11:07   11   that hierarchy of the menu structure; is that fair?

11:07   12       A.    Yes.

11:07   13       Q.    Okay.  And you'd agree that a website is --

11:07   14   can broadly be characterized as an information

11:07   15   structure; is that fair?

11:08   16       A.    Yeah.

11:08   17       Q.    Was that a "yes"?  Sorry.

11:08   18       A.    Yes.

11:08   19       Q.    Great.  Thank you so much.

11:08   20             Okay.  Now, before Mr. Gooden clicks this,

11:08   21   let's just agree on what we think's going to happen.

11:08   22             He's going to click -- he's now on the third

11:08   23   level of the hierarchy.  He's on the third item down.

11:08   24   He's not going to click yet, please.  And he's over

11:08   25   Timing and Measurements.

849

11:08   1              Do you see that?

11:08   2       A.    Yes.

11:08   3       Q.    Okay.  Now, when he clicks this, what's going

11:08   4  to happen is this menu structure's going to collapse;

11:08   5  is that right?

11:08   6       A.    Yes.

11:08   7       Q.    And then there's going to be created a series

11:08   8  of links, a sequence of links across the top of the

11:08   9  page, just below the top nav; is that right?

11:08  10       A.    Yes.

11:08  11       Q.    Okay.  Great.

11:08  12              MR. DEVLIN:  Now, don't do it yet,

11:08  13  Mr. Gooden.

11:08  14  BY MR. DEVLIN:

11:08  15       Q.    I want to ask you something here.  The way we

11:08  16  got to where Mr. Gooden is now with that mouse hovering

11:08  17  over that third item of this particular grouping in the

11:08  18  third level of the hierarchy is he hovered over the

11:08  19  third item at the first level.

11:09  20              Do you remember that?

11:09  21              The particular -- let me ask you --

11:09  22              MR. DEVLIN:  Let's go back, Mr. Gooden,

11:09  23  to the first level.  Okay.

11:09  24  BY MR. DEVLIN:

11:09  25       Q.    So when he hovers over the third one of those

850

```
11:09    1    items down, it opens up a given menu in the second
11:09    2    level of the hierarchy, right?
11:09    3        A.    Right.
11:09    4        Q.    Great.
11:09    5             MR. DEVLIN:  Why don't you scroll down
11:09    6    just one, Mr. Gooden?
11:09    7             Great.
11:09    8    BY MR. DEVLIN:
11:09    9        Q.    Now, that opened a second level of the
11:09   10    hierarchy, right?
11:09   11        A.    Right.
11:09   12        Q.    But it's a different set of selections than
11:09   13    the one just above we were hovering over.  That's my
11:09   14    point.
11:09   15             Do you understand me?
11:09   16        A.    Yes.
11:09   17        Q.    Okay.  And likewise, if he went down each of
11:09   18    these, there'd be a set of selections that is different
11:09   19    than the other sets of selections you'd get from other
11:09   20    items in that first level.  Fair?
11:09   21        A.    Yes.
11:09   22        Q.    Great.  Thank you.
11:09   23             So let's go back to the third and let's -- and
11:09   24    same here.  When we're at the second level, if he
11:09   25    hovers on one of those items, that may or may not pull
```

11:09  1    up an extra menu, correct?

11:09  2        A.    Yes.

11:09  3        Q.    Some of those are just direct links to a page;

11:10  4    is that right?

11:10  5        A.    Yes.

11:10  6        Q.    Okay.  And then he can hover over that third

11:10  7    one, and that opens up a third level, correct?

11:10  8        A.    Yes.

11:10  9        Q.    Okay.  Great.

11:10  10            Now, let me see if I can get this right.  If

11:10  11   Mr. Gooden had hovered over a different item at the

11:10  12   first level and that opened up a different item in the

11:10  13   second level -- are you with me so far?

11:10  14       A.    Yes.

11:10  15       Q.    Then hovering over that might open up a third

11:10  16   level, right?

11:10  17       A.    Yes.

11:10  18       Q.    But that third level would be different than

11:10  19   the one that we're looking at on the screen, given the

11:10  20   path we took so far to get here, correct?

11:10  21       A.    Yes.

11:10  22       Q.    Great.  Thank you.

11:10  23            THE COURT:  Ma'am, you need to -- I

11:10  24   know -- if I can help you, you need to wait until he's

11:10  25   done asking a question.  When you are kind of

| | | |
|---|---|---|
| 11:10 | 1 | interjecting with yes or no -- I'm having to correct |
| 11:10 | 2 | you here, I don't mean to -- but we're -- it doesn't |
| 11:10 | 3 | work as well for us in this setting. |
| 11:10 | 4 | THE WITNESS:  I'm so sorry. |
| 11:10 | 5 | THE COURT:  No, no.  I don't mean to -- |
| 11:10 | 6 | you're just acting normally.  And you're -- but I'm |
| 11:10 | 7 | just saying it'll help keep the record a little clearer |
| 11:11 | 8 | and help Mr. Devlin and the jury if you can just wait, |
| 11:11 | 9 | sit on your hands a little bit and let him -- I don't |
| 11:11 | 10 | mean to chastise you.  It'll just help all of us if you |
| 11:11 | 11 | can wait a little bit. |
| 11:11 | 12 | THE WITNESS:  Sure.  Sorry about that, |
| 11:11 | 13 | folks. |
| 11:11 | 14 | MR. DEVLIN:  And, ma'am, I got to say I |
| 11:11 | 15 | know it's partly me also.  It's part of the process |
| 11:11 | 16 | here.  I have to ask sometimes really long questions to |
| 11:11 | 17 | make sure I'm getting the precise question out that I |
| 11:11 | 18 | need.  And I know that's -- it's artificial but it's |
| 11:11 | 19 | something I need to do.  So I know it's not you; it's |
| 11:11 | 20 | me.  All right?  Or we're in it together. |
| 11:11 | 21 | BY MR. DEVLIN: |
| 11:11 | 22 | Q.   Okay.  So I think we've agreed that the |
| 11:11 | 23 | different choices that you see at a given level of the |
| 11:11 | 24 | hierarchical menu structure depend on the choices you |
| 11:11 | 25 | made to get to that particular spot in the level; is |

11:11   1    that fair?

11:11   2        A.    Yes.

11:11   3        Q.    Okay.  Thank you so much.

11:11   4              MR. DEVLIN:  Now, still -- yet,

11:11   5    Mr. Gooden.

11:11   6    BY MR. DEVLIN:

11:11   7        Q.    When we click on this, we're going to get that

11:11   8    collapsing menu.  We're going to see that series of

11:12   9    links up at the top.  And then we'll see what happens.

11:12   10   All right?  Are you with me?

11:12   11       A.    Yes.

11:12   12       Q.    Great.  We're going to click on it.

11:12   13             MR. DEVLIN:  Go ahead, Mr. Gooden.  Thank

11:12   14   you so much.

11:12   15   BY MR. DEVLIN:

11:12   16       Q.    All right.  Now, would you agree if -- that in

11:12   17   the Forums website -- now, I'm not -- let me be very

11:12   18   clear about what I'm going to ask you here.  I'm not

11:12   19   asking you anything right yet about the main website,

11:12   20   microchip.com, okay?

11:12   21       A.    Okay.

11:12   22       Q.    And I'm definitely not asking you about the

11:12   23   new -- the redesigned version.  I'm just asking you

11:12   24   right about Forums right now.  So I don't want you to

11:12   25   feel like I'm trying to catch you on anything, okay?

854

| | | |
|---|---|---|
| 11:12 | 1 | A.    Thank you.  That's fair. |
| 11:12 | 2 | Q.    Yes.  All right.  So we're just talking about |
| 11:12 | 3 | the Forum. |
| 11:12 | 4 | Would you agree that what is there just below |
| 11:12 | 5 | the top nav, that sequence of links, that that's an |
| 11:12 | 6 | Active Path that we've been talking about this week -- |
| 11:12 | 7 | MR. JENSEN:  Objection, Your Honor.  This |
| 11:12 | 8 | calls for expert testimony.  He's asking about the |
| 11:12 | 9 | claim language.  And it's beyond the scope of direct. |
| 11:12 | 10 | Clearly we didn't go on and navigate the Forum site or |
| 11:13 | 11 | do any of this. |
| 11:13 | 12 | THE COURT:  Overruled. |
| 11:13 | 13 | A.    Yes.  I don't know exactly what Active Path |
| 11:13 | 14 | is.  I haven't heard that term before this trial.  But |
| 11:13 | 15 | from what I understand from sitting in for the last few |
| 11:13 | 16 | days, I believe what you're saying is an Active Path. |
| 11:13 | 17 | BY MR. DEVLIN: |
| 11:13 | 18 | Q.    Okay.  Thank you so much, ma'am. |
| 11:13 | 19 | And that's partly because when we hover over |
| 11:13 | 20 | one of these links, is it fair to say that's an -- so |
| 11:13 | 21 | let me just be clear while we are on the record. |
| 11:13 | 22 | So we've got five different links in a |
| 11:13 | 23 | sequence right there in what we just said was an Active |
| 11:13 | 24 | Path, right?  Five different links? |
| 11:13 | 25 | A.    Yes. |

855

| | | |
|---|---|---|
| 11:13 | 1 | Q. Okay. Great. |
| 11:13 | 2 | And if Mr. Gooden hovers over the third of |
| 11:13 | 3 | those as he's doing now, we see a drop-down menu that |
| 11:13 | 4 | offers other choices, other items. We'll leave it at |
| 11:13 | 5 | that. Is that fair? |
| 11:13 | 6 | A. Yes. |
| 11:13 | 7 | Q. Okay. Now, did you -- |
| 11:14 | 8 | MR. DEVLIN: Mr. Gooden, do we have those |
| 11:14 | 9 | screenshots of where -- or can you do them when we're |
| 11:14 | 10 | going down Forums? |
| 11:14 | 11 | BY MR. DEVLIN: |
| 11:14 | 12 | Q. Let me move on and make it a little simpler. |
| 11:14 | 13 | MR. DEVLIN: That's okay, Mr. Gooden. I |
| 11:14 | 14 | think we'll stay here. |
| 11:14 | 15 | BY MR. DEVLIN: |
| 11:14 | 16 | Q. Let me just try to summarize a couple of |
| 11:14 | 17 | things we've seen. We've seen this hierarchical menu |
| 11:14 | 18 | structure. And then we go through that, we can select |
| 11:14 | 19 | something, and we get a new page, a collapsed menu, and |
| 11:14 | 20 | an Active Path. So far so good? Want me to say it |
| 11:14 | 21 | again? |
| 11:14 | 22 | A. Nope. I'm thinking. Collapsed menu. And we |
| 11:14 | 23 | get the breadcrumb. Yes. |
| 11:14 | 24 | Q. Thank you. |
| 11:14 | 25 | And when you said "breadcrumb," that's -- |

| | | |
|---|---|---|
| 11:14 | 1 | you're referring to the thing that we just labeled an |
| 11:14 | 2 | Active Path.  Is that okay?  Just trying to make it |
| 11:14 | 3 | clear for the record. |
| 11:14 | 4 | A.    Yes. |
| 11:14 | 5 | Q.    Okay.  And sometimes in the verbiage of how |
| 11:14 | 6 | you've operated in the past and so forth, what we were |
| 11:14 | 7 | calling an -- what we are calling here an Active Path, |
| 11:15 | 8 | you might still refer to as a breadcrumb.  Maybe a |
| 11:15 | 9 | breadcrumb with drop-down or a breadcrumb with hover; |
| 11:15 | 10 | is that right? |
| 11:15 | 11 | A.    Yes.  That's right. |
| 11:15 | 12 | MR. JENSEN:  Objection, Your Honor.  This |
| 11:15 | 13 | is the claim language.  He's asking her to do claim |
| 11:15 | 14 | construction, to interpret the claim language.  She |
| 11:15 | 15 | said she hasn't read the patents.  She's not an expert. |
| 11:15 | 16 | THE COURT:  If she feels she's unable to |
| 11:15 | 17 | answer the question, she can say, I don't know. |
| 11:15 | 18 | Overruled. |
| 11:15 | 19 | MR. DEVLIN:  Thank you, Your Honor. |
| 11:15 | 20 | BY MR. DEVLIN: |
| 11:15 | 21 | Q.    And let me just make one other thing clear, |
| 11:15 | 22 | because I'm really not trying to catch you here, okay? |
| 11:15 | 23 | You're not a patent expert; is that right? |
| 11:15 | 24 | A.    I'm not. |
| 11:15 | 25 | Q.    Okay.  Great. |

—857—

11:15   1              So we're going to talk to someone else who's a

11:15   2   technical expert from Microchip.  You know that, right?

11:15   3      A.    Yes.

11:15   4      Q.    Okay.  And then we'll all have a chance to

11:15   5   argue again and tie all this up with the evidence and

11:15   6   the law later on, right?

11:15   7      A.    Right.

11:15   8      Q.    Okay.  Great.  Thank you so much.

11:15   9              Another thing we saw is this concept of

11:15   10  truncation.

11:15   11             Do you remember seeing that earlier in the

11:15   12  trial?

11:15   13     A.    Yes.

11:15   14     Q.    And let's just confirm with you that what we

11:15   15  saw before is exactly happening.  So before Mr. Gooden

11:16   16  does it -- he's now hovering over the fourth of those

11:16   17  links in that Active Path.  And he's going to click

11:16   18  that.  And can you tell us what's going to happen when

11:16   19  he does that?  If he clicks that?

11:16   20     A.    I don't know.  Click it.

11:16   21     Q.    What's that?

11:16   22     A.    I don't know.  Click it.

11:16   23     Q.    All right.  Let's see.

11:16   24             MR. DEVLIN:  Let's click it.  All right.

11:16   25  BY MR. DEVLIN:

858

11:16   1        Q.   So one thing happened.  We went to a new page,

11:16   2   right?

11:16   3        A.   Uh-huh.

11:16   4        Q.   Okay.

11:16   5             MR. DEVLIN:  Mr. Gooden, if you could

11:16   6   just hit the back button on the browser.

11:16   7             Thank you.

11:16   8   BY MR. DEVLIN:

11:16   9        Q.   You see how the link that he hit was called

11:16  10   Peripheral/Core Independent Peripherals?

11:16  11        A.   Yes.

11:16  12        Q.   Okay.  This was on the page we just came from.

11:16  13   And then there was another link in that sequence to the

11:16  14   right of it.

11:16  15             Do you see that?

11:16  16        A.   Yes.

11:16  17        Q.   Okay.

11:16  18             MR. DEVLIN:  So now just hit the forward

11:16  19   button, Mr. Gooden.

11:16  20             Thank you.

11:16  21   BY MR. DEVLIN:

11:16  22        Q.   Now, this is the result of that maneuver.  We

11:16  23   see that last link in the sequence has now disappeared,

11:17  24   right?

11:17  25        A.   Yes.

859

11:17  1        Q.    Okay.  And did you hear that referred to as

11:17  2   truncation before in the trial?

11:17  3        A.    You know, I really don't remember that.

11:17  4        Q.    That's okay.  That's fine.

11:17  5              But we've confirmed that one of those links

11:17  6   has now disappeared when we clicked -- sorry.  When we

11:17  7   clicked the fourth link in that sequence in the Active

11:17  8   Path, we went to a new page and the fifth link

11:17  9   disappeared; is that fair?

11:17  10       A.    Yeah.  That's what we saw.

11:17  11       Q.    Great.  Thank you so much.

11:17  12             All right.  Let's go to the -- that video that

11:17  13  you looked at.

11:17  14             MR. DEVLIN:  That was, I believe,

11:17  15  Defendant's Exhibit 463.

11:17  16  BY MR. DEVLIN:

11:17  17       Q.    I want to talk about that.

11:17  18             Okay.  So this video, just so we're all clear,

11:17  19  this is the Microchip --

11:17  20             MR. DEVLIN:  Maybe this starts in and

11:17  21  someone goes to the microchip.com website.  There we

11:17  22  go.  All right.

11:17  23  BY MR. DEVLIN:

11:17  24       Q.    Someone types in microchip.com, and then we're

11:18  25  at the microchip.com main website, right here on this

860

11:18  1   video on the screen right now.

11:18  2       A.    Yes.

11:18  3       Q.    Okay.  And this was at a time when the

11:18  4   microchip.com website also still had those breadcrumbs

11:18  5   with drop-down, right?

11:18  6       A.    During the transition we had some of the new

11:18  7   pages and some of the old pages on the website.  Yes.

11:18  8       Q.    Okay.  Thank you.

11:18  9             And so -- and this video's actually, you said,

11:18  10  in that transition, right?

11:18  11      A.    Yes.

11:18  12      Q.    So some of the stuff might be new, and some of

11:18  13  the stuff might be old, right?

11:18  14      A.    That's right.

11:18  15      Q.    Okay.  So what you did, though, in the

11:18  16  video -- and we can play it -- is we have a menu

11:18  17  structure.  And those open up a set of items.  And

11:18  18  hovering over one opens up another set of items, right?

11:19  19      A.    Uh-huh.

11:19  20      Q.    Okay.

11:19  21             MR. DEVLIN:  And then you can click on

11:19  22  that, is what happens in the video.  All right.  Let's

11:19  23  pause there for a second.

11:19  24             Now, if you can run the video back just a

11:19  25  few seconds, Mr. Gooden.  Backwards.  Right till we get

861

11:19  1   to there.  That's perfect.  Click on that.  And stop

11:19  2   there.

11:19  3                    Awesome.  Thank you.

11:19  4   BY MR. DEVLIN:

11:19  5       Q.   So what's happened here is the selection's

11:19  6   been made, and we've gone to something that is a new

11:19  7   page, right?

11:19  8       A.   Right.

11:19  9       Q.   And that page has -- we'll at least agree

11:19  10  right now it's a breadcrumb at some level, right?

11:19  11      A.   Yeah.

11:19  12      Q.   Okay.  And the person making this video, where

11:19  13  their mouse is right now, they left it right in the

11:19  14  middle -- well, they didn't leave it.  That was where

11:19  15  they clicked from.  That was where the mouse was when

11:19  16  they clicked.  So that's why that little hand is still

11:19  17  right in the middle.

11:19  18                    Do you see that?

11:19  19      A.   Yeah.

11:19  20      Q.   Okay.  And then what happens in the video is

11:19  21  it kind of goes up, and I think you were making the

11:19  22  point that some of the labeling in what's this -- I'm

11:20  23  going to call it a breadcrumb still, that was different

11:20  24  than the labeling of the selections along the way?

11:20  25      A.   That's right.

862

```
11:20   1        Q.    Okay.  Now, I just want to confirm that you
11:20   2   don't know something.  So that's the nature of my next
11:20   3   question, okay?
11:20   4             Is it fair to say that you don't know whether
11:20   5   the issue of those labels matching up has any bearing
11:20   6   on the question of infringement here?
11:20   7             That's not something you know about; is that
11:20   8   fair?
11:20   9        A.    I haven't read the infringement document.  So
11:20  10   no.
11:20  11        Q.    Great.  I'm just confirming that you're not
11:20  12   the person to talk to about that.
11:20  13        A.    Okay.
11:20  14        Q.    So I'll talk to someone else.  Okay.  Thank
11:20  15   you.
11:20  16             But that was the point you were making, is
11:20  17   that the labels in this -- in this breadcrumb --
11:20  18        A.    Yeah.
11:20  19        Q.    -- were different than the labels along the
11:20  20   way.  That's why you went through this video?
11:20  21        A.    Yeah.
11:20  22        Q.    Okay.  Great.
11:20  23             So I'll talk with someone later about how
11:20  24   meaningful that may or may not be.
11:20  25        A.    Okay.
```

11:20    1        Q.    All right.  All right.  Thank you.  That's

11:21    2    what I'm getting at.

11:21    3              Now, if we continue this video --

11:21    4              MR. DEVLIN:  Is this the end?  Maybe

11:21    5    scroll back a few seconds, Mr. Gooden.

11:21    6              And just play the whole thing through

11:21    7    without pausing it.

11:21    8    BY MR. DEVLIN:

11:21    9        Q.    There goes that mouse.  Just -- whoops.

11:21   10    Sorry.

11:21   11              MR. DEVLIN:  Play the whole thing

11:21   12    through.  Great.

11:21   13    BY MR. DEVLIN:

11:21   14        Q.    So we're playing.  There goes that mouse.

11:21   15    It's getting really near those breadcrumbs, but whoever

11:21   16    made this video was very careful not to hover over

11:21   17    them, right?

11:21   18        A.    I wouldn't characterize it as that.  They just

11:21   19    didn't go up to the breadcrumb.

11:21   20        Q.    They just didn't get there?

11:21   21        A.    Yeah.

11:21   22        Q.    Okay.  Fair enough.

11:21   23              If they had gotten to that breadcrumb and

11:21   24    hovered over where it says "USB," what would've

11:21   25    happened?

864

11:21   1        A.    They would have seen a drop-down menu.

11:21   2        Q.    Okay.  So that's an active link then, that

11:21   3   USB, as we've been talking about it this week?

11:21   4                MR. JENSEN:  Objection, Your Honor.

11:21   5   Again, this is the claim language.

11:21   6        A.    No.

11:21   7                THE COURT:  Overruled.

11:21   8        A.    No.

11:21   9   BY MR. DEVLIN:

11:21   10       Q.    You don't think that's an active link?

11:21   11       A.    I wouldn't characterize that as an active

11:22   12   link.  No.

11:22   13       Q.    You would characterize it as a breadcrumb with

11:22   14   a drop-down?

11:22   15       A.    Yeah.  It's a static path.

11:22   16       Q.    Oh, I'm sorry.  Let's talk about that in a

11:22   17   second.

11:22   18             When you say "static path," are you talking

11:22   19   about the collection of the links that make up that

11:22   20   breadcrumb, or are you talking about something

11:22   21   different?

11:22   22       A.    Yeah.  The code that we enter into the system

11:22   23   to display those links are static.

11:22   24       Q.    Got you.

11:22   25             We're going to get to that in a minute, okay?

865

11:22   1         A.    Okay.

11:22   2         Q.    And what you're -- just so we're clear, what

11:22   3   you're talking about is the collection of those links

11:22   4   that are in a sequence together.  That code that puts

11:22   5   those things in there, that's static code.

11:22   6               That's what you're saying?

11:22   7         A.    That's right.

11:22   8         Q.    Great.  We're going to talk about that in just

11:22   9   a moment.

11:22   10              What I'm saying, though, is each of those

11:22   11  links individually, it has functionality right now

11:22   12  other than just clicking on it and going back to the

11:23   13  page that the actual label identifies?

11:23   14        A.    They're links.  Links go to pages.

11:23   15        Q.    Right.  You could click through where it says

11:23   16  "USB"; it would take you to a page, right?

11:23   17        A.    Yeah.

11:23   18        Q.    Okay.  But there's other functionality that

11:23   19  that can do.  If you hover over it, it has a drop-down,

11:23   20  right?

11:23   21        A.    Yes.

11:23   22        Q.    And those drop-downs have other selections,

11:23   23  right?

11:23   24        A.    Yes.

11:23   25        Q.    Okay.  Great.  That's all I wanted to see if

866

11:23  1    we could agree on.

11:23  2              Let's talk about this issue of static and

11:23  3    dynamic, all right?

11:23  4              What do you mean by "static"?

11:23  5              Let's start there.  Let's go back to this

11:23  6    issue.  Let me be a little more clear here.

11:23  7              We're going to go back to the issue you and I

11:23  8    were talking about a minute ago, which is that this

11:23  9    page has code in it that will define each of those

11:23  10   links in that sequence in that breadcrumb, right?

11:23  11      A.    Okay.

11:23  12      Q.    Okay.  Great.

11:23  13            Now, let me ask you this again.  It'll be --

11:23  14   this is one of those making sure you're not the person

11:23  15   to talk to questions, all right?

11:24  16      A.    Okay.

11:24  17      Q.    You don't know, one way or the other, the

11:24  18   impact of whether -- the way that this breadcrumb is

11:24  19   created with static code, you don't know, one way or

11:24  20   the other, whether that impacts the issue of

11:24  21   infringement here.

11:24  22            That's not you, fair?

11:24  23      A.    I'm not an infringement person, attorney,

11:24  24   specialist.  No.

11:24  25      Q.    Great.  Thanks so much.

—867—

11:24  1              Okay.  Do you remember, one way or the

11:24  2   other -- let me just ask you:  If someone on this page,

11:24  3   back at the time this video was created, if they had

11:24  4   clicked Interface and Connectivity -- see that second

11:24  5   link in the sequence?

11:24  6       A.    Yes.

11:24  7       Q.    If they had clicked that, clicked through,

11:25  8   they would have gone to that page, right, Interface and

11:25  9   Connectivity?

11:25  10      A.    I don't know.

11:25  11      Q.    You don't know?

11:25  12      A.    I don't know because I don't know if that had

11:25  13  a link on it or not.  I can't tell from this screen.

11:25  14      Q.    Okay.  Great.  No problem.

11:25  15             Let me just ask you this generally:  Remember

11:25  16  in the Forum section when we clicked one of those links

11:25  17  that went to a page and the rest of the sequence of

11:25  18  links to the right was eliminated?

11:25  19             Do you remember that?

11:25  20      A.    Yes.

11:25  21      Q.    Did the main website, not the current version,

11:25  22  not the redesigned version, but the -- what we call the

11:25  23  original or older version, would that eliminate

11:25  24  right-hand links and the sequence in the same way?

11:25  25             Do you remember that?

11:25  1       A.     I don't remember if it did or not.

11:25  2       Q.     Okay.  If Mr. Sherwood had said that he'd seen

11:25  3  that happen, would you, sitting here today, be in a

11:25  4  position to say he was wrong?

11:25  5              MR. JENSEN:  Objection.  This calls for

11:25  6  speculation, something that their expert didn't even

11:25  7  say, and she already said she didn't know.

11:26  8              THE COURT:  Sustained.

11:26  9              MR. DEVLIN:  I'm not sure that's fully

11:26  10 accurate, but we shall see.

11:26  11             Okay.  Let's talk about -- let's talk

11:26  12 about me taking off my glasses and reading my notes.

11:26  13 BY MR. DEVLIN:

11:26  14      Q.     You said that you're very familiar in your --

11:26  15 I wrote that down, that's a quote -- "very familiar"

11:26  16 with the microchip.com website.

11:26  17             Do you remember that?

11:26  18      A.     That's right.

11:26  19      Q.     Okay.  And that's because you -- you're on it

11:26  20 regularly, I take it?

11:26  21      A.     That's right.

11:26  22      Q.     And I suppose a lot of Microchip employees go

11:26  23 to that website to get information; is that fair?

11:26  24      A.     That's right.

11:26  25      Q.     Okay.  And that happens in a testing process

869

11:26    1    before you roll out any new page, right?

11:26    2        A.    That's right.

11:26    3        Q.    That happened for the redesign certainly,

11:26    4    correct?

11:26    5        A.    Yes.

11:26    6        Q.    And it happened for the -- when you went from

11:26    7    those side links to what we're calling the original

11:26    8    version, people would have tested that at some point?

11:27    9        A.    You know, that happened right before me.  So I

11:27   10    wasn't as familiar with that as I am with the rest of

11:27   11    the functions of the site.

11:27   12        Q.    Sure.  And I wasn't trying to get at the

11:27   13    function.

11:27   14              I'm just saying, whenever you're going to roll

11:27   15    out some new version, it's going to get tested, fair?

11:27   16        A.    Yeah.

11:27   17        Q.    And then as you said, just in the normal

11:27   18    course of activities, you and others at Microchip will

11:27   19    go to the microchip.com website for a variety of

11:27   20    reasons, fair?

11:27   21        A.    That's right.

11:27   22        Q.    Thank you.

11:27   23              Let me talk about this issue of servers, okay,

11:27   24    and the location of stuff and how all this works, okay?

11:27   25        A.    Uh-huh.

870

11:27  1        Q.    And let me just make sure I understand it and

11:27  2   that the record's clear.  I think we're going to be

11:27  3   agreeing on a lot on this one, but you let me know if

11:27  4   we're not, okay?

11:27  5        A.    Sure.

11:27  6        Q.    Thanks.

11:27  7              So the way that the sort of architecture of

11:27  8   what's happening is there's a microchip.com server or

11:28  9   set of servers in the U.S., right?

11:28  10       A.    There are many.  Yes.

11:28  11       Q.    Okay.  And when you're going to make any

11:28  12   update to the code, what happens is it happens on the

11:28  13   microchip.com server and then it gets pushed out to

11:28  14   these Akamai servers, right?

11:28  15       A.    Yes.

11:28  16       Q.    Okay.  So the code starts -- and by the way,

11:28  17   the code I'm talking about is the -- what we've heard

11:28  18   as HTML code, but in general what we're talking about

11:28  19   is the stuff that's going to go down to a user's

11:28  20   browser.

11:28  21              That's the code we're talking about now,

11:28  22   right?

11:28  23       A.    That's some of it.  Yes.

11:28  24       Q.    Okay.  Can -- when you say "that's some of

11:28  25   it," what do you mean?

—871—

11:28   1        A.    Well, some of the code stays on the server

11:28   2   side and some of it, you know, goes out to the client

11:28   3   side.  Most of the site goes client side, which is any

11:28   4   laptop or, you know, a tablet.  You have your phone.

11:29   5        Q.    Thanks.

11:29   6              So microchip.com will also push out to Akamai

11:29   7   stuff that might stay on Akamai servers, you mean, is

11:29   8   what you're saying?

11:29   9        A.    Most of it.  Yeah.

11:29   10       Q.    Great.  And will also push out to Akamai the

11:29   11  code that will go down to the client device, the

11:29   12  browser, laptop, whatever, right?

11:29   13       A.    Yeah.

11:29   14       Q.    Okay.  So the point of all this is to say it

11:29   15  starts at the microchip.com server.  The microchip.com

11:29   16  server provides that code to the Akamai servers.  Or to

11:29   17  Akamai; Akamai may distribute it to its servers, right?

11:29   18       A.    Yeah.  So we maintain our code on servers so

11:29   19  that we can keep a true record of what we have.  And

11:29   20  then we share that code.  We copy it out to all of

11:29   21  Akamai's servers worldwide.  So when you're in another

11:29   22  country, you go to a local server.

11:29   23       Q.    Thank you.

11:29   24             And so you just said something where I was

11:29   25  going in a minute, which is that Microchip controls the

872

11:29  1    code.  You know, Akamai's not making edits to

11:30  2    microchip.com website, the content of it, right?

11:30  3                    MR. JENSEN:  Objection.  Relevance, Your

11:30  4    Honor.  This goes to a joint infringement issue, which

11:30  5    is not in the case.

11:30  6                    MR. DEVLIN:  It actually goes to the

11:30  7    opposite.  Its goes to direct infringement, which is in

11:30  8    the case.

11:30  9                    THE COURT:  Overruled.

11:30  10                   MR. DEVLIN:  Thank you.

11:30  11   A.     Could you repeat the question?

11:30  12   BY MR. DEVLIN:

11:30  13   Q.     Sure.  And I'm sorry.  Something's in my

11:30  14   throat, and I don't want to cough too loud on

11:30  15   everybody.

11:30  16          Where was I?  Oh, Microchip is the entity that

11:30  17   controls the content and layout and design of its

11:30  18   website.  You guys make those changes, and you make

11:30  19   them on the microchip.com servers here, right?

11:30  20   A.     We write the code that gets copied to the

11:30  21   Akamai servers.

11:30  22   Q.     Got it.  And it gets copied from the

11:30  23   microchip.com servers here in the U.S., correct?

11:30  24   A.     Yeah.

11:30  25   Q.     Thank you.

11:30   1          All right.  Is it fair to say that you're not

11:31   2   the person to talk to about the legal consequences of

11:31   3   that with respect to this case?

11:31   4       A.   Yes.

11:31   5       Q.   Excellent.

11:31   6          I want to talk about --

11:31   7              MR. DEVLIN:  If we could pull up

11:31   8   Plaintiffs' Exhibit 96.

11:31   9              Thank you.  And if we could go to page --

11:31  10   BY MR. DEVLIN:

11:31  11       Q.   Oh, sorry.  Let's center ourselves.  This is a

11:31  12   Microchip presentation you spoke about on your direct

11:31  13   testimony, right?

11:31  14       A.   Yeah.  I believe so.  I can't see where

11:32  15   Grace's name is, but I believe so.

11:32  16       Q.   Okay.

11:32  17              MR. DEVLIN:  And let's go to Page 36,

11:32  18   Mr. Gooden.

11:32  19   BY MR. DEVLIN:

11:32  20       Q.   Do you remember this page?

11:32  21       A.   Yes.

11:32  22       Q.   Okay.  And I want to talk about this

11:32  23   annotation about --

11:32  24              MR. DEVLIN:  Yeah.  Right there.

11:32  25   BY MR. DEVLIN:

—874—

11:32  1        Q.    So let me talk first --

11:32  2                    MR. DEVLIN:  Actually, you can put that

11:32  3    down for a second, Mr. Gooden.  I'm sorry.  I jumped

11:32  4    the gun.

11:32  5    BY MR. DEVLIN:

11:32  6        Q.    I want to talk a little bit first about this

11:32  7    document.  This document was created in, I think it was

11:32  8    sort of the first half of 2019, if I saw.

11:32  9              Does that sound right?

11:32  10       A.    I think it's the fall of 2018.

11:32  11       Q.    Fall of 2018, so a little earlier.  Okay.

11:32  12             And this was created as part of Microchip

11:32  13   thinking about what it's going to do with its website,

11:32  14   right?

11:32  15       A.    With microchip.com?

11:32  16       Q.    With microchip.com.

11:32  17       A.    Yes.

11:32  18       Q.    And it's fair to say that's a big deal,

11:32  19   correct?

11:32  20       A.    Yes.

11:32  21       Q.    It's a big decision to be made, right?

11:32  22       A.    Yes.

11:32  23       Q.    Lot of people involved?

11:32  24       A.    Yes.

11:32  25       Q.    Business purpose going on here?

875

11:33   1        A.     I'm sorry.  Business --

11:33   2        Q.     There's a business purpose to having this

11:33   3   conversation?

11:33   4        A.     Yes.

11:33   5        Q.     Okay.  And as part of that, someone put in

11:33   6   this presentation this statement about what revenue

11:33   7   microchip.com drives through the e-commerce portal,

11:33   8   right?

11:33   9        A.     Yes.

11:33   10       Q.     Now, at least at the time of your deposition

11:33   11  you weren't really sure where that came from, right?

11:33   12       A.     I'm still not exactly sure where that number

11:33   13  came from.

11:33   14       Q.     Haven't gone back and -- did you try to

11:33   15  investigate further after your deposition?

11:33   16       A.     Yes.

11:33   17       Q.     You did.  Still couldn't figure it out?

11:33   18       A.     No.

11:33   19       Q.     Okay.  That's all right.

11:33   20              So but I think we can agree that whoever did

11:33   21  it knew that this was a big deal, what people were

11:33   22  trying to do with the website?

11:33   23       A.     Yes.

11:33   24       Q.     All right.  And they were going to work hard

11:33   25  and do their best to try to give accurate information

—876—

| | | |
|---|---|---|
| 11:33 | 1 | to the decision makers; is that fair? |
| 11:33 | 2 | A.   You know, sometimes our management doesn't |
| 11:34 | 3 | want to spend money.  So sometimes you have to tell the |
| 11:34 | 4 | best-case scenario.  So yeah.  They would have used |
| 11:34 | 5 | their best estimate on the information. |
| 11:34 | 6 | Q.   Right.  So you mean the person doing this is |
| 11:34 | 7 | going to give their best estimate? |
| 11:34 | 8 | A.   Yeah. |
| 11:34 | 9 | Q.   Yeah.  Thank you.  Okay. |
| 11:34 | 10 | MR. DEVLIN:  And let's pull that up now |
| 11:34 | 11 | again, Mr. Gooden. |
| 11:34 | 12 | BY MR. DEVLIN: |
| 11:34 | 13 | Q.   This is this $215,000 a day that microchip.com |
| 11:34 | 14 | drives through the e-commerce portal. |
| 11:34 | 15 | Do you see that? |
| 11:34 | 16 | A.   I see that.  And that number seems a little |
| 11:34 | 17 | high to me for that time frame.  We get to have |
| 11:34 | 18 | quarterly meetings where the CEO will stand up and talk |
| 11:34 | 19 | to us, and they'll tell us about our sales and how |
| 11:34 | 20 | we're doing with the competition and that kind of |
| 11:34 | 21 | thing. |
| 11:34 | 22 | So over time I've seen sales numbers.  And |
| 11:34 | 23 | that number seems a little bit high to me.  It must |
| 11:34 | 24 | have been the best days of the previous time period |
| 11:35 | 25 | that was used to come up with the number. |

11:35  1      Q.   Okay.  You say it must have been.  Are you

11:35  2  sure about that?

11:35  3      A.   Yeah.  Because you want to make the best case

11:35  4  you can to get funding for a project you want to do.

11:35  5  So you want to use the information you can use, right?

11:35  6      Q.   What I'm trying to confirm is, I think you

11:35  7  just said this must have been the highest time period

11:35  8  of the revenues for the -- for what was going on.

11:35  9           Did I understand you right?

11:35 10      A.   It seems pretty high to me.  Yeah.

11:35 11      Q.   It seems high to you.  You didn't do this

11:35 12  work?

11:35 13      A.   No.

11:35 14      Q.   This was not your work?

11:35 15      A.   No.  I believe it was Grace Ramon.

11:35 16      Q.   What's that?

11:35 17      A.   I believe it was Grace Ramon, the person

11:35 18  before me.

11:35 19      Q.   Grace Ramon.  She's not -- she's no longer

11:35 20  with the company?

11:35 21      A.   That's right.

11:35 22      Q.   I see.  Okay.

11:35 23           Do -- you still ever in contact with her?

11:35 24      A.   No.  I'm not.

11:35 25      Q.   She's not.  Did you ever try to get in contact

—878—

11:35   1    with her during the case?

11:35   2        A.    No.  I haven't.

11:35   3        Q.    You don't know if she's alive and well or

11:35   4    anything like that?

11:35   5        A.    No.  I don't.

11:35   6        Q.    Okay.  Thank you.

11:36   7              You, in your direct, you mentioned a lot of

11:36   8    money that Microchip makes that has nothing to do with

11:36   9    the Internet?

11:36   10       A.    That's right.

11:36   11       Q.    Right?  Bulk orders from big companies where

11:36   12   you've got other highly-detailed and sophisticated

11:36   13   sales channels that do not require going onto

11:36   14   microchip.com at all; is that fair?

11:36   15       A.    That's fair.

11:36   16       Q.    Okay.  And now you understand that none of

11:36   17   that sort of revenue is even being looked at for

11:36   18   purposes of damages in this case?

11:36   19       A.    That's right.

11:36   20       Q.    Okay.  The only revenue that's being looked at

11:36   21   for purposes of damages is this revenue that

11:36   22   Microchip's own documents identify as being driven from

11:36   23   microchip.com through the e-commerce portal.

11:36   24             You understand that, correct?

11:37   25       A.    I understand.

—879—

11:37  1          Q.    Okay.  Just to be clear, the e-commerce portal

11:37  2    is microchipdirect.com, correct?

11:37  3          A.    That's right.

11:37  4          Q.    Okay.  Thank you.

11:37  5          A.    Can I make another comment on this slide?

11:37  6          Q.    Well, let me try to move on, ma'am, because

11:37  7    your attorney's going to have a chance to do that.

11:37  8          A.    Okay.

11:37  9          Q.    I just have limits on my time.

11:37  10         A.    Sure.

11:37  11         Q.    I'm going to try to move myself along.

11:37  12         A.    Thank you.

11:37  13         Q.    Yeah.  But I'm not trying to hold you back, so

11:37  14   I encourage your lawyer to come up and ask you about

11:37  15   that, and then you clear it up on his time.

11:37  16               Is that okay?

11:37  17         A.    Sure.  Uh-huh.

11:37  18         Q.    Thank you.  Thank you so much.

11:37  19               Let's talk about growth for a second while we

11:37  20   have this up.  You're saying that before late 2018 or

11:37  21   early 2019, whenever this document was from, before

11:37  22   then the company was growing, right?

11:37  23         A.    Uh-huh.

11:37  24         Q.    And I think you said it has three times the

11:38  25   revenue from 2014 now; is that right?

11:38   1        A.    That's right.

11:38   2        Q.    Okay.  Now, did all of that growth happen

11:38   3    between 2014 and 2018?

11:38   4        A.    No.

11:38   5        Q.    Okay.  So after this number was identified and

11:38   6    placed in this business-oriented document, the company

11:38   7    continued to grow?

11:38   8        A.    Well, let me correct what I just said.  Most

11:38   9    of the acquisitions, as I understand it, were --

11:38   10   financially, the paperwork was completed by the end of

11:38   11   2018, I believe.  But yeah, the company continued to

11:38   12   grow after 2018.

11:38   13       Q.    Okay.  Thank you.

11:38   14             Bear with me.  When I'm looking down and

11:39   15   crossing something off, that means we're moving faster.

11:39   16   So please bear with me.

11:39   17             Thank you.

11:39   18       A.    I'm sure the juries appreciate that too.

11:39   19       Q.    During your direct testimony you mentioned --

11:39   20             MR. DEVLIN:  Thank you, Mr. Gooden.

11:39   21   BY MR. DEVLIN:

11:39   22       Q.    You mentioned that the purpose of

11:39   23   microchip.com was informational.  Remember that?

11:39   24       A.    Yes.  That's right.

11:39   25       Q.    What'd you mean by that?

—881—

11:39   1       A.    We provide a lot of information, you know.  I

11:39   2   told you that each silicon chip has a datasheet, and

11:39   3   sometimes they have another document called an errata.

11:39   4   And the errata is just corrections to the original

11:39   5   document.

11:39   6             Well, we have like 40,000 documents on our

11:39   7   website.  It's huge.

11:39   8       Q.    And lots of other pages as well, fair?

11:39   9       A.    Web pages, in addition to the documents.

11:39   10      Q.    Got it.  Thank you.

11:39   11            Okay.  And the purpose, though, is to be a

11:39   12  resource of information for --

11:40   13      A.    Right.

11:40   14      Q.    -- customers and potential customers?

11:40   15      A.    That's right.

11:40   16      Q.    Thank you.

11:40   17            And, you know, that was my fault.  I paused in

11:40   18  the middle of that question, so I apologize for that.

11:40   19            You mentioned some problems.  You had the old

11:40   20  house that's about to collapse, and then you got the

11:40   21  new house.  Remember that?

11:40   22            Okay.

11:40   23            And you had identified a bunch of problems,

11:40   24  loading issues, stability of the code.  Remember that?

11:40   25      A.    Yes.

11:40   1      Q.    Those existed before the transition to what

11:40   2   we're calling the original website here, what's accused

11:40   3   on the main web page, right?

11:40   4      A.    Those problems have happened prior to the coat

11:40   5   of paint and throughout the coat of paint, until we

11:40   6   redesigned the site.

11:40   7      Q.    Understood.  That's exactly what I'm getting

11:40   8   at though.

11:40   9      A.    Yeah.

11:40   10     Q.    All right.  Thank you.  That's great.

11:40   11           You talked about why you implemented -- let

11:41   12   me -- let's find words that you're okay with, okay?

11:41   13     A.    Okay.

11:41   14     Q.    We -- on the redesigned main website, which is

11:41   15   the current version, there's a breadcrumb, correct?

11:41   16     A.    Yes.

11:41   17     Q.    And it has no drop-down functionality, right?

11:41   18     A.    Yes.

11:41   19     Q.    And in the original version of the main

11:41   20   website, there was what we called a breadcrumb and it

11:41   21   had drop-down, right?

11:41   22     A.    The coat of paint site had that.  Yes.

11:41   23     Q.    Okay.  Give me a word that you're comfortable

11:41   24   with for that functionality, where you have a

11:41   25   breadcrumb that has drop-down.  I just want a label

—883—

11:41  1    that we can use as we discuss it.

11:41  2         A.   Yeah.  Let's just use breadcrumb.  Everybody

11:41  3    else seems to understand that.

11:41  4         Q.   Well, I need to distinguish between

11:41  5    breadcrumbs that don't have a drop-down versus ones

11:41  6    that do.  And that's what I'm trying to find a label

11:42  7    for that --

11:42  8         A.   Well, let's call it a secondary navigation.

11:42  9         Q.   Okay.

11:42  10        A.   Is that okay?

11:42  11        Q.   Are breadcrumbs in general an example of

11:42  12   secondary navigation?

11:42  13        A.   You could call them that.

11:42  14        Q.   So then that's not going to work, because I

11:42  15   need something that's going to distinguish between

11:42  16   breadcrumbs that don't have drop-down and breadcrumbs

11:42  17   that do.

11:42  18             How can we label for us, in a way that you're

11:42  19   happy, the breadcrumbs that do have drop-down that

11:42  20   distinguishes it from the breadcrumbs that don't?

11:42  21        A.   What do you want to call it?

11:42  22        Q.   How about breadcrumb with drop-down?  Is that

11:42  23   okay?

11:42  24        A.   That sounds fine.

11:42  25        Q.   All right.  We'll do that.

884

11:42  1          I don't want to create a label that your

11:42  2     counsel's going to get upset with.  That's what I'm

11:42  3     trying to do, okay?

11:42  4          A.    Okay.

11:42  5          Q.    Breadcrumb with drop-down.  All right.

11:42  6          So I think you said in your direct that you

11:42  7     decided to implement breadcrumb with drop-down because

11:42  8     it was happening on some sites; is that right?

11:42  9          A.    That's right.

11:42  10         Q.    You were going to try it out.  That's what you

11:42  11    said?

11:42  12         A.    That's right.

11:42  13         Q.    Okay.  Now, fair to say that Microchip is a

11:43  14    sophisticated company?

11:43  15         A.    Yes.

11:43  16         Q.    All right.  You're not -- you don't just copy

11:43  17    things for fads; is that fair?

11:43  18         A.    I don't copy things for -- what was that word?

11:43  19         Q.    Fad, f-a-d?  Frank, Ann, David.

11:43  20         A.    Oh, fad.

11:43  21         Q.    Fad.

11:43  22         A.    So with the Internet, you try different

11:43  23    things.  There's so many changes.  And honestly, you

11:43  24    just have try it out to see if it's going to resonate

11:43  25    with your customers.

885

11:43  1      Q.   Okay.  But would you agree or disagree?  Would

11:43  2  you say that Microchip goes along with fads, or would

11:43  3  you say that's not really a fair way to put it?

11:43  4      A.   That's not a fair way to put it.

11:43  5      Q.   Thank you.

11:43  6           Let's talk a little bit -- sorry to hop

11:44  7  around, but I want to go back to the Forum section a

11:44  8  little bit.

11:44  9           And you had mentioned that Microchip didn't --

11:44 10  doesn't write the software.  You acquired this software

11:44 11  package; is that right?

11:44 12      A.   Right.  We purchased the software license.

11:44 13      Q.   Okay.  When you say "purchased the license,"

11:44 14  that's from that ASP Playground?

11:44 15      A.   That's right.

11:44 16      Q.   Thanks so much.

11:44 17           Now, what they give to you is not exactly what

11:44 18  the Forum section looks like, right?

11:44 19      A.   It's a software package.

11:44 20      Q.   And then -- but Microchip has to make some

11:44 21  choices and to modify it in certain ways for your own

11:44 22  purposes, correct?

11:44 23      A.   There's some what they call configurations.

11:44 24      Q.   Thank you.  That was the word I was going to

11:44 25  use next.

11:44   1        So what happens is they give you a software

11:44   2   package of that certain functionality, and then

11:44   3   Microchip configures that software package for its use,

11:44   4   correct?

11:44   5        A.   I understand it -- I understand that to be

11:44   6   true.  I don't work a lot -- I've never worked in Forum

11:45   7   code.  So I don't know exactly what they did.

11:45   8        Q.   Great.  And I won't ask you, because you're

11:45   9   not the, you know, the person responsible for it, but I

11:45   10  just wanted to confirm that that does, in fact, happen

11:45   11  and it did, in fact, happen here.

11:45   12       Without going into the details of how it was

11:45   13  configured, Microchip did configure that Forum software

11:45   14  for its purposes here, right?

11:45   15       A.   We would have added things like the Microchip

11:45   16  logo and names of categories in the system.

11:45   17       Q.   Names of the categories like that appear --

11:45   18       A.   Uh-huh.

11:45   19       Q.   -- on those links and so forth, right?

11:45   20       A.   That's about it.

11:45   21       Q.   Okay.  Thank you.

11:45   22       How long have you known about the Salesforce

11:45   23  option?

11:45   24       A.   Maybe just the last few months.

11:45   25       Q.   Uh-huh.  Were there other Forum -- you've seen

—887—

| | | |
|---|---|---|
| 11:45 | 1 | other Forums available on the Internet over the years? |
| 11:45 | 2 | A.    Yeah. |
| 11:46 | 3 | Q.    Okay. |
| 11:46 | 4 | A.    But only recently, I should add that.  I |
| 11:46 | 5 | haven't really looked into that software before. |
| 11:46 | 6 | Q.    You haven't looked into Forum software |
| 11:46 | 7 | specifically for Microchip before. |
| 11:46 | 8 | Did I get that right? |
| 11:46 | 9 | A.    That's right.  That's what I mean. |
| 11:46 | 10 | Q.    Thank you. |
| 11:46 | 11 | That $215,000-a-day number, that appears on at |
| 11:46 | 12 | least one other report that was circulated during that |
| 11:46 | 13 | period of investigating or evaluating the redesign, |
| 11:46 | 14 | right? |
| 11:46 | 15 | Remember that? |
| 11:46 | 16 | A.    I remember it on two presentations, but they |
| 11:46 | 17 | were both done by Grace Ramon. |
| 11:46 | 18 | Q.    Okay.  Thank you. |
| 11:46 | 19 | We've talked about the server for the |
| 11:47 | 20 | microchip.com main page. |
| 11:47 | 21 | Now, the server for the Forum section in the |
| 11:47 | 22 | same way, that's also in the United States, right? |
| 11:47 | 23 | A.    Let me think.  The Forums software, I believe, |
| 11:47 | 24 | is hosted on Microsoft operating system servers in |
| 11:48 | 25 | Chandler. |

888

| | | |
|---|---|---|
| 11:48 | 1 | Q.    Chandler, Arizona? |
| 11:48 | 2 | A.    Arizona. |
| 11:48 | 3 | Q.    Okay.  And do you use Akamai to serve that or |
| 11:48 | 4 | host that at all? |
| 11:48 | 5 | A.    I don't know. |
| 11:48 | 6 | Q.    You don't know? |
| 11:48 | 7 | A.    I don't use that system. |
| 11:48 | 8 | Q.    Okay.  But it at least starts in -- or it's |
| 11:48 | 9 | hosted primarily at, you know, at the outset, at the |
| 11:48 | 10 | start of -- the center of the architecture, as it were, |
| 11:48 | 11 | in Chandler, Arizona? |
| 11:48 | 12 | A.    Yes.  I believe so. |
| 11:48 | 13 | Q.    Thank you. |
| 11:48 | 14 | I want to talk about the process of the |
| 11:49 | 15 | redesign and the implementation of that -- |
| 11:49 | 16 | A.    Sure. |
| 11:49 | 17 | Q.    -- over time. |
| 11:49 | 18 | Okay.  So you're aware that even as of |
| 11:49 | 19 | November or December of last year there were still |
| 11:49 | 20 | pages that had not been redesigned? |
| 11:49 | 21 | A.    It's possible that some of the old pages could |
| 11:49 | 22 | have still been on the Internet. |
| 11:49 | 23 | MR. DEVLIN:  If we could look at |
| 11:49 | 24 | Plaintiffs' Exhibit 35, which I believe is in evidence. |
| 11:49 | 25 | BY MR. DEVLIN: |

11:49   1          Q.    Do you see this is --

11:49   2                    MR. DEVLIN:  If we could just pull up

11:49   3    that -- and whole photo.  Yeah.

11:49   4                    Actually, I'd love the -- there we go.

11:50   5    Thanks.

11:50   6    BY MR. DEVLIN:

11:50   7          Q.    So you recognize this as a page from

11:50   8    microchip.com website, right?

11:50   9          A.    The old website.

11:50   10         Q.    The old -- what we're calling the original or

11:50   11   old website, right?

11:50   12         A.    That's right.

11:50   13         Q.    Okay.  Great.

11:50   14               And are you aware -- you heard Mr. Sherwood

11:50   15   say that when he was investigating in November or

11:50   16   December of last year, he found at least 100 or so

11:50   17   pages that actually functionally still worked like

11:50   18   this.

11:50   19               Do you remember that?

11:50   20         A.    Yes.  And I have no reason to doubt that.

11:50   21   But, you know, you're talking about a website with

11:50   22   25,000 pages.  So there could have been a few pages

11:50   23   left.

11:50   24         Q.    Sure.  Okay.

11:50   25               And is it -- is the thought that this has been

890

11:50  1    redesigned since then; so in other words, now all of

11:50  2    these pages have been shifted to the new redesigned

11:50  3    format?

11:50  4         A.    I believe so.  I believe they're all

11:51  5    substantially done.  There may be applications that go

11:51  6    around the website, you know, like the Forums, that are

11:51  7    not -- that are not at the new -- but when I talk about

11:51  8    microchip.com, I'm talking about the core of the

11:51  9    website itself.

11:51  10        Q.    Okay.  Like this page right here that we're

11:51  11   looking at?

11:51  12        A.    Yes.  This page is.

11:51  13        Q.    Okay.  So this page would have been redesigned

11:51  14   by now?

11:51  15        A.    Yes.

11:51  16        Q.    Okay.  And in the redesign, it will have a

11:51  17   breadcrumb that does not have the drop-down, right?

11:51  18        A.    That's right.

11:51  19        Q.    Okay.  Were you here during the openings?

11:51  20        A.    Yes.

11:51  21        Q.    Opening statements?

11:51  22        A.    I think so.

11:51  23        Q.    And I said there were some pages that hadn't

11:51  24   quite been redesigned in that way.

11:51  25              Do you remember that?

11:51   1       A.    I remember you saying that.  I don't remember

11:51   2   what pages you were referring to.

11:51   3       Q.    Okay.

11:51   4             MR. DEVLIN:  Mr. Gooden, are we able to

11:51   5   go to this exact page here?

11:51   6   BY MR. DEVLIN:

11:51   7       Q.    Let me ask you:  So here we are on the -- do

11:52   8   you recognize this as the same page we were just at?

11:52   9       A.    Yes.

11:52   10      Q.    Okay.  And the breadcrumb would exist below

11:52   11  that sort of image and above where it says "MCU/MPU

11:52   12  Development Tools," right?

11:52   13      A.    Yes.

11:52   14      Q.    And it's not there?

11:52   15      A.    Yes.  But as I look at this URL, it's not

11:52   16  formed correctly.  It doesn't have en-us.  This must be

11:52   17  a page that we did in the interim that is still on the

11:52   18  site, but it doesn't -- it's not the final version.

11:52   19      Q.    That's exactly my point.  So this is not

11:52   20  redesigned in the same way that many, many of the other

11:52   21  pages have been redesigned, as we've been talking about

11:52   22  during this case, right?

11:52   23      A.    Well, it's not exactly true.  With the

11:52   24  development tools pages in that section, we actually

11:52   25  changed the URL layout.  And they were -- they started

11:52  1    out pretty early on, and we didn't have the en-us in

11:53  2    it.

11:53  3              And so when we went that route, when we

11:53  4    decided, okay, we're going to do international sites,

11:53  5    so we need to prepare ahead of time and put en-us in

11:53  6    it, so this one would have been kind of a precursor to

11:53  7    what we ended up with.

11:53  8        Q.   So your thought is that this document --

11:53  9        A.   Uh-huh.

11:53  10       Q.   -- was converted earlier -- very early in the

11:53  11   redesign stage?

11:53  12       A.   Yes.

11:53  13       Q.   Okay.  Rather than it being available in

11:53  14   November or December of this year?

11:53  15       A.   Well, I don't know if it's still available or

11:53  16   not.  It was just designed earlier.

11:53  17       Q.   Okay.  I see.  But what we're seeing, though,

11:53  18   is that this has no breadcrumb at all.  That's been

11:53  19   either stripped out or commented out, right?

11:53  20       A.   Or it never was put in.

11:53  21       Q.   Well, we just saw the same page where it was

11:53  22   in there.

11:53  23       A.   Oh, yes.  You're right.  Well, that was the

11:53  24   old site, and this is the new site.

11:53  25       Q.   That's what I mean.  So in the new site what's

| | | |
|---|---|---|
| 11:53 | 1 | happened is, page looks the same -- |
| 11:53 | 2 | A.    Uh-huh. |
| 11:53 | 3 | Q.    -- but the entire breadcrumb, active or not, |
| 11:53 | 4 | has been either stripped out or commented out, right? |
| 11:54 | 5 | A.    It's not displaying on the page.  Yes. |
| 11:54 | 6 | Q.    Okay.  And the reason it's not displaying is |
| 11:54 | 7 | because the software code is not executing to display |
| 11:54 | 8 | it, right? |
| 11:54 | 9 | A.    Yes. |
| 11:54 | 10 | Q.    And the reason that's happening or not |
| 11:54 | 11 | happening is because that code that would display it |
| 11:54 | 12 | has either been deleted or commented out? |
| 11:54 | 13 | A.    Well, that would be a question for a software |
| 11:54 | 14 | developer. |
| 11:54 | 15 | Q.    One or the other, right? |
| 11:54 | 16 | A.    It would be a question for a software |
| 11:54 | 17 | developer. |
| 11:54 | 18 | Q.    There's no code executing to put the active -- |
| 11:54 | 19 | A.    I don't know -- |
| 11:54 | 20 | MR. JENSEN:  Objection.  Asked and |
| 11:54 | 21 | answered. |
| 11:54 | 22 | THE COURT:  Yeah. |
| 11:54 | 23 | Ladies and gentlemen, we're going to take |
| 11:54 | 24 | our lunch break. |
| 11:54 | 25 | MR. DEVLIN:  Thank you. |

11:54   1                    THE COURT:  If you all would remember my

11:54   2   instructions not to discuss the case amongst

11:54   3   yourselves.  We'll try to start at, as best we can, by

11:54   4   1:15 or so.  Thank you.

11:54   5                    THE BAILIFF:  All rise.

11:54   6                    (Jury exited the courtroom.)

11:54   7                    THE COURT:  Thank you.  You may be

11:55   8   seated.

11:55   9                    Mr. Devlin, is there anything we need to

11:55  10   take up?

11:55  11                    MR. DEVLIN:  I think we wanted to

11:55  12   organize our exhibits to correct the errors that we had

11:55  13   made yesterday.  And we also have the exhibit list that

11:55  14   was used this morning with Mr. Blok.

11:55  15                    THE COURT:  Okay.

11:55  16                    MR. DEVLIN:  And as I understand it, we

11:55  17   used both of these -- all of these exhibits now have

11:55  18   been agreed upon by both sides.  And we got our ducks

11:55  19   in a row.

11:55  20                    So on the first issue, yesterday we

11:55  21   offered Plaintiffs' 13 and Plaintiffs' 478.  And those

11:55  22   are being withdrawn.  Plaintiffs' 13 and Plaintiffs'

11:55  23   478.

11:55  24                    And then what I should have said

11:56  25   yesterday for those was Defendant's 189 and Defendant's

895

11:56    1    478.

11:56    2              MR. JENSEN:  And, Your Honor, we object

11:56    3    to Defendant's Exhibit 478.

11:56    4              MR. DEVLIN:  Your Honor, Defendant's

11:56    5    478 -- thank you for that.  My apologies.

11:56    6              Defendant's 478 is the one where -- it's

11:56    7    the -- it's the live website.  And so the parties are

11:56    8    going to talk about that and try to propose something

11:56    9    jointly to the Court about how to deal with that.

11:56   10              THE COURT:  Okay.

11:56   11              MR. DEVLIN:  And then today with Mr. Blok

11:56   12    we have Joint 15, Joint 16, Joint 17, Joint 18, Joint

11:56   13    19, Joint 21, Joint 104, Defendant's 467, and

11:56   14    Plaintiffs' 96.

11:56   15              And I'm going to apologize now.  I'm not

11:56   16    sure if that has been deduped with what had already

11:56   17    been admitted previously.  But that was what was used

11:57   18    with Mr. Blok.

11:57   19              THE COURT:  Any objections?

11:57   20              MR. JENSEN:  I'd like to double-check on

11:57   21    some of those.  But we can talk about that.  I'm not

11:57   22    aware at this moment.  I've just got that list right

11:57   23    now.  So...

11:57   24              MR. DEVLIN:  Well, that's fine.  That's

11:57   25    not quite right.  They've had the list, and my

—896—

11:57   1    understanding is they're okay with it.  But we'll deal

11:57   2    with it, Your Honor.

11:57   3                    THE COURT:  Just let us know.  Okay.

11:57   4                    Anything else?

11:57   5                    MR. DEVLIN:  Nothing from the plaintiff,

11:57   6    Your Honor.  Thank you.

11:57   7                    THE COURT:  Okay.

11:57   8                    THE BAILIFF:  All rise.

11:57   9                    (Recess taken.)

01:25  10                    THE BAILIFF:  All rise.

01:25  11                    THE COURT:  Please remain standing for

01:25  12    the jury.

01:25  13                    (Jury entered the courtroom.)

01:25  14                    THE COURT:  Thank you.  You may be

01:25  15    seated.

01:25  16                    Mr. Devlin?

01:26  17                    MR. DEVLIN:  Thank you, Your Honor.  May

01:26  18    it please the Court.

01:26  19    BY MR. DEVLIN:

01:26  20        Q.    You all set, Ms. Mahar?

01:26  21        A.    I think it's good.  Can you hear me?

01:26  22        Q.    Yeah.  Thank you.

01:26  23        A.    Great.

01:26  24        Q.    Let's just finish off where we -- or finish up

01:26  25    where we left off, just to clear that up.  So we had --

—897—

01:26  1              MR. DEVLIN:  I don't know if you can pull

01:26  2   that screen up again, Mr. Gooden.

01:26  3   BY MR. DEVLIN:

01:26  4      Q.   We're not going to delve into the details, but

01:26  5   I just want to center our minds on what we were looking

01:26  6   at.

01:26  7              So as I understood it, we agree that there's

01:26  8   no breadcrumb at all on this particular page which is

01:26  9   current.  It's what we're looking at live; is that

01:26  10  right?

01:26  11     A.   So I don't see it on the page.  But it doesn't

01:26  12  mean it wasn't in the code.

01:26  13     Q.   Right.  If it's in the code, you can comment

01:26  14  it out?

01:26  15     A.   That would be a question for a software

01:27  16  developer.

01:27  17     Q.   Right.  I'm just saying you know what

01:27  18  commenting out is.  I'm not -- I know you can't confirm

01:27  19  what happened with this page.  But I just want to talk

01:27  20  about what that is.  Let me just try it and you see if

01:27  21  you agree.

01:27  22              Commenting out is when you convert something

01:27  23  that can be executed or interpreted in code.  And

01:27  24  instead you put a little syntax in front of it, and

01:27  25  then it looks to the computer like a comment that it's

898

01:27   1    not going to execute; is that right?

01:27   2        A.    That would be a question for the software

01:27   3    developer.

01:27   4        Q.    Okay.  You've used that term, "commented out,"

01:27   5    right?

01:27   6        A.    Yes.

01:27   7        Q.    So that's what I'm saying.  I'm just

01:27   8    confirming that's one way that one can do something

01:27   9    with code so that it doesn't execute.  You can comment

01:27   10   it out, right?

01:27   11       A.    Yes.  But I don't know if that's what happened

01:27   12   here.

01:27   13       Q.    I understand that.

01:27   14       A.    Okay.

01:27   15       Q.    I'm just trying to confirm that we all know

01:27   16   what commented out means --

01:27   17       A.    Okay.

01:27   18       Q.    -- and what that says.  Okay.  Awesome.

01:27   19   Great.

01:27   20             So the breadcrumb code might be in there

01:27   21   somewhere but commented out or it might be gone.  You

01:27   22   don't know?

01:27   23       A.    I don't know.

01:27   24       Q.    Great.  But we can agree it's not executing.

01:27   25   There's no breadcrumb on the page that we see, right?

01:27  1           MR. JENSEN:  Objection, asked and

01:28  2  answered.  Calls for speculation.

01:28  3           THE COURT:  Sustained.

01:28  4           MR. DEVLIN:  Thank you.

01:28  5  BY MR. DEVLIN:

01:28  6      Q.   So, if I heard you right before, the -- what

01:28  7  your thought was, was that this would have been a page

01:28  8  that had been redesigned early on before you made some

01:28  9  decisions about putting in that en.us (sic) snippet?

01:28  10     A.   Yes.  That's right.

01:28  11     Q.   Okay.  Thank you.

01:28  12          MR. DEVLIN:  We can take that down.

01:28  13  BY MR. DEVLIN:

01:28  14     Q.   I want to circle back and just get another

01:28  15  little bit of information about something we talked

01:28  16  about before, which was the sales that are driven by

01:28  17  microchip.com to microchipdirect.com.

01:28  18          Are you with me?

01:28  19     A.   Sure.

01:28  20     Q.   Okay.  And the relationship between that and

01:28  21  the different versions of the website over the years.

01:28  22  Remember that?

01:28  23     A.   Okay.

01:28  24     Q.   Okay.  Great.

01:28  25          And so I think you said that when the new

01:28  1    version of the website came online, that the sales went

01:29  2    up a lot?

01:29  3        A.   No.  What I said was that the sales went up a

01:29  4    lot from 2014 to 2020 and even today over time.

01:29  5        Q.   Okay.  Thank you.

01:29  6             And I'm glad we cleared that up because

01:29  7    there's -- that's a separate issue in my mind, I think.

01:29  8    So let me know.  I thought you had said something like

01:29  9    when the conversion was made to the redesigned website,

01:29  10   that that also caused the sales to go up.

01:29  11            But did I misunderstand that?  Maybe I made it

01:29  12   up.

01:29  13       A.   I don't recall saying that.

01:29  14       Q.   Okay.  Thank you.

01:29  15            You mentioned that, to your knowledge,

01:29  16   Microchip would never willfully infringe anyone's

01:29  17   patents.

01:29  18            Did I get that right?

01:29  19       A.   Yes.

01:29  20       Q.   Okay.  Now, I know Microchip hired litigation

01:29  21   counsel, obviously.

01:29  22            Are you aware of whether Microchip ever hired

01:30  23   something called "opinion counsel" to provide an

01:30  24   independent legal opinion about infringement?

01:30  25            Are you aware of anything like that?

01:30   1        A.    That would be a question for the attorneys.

01:30   2        Q.    Okay.  So you're not aware of it, is what I'm

01:30   3   saying?

01:30   4        A.    No.

01:30   5        Q.    Okay.  Thank you.

01:30   6              How's the reception been in the community, the

01:30   7   user community, to the redesigned website?

01:30   8        A.    So we don't hear compliments a lot.  We hear

01:30   9   complaints.  But this time we heard some compliments.

01:30   10   Hey, that site loads fast.  Thank you so much.  And I

01:30   11   can find what I need to find.  Thank you so much.  The

01:30   12   search is working great, so much improved.  Things like

01:30   13   that.

01:30   14              MR. DEVLIN:  Let's go onto the Forum

01:31   15   website now.

01:31   16   BY MR. DEVLIN:

01:31   17        Q.    And we can see -- so this is live on the

01:31   18   Forums website.

01:31   19              And do you see this is -- this is how the

01:31   20   Forum works.  There's posts.  Someone can make a post,

01:31   21   right?

01:31   22        A.    Correct.

01:31   23        Q.    And then others --

01:31   24              MR. DEVLIN:  If you just scroll,

01:31   25   Mr. Gooden.

01:31  1    BY MR. DEVLIN:

01:31  2        Q.    Others can respond to that post and, you know,

01:31  3    comment back or ask questions or whatever.  That's how

01:31  4    Forum looks, right?

01:31  5        A.    Correct.

01:31  6        Q.    This is a typical page from the Forum website?

01:31  7        A.    Correct.

01:31  8        Q.    Great.  Okay.

01:31  9              And this one is a page where someone was

01:31  10   making this first comment on November 16th, 2020.

01:31  11             Do you see that?

01:31  12       A.    Yeah.

01:31  13       Q.    Okay.  And it looks like they're -- in this

01:31  14   first post, they've got some thoughts here.  And then

01:31  15   about eight lines downs there's a word that says

01:31  16   "recently," right near the bottom of that post.

01:31  17             MR. DEVLIN:  Hold that, Mr. Gooden.

01:31  18   BY MR. DEVLIN:

01:31  19       Q.    Now, I think you said that the start of the

01:31  20   implementation of the redesign was in June 2020; is

01:31  21   that right?

01:31  22       A.    That's right.

01:31  23       Q.    Okay.  So here we're in November 2020, but it

01:32  24   was gradual.  Is that what you said, over time?

01:32  25       A.    Yeah.

01:32   1          Q.    Okay.  And so this poster is saying:

01:32   2   Recently, I tend to have the impression that it has

01:32   3   become more difficult to find information on the

01:32   4   Microchip website.

01:32   5          You see that?

01:32   6          A.    Yes.

01:32   7          Q.    Okay.  Let's go to another one.

01:32   8                MR. JENSEN:  Objection, Your Honor.  This

01:32   9   is hearsay.  He's just reading third-party comments off

01:32  10   the Internet.

01:32  11                MR. DEVLIN:  Well, they've made an issue

01:32  12   of the reaction, and we're not here for matters

01:32  13   asserted.  This is people's reactions.

01:32  14                THE COURT:  Sustained.

01:32  15                MR. DEVLIN:  Thank you.

01:32  16   BY MR. DEVLIN:

01:32  17          Q.    Have you seen any other negative comments?

01:32  18          A.    Oh, I'm sure there have been some that have

01:32  19   come in.

01:32  20          Q.    Okay.

01:32  21          A.    You know.

01:32  22          Q.    That's it?  Some that have come in?

01:32  23          A.    Yeah.

01:32  24          Q.    All right.  You've seen that happen?

01:32  25          A.    Uh-huh.

904

01:32  1        Q.    All right.  Thank you so much.

01:32  2                    MR. DEVLIN:  Nothing further.

01:32  3                    REDIRECT EXAMINATION

01:32  4   BY MR. JENSEN:

01:33  5        Q.    I have just a couple of follow-up questions

01:33  6   for you, Ms. Mahar.

01:33  7              You were asked some questions about the Forum

01:33  8   website at the beginning of Mr. Devlin's questioning,

01:33  9   where he pulled up the site on the screen.

01:33  10             Do you recall that?

01:33  11       A.    Yes.

01:33  12       Q.    And he kind of navigated some links?

01:33  13       A.    Yes.

01:33  14       Q.    And the software for the Forum website is

01:33  15  provided by a third party, correct?

01:33  16       A.    Yes.

01:33  17       Q.    And that's ASP Playground?

01:33  18       A.    Yes.

01:33  19       Q.    And that's not Microchip software?

01:33  20       A.    No.

01:33  21       Q.    Okay.  And your primary responsibility at

01:33  22  Microchip is not for the Forum website, is it?

01:33  23       A.    That's correct.

01:33  24       Q.    And you don't regularly use the Forum website

01:33  25  as part of your job?

01:33    1      A.    No.   I don't.

01:33    2      Q.    And you're not here to testify today about the

01:33    3   issue of infringement in this case, are you?

01:33    4      A.    No.   I'm not.

01:33    5      Q.    And we haven't heard yet from Mr. Tittel,

01:33    6   Microchip's technical expert, have we?

01:33    7      A.    No.   We haven't.

01:34    8      Q.    And Mr. Devlin didn't walk through with you

01:34    9   the claim elements like he did with Mr. Sherwood over

01:34   10   an extended period of time?

01:34   11      A.    No.

01:34   12      Q.    And you haven't performed any analysis or

01:34   13   prepared any opinions on the patents in this case, have

01:34   14   you?

01:34   15      A.    No.

01:34   16      Q.    And you're not a patent expert?

01:34   17      A.    No.

01:34   18      Q.    All right.

01:34   19      A.    No.

01:34   20           MR. JENSEN:   Mr. Thompson, could we pull

01:34   21   up Defendant's Exhibit -- I believe it's 463, the

01:34   22   video?

01:34   23   BY MR. JENSEN:

01:34   24      Q.    And Mr. Devlin asked you, I think, some

01:34   25   questions, Ms. Mahar, about what he called "labels."

906

01:34    1      A.    Yes.

01:34    2      Q.    Okay.  I'd like to ask just one or two

01:34    3  follow-up questions on that topic once we get the

01:34    4  video.

01:35    5              MR. JENSEN:  Okay.  There we go.  Thank

01:35    6  you.

01:35    7              And could you just play the video one

01:35    8  time through, Mr. Thompson?

01:35    9              (Video played.)

01:35   10  BY MR. JENSEN:

01:35   11      Q.    And while this is playing, please just watch

01:35   12  the path that is selected, Tools and Software, Embedded

01:35   13  Software Center, MPLAB® Connect Configurator.

01:35   14              MR. JENSEN:  Okay.  And you can just

01:35   15  pause it there.

01:35   16  BY MR. JENSEN:

01:35   17      Q.    And the resulting menu path includes links for

01:35   18  Home, Interface and Connectivity, USB, and then MPLAB®

01:35   19  Connect Configurator.

01:35   20          Do you see that?

01:35   21      A.    Yes.

01:35   22      Q.    If you were to click on, for example, the USB

01:35   23  link, would that load any of the pages that were

01:35   24  previously navigated?

01:35   25              THE COURT:  Counsel --

01:35   1                    MR. DEVLIN:  Objection.  Calls for
01:35   2   speculation.  She said she doesn't know.
01:35   3                    THE COURT:  Why don't you ask her if she
01:35   4   knows, and then that'll take care of at least the
01:35   5   objection, and we'll go from there.
01:36   6   BY MR. JENSEN:
01:36   7       Q.   Ms. Mahar, do you know what page would load
01:36   8   if -- strike that.  Let me ask the question this way.
01:36   9            Would a USB page load if someone were to click
01:36  10   on the USB link?
01:36  11       A.   Yes.
01:36  12       Q.   Okay.  And a USB page was not one of the links
01:36  13   that was navigated by the user?
01:36  14       A.   That's right.
01:36  15       Q.   Okay.
01:36  16                    MR. JENSEN:  No further questions.
01:36  17                    THE COURT:  Mr. Devlin?
01:36  18                    RECROSS-EXAMINATION
01:36  19   BY MR. DEVLIN:
01:36  20       Q.   You don't know who made that video, do you?
01:36  21       A.   No.
01:36  22       Q.   Okay.  There are many, many, many, many
01:36  23   hundreds of such progressions one can make through the
01:36  24   main website through the different options in the
01:36  25   various levels of the hierarchical menu structure,

01:36  1  right?

01:36  2     A.    Like any website, there's lots of ways to get

01:36  3  to different pages, yes.

01:36  4     Q.    Right.  What I mean is there's lots and lots

01:37  5  of pages, is what I'm saying.

01:37  6     A.    Yeah.  Our website's -- is huge.

01:37  7     Q.    Okay.  Got it.

01:37  8           And the point, I guess, here is for this

01:37  9  particular website, it doesn't look like these things

01:37  10  line up.

01:37  11          Did I get that right?

01:37  12     A.    Yes.

01:37  13     Q.    Okay.  Now, for some of them, they would line

01:37  14  up?

01:37  15     A.    If we made them that way.

01:37  16     Q.    All right.  And you did make them that way for

01:37  17  some of them?

01:37  18     A.    Yes.

01:37  19     Q.    All right.  Thank you.

01:37  20              MR. DEVLIN:  Nothing further.

01:37  21              MR. JENSEN:  No further questions.

01:37  22              THE COURT:  You may step down, ma'am.

01:37  23              Who's your next witness?

01:37  24              MR. JENSEN:  Microchip calls Mr. Ed

01:37  25  Tittel.

909

| 01:37 | 1 | Before Mr. Tittel takes the stand, could |
| 01:37 | 2 | we confirm with the plaintiff that their case-in-chief |
| 01:37 | 3 | is now closed? |
| 01:37 | 4 | MR. DEVLIN:  Subject to the issues we |
| 01:37 | 5 | raised before, Your Honor, yes.  Our direct case is |
| 01:38 | 6 | closed. |
| 01:38 | 7 | Thank you. |
| 01:38 | 8 | (The witness was sworn.) |
| 01:38 | 9 | DIRECT EXAMINATION |
| 01:38 | 10 | BY MR. JENSEN: |
| 01:38 | 11 | Q.    We're getting you a binder, Mr. Tittel. |
| 01:38 | 12 | Please bear with us just one moment. |
| 01:38 | 13 | Good afternoon, Mr. Tittel. |
| 01:39 | 14 | A.    Good afternoon. |
| 01:39 | 15 | Q.    Could you please state and spell your name for |
| 01:39 | 16 | the record? |
| 01:39 | 17 | A.    Sure.  My name is Edward Tittel.  E-d-w-a-r-d |
| 01:39 | 18 | T-i-t-t-e-l. |
| 01:39 | 19 | Q.    Where do you reside? |
| 01:39 | 20 | A.    I reside in Round Rock, Texas. |
| 01:39 | 21 | Q.    And what do you do for a living? |
| 01:39 | 22 | A.    I'm a writer, consultant, and a part-time |
| 01:40 | 23 | expert witness. |
| 01:40 | 24 | Q.    Do you work for a company? |
| 01:40 | 25 | A.    No, sir. |

01:40  1      Q.    Are you on your own, so to speak?

01:40  2      A.    I'm pretty much self-employed.  That's right.

01:40  3      Q.    Mr. Tittel, do you have a resume?

01:40  4      A.    I do.

01:40  5      Q.    Okay.

01:40  6                 MR. JENSEN:  Mr. Thompson, could you pull

01:40  7  up Mr. Tittel's resume, please?

01:40  8  BY MR. JENSEN:

01:40  9      Q.    And while that's coming up, let me just ask

01:40  10  you.  What -- well, how long have you been kind of

01:40  11  self-employed, as you put it?

01:40  12     A.    With a couple of small gaps, since 1994.

01:40  13     Q.    And without going too far back into ancient

01:40  14  history, at a very high level, what were you doing kind

01:40  15  of prior to that time?

01:40  16     A.    You mean prior to 1994?

01:40  17     Q.    Yeah.

01:40  18     A.    I was working as a software developer and as a

01:40  19  training developer and a slide jockey for a variety of

01:40  20  different companies.

01:41  21     Q.    Let me kind of ask -- well, first off, is this

01:41  22  a copy of your resume that we see on the screen?

01:41  23     A.    Yes.  It is.

01:41  24     Q.    And I'm not going to walk through all of the

01:41  25  kind of prior work experience, et cetera, that you

01:41   1   have.  But I did want to ask kind of, you know, what
01:41   2   were you doing in the, let's say, early 2002 time frame
01:41   3   when the patent application in this case was filed?
01:41   4       A.    In the period from the late '90s through 2002,
01:41   5   I was involved in writing books and in developing
01:41   6   courses.  I was also an adjunct member of the faculty
01:41   7   at Austin Community College for whom I developed a
01:41   8   four-course sequence for a webmaster certification.
01:41   9       Q.    And your mention of the community college
01:41  10   reminded me, I did want to ask a little bit about your
01:41  11   kind of academic background.
01:41  12            Do you have some academic credentials that are
01:42  13   listed in your resume?
01:42  14       A.    I do.
01:42  15       Q.    Okay.
01:42  16                MR. JENSEN:  Could we jump, I think, to
01:42  17   the --
01:42  18       A.    The bottom of Page 2.
01:42  19   BY MR. JENSEN:
01:42  20       Q.    Okay.
01:42  21       A.    There we go.
01:42  22       Q.    And as it relates to this case, what sort of
01:42  23   degrees or diplomas have you obtained?
01:42  24       A.    I have a bachelor's equivalency in computer
01:42  25   science from the University of Texas at Austin.  And

01:42  1    about 18 additional graduate hours of credit from their

01:42  2    graduate school.

01:42  3         Q.    Do you hold any other degrees?

01:42  4         A.    Yes.  I hold two other degrees.

01:42  5         Q.    What are those?

01:42  6         A.    I have a bachelor's from Princeton that I got

01:42  7    in 1973 and a master's from the University of Texas in

01:42  8    1979, both of which are in anthropology.

01:42  9         Q.    Mr. Tittel, do you have any publications that

01:42  10   relate to the subject matter of this case?

01:42  11        A.    Yes.  I do.

01:42  12        Q.    Can you give me an example of one of those?

01:42  13        A.    Well, it just so happens that I brought some

01:42  14   with me.

01:42  15              (Laughter.)

01:42  16   BY MR. JENSEN:

01:42  17        Q.    All right.

01:42  18        A.    Let's see.  Where did I put them?

01:43  19              What really got me started on working on the

01:43  20   web was writing the first edition of "HTML For Dummies"

01:43  21   in 1995.  Unfortunately, I couldn't find it anymore, so

01:43  22   I brought the 14th edition of that book which came out

01:43  23   in 2013.

01:43  24              And --

01:43  25        Q.    Let me just pause you there and ask:  Is

01:43   1    that -- so the "HTML For Dummies."  What is HTML?

01:43   2        A.    HTML is the HyperText Markup Language.  It's

01:43   3    sort of the basic way of defining what shows up on a

01:43   4    web page in a browser.

01:43   5        Q.    And were you the -- I want to make sure I

01:43   6    caught this.  Were you the co-author or principal

01:43   7    author on that book?  What was your role in the "HTML

01:43   8    For Dummies" series?

01:43   9        A.    I was approached by my agent and asked to

01:43   10   write the book.  And I recruited another friend of mine

01:43   11   to help me.  And I wrote the outline and a little bit

01:43   12   more than half the book.  And I've been working on it

01:43   13   ever since.

01:43   14       Q.    And you said it's in the 14th edition now?

01:43   15       A.    Yes.  That's correct.

01:44   16       Q.    Mr. Tittel, do you have a CV?

01:44   17       A.    I do.

01:44   18       Q.    And what is a CV?

01:44   19       A.    A CV is a Latin phrase.  It stands for

01:44   20   curriculum vitae, which means a listing of things from

01:44   21   one's life.  But in this case it's just a list of

01:44   22   publications.

01:44   23       Q.    All right.

01:44   24              MR. JENSEN:  Mr. Thompson, could you

01:44   25   please pull up Mr. Tittel's CV?

914

01:44  1    BY MR. JENSEN:

01:44  2        Q.   And while that's coming up -- all right.

01:44  3    Looks like we've got it up here right now.  Okay.

01:44  4             And how long is this CV?  I can't tell by

01:44  5    looking at the front page.

01:44  6        A.   It's 86 pages long.

01:44  7        Q.   86 pages.  And at a high -- we're not going to

01:44  8    go through 86 pages of material in your CV, believe me.

01:44  9    But can you just give me a sense, kind of a summary

01:44 10    level, what sort of materials are listed in your CV?

01:44 11        A.   You bet.  If you take a look at the top of the

01:44 12    page there, it has a list of different topics.  There's

01:44 13    books and custom books, and then books either I edited

01:44 14    or just contributed pieces to.  There's white papers

01:45 15    and tech briefs, webinars, blogs, certification

01:45 16    articles, magazines articles, other writing, and

01:45 17    projects in progress.

01:45 18             (Clarification by the reporter.)

01:45 19    BY MR. JENSEN:

01:45 20        Q.   Approximately how many or what percentage of

01:45 21    your writings and publications relate to website design

01:46 22    and development?

01:46 23        A.   About 40 percent.

01:46 24        Q.   And how long have you been publishing in this

01:46 25    area?

01:46   1        A.    Well, the first thing that I published on this

01:46   2    subject matter was the first edition of "HTML For

01:46   3    Dummies," and that came out in 1995.  So that was,

01:46   4    what?  37 years ago.  Yeah.  I think so.

01:46   5        Q.    All right.  And what sorts of web-related

01:46   6    topics have you published on?

01:46   7        A.    I've written about HTML.  I've written about

01:46   8    XML.  I've written about XHTML.  I've written about

01:46   9    Cascading Style Sheets.  I've written about web design.

01:46   10   I've written about a variety of programming languages

01:46   11   that run in the web environment, including Java and

01:46   12   JavaScript.

01:46   13          And also I have written a book on e-commerce,

01:46   14   building -- web e-commerce sites came out, I believe,

01:46   15   in 1997.  And as far as I can tell, it was one of the

01:46   16   first ever books to come out on that subject matter.

01:47   17          And a year before that -- this is actually the

01:47   18   second edition of a book, but the first title was so

01:47   19   long I think the publisher decided they needed

01:47   20   something shorter, so they called it the CGI Bible.

01:47   21       Q.    And what is CGI?  I've heard of that in the

01:47   22   context of, like, special effects for movies.

01:47   23          What is a CGI in the context of websites?

01:47   24       A.    It stands for the common gateway interface,

01:47   25   and it was defined at NCSA by Rob McCool in the 1993

916

01:47  1   time frame as the first way to hook other programs up

01:47  2   to a web server so that you could have a web server

01:47  3   call on a database or interact with another program and

01:47  4   essentially get the web pages to do more than HTML can

01:47  5   do by itself.

01:47  6       Q.    Do you cover the topics of web navigation in

01:47  7   any of your books?

01:47  8       A.    Yes.  I do.

01:47  9       Q.    And you mentioned the "For Dummies" book, I

01:48  10  think, was first published in 1995; is that correct?

01:48  11      A.    Correct.

01:48  12      Q.    Is that before or after the Google website had

01:48  13  launched?

01:48  14      A.    Well, Google started in 1998, so I guess it

01:48  15  was before.

01:48  16      Q.    So you were publishing in the area of website

01:48  17  design and development before the advent of Google?

01:48  18      A.    Yes, sir.

01:48  19      Q.    And sounds like some of your books go back,

01:48  20  you know, quite a ways, some decades.

01:48  21            Are you still actively publishing in these

01:48  22  areas today?

01:48  23      A.    We're actually in the process of negotiating

01:48  24  the 15th edition of "HTML for Dummies" right now.  And

01:48  25  I still write publications for a couple of different

01:48   1   publishers, including Wiley, who now owns the Dummies

01:48   2   brand, and also an outfit called ActualTech Media that

01:48   3   publishes for a variety of different industries.

01:48   4       Q.   Have you ever previously testified in court as

01:48   5   a witness?

01:48   6       A.   Yes.  I have testified at three previous

01:49   7   trials.

01:49   8       Q.   And were those trials in patent cases?

01:49   9       A.   Yes.  They were.

01:49   10      Q.   Did they relate to website design?

01:49   11      A.   By and large, yes.

01:49   12      Q.   Approximately how much of your time do you

01:49   13  devote to this type of expert witness work as opposed

01:49   14  to your, you know, writing and other endeavors?

01:49   15      A.   That's about 25 or 20 percent, and the reason

01:49   16  why I don't do more is because I like to keep my other

01:49   17  writing engagements up and running, and I don't want to

01:49   18  get too overwhelmed with legal work.

01:49   19      Q.   You showed -- kind of did a little

01:49   20  show-and-tell with a few books there.

01:49   21           What was your best selling book?

01:49   22      A.   Well, that would be "HTML For Dummies" by

01:49   23  virtue of having gone through so many editions.  It

01:49   24  sold a total of over two million copies across all

01:49   25  editions.

918

01:49   1        Q.    I hope you get royalties for that.

01:49   2        A.    Amen.

01:49   3        Q.    Mr. Tittel, have you ever created a website?

01:50   4        A.    Yes.  I have.

01:50   5        Q.    Okay.

01:50   6              MR. JENSEN:  At this time, Your Honor,

01:50   7   I'd like to offer Mr. Tittel as an expert in website

01:50   8   design, development, and implementation.

01:50   9              MR. DEVLIN:  No objection.

01:50   10             THE COURT:  He'll be admitted.

01:50   11   BY MR. JENSEN:

01:50   12       Q.    Mr. Tittel, did you prepare some demonstrative

01:50   13   slides to assist with the presentation of your

01:50   14   testimony today?

01:50   15       A.    Yes, sir.  I did.

01:50   16             MR. JENSEN:  Mr. Thompson, why don't we

01:50   17   go ahead and pull those slides up?

01:50   18   BY MR. JENSEN:

01:50   19       Q.    And let me just ask another question here.

01:50   20   You've been with us throughout the trial the entire

01:50   21   time in the galley in the back; is that right?

01:50   22       A.    Yes, sir.

01:50   23       Q.    Okay.  And you were here when Mr. Sherwood

01:50   24   testified as well?

01:50   25       A.    I was.

919

01:50   1        Q.    Okay.  Before we kind of dig in and get into

01:50   2    the meat of your testimony, I wanted to ask you if you

01:50   3    could provide just a high-level summary of what it was

01:50   4    that you undertook to do, what were you asked to

01:51   5    evaluate, and what conclusions and opinions did you

01:51   6    reach?

01:51   7        A.    I was asked to provide a noninfringement

01:51   8    summary of the various Microchip websites that were the

01:51   9    subject of this process we're involved in, and that

01:51   10   included the old website, the redesigned website, and

01:51   11   the Forum website.

01:51   12            And as far as the old website goes, as I will

01:51   13   be explaining, I concluded that Microchip did not

01:51   14   infringe.

01:51   15            The redesigned website is not accused.  So it

01:51   16   does not infringe either.

01:51   17            And as I examined the Forum section and looked

01:51   18   at the behavior of that website, I concluded that it

01:51   19   also does not infringe.

01:52   20       Q.    Okay.  And then I wanted to ask you to maybe

01:52   21   go one step further for each of these websites and just

01:52   22   provide -- maybe I could call it -- the top-line reason

01:52   23   as to why you concluded each one did not infringe.

01:52   24            And I understand you may have additional

01:52   25   reasons, and we may explore some of those in further

01:52  1     detail, but I wanted to focus just at the outset on

01:52  2     what is the -- or maybe you'd call it the primary

01:52  3     reason that the original website did not infringe?

01:52  4          A.    Sure.  Essentially, after examining the

01:52  5     behavior of the website and its use of breadcrumbs, I

01:52  6     came to the conclusion that there is no Active Path as

01:52  7     defined by the Court's construction and in the patents

01:52  8     at issue.

01:52  9          Q.    And I see you included a little figure here

01:52  10    with the soccer ball and football.

01:53  11                What does that have reference to?

01:53  12         A.    Well, that's a little bit of a reminder of

01:53  13    some slides that the jury has seen before that

01:53  14    basically talks about the way you decide if a claim is

01:53  15    infringed or not.

01:53  16                And the requirement is that all elements in a

01:53  17    claim must be infringed in order for infringement to

01:53  18    occur.  And the notion of all elements not met means

01:53  19    that one or more of the claims -- of the claim elements

01:53  20    is not infringed and, therefore, the claim itself is

01:53  21    not infringed.

01:53  22         Q.    And what is the top-line reason, in your

01:53  23    opinion, that the redesigned website does not infringe?

01:53  24         A.    Well, the redesigned website no longer has a

01:53  25    drop-down menu.  So without the cascade for the

01:53   1   hierarchical menus, you can't have an Active Path and,

01:54   2   therefore, the redesigned website does not infringe.

01:54   3       Q.    And with respect to the Forum website, I see

01:54   4   you've highlighted kind of two sections of the claim

01:54   5   here.

01:54   6           Is that because there are two primary reasons?

01:54   7       A.    Yes, sir.  That's correct.

01:54   8           The preamble of the Forum website essentially

01:54   9   says a method for navigating, and that means that an

01:54   10  actor has to do something.  And what I'm saying is that

01:54   11  Microchip does not infringe because Microchip is not

01:54   12  the actor that's doing the work with Forums.

01:54   13          The second reason on the slide is that there

01:54   14  is not a one-to-one correspondence between the number

01:54   15  of selections that the user makes when they're

01:55   16  navigating the Forum website and the number of links

01:55   17  that show up in the breadcrumb.

01:55   18      Q.    And what claims did you analyze with respect

01:55   19  to your noninfringement opinions?

01:55   20      A.    I analyzed the claims shown here in this slide

01:55   21  for the various patents at issue.  The ones that are in

01:55   22  bold are called independent claims, and the ones that

01:55   23  are in regular text are dependent claims, which means

01:55   24  they depend on one of the independent claims that is

01:55   25  shown.  And typically, it looks like, from looking at

01:55  1    the diagram now, they're all in the left-hand column

01:55  2    there.

01:55  3         Q.    And are these the same claims that

01:55  4    Mr. Sherwood testified about?

01:56  5         A.    Yes, sir.  That's correct.

01:56  6         Q.    It includes all the claims he analyzed and no

01:56  7    additional ones?

01:56  8         A.    Gosh, I hope not.

01:56  9         Q.    It's a lot to keep track of.  There's a lot of

01:56  10   claims.

01:56  11              MR. JENSEN:  Mr. Thompson, could we pull

01:56  12   up Slide 2 from the slides that Mr. Sherwood presented?

01:56  13   BY MR. JENSEN:

01:56  14        Q.    And, Mr. Tittel, while that's coming up, I

01:56  15   want to ask you if you're familiar with the concept of

01:56  16   what's referred to as a person of ordinary skill in the

01:56  17   art?

01:56  18        A.    Yes.  I am.  And that's usually pronounced as

01:56  19   a "POSITA" or "POSITA," depending on how you like to

01:56  20   speak out your acronyms.

01:56  21              It refers to a person who, at the time of the

01:56  22   patent's filing, had what you might consider to be an

01:56  23   ordinary understanding of the subject matter related to

01:56  24   the patent.

01:56  25              They would have certain levels of education,

01:57 1    certain levels of experience, certain areas of
01:57 2    knowledge and skill, and all those things taken
01:57 3    together define a person of ordinary skill in the art.
01:57 4        Q.    And did you form an opinion as to what the
01:57 5    level of ordinary skill in the art would be, in this
01:57 6    case, back in 2002 for, you know, kind of an ordinary
01:57 7    software developer?
01:57 8        A.    Well, I would say an ordinary web developer,
01:57 9    but --
01:57 10       Q.    Thank you.
01:57 11       A.    -- yes.  I did.
01:57 12       Q.    Okay.  And you see on the screen here, this is
01:57 13   a slide from Mr. Sherwood's presentation that sets
01:57 14   forth his -- I'll call it a definition of the level of
01:57 15   skill in the art.
01:57 16           Did you have an opportunity to review this?
01:57 17       A.    I did.
01:57 18       Q.    Does it match identically with your definition
01:57 19   of a person of ordinary skill in the art?
01:57 20       A.    No.  It does not.
01:57 21           Mine says two to three years of experience
01:57 22   working in the field, whereas his says three to five
01:57 23   years of working in the field.  And there's a couple
01:57 24   reasons for that.
01:57 25           One of them is that in 2002 the web hadn't

01:58   1   really been a big thing for all that long, so -- and it

01:58   2   was getting to be a hot thing.  So it would have been a

01:58   3   little bit harder to find people with relatively more

01:58   4   experience.  But I don't disagree with Mr. Sherwood's

01:58   5   characterization.

01:58   6       Q.    Would it make a difference, one way or the

01:58   7   other, to your opinions in this case whether you

01:58   8   applied Mr. Sherwood's definition or your definition of

01:58   9   a person of ordinary skill?

01:58   10      A.    No.  It would not.

01:58   11      Q.    Okay.  And in 2002, did you possess the

01:58   12   qualifications of a person of ordinary skill in the

01:58   13   art?

01:58   14      A.    Yes.  I think so.

01:58   15      Q.    And it looked like maybe you possessed more

01:58   16   than that?

01:58   17      A.    I hope so.

01:58   18      Q.    In forming your opinions in this case, did you

01:58   19   form those opinions from the perspective of an ordinary

01:58   20   person of skill in the art or of someone who had

01:58   21   additional, you know, qualifications and credentials?

01:58   22      A.    Well, the requirement for doing an

01:59   23   infringement analysis is that you consider the POSITA

01:59   24   as your point of reference.  So I did it from the

01:59   25   perspective of a person of ordinary skill in the art as

01:59  1    I was required to do.

01:59  2                    MR. JENSEN:  Mr. Thompson, you can take

01:59  3    that down, and let's go back to the slide presentation.

01:59  4                    Let's -- can we -- I think you need to

01:59  5    activate the clicker here.  Okay.

01:59  6    BY MR. JENSEN:

01:59  7        Q.   In forming your opinions and conducting your

01:59  8    analysis, Mr. Tittel, what materials did you consider

01:59  9    or analyze?

01:59  10       A.   Well, it's no accident that we see those

01:59  11   materials on a table and covering most of that table

01:59  12   up, because I actually had to review quite a lot of

01:59  13   materials.

01:59  14            It started out with the patents-in-suit and

01:59  15   their file history.  And if you put them in a pile on

01:59  16   top of each other, the file history would account for

01:59  17   most of that stuff there.  It also includes all kinds

02:00  18   of legal filings, like the Judge's claim construction

02:00  19   order in the case, and various kinds of interrogatories

02:00  20   and responses, and various other kinds of pleadings and

02:00  21   materials related to the case.

02:00  22            I looked at source code and manuals for the

02:00  23   websites at issue and plenty of other websites besides,

02:00  24   to try to get a sense of how the world worked and what

02:00  25   was going on at the time.

02:00   1          I did read the third-party analysis materials

02:00   2   from Dynamic Range Labs, the DRL that you see there on

02:00   3   the slide.

02:00   4          I read the transcripts of witness testimony

02:00   5   for witnesses that were taken on by the prosecution and

02:00   6   also by the Microchip side.

02:00   7          And then I looked at a number of test cases

02:00   8   and other kinds of materials related to the case.

02:00   9      Q.    I wanted to ask just one follow-up question

02:00   10   about this kind of mountain of materials here.  You

02:01   11   mentioned that you reviewed some source code in this

02:01   12   case; is that correct?

02:01   13      A.    It is.

02:01   14      Q.    Did you personally review that source code?

02:01   15   Or did you have somebody else do that work for you?

02:01   16      A.    I reviewed it myself on the belief that my own

02:01   17   impressions would be most useful in helping me to form

02:01   18   my own opinions.

02:01   19      Q.    Is that your normal practice?

02:01   20      A.    It is.

02:01   21      Q.    I understand, Mr. Tittel, that you've prepared

02:01   22   a short technology tutorial for the jury; is that

02:01   23   correct?

02:01   24      A.    Yes.  It is.

02:01   25      Q.    Okay.  I'd like to have you maybe present

02:01  1    that.  Do you know how long that tutorial is?

02:01  2        A.    It shouldn't run more than ten minutes.

02:01  3        Q.    Okay.

02:01  4        A.    I'm going to move the microphone a little bit.

02:01  5    If it causes the court reporter any problems, I hope

02:01  6    she'll let me know.

02:01  7            Basically what we're going to talk about is

02:01  8    the two fundamental concepts that really guide and

02:02  9    drive the Active Path that is the central concept to

02:02  10   the '411 patent family at issue in this case.

02:02  11           We're going to talk about collapsing menus as

02:02  12   you see on the left-hand side.  And we're going to talk

02:02  13   about breadcrumbs or the breadcrumb trail, as you can

02:02  14   see from the little picture of Hansel and Gretel over

02:02  15   there on the right-hand side.

02:02  16           Our first topic is a collapsing menu.  And

02:02  17   what I have taken is a snapshot of two of the figures

02:02  18   that are used in the various patents, where Figure 1A

02:02  19   shows a prior art, which means the preexisting, already

02:02  20   understood idea of what a collapsing menu was at the

02:02  21   time of the invention.  And on the right-hand side we

02:03  22   see the actual menu cascade as it's been opened up to

02:03  23   three levels.

02:03  24           And what we see, looking back at Figure 1A to

02:03  25   the left, is that we've hovered the mouse over the 1.4

928

02:03  1    item there.  And what we see in the right-hand picture

02:03  2    is having taken that same cascade out to three levels,

02:03  3    so that we started by hovering over File to open up the

02:03  4    first cascade.  Then hovering over 1.2 to open up the

02:03  5    second cascade.  Hovering over 1.2.3 to open up the

02:03  6    third cascade.  And then hovering over 1.2.3.4.

02:03  7                 THE WITNESS:  Next slide, please.

02:03  8        A.    Now, in the '301 patent we find a passage that

02:04  9    says:  By far the most popular menu navigation system

02:04  10   is the so-called collapsing menu system which, for

02:04  11   example, is used by many traditional personal computer

02:04  12   applications.

02:04  13          If you use any of the Microsoft Office

02:04  14   components, for example, those are the kinds of menus

02:04  15   that they have too.

02:04  16                 THE WITNESS:  Next slide, please.

02:04  17       A.    Now we're going to take a look at

02:04  18   the breadcrumb trail.  This is based, of course, on the

02:04  19   famous fairytale of Hansel and Gretel that the Brothers

02:04  20   Grimm first published in the early part of the 1800s.

02:04  21   And, basically, the central idea of the story is that

02:04  22   to find their way back from the forest, Hansel and

02:04  23   Gretel sprinkled breadcrumbs so that they can follow

02:04  24   their trail to get back home.

02:04  25          Now, of course, because the birds came and ate

929

02:04  1    the breadcrumbs, it didn't end well for Hansel and

02:05  2    Gretel.  But for us that trail of items that shows

02:05  3    where we've been is what defines the notion of a

02:05  4    breadcrumb trail.

02:05  5          And the kind of breadcrumb trail that we're

02:05  6    most interested in for this case is the kind of

02:05  7    breadcrumb trail that keeps track of where Hansel and

02:05  8    Gretel are going as they take each step along the way.

02:05  9          So in this picture, we see a trail that goes

02:05  10   from A to B to C to D.  And that trail contains an

02:05  11   entry for each of those things.

02:05  12              THE WITNESS:  Next slide, please.

02:05  13   A.    Of course, if you want to navigate around on a

02:05  14   website, like, for example, Amazon, if you've got socks

02:05  15   and a barbecue pit and some USB drives, you're going to

02:05  16   have a few trails as you go around on the site.  And so

02:05  17   we see --

02:06  18              THE WITNESS:  If Mr. Thompson will expand

02:06  19   the various paths there for me.

02:06  20   A.    We see a trail at the top that goes from A

02:06  21   through E.  We see, in the middle, a trail that goes

02:06  22   from A through I, and then on the bottom we see a trail

02:06  23   that goes from A through L.

02:06  24          And the thing to pay attention to about this

02:06  25   is that as we jump back to A to start our next trail,

02:06   1   the old trail goes away and a new trail starts up.

02:06   2               THE WITNESS:  Next slide, please.

02:06   3       A.    Now, it's possible that you could find

02:06   4   yourself in a situation where you might have more than

02:06   5   one way to get from a starting point to a final

02:06   6   destination.  And what this figure shows, just as an

02:06   7   example, is that there's three different ways to get

02:06   8   from A to G.

02:06   9               There's the path that goes on top.  There's

02:07   10   the path that goes in the middle.  And there's the path

02:07   11   that goes on the bottom.  And the thing is, as you

02:07   12   would follow each one of these trails, the resulting

02:07   13   breadcrumb would exactly reflect the path that you took

02:07   14   from A to G.

02:07   15               So the breadcrumb for the first trail is on

02:07   16   the top of the slide.  The breadcrumb for the second

02:07   17   trail is on the middle of the slide.  And the

02:07   18   breadcrumb for the third trail is on the bottom of the

02:07   19   slide.

02:07   20               THE WITNESS:  Next slide, please.

02:07   21       A.    Now, typically we don't end up scattering

02:07   22   breadcrumbs in the forest when we're navigating on the

02:07   23   web.  So I wanted to show you something that looked

02:07   24   more familiar for those of you who've done any online

02:07   25   shopping.

931

02:07   1          If we visit this sort of very generic mockup

02:07   2   of a website and we click on Products, then we get a

02:07   3   menu beneath Products that tells us what kinds of

02:07   4   products we can buy.

02:07   5          And let's, for example, pick Home Decor.  And

02:08   6   then we get a list of different kinds of home decor

02:08   7   that we could buy.

02:08   8          If we pick Bedding, then we get a list of

02:08   9   various kinds of accessories that we could buy.

02:08   10         And if we click on Blankets, the cascading

02:08   11  menus go away and we're left with that breadcrumb that

02:08   12  you see on the right-hand side of the screen, which is

02:08   13  Products, Home Decor, Bedding, and Blankets.

02:08   14         Notice that the things that we selected as we

02:08   15  went down the cascade are exactly reproduced in the

02:08   16  breadcrumb.  And the number of things that we picked as

02:08   17  we went through the cascade is also reflected in the

02:08   18  breadcrumb.

02:08   19              THE WITNESS:  Next slide, please.

02:08   20  BY MR. JENSEN:

02:08   21    Q.    Thank you, Mr. Tittel.  Let's turn next to the

02:08   22  Caddo patents and apply the teachings that you just

02:08   23  provided in the context of the patents asserted in this

02:08   24  case.

02:09   25         First off, how many patents are we talking

02:09  1    about here?

02:09  2        A.    We're talking a half dozen patents, or six, if

02:09  3    you prefer numbers.

02:09  4        Q.    And are those patents all part of the same

02:09  5    patent family?

02:09  6        A.    Yes.  As you can see here on this slide, the

02:09  7    '411 patent is the original, or parent, patent in this

02:09  8    family.  And if you look to the right, on top, outlined

02:09  9    in blue, you'll see that the '517 patent is an

02:09  10   out-and-out continuation of the '411 patent.

02:09  11            And what that means is that the specification,

02:09  12   or the text in the front of the patent before the

02:09  13   claims, is exactly the same between the '411 patent and

02:09  14   the '517 patent.

02:09  15            And what you see down below in the patent and

02:09  16   their numbers outlined in red is what's called a

02:09  17   "continuation-in-part."  And what that means is that

02:09  18   the front matter, the specification for those patents

02:10  19   down below, has everything in it that the '411 patent

02:10  20   has.  But it also has some additional material that

02:10  21   wasn't in the '411 patent.

02:10  22            Now, of course any time you file either just

02:10  23   an out-and-out continuation or a continuation-in-part,

02:10  24   you'll also have new sets of claims that define what

02:10  25   the patent is trying to scope out in terms of

02:10  1    functionality that it wants to describe.

02:10  2         Q.   All right.  Turning to the -- sort of the body

02:10  3    of the patents, what is shown on this slide here?  What

02:10  4    are you intending to convey?

02:10  5         A.   Well, what I'm intending to convey is that the

02:10  6    menu cascade and associated breadcrumb that gets formed

02:10  7    along with it --

02:10  8              THE WITNESS:  And if Mr. Thompson will

02:10  9    click his way through the various elements, we'll pick

02:10  10   an item underneath the first level.  And then we'll

02:11  11   pick an item in the second level.  And ultimately we'll

02:11  12   wind up with an item on the third level.

02:11  13        A.   And when we click that, what we'll do is we'll

02:11  14   wind up with a breadcrumb, as shown on the right-hand

02:11  15   side, where the number of elements and the names or

02:11  16   labels for those elements are the same from one to the

02:11  17   other.

02:11  18             And let me also correct myself on something.

02:11  19   I think I may have said "click" somewhere before I got

02:11  20   to the last item.  I apologize for that.  That was a

02:11  21   mistake.  We have to hover, or hold the mouse cursor

02:11  22   over things as we're moving through the cascade.  And

02:11  23   we don't actually click till the end.  I'm sorry.  I

02:11  24   misspoke on that.

02:11  25   BY MR. JENSEN:

02:11   1        Q.    And so in Figure 6B on the right side of the

02:11   2   screen, is what is shown there a -- I'll call it a

02:11   3   Hansel and Gretel breadcrumb, as you explained?

02:11   4        A.    Yes.  It is.

02:11   5        Q.    And does that breadcrumb have any additional

02:12   6   functionality in the context of the asserted patents?

02:12   7        A.    Yes.  It does.  And it's shown here in Figure

02:12   8   5c where we see that we can hover over any of the

02:12   9   active links in the top line of the breadcrumb and get

02:12   10  the cascade to open from whichever one of those links

02:12   11  that we pick and then navigate the cascade from there.

02:12   12       Q.    And the title of this slide that you put up

02:12   13  there was "Active Path"; is that correct?

02:12   14       A.    Yes.  What I'm essentially saying is that --

02:12   15            THE WITNESS:  Mr. Thompson, would you

02:12   16  mind going back to that last slide, please?

02:12   17       A.    What I'm saying is that the Active Path is the

02:12   18  breadcrumb plus the menu cascade or collapsing menus

02:12   19  that we can open up from that breadcrumb through the

02:12   20  active links that make it up.

02:12   21  BY MR. JENSEN:

02:12   22       Q.    And in the figure on the screen right now, how

02:13   23  many active links are there that comprise the Active

02:13   24  Path?

02:13   25       A.    I see four.

935

02:13  1        Q.    And that matches up on the previous slide with

02:13  2   the four links kind of under the Item 100?

02:13  3        A.    Yes.  It does.  You can see it best by looking

02:13  4   to your right at the multi-colored items there.

02:13  5        Q.    And we've heard the term, I think, "Active

02:13  6   Path" a number of times throughout this trial, correct?

02:13  7        A.    Yes.  We have.

02:13  8        Q.    Is that term a term for which the Court

02:13  9   provided a claim construction or definition?

02:13  10       A.    Yes.  It is.  And, in fact, that definition is

02:13  11  shown underneath the term on the left-hand side of the

02:13  12  slide.  And the Court defined an Active Path as:  A

02:13  13  sequence of links that is dynamically created as a menu

02:13  14  system is navigated.

02:13  15             And the reason why I highlighted "dynamically

02:13  16  created" is because you build the breadcrumb as you

02:14  17  hover through the cascade and move down to the next

02:14  18  level.  And that's how you're navigating the menu

02:14  19  system.

02:14  20       Q.    Did you apply the Court's definition when

02:14  21  forming your opinions in this case?

02:14  22       A.    Yes.  I did.

02:14  23       Q.    Let's take a look now at -- this is Claim 1 of

02:14  24  the '301 patent.  And that's one of the asserted claims

02:14  25  in this case, correct?

936

02:14    1          A.    Yes.  It is.

02:14    2          Q.    And could you just kind of walk the jury

02:14    3   through what the -- I'll just put it all on the screen

02:14    4   here.

02:14    5          Could you just walk the jury through what the

02:14    6   various elements of Claim 1 are for the '301 patent?

02:14    7          A.    Yes.  The first portion of a multistep claim,

02:14    8   a method claim in this case, for example, is what's

02:14    9   called the preamble, and that just basically means the

02:14   10   beginning.

02:14   11          And in this preamble, what we're talking about

02:14   12   is a method, which means it's something that has to be

02:15   13   performed step-by-step in order to be satisfied.  We're

02:15   14   talking about a method for navigating that set of

02:15   15   cascading entries that we saw, navigating from the

02:15   16   graphical user menu, where each level in the

02:15   17   information structure has more than one element in it,

02:15   18   and each one of those items is either a function, a

02:15   19   pointer to a location, or a pointer to another level.

02:15   20   And then we get into the steps we have to follow.

02:15   21          So that's where the colored Nos. 1 through 3

02:15   22   come into play, where the first one is essentially all

02:15   23   about what's involved in providing a graphical user

02:15   24   menu system where it actually displays items from a

02:15   25   given level of the hierarchical information structure

937

02:15    1    that can be selected.

02:15    2              The second claim element, which is labeled 2

02:16    3    here on the slide, talks about dynamically constructing

02:16    4    an Active Path -- and remember, that's something that

02:16    5    the Court gave us a definition for -- which is a

02:16    6    sequence of active links as items are selected, where

02:16    7    there's a one-to-one correspondence between the items

02:16    8    that are selected and the items that show up in the

02:16    9    path, the Active Path, or the resulting breadcrumb.

02:16   10              And then finally, it says that each active

02:16   11    link lets the user open the cascade and start

02:16   12    navigating from there.

02:16   13        Q.    And you were here during Mr. Sherwood's

02:16   14    testimony where he walked through all of the claims and

02:16   15    all of the elements one by one.

02:16   16              Do you recall that?

02:16   17        A.    Yes.  I do.

02:16   18        Q.    And I believe at one point he kind of grouped

02:16   19    various of the claims or claim elements together and

02:16   20    said these are all, more or less, the same?

02:16   21        A.    I remember.

02:16   22        Q.    Okay.

02:16   23              MR. JENSEN:  Mr. Thompson, could you pull

02:16   24    up Demonstrative Slide 64 from Mr. Sherwood's

02:17   25    presentation?

| | | |
|---|---|---|
| 02:17 | 1 | BY MR. JENSEN: |
| 02:17 | 2 | Q.    Do you recognize this slide as one of the |
| 02:17 | 3 | slides presented by Mr. Sherwood? |
| 02:17 | 4 | A.    I do, indeed. |
| 02:17 | 5 | Q.    And what is the title of this slide? |
| 02:17 | 6 | A.    The title of this slide is "Asserted Patents |
| 02:17 | 7 | Claim Comparison," but what it really is doing is |
| 02:17 | 8 | taking the first entry at the top of the chart, which |
| 02:17 | 9 | is the '411, Claim Element 1.2, which would be the |
| 02:17 | 10 | second claim element beneath the preamble in that |
| 02:17 | 11 | claim, and saying that all of the other claim elements |
| 02:17 | 12 | that are listed underneath it -- and I'm not going to |
| 02:17 | 13 | repeat them for you because you can read as well as I |
| 02:17 | 14 | can -- and saying that they're all substantially enough |
| 02:17 | 15 | like each other that if we take care of one, we take |
| 02:18 | 16 | care of the other ones too. |
| 02:18 | 17 | Q.    And what particular limitation is highlighted, |
| 02:18 | 18 | at least in the first two entries of this slide? |
| 02:18 | 19 | A.    Both of them mention an Active Path.  And, in |
| 02:18 | 20 | fact, if you look at the remaining elements in the |
| 02:18 | 21 | list, you'll see that they also mention an Active Path. |
| 02:18 | 22 | Q.    Is it correct that all of the asserted claims |
| 02:18 | 23 | in this case require an Active Path? |
| 02:18 | 24 | A.    Yes.  It is. |
| 02:18 | 25 | Q.    And we can see that here on the screen, all |

02:18  1    six patents, the independent claims, each and every one

02:18  2    of them has the same Active Path requirement?

02:18  3         A.    Yes.  That's true.

02:18  4         Q.    Okay.  Thank you.

02:18  5               I think that will save us a lot of time.

02:18  6         A.    Let's make it happen.

02:18  7         Q.    All right.  So we've discussed a little bit

02:18  8    about the Caddo patents now.  Let's move to the next

02:18  9    module that you have in your slides here, which is the

02:18  10   Microchip websites.

02:19  11              And can you just kind of summarize for us, or

02:19  12   walk us through your understanding of what these

02:19  13   websites are, you know, which ones you analyzed, which

02:19  14   ones maybe you didn't need to?

02:19  15        A.    Sure.  I'd be happy to.

02:19  16              THE WITNESS:  Thanks, Mr. Thompson, for

02:19  17   expanding the whole thing.  It's a lot easier to talk

02:19  18   to when we do that.

02:19  19        A.    One of the sites that I looked at is what has

02:19  20   been called the e-commerce site for Microchip.  It has

02:19  21   a URL of microchipdirect.com, and it's been up and

02:19  22   running since at least 2014.  And it was not accused in

02:19  23   the lawsuit in which we're currently engaged.

02:19  24              There have been multiple different versions of

02:19  25   microchip.com.  The one that predates 2018 is what we

02:19   1   call the legacy website, and it was not accused in this

02:19   2   suit because it didn't have a breadcrumb or cascading

02:20   3   menus.

02:20   4           Then there's the old website, which has a

02:20   5   duration of about fall 2018 to mid-2020 and it was

02:20   6   accused in this lawsuit.

02:20   7           The redesigned website starts taking over in

02:20   8   early 2020 and gets really up and running from mid-2020

02:20   9   to the present, and it was not accused in this lawsuit.

02:20   10          And then, finally, there's the

02:20   11  microchip.com/forums, which, as you guys have already

02:20   12  heard repeatedly, is the Forum website, and it too has

02:20   13  been running since at least 2014 to the present day.

02:20   14  And it is accused in this suit.

02:20   15  BY MR. JENSEN:

02:20   16     Q.    All right.  Let's step through each of these,

02:20   17  and I think we can go through some of these rather

02:20   18  quickly.

02:20   19          The first is the Microchip e-commerce portal.

02:20   20  Is this the microchipdirect.com site?

02:21   21     A.    Yes.  It is.

02:21   22     Q.    And I think we've seen that several times.

02:21   23          Did you, you know, navigate that site and

02:21   24  visit it as part of your analyses?

02:21   25     A.    I did.

02:21   1          Q.    Okay.   Let's pause on this next one for just a

02:21   2    moment because I don't think we spent quite as much

02:21   3    time on it, and this is, I think, what you called the

02:21   4    legacy website.   So before fall of 2018?

02:21   5          A.    Yes.   That's correct.

02:21   6          Q.    Okay.   And what do you have shown highlighted,

02:21   7    kind of on the left there, in that red box?

02:21   8          A.    Well, this is what we call a left nav type of

02:21   9    website, which means essentially we've got a navigation

02:21   10   menu on the left-hand side of the screen.

02:21   11         Q.    Okay.   And that implementation is not at issue

02:21   12   in this case?

02:21   13         A.    No.   It is not.

02:21   14         Q.    And what about the old website?

02:21   15         A.    The old website has the combination of a top

02:21   16   nav or a graphical user menu, which we see up on the

02:22   17   top bar underneath the address that reads Microchip,

02:22   18   Products, and so forth from left to right.

02:22   19               And then we see that we've got a breadcrumb

02:22   20   open on the area beneath the banner there, where we've

02:22   21   got a breadcrumb that consists of a Home link and a

02:22   22   Microcontroller link, and we've actually hovered over

02:22   23   Microcontrollers and cascaded the menu out a level,

02:22   24   then hovered over Applications, and cascaded the menu

02:22   25   out yet another level.

02:22  1      Q.    And this is one of the websites that you

02:22  2   analyzed to form your opinions?

02:22  3      A.    Yes, sir.  It is.

02:22  4      Q.    Okay.  And I see you've included one of my

02:22  5   favorite slides, the old house/new house slide.

02:22  6            At some point did Microchip redesign its

02:22  7   website?

02:22  8      A.    Yes.  It did.

02:22  9      Q.    Okay.  And we heard about that just a little

02:22  10  bit ago from Ms. Mahar?

02:23  11     A.    Yes.  We did.

02:23  12     Q.    And what is shown on this slide?

02:23  13     A.    This slide shows the current Microchip

02:23  14  website, which is also known as the redesigned website,

02:23  15  that started getting phased in in mid-2020 and is the

02:23  16  primary source of web pages in the current

02:23  17  microchip.com website.

02:23  18     Q.    And I think you said the mid-2020 time point,

02:23  19  that was sort of the start of the actual rollout onto

02:23  20  the Internet and then over time --

02:23  21     A.    It was a phased implementation, as Ms. Mahar

02:23  22  explained, with tens of thousands of pages for them to

02:23  23  have to convert from the old content management system

02:23  24  to a new content management system.  There's just a lot

02:23  25  of work involved in crossing all the Is and dotting all

02:23  1    the Ts.

02:23  2        Q.    And that was this kind of burndown chart, as

02:24  3    Ms. Mahar called it, showing the progress?

02:24  4        A.    Right.  Right.

02:24  5              You can tell Ms. Mahar is a project manager

02:24  6    because this is a very common project management tool.

02:24  7              And what we see here in this curve is

02:24  8    essentially the line dropping as we go from left to

02:24  9    right as the amount of old stuff decreases and, by

02:24  10   implication, the amount of new stuff increases.

02:24  11       Q.    And were you here -- I don't think -- recall

02:24  12   if it was yesterday or the day before -- when

02:24  13   Mr. Sherwood testified that he did an analysis of a

02:24  14   site map at a certain point in time to determine the

02:24  15   number of old pages that were still on the Internet

02:24  16   versus the number of redesigned pages?

02:24  17       A.    Yes.  I did.

02:24  18       Q.    Okay.  Do you recall at what point in time

02:24  19   that analysis took place?

02:24  20       A.    He said in testimony, and I think the date of

02:24  21   his expert report is sometime in December of 2021.

02:24  22       Q.    Okay.  And you had the opportunity to review

02:25  23   and respond to Mr. Sherwood's report, where he included

02:25  24   that opinion as to the number of old infringing pages

02:25  25   that remained live on the Internet in December of 2021?

02:25  1      A.    I did.

02:25  2      Q.    Did you agree with his analyses?

02:25  3      A.    No.  I did not.

02:25  4      Q.    Did you undertake your own analysis to

02:25  5  determine the number of old web pages that were on the

02:25  6  Internet in that time frame?

02:25  7      A.    I did.  I actually performed some text

02:25  8  analysis on the four site map files that he got from

02:25  9  Dynamic Range Labs and kind of did some kicking-out

02:25  10  activities to get rid of the stuff that couldn't

02:25  11  possibly infringe and took account of what was left

02:25  12  over.

02:25  13      Q.    Could you describe how you went about that

02:25  14  analysis to determine the number of old web pages that

02:25  15  were live on the Internet in December or January of

02:26  16  this year?

02:26  17      A.    Yes.  I could.

02:26  18            Essentially what you do when you do an

02:26  19  analysis like this is you match text strings and then

02:26  20  you kick out the elements in the file that match the

02:26  21  text string.

02:26  22            So, for example, Mr. Sherwood learned from

02:26  23  Cody Miller at DRL that all of the URLs that had an

02:26  24  en-us in it were new website pages and therefore

02:26  25  shouldn't be counted.  So you just basically write a

02:26  1    filter that goes through the file and removes all of

02:26  2    the entries that have the en-us string in it.

02:26  3          Then the next thing that I did was to look at

02:26  4    files that were left over and see what kind of file

02:26  5    extensions they have.

02:26  6          Like, for example, I knew that the PDF files

02:26  7    that were in the various directories didn't have any

02:27  8    navigation on them at all, and so I knew they could be

02:27  9    kicked out.

02:27  10         There were a number of image files which might

02:27  11    have an extension like JPEG or GIF or something else

02:27  12    along those lines, and I knew that they couldn't have

02:27  13    navigation on them either, so I kicked them out.

02:27  14         And then I found some XML files that didn't

02:27  15    have navigation on them, and I kicked them out as well.

02:27  16    Q.    And what conclusions did you reach at the end

02:27  17    of this analysis in terms of the number of old web

02:27  18    pages that remained live on the Internet in January of

02:27  19    this year?

02:27  20    A.    The number of files that was left over was

02:27  21    under 100.

02:27  22    Q.    And that's out of approximately how many?

02:27  23    A.    I think that Dr. -- I'm sorry --

02:27  24    Mr. Sherwood's analysis came up with an initial number

02:27  25    that was just a little bit north of 10,000.

02:28   1        Q.   All right.  Let's touch on the Forum website.
02:28   2   And that's shown here on the slide; is that correct?
02:28   3        A.   Yes, sir.
02:28   4        Q.   And what is your understanding of what the
02:28   5   Forum website is?
02:28   6        A.   Well, it's been described as an online
02:28   7   community site.  And as somebody who earned his stripes
02:28   8   in the forum world as a sysop on CompuServe starting in
02:28   9   1988, I also know it's a place where people go to hang
02:28   10  out with each other to try and learn more stuff, to ask
02:28   11  for help with problems, and to try to find cool new
02:28   12  things to play with and mess around with.
02:28   13       Q.   And who provides the Forum website software?
02:28   14       A.   The Forum website software was developed by a
02:28   15  company called ASP Playground.
02:29   16       Q.   Does the Forum website have the same look and
02:29   17  feel as the regular microchip.com website?
02:29   18       A.   It has the same trade dress and a similar
02:29   19  color scheme.  But other than that, it does not have
02:29   20  the same look and feel as the main Microchip.
02:29   21       Q.   Does it serve the same purpose?
02:29   22       A.   No.  It does not serve the same purpose.
02:29   23       Q.   Does it run the same software?
02:29   24       A.   No.  It does not run the same software.
02:29   25       Q.   Does it contain the same content?

947

02:29    1        A.     No.  It does not contain the same content.

02:29    2        Q.     All right.

02:29    3               Next, let's turn to your opinions in this

02:29    4   case.  And to start off, can you just summarize at a

02:29    5   high level what the various topics were that you

02:29    6   analyzed?  I think you told us about noninfringement

02:29    7   already.  But there's several other items listed here.

02:29    8        A.     Sure.

02:29    9               You've heard before in testimony in the court

02:29   10   about something called a noninfringing alternative,

02:30   11   which is basically something that's -- allows the

02:30   12   website to keep functioning without diminishing its

02:30   13   capability, or the kinds of things it can do that was

02:30   14   available at the same time as the infringement was

02:30   15   supposed to have started to occur, that you could

02:30   16   essentially swap out and therefore cease to infringe on

02:30   17   the asserted patents.

02:30   18               And so the question I was trying to answer

02:30   19   was, were there noninfringing alternatives?  And

02:30   20   Mr. Sherwood's assertions to the contrary

02:30   21   notwithstanding, I do think there are some

02:30   22   noninfringing alternatives.  And I'm going to tell you

02:30   23   about them.

02:30   24        Q.     And the Topic No. 3, can you kind of outline

02:30   25   for us as well what that is all about?

02:30   1          A.    Yeah.  Comparable licenses basically looks at

02:30   2    licenses that have been issued that have something to

02:31   3    do with, in this case, web navigation and trying to

02:31   4    decide if any of the other licenses that are presented

02:31   5    for inspection -- and they might come from either

02:31   6    Microchip or they might come from Caddo -- are enough

02:31   7    like the patents-in-suit that you can say, yeah, these

02:31   8    things are technically comparable to each other.

02:31   9          So the answer to my question in this case is,

02:31   10   are there technically comparable licenses?  Yes.

02:31   11          And then finally I took a look at the patent

02:31   12   benefits that Mr. Sherwood described for the '411

02:31   13   family of patents.  And to answer the question, do I

02:31   14   agree with the alleged benefits of the patents?  The

02:31   15   answer is no.

02:31   16         Q.    All right.  So before we turn to the meat of

02:31   17   your noninfringement opinions, I want to just review a

02:32   18   basic concept I think the jury has heard a little bit

02:32   19   about and that I discussed with Mr. Sherwood yesterday.

02:32   20         And I want to ask your understanding of this

02:32   21   concept.  Are you familiar, Mr. Tittel, with what's

02:32   22   been referred to as the all-elements rule?

02:32   23         A.    Yes.  I'm familiar enough with it that I'm

02:32   24   wondering why I forgot to put it on this slide.

02:32   25         Essentially what the all-elements rule refers

02:32    1    to is the idea that when a claim and its preamble

02:32    2    define a number of different elements, each and every

02:32    3    one of those elements must be satisfied in order to

02:32    4    infringe the patent.

02:32    5              So if we have a patent for a soccer ball, for

02:32    6    example, we can look at the requirements for that

02:32    7    soccer ball, and we can see as we march through the

02:32    8    different requirements there in the slide that it fails

02:32    9    because it is not round.

02:33   10              So essentially we can say the claim is not

02:33   11    infringed because one of the elements is missing.  And

02:33   12    that's why we call it the all-elements rule.

02:33   13    Q.    All right.  So we're showing on this slide,

02:33   14    again, the Claim 1 of the '301 patent.  And I wanted to

02:33   15    ask you, you know, why you have certain elements

02:33   16    highlighted on this slide, and how does that relate to

02:33   17    your noninfringement opinions?

02:33   18              And maybe I can focus you a little bit more in

02:33   19    the preamble, in the yellow highlighting, you've

02:33   20    highlighted the phrase that states:  A method for

02:33   21    navigating.

02:33   22    A.    Yes.  That's --

02:33   23    Q.    I'm going to call it a website -- a method for

02:33   24    navigating a website.

02:33   25    A.    Yes.  And, in fact, all of the independent

02:33   1    claims in all of the asserted patents have -- are

02:34   2    method claims.  So by making a statement that Microchip

02:34   3    does not infringe this particular claim, I'm

02:34   4    essentially saying that Microchip doesn't infringe any

02:34   5    of the claims.

02:34   6        Q.    Let me ask you a question.  You used a word

02:34   7    that triggered something for me which is this word

02:34   8    "method."

02:34   9        A.    Yes.

02:34   10       Q.    Are you familiar with the concept of a method

02:34   11   claim?

02:34   12       A.    Yes.  I am.

02:34   13       Q.    And there are other types of claims as well,

02:34   14   like product claims or apparatus claims?

02:34   15       A.    Yes.  And system claims as well.

02:34   16       Q.    And system claims.  Okay.  Very good.

02:34   17             Are the claims in this case system claims or

02:34   18   are they method claims?

02:34   19       A.    Well, because -- if you look at the language

02:34   20   of the patents, and you generally see the word "method"

02:34   21   mentioned in the preamble of the independent -- of all

02:34   22   the preambles of the independent claims in all of the

02:34   23   patents, they are all method.

02:34   24       Q.    And what is the significance of the fact that

02:35   25   these are method claims?

02:35   1       A.    A method claim is a claim in which the steps

02:35   2  of the method must be performed to meet the

02:35   3  requirements of the claim.

02:35   4       Q.    And that could be something like a recipe has

02:35   5  certain steps.  You have to do them in a particular

02:35   6  order?

02:35   7       A.    It could mean that you have to do them in a

02:35   8  particular order.  It could also mean that you just

02:35   9  need to do all of them.  The claim will generally tell

02:35   10 you if the order is important or not.

02:35   11      Q.    Very good.

02:35   12            But in any event, regardless of the order,

02:35   13 each of the method steps would have to be performed to

02:35   14 establish an infringement?

02:35   15      A.    Yes, sir.  That's correct.

02:35   16      Q.    Okay.  Very good.  All right.

02:35   17            And I think you mentioned earlier that, you

02:35   18 know, with respect to the Forum website, and I suppose

02:35   19 the other website as well, that somebody -- or, in

02:35   20 fact, in this case, Microchip would have to perform

02:35   21 that step or there would not be an infringement; is

02:35   22 that correct?

02:35   23      A.    Correct.

02:35   24      Q.    So if somebody else was performing this step,

02:36   25 you know, a method of navigating a website, would that

02:36  1    be an infringement on the part of Microchip?

02:36  2        A.    No, sir.  It would not.  And Mr. Sherwood also

02:36  3    testified that Microchip was the one that was

02:36  4    infringing.

02:36  5        Q.    Okay.  And you've got, I think, the Item

02:36  6    No. 2, the second claim element in orange, "dynamically

02:36  7    constructing," and it looks like that corresponds to

02:36  8    the note that the old website does not infringe?

02:36  9        A.    Right.  As we already looked at a little bit

02:36 10    earlier, each and every one of the independent claims

02:36 11    in all of the asserted patents includes a requirement

02:36 12    for an Active Path.

02:36 13            And essentially, what I'm saying is the old

02:36 14    website does not infringe because it does not have an

02:36 15    Active Path.

02:36 16        Q.    And now, what about the green highlighting

02:36 17    that corresponds to the note about the Forum?

02:36 18        A.    Well, if you look at the number of links in

02:36 19    the breadcrumbs on the Forum, you'll see that that

02:37 20    number is different from the number of items that you

02:37 21    selected when you were navigating through the Forum

02:37 22    menus.

02:37 23            And the language of this part of the claim

02:37 24    says "one active link corresponding to each of the

02:37 25    items selected."  And we don't see that correspondence

02:37  1    in the breadcrumbs for the Forum site.

02:37  2        Q.    And the last one on this slide, the blue

02:37  3    highlighting and text.

02:37  4        A.    That is about the redesigned website.  And as

02:37  5    you'll recall, the redesigned website does not have any

02:37  6    drop-down menus anymore.  And if we can't browse

02:37  7    through the breadcrumb to get to the drop-down menus,

02:37  8    then we can't infringe.

02:37  9        Q.    Okay.  So depending on the particular website

02:37  10   that you were looking at, there are different claim

02:38  11   elements that are not met; is that correct?

02:38  12       A.    Yes, sir.  That is correct.

02:38  13       Q.    All right.  Let's look at the old website now,

02:38  14   and we've touched on this dynamically constructing

02:38  15   claim requirement, the Active Path claim requirement.

02:38  16            And I just want to put up here a slide that

02:38  17   you prepared that, again, reflects that every single

02:38  18   claim in this case requires an Active Path; is that

02:38  19   correct?

02:38  20       A.    Yes.  And in case the jury is wondering why we

02:38  21   don't have some of the other claims that we know are

02:38  22   being asserted in this case showing up on the chart,

02:38  23   we've got them covered.  It's because they depend on

02:38  24   one of these independent claims that is shown here that

02:38  25   they are also covered by the same maneuver that we're

02:38  1  undertaking here.

02:38  2  Q.   And is that a -- I'll call it a definitional

02:38  3  principle?  In other words, in every patent case, it's

02:38  4  always the case that if the independent claim is not

02:39  5  infringed that the subsequent dependent claims are not

02:39  6  infringed?

02:39  7  A.   Yes.  That's correct.

02:39  8  Q.   Okay.

02:39  9  A.   And here's another repeat of the definition of

02:39  10  Active Path.  And the reason why I underlined the

02:39  11  "dynamically created" and the "menu system is

02:39  12  navigated" is I'm going to show you that that doesn't

02:39  13  happen on the -- Microchip's old website.

02:39  14  Q.   And can you just summarize for the jury, you

02:39  15  know, what aspect of the old website it was that

02:39  16  Mr. Sherwood kind of mapped to the Active Path or

02:39  17  accused of being the Active Path?

02:39  18  A.   That would be the breadcrumb and the drop-down

02:39  19  menus that show up in the area underneath the graphical

02:39  20  user menu with the drop-down menus beneath a breadcrumb

02:39  21  that reads Home, Automotive Solutions, and Automotive

02:40  22  Applications.

02:40  23  Q.   Do you agree with Mr. Sherwood that the old

02:40  24  website has an Active Path?

02:40  25  A.   No, sir.  I do not.

```
02:40   1        Q.    Why not?

02:40   2        A.    The Active Path must be dynamically

02:40   3   constructed.  I am preparing to show you that on the

02:40   4   old Microchip website, the breadcrumb information that

02:40   5   shows up and the drop-down menus that show up on the

02:40   6   web pages for that site are created in advance and

02:40   7   downloaded to the web page as part of the building of

02:40   8   the web page when it comes up on the site.

02:40   9        Q.    And why have you shown this Hansel and Gretel

02:40  10   image here on the screen?

02:40  11        A.    I just want to remind the jury that the

02:40  12   requirement for a dynamic breadcrumb is that it be

02:40  13   constructed as the user takes each step on a path and

02:41  14   therefore that it track precisely each step that was

02:41  15   taken.

02:41  16             If you think back to that slide I had earlier

02:41  17   in the tutorial, we had the three different ways to get

02:41  18   from A to G.  Essentially, that means if I took the

02:41  19   middle path, I should see the links that I went through

02:41  20   on the middle path in the breadcrumb.  And that's not

02:41  21   the way the old website works for Microchip.

02:41  22        Q.    And I think you used the term kind of "static

02:41  23   path" and, you know, "dynamic path" or "dynamically

02:41  24   created active path."

02:41  25        A.    Yes.
```

02:41 1      Q.   Can you help the jury understand the

02:41 2  difference between those two types of paths?

02:41 3      A.   I certainly will.

02:41 4           THE WITNESS:  Mr. Thompson, will you go

02:41 5  ahead -- yeah.  Thank you.

02:41 6      A.   Essentially, the difference between a static

02:41 7  path and a dynamic path is that a static path is always

02:41 8  the same.  It's decided in advance.  It doesn't get

02:42 9  created as we drop our breadcrumbs like Hansel and

02:42 10 Gretel did, and it's manually created.

02:42 11          As Ms. Mahar testified, they had to sit there

02:42 12 putting all those links together and taking hundreds of

02:42 13 person hours and lots of time to actually manually

02:42 14 create that stuff.

02:42 15          A dynamic path, on the other hand, it tracks

02:42 16 the menu choices as those choices get made.  It happens

02:42 17 when those choices get made, which is what I mean when

02:42 18 I say it's built in real time.

02:42 19          And then, finally, it's automatically created

02:42 20 as part of the software so that each time you make a

02:42 21 selection and go down and collapse the cascade and

02:42 22 create a new breadcrumb, the elements that you have

02:42 23 selected to get where you are, are what shows up in

02:42 24 that breadcrumb.

02:42 25 BY MR. JENSEN:

02:43  1      Q.    And what evidence do you have that the old

02:43  2  Microchip website does not infringe because it uses a

02:43  3  static-path approach?

02:43  4      A.    I looked at multiple sources of evidence to

02:43  5  come to this conclusion.  I examined the behavior of

02:43  6  the old website.  And, fortunately, I got involved last

02:43  7  September or thereabouts, when there were still enough

02:43  8  of those old pages around that you could find them

02:43  9  easily and make them do their thing.

02:43  10      The second thing was I looked at the DRL

02:43  11  report that basically said that they noticed that there

02:43  12  were often occurrences where the navigation path and

02:43  13  the breadcrumb didn't match.

02:43  14      I also looked at transcripts from Microchip

02:43  15  employees to -- that explain that a hard-coded approach

02:44  16  was used, and that basically is the manual stuff that

02:44  17  Ms. Mahar was telling you about.

02:44  18      And then, finally, as I will show you a little

02:44  19  bit later on, there's actual source code in the

02:44  20  Microchip system that shows you those -- all of those

02:44  21  menu entries in a data block, where you can see that

02:44  22  information there, and that's what gets sent from the

02:44  23  server to the client.  So we know that it's all figured

02:44  24  out in advance.

02:44  25      Q.    And have you prepared a slide or two on each

958

02:44  1    of these points?

02:44  2        A.    Gosh.   I hope that's what we're going to next.

02:44  3        Q.    All right.   So this is an image from the

02:44  4    Defendant's Exhibit 463.

02:44  5              MR. JENSEN:   And I think I'd like to ask

02:44  6    Mr. Thompson to just pull up Exhibit 463.

02:44  7    BY MR. JENSEN:

02:44  8        Q.    And this is the video I think we've seen

02:44  9    before, but I would like to walk through it with your

02:44  10   explanation and narration as to what was going on.

02:45  11       A.    You bet.

02:45  12       Q.    While he's pulling that up --

02:45  13             MR. JENSEN:   And maybe hit pause,

02:45  14   Mr. Thompson, for just a moment.

02:45  15   BY MR. JENSEN:

02:45  16       Q.    I think a few minutes ago, Ms. Mahar was asked

02:45  17   if she knew, you know, where this video came from or

02:45  18   who had prepared it, and she didn't know.

02:45  19             Do you recall that?

02:45  20       A.    I do.

02:45  21       Q.    Do you know where this video came from?

02:45  22       A.    Yes.   I know where this video came from.

02:45  23       Q.    Where did this video come from?

02:45  24       A.    Well, I found this path on the microchip.com

02:45  25   website in late September.   And in connection with

959

02:45  1    preparing materials for a disclosure that was to be

02:45  2    made to the other side in this case, I worked with Matt

02:45  3    Bonini, who's one of the paralegals at Mr. Jensen's law

02:45  4    firm, and we figured out how to capture the various

02:45  5    steps that you're about to see in video form so that it

02:45  6    kind of animates what's going on.

02:45  7                    MR. JENSEN:  With that background,

02:45  8    Mr. Thompson, why don't you go ahead and play the clip?

02:45  9    BY MR. JENSEN:

02:46  10       Q.    And, Mr. Tittel, you can just kind of talk us

02:46  11   through what we're seeing and why this supports your

02:46  12   opinion.

02:46  13       A.    Sure.

02:46  14                    THE WITNESS:  And, Mr. Thompson, I'm

02:46  15   going to ask you to pause from time to time.  So keep

02:46  16   your wits about you.

02:46  17       A.    All right.  So what we're seeing now is the

02:46  18   URL being typed in so that we can get to Microchip in

02:46  19   the first place.

02:46  20                    And then the next thing that's going to

02:46  21   happen --

02:46  22                    THE WITNESS:  And let's go ahead and

02:46  23   pause.

02:46  24       A.    -- is we're going to open the homepage.  And

02:46  25   as soon as the homepage opens, we start navigating, as

02:46  1   you see on the graphical user interface at the top of

02:46  2   this screen, which is why it's often called top nav.

02:46  3            So we're navigating the top nav.

02:46  4                 THE WITNESS:  Okay.  Let her rip,

02:46  5   Mr. Thompson.

02:46  6        A.    Then we go to Solutions, then we go to Tools

02:46  7   and Software.

02:46  8                 THE WITNESS:  Stop, Mr. Thompson.

02:46  9        A.    Now, what we do when we get to Tools and

02:46  10  Software is we start mousing around inside the

02:46  11  drop-down menu for Tools and Software.

02:47  12            And, essentially, what we're doing is we're

02:47  13  looking to pick an item in the second-level hierarchy

02:47  14  so that we can drill down in the content that's

02:47  15  available on the microchip.com website.  And in this

02:47  16  case, we're going to go to the Embedded Software

02:47  17  Center.

02:47  18                 THE WITNESS:  Okay.  Let her rip,

02:47  19  Mr. Thompson.

02:47  20            Hold it right there.

02:47  21        A.    When we get into the Embedded Software Center,

02:47  22  we see there's a number of different options there, and

02:47  23  we're picking one called the MPLAB® Connect

02:47  24  Configurator, which we know from the title of the

02:47  25  group, Embedded Software Center, is a collection of

02:47  1    different kinds of software that Microchip makes

02:47  2    available to its customers to help them visualize,

02:47  3    analyze, model, and do other things to help -- to make

02:47  4    better use of their products.

02:47  5              THE WITNESS:  So let's go ahead and click

02:47  6    on that MPLAB® Connect Configurator.  Hold it right

02:48  7    there.

02:48  8        A.    Now, we know that what happens when we click

02:48  9    on the result of a menu cascade, as you just saw there,

02:48  10   we're going to collapse all the menus -- you see

02:48  11   they're gone -- and then we're going to have a

02:48  12   breadcrumb show up on the top of the page.

02:48  13             And if you look at the elements in that

02:48  14   breadcrumb, you must recall that we didn't visit either

02:48  15   Interface and Connectivity or USB in the trail that we

02:48  16   just took to get to the MPLAB® Connect Configurator.

02:48  17             Now, obviously this is another valid path

02:48  18   through the website to get you to that web page,

02:48  19   because that's the web page that's showing.  But it's

02:48  20   not the path that we took.

02:48  21             And what we're going to be doing in the next

02:48  22   part of the presentation that we look at is I'm going

02:48  23   to be telling you why that's so.  You've already gotten

02:48  24   a taste of why that's so from Ms. Mahar's testimony.

02:49  25   I'm going to show you in detail.

962

02:49  1     BY MR. JENSEN:

02:49  2         Q.    And how many links are present in the path

02:49  3     that's highlighted in red?

02:49  4         A.    Four.

02:49  5         Q.    And how many selections were made from the top

02:49  6     navigation menu?

02:49  7         A.    Three.

02:49  8              MR. JENSEN:  Mr. Thompson, you can go

02:49  9     ahead and take that down.

02:49  10    BY MR. JENSEN:

02:49  11        Q.    And what is shown on this slide?  Is it just a

02:49  12    kind of still screen image comparing the --

02:49  13        A.    Yeah.  Essentially what we're doing is we're

02:49  14    showing you what we went through on the left-hand side,

02:49  15    and we're showing you what pops up as the result when

02:49  16    the menus collapse and the selected page pops up.

02:49  17        Q.    And was this just a, you know, like a

02:49  18    cherry-picked example, Mr. Tittel, of how the old

02:49  19    website operated?

02:49  20        A.    Well, we heard testimony from Ms. Mahar, and

02:50  21    we also heard testimony from Mr. Sherwood, that there

02:50  22    were numerous pages on the microchip.com website, a

02:50  23    number that the burndown chart shows us has been

02:50  24    steadily declining over time.  But that there were

02:50  25    pages on the site that continued to show this behavior.

02:50 1      Q.    And what evidence do you have that this was

02:50 2    not a kind of a one-off exception to how the old

02:50 3    website operated?

02:50 4      A.    Well, when I conducted my count of pages that

02:50 5    were left over from the old website, I still found some

02:50 6    left over.  Although I can't find any more now.  And

02:50 7    also because we can see certain pages where things

02:50 8    don't match up.

02:50 9      Q.    So did you personally navigate and identify

02:50 10   some number of old website pages that demonstrated this

02:51 11   static path functionality?

02:51 12     A.    Yes.

02:51 13     Q.    Okay.  Do you have any other third-party

02:51 14   documentation that confirmed your initial findings?

02:51 15     A.    Yes.  Well, we've seen the report -- or,

02:51 16   actually, reports from DRL where the first one shows

02:51 17   that navigation on the page doesn't match top

02:51 18   navigation.  And then we saw the later design guide

02:51 19   where they were trying to solve that problem by going

02:51 20   to what they called a real breadcrumb.

02:51 21     Q.    And how frequently did DRL say this problem

02:51 22   manifested itself?

02:51 23     A.    Well, what they say is "often."  They don't

02:51 24   actually specify a number.  But they say -- to me

02:51 25   "often" means enough to notice, but not everything.

964

02:51  1      Q.    And let me ask a follow-up question on that.
02:51  2  It sounds like, you know, often there would be a
02:51  3  mismatch between the breadcrumb and the path that was
02:52  4  navigated, but not always; is that correct?
02:52  5      A.    Yes.   That's essentially what I just said.
02:52  6      Q.    And what about in the circumstance where the
02:52  7  path does match on the old website?   Is it your opinion
02:52  8  that that would be an Active Path or an infringement of
02:52  9  the asserted claims?
02:52 10      A.    No.   I will show you that it remains static
02:52 11  whether it matches or not.   I would say that if it did
02:52 12  match, it was kind of like you won the scratch-off or
02:52 13  something.   Not a big one, but you hit it.
02:52 14      Q.    All right.   And what's the third point that
02:52 15  you have on your summary slide here?
02:52 16      A.    Well, we heard in Ms. Mahar's testimony here
02:52 17  in the courtroom, and there's actually a transcript of
02:52 18  a deposition called the 30(b)(6) deposition where she
02:52 19  testified about "hard coding paths."   And she talked
02:52 20  about the manual effort involved in doing that work,
02:52 21  and the fact that she actually did some of the typing
02:53 22  herself.
02:53 23      Q.    And why was this hard-coded or, you know,
02:53 24  fixed static-path approach used by Microchip?
02:53 25      A.    Well, I can't do any better than to repeat

965

02:53  1   Mrs. Mahar explanation, which is that they were putting

02:53  2   a Band-Aid on a building that was getting ready to fall

02:53  3   down.  And essentially what they did was they looked at

02:53  4   how the left nav on the website was built and they

02:53  5   figured out how to turn it into a horizontal

02:53  6   equivalent.

02:53  7        And what that ended up meaning is that

02:53  8   sometimes it matched and sometimes it didn't.  And it

02:53  9   kind of depended on where you were navigating and what

02:53  10  was in the left nav before it got translated into its

02:53  11  horizontal equivalent.

02:53  12     Q.    Even in those instances where there would be a

02:53  13  superficial match, I'll call it, was the static-path

02:53  14  approach still used on the old website?

02:53  15     A.    Yes.  They did not build breadcrumbs

02:53  16  dynamically.  And, again, we'll be looking at a data

02:54  17  structure that shows the content of those items

02:54  18  shortly.  And they didn't track what the user was

02:54  19  doing.  Once you got to a page, you looked up what path

02:54  20  was associated with it and a link that matched.

02:54  21     Q.    Do you think that a static-path approach is a

02:54  22  good approach to create a breadcrumb?

02:54  23     A.    It is a God-awful way to do it.

02:54  24        (Laughter.)

02:54  25  BY MR. JENSEN:

02:54  1      Q.    All right.  Let's take a look at the fourth

02:54  2   bullet point that you have here, the source code.  And

02:54  3   what can you tell us about that?  And what code did you

02:54  4   look at?  What was the analysis that you went through?

02:54  5      A.    Well, I got a number of files from the

02:54  6   information that was shared with Caddo.  And in looking

02:54  7   at those files, I discovered a data structure that

02:55  8   includes the content of the menus.

02:55  9      Q.    And this was the source code for which website

02:55  10  that you're talking about here?

02:55  11     A.    This is the old microchip.com website.

02:55  12     Q.    And what did the source code reveal,

02:55  13  Mr. Tittel?

02:55  14     A.    Well, among other things, I found a comment

02:55  15  that explained how they were transitioning from what

02:55  16  we've called the legacy site, or the site before they

02:55  17  did the old website conversion.  And it says that they

02:55  18  are performing a number of presentation changes to the

02:55  19  way things get laid out on the web page to make changes

02:55  20  to remove the left navigation and make the breadcrumbs

02:55  21  work.  This is not actually code.  It's just a comment.

02:55  22     Q.    And how do you know that this source code

02:55  23  relates to the old website as opposed to the redesigned

02:55  24  website?

02:55  25     A.    Well, I can tell you in two ways, actually.

02:56  1     We know that the old website ran on the Sitefinity

02:56  2     content management system.  And if you look at the --

02:56  3     above the middle of the URL there, the word

02:56  4     "Sitefinity" shows up.

02:56  5          And I happen to know that Sitefinity has a

02:56  6     number of file extensions that tell you what the

02:56  7     content management system is going to do.  And if you

02:56  8     look at the end of that file, it says SCSS.  Well,

02:56  9     that's not actually a valid web file extension, but it

02:56  10    is a valid file extension inside of Sitefinity.

02:56  11         And, basically, what it means is this is a

02:56  12    Sitefinity file that's going to create a CSS style

02:56  13    sheet that I'm going to send to a browser somewhere

02:56  14    after I fiddle around with its innards a little bit.

02:56  15    Q.   Have you written CSS style sheets before,

02:56  16    Mr. Tittel?

02:56  17    A.   Yes.  I actually -- I can't -- I think I've

02:56  18    written two books on CSS.

02:56  19    Q.   Very good.

02:57  20         MR. JENSEN:  Mr. Thompson, could you

02:57  21    bring up Defendant's Exhibit 205, please?

02:57  22    BY MR. JENSEN:

02:57  23    Q.   And, Mr. Tittel, what are we looking at here

02:57  24    in Defendant's Exhibit 205?

02:57  25    A.   This is an HTML file that's getting loaded

968

02:57    1    down to a web page.  And it begins with a huge

02:57    2    JavaScript that has a boatload of data in it that's

02:57    3    going to be used to build the web page.  And I think

02:57    4    this page is something like 30 or 40 pages long.

02:57    5              THE WITNESS:  Mr. Thompson, can you give

02:57    6    us an indication of the size of this file?

02:58    7        A.    32 pages long.  Okay.  Let's go back to the

02:58    8    beginning.

02:58    9    BY MR. JENSEN:

02:58    10       Q.    And was this one of the source code files that

02:58    11   you reviewed in conducting your analysis?

02:58    12       A.    Yes.  It is.

02:58    13       Q.    And what did you learn from this file about

02:58    14   the operation or implementation of the old website as

02:58    15   it relates to the static path?

02:58    16       A.    I'm going to show you.

02:58    17             THE WITNESS:  Mr. Thompson, please jump

02:58    18   us to Line 80 of the file.

02:58    19       A.    Now, it won't take you long to figure out that

02:58    20   Line 80 isn't really a line.  It's a huge chunk of

02:58    21   data.  And it goes on for, like, pages and pages and

02:58    22   pages, but --

02:58    23             THE WITNESS:  You can stop it right

02:58    24   there, Mr. Thompson.

02:58    25       A.    If you look at what's inside that data block,

02:58   1   what do you see?  After you get through a bunch of

02:58   2   introductory stuff, you see a bunch of items that say

02:58   3   "title" and then "link."

02:59   4           And if you keep reading down and looking at

02:59   5   the difference between the title entries and the link

02:59   6   entries, you'll see that the title displays the text

02:59   7   that shows up in the whole breadcrumb.  And then the

02:59   8   link that follows afterward is a URL that -- oh, I

02:59   9   should say a partial URL because we know some things

02:59   10  about what it's going to look like when it gets fully

02:59   11  built, so we don't actually have to include all of it.

02:59   12          We know that all of these are going to start

02:59   13  with https/www.microchip.com.  And so we'd only capture

02:59   14  the part that comes after that.  And that's what's in

02:59   15  there.

02:59   16          And if you look at those URLs, those are the

02:59   17  URLs that show up on the web page.  And if you look at

02:59   18  the title, that's the title that shows up for that page

02:59   19  when you open it up.

02:59   20          And furthermore, this is the stuff -- and I

03:00   21  just shudder to think of it -- this is the stuff that

03:00   22  Ms. Mahar and her team had to key in by hand in order

03:00   23  to put this data into the database so that this page

03:00   24  could be put together and then shipped to the user to

03:00   25  be set up.

970

03:00   1           And the reason that I say it's static and that

03:00   2    it doesn't track dynamic user activity is that

03:00   3    everything's in here.  It's deferring in advance.  And

03:00   4    it doesn't matter what the user clicks on to get from

03:00   5    the top of the microchip.com website to wherever they

03:00   6    wind up.  Because they're going to be using the text

03:00   7    from the title part of this data block, and they're

03:00   8    going to be using the fully-expanded URL version of the

03:00   9    link part from this data block.

03:00   10   BY MR. JENSEN:

03:00   11       Q.    Was this an efficient way to implement a path

03:00   12   menu on a website?

03:00   13       A.    No.

03:00   14       Q.    And why is that?

03:00   15       A.    Well, where to begin?  As Ms. Mahar has

03:01   16   explained, when you do things this way, you have to

03:01   17   keep up with it by hand.  Nobody -- I mean, computers

03:01   18   are there to take over the repetitive and mindless

03:01   19   drudgery of making stuff like this happen.  That's one

03:01   20   reason.

03:01   21           Another reason is this thing's pretty big.

03:01   22           MR. JENSEN:  And, Mr. Thompson, could you

03:01   23   just scroll down?  I'd like to --

03:01   24       A.    Yeah.  It's 32 pages long.

03:01   25   BY MR. JENSEN:

03:01   1        Q.    -- see how -- yeah, this particular line.

03:01   2    Line 80?

03:01   3        A.    Yeah.  32 pages long.  Which means tens of

03:01   4    thousands of characters.  And when you have that much

03:01   5    data, you have to transfer it from the server to the

03:01   6    client.  And it takes time to do that.  And that's not

03:01   7    going to help the load time -- page load times improve.

03:01   8              And we already know from Ms. Mahar that one of

03:01   9    the problems they had with their site was that the page

03:01   10   load times were too long.  I think we're looking at one

03:01   11   of the reasons why.

03:01   12       Q.    Would it be necessary to download this amount

03:02   13   of information if a website used a dynamic path

03:02   14   approach?

03:02   15       A.    To do a dynamic breadcrumb would involve

03:02   16   probably 1 percent of this amount of data.

03:02   17             MR. JENSEN:  Why don't we exit out of

03:02   18   this, Mr. Thompson, and go back to the slides?

03:02   19   BY MR. JENSEN:

03:02   20       Q.    Did you want to comment further on the source

03:02   21   code here or -- it's in your slides, so I don't want to

03:02   22   cut you off, but...

03:02   23       A.    Well, this is the breadcrumb navigation file

03:02   24   that actually ends up calling the other file, and

03:02   25   that's just to show you it's part of the overall

03:02   1   software chain.

03:02   2       Q.    And what have you blown up here on this slide

03:02   3   out of the source code?

03:02   4       A.    This is where we're walking through and

03:02   5   grabbing things to put all the -- the information that

03:03   6   we're downloading from the server to the client that we

03:03   7   looked at in the other file is -- you could see it was

03:03   8   not complete and it wasn't perfectly formatted.

03:03   9           This is actually doing the work to go through

03:03   10  and create the stuff that's going to allow the cascade

03:03   11  to appear on screen, and then to allow the associated

03:03   12  link to be invoked when we select one of those items.

03:03   13      Q.    Let me see if I understood this correctly.

03:03   14  This file here sort of pretties up and makes

03:03   15  presentable the content from the Exhibit --

03:03   16      A.    Well, that's one way of putting it.  Another

03:03   17  way of putting it would be to say it's what makes --

03:03   18  it's what turns the data into stuff that's going to

03:03   19  work on the web page.  Because all we have really in

03:03   20  the other item is a bunch of raw data, and we have to

03:03   21  turn it into the format and the kinds of strings that

03:04   22  work in a web browser.  And this drives that process.

03:04   23      Q.    Okay.

03:04   24           MR. JENSEN:  I would like to move the

03:04   25  admission of Defendant's Exhibit 205.

03:04    1                    MR. DEVLIN:  Sorry.  Was 205 the code?

03:04    2                    MR. JENSEN:  That was the HTML that we

03:04    3    were just looking at.

03:04    4                    MR. DEVLIN:  The Line 80 thing?

03:04    5                    MR. JENSEN:  The Line 80 thing.

03:04    6                    MR. DEVLIN:  Yeah.  No objection.  Thank

03:04    7    you.

03:04    8                    THE COURT:  It'll be admitted.

03:04    9    BY MR. JENSEN:

03:04   10       Q.    Could you summarize for us now, Mr. Tittel,

03:04   11    your conclusions and findings as it related to the old

03:04   12    website?

03:04   13       A.    Sure.  Essentially, what I'm saying is that

03:04   14    the old website's breadcrumb paths were not dynamic,

03:04   15    that they were hard-coded or established in advance.

03:04   16    They're static, they don't change, and this is not the

03:04   17    same thing as dynamically created.

03:04   18            That means also that the paths don't change if

03:05   19    the user's selection changed.  No matter which path you

03:05   20    take to get from the starting point to the ending

03:05   21    point, the path that's in that data block is going to

03:05   22    be the one that shows up in the breadcrumb.

03:05   23            So that's why, of course, the paths don't

03:05   24    always --

03:05   25                    THE WITNESS:  Please go back to the

03:05   1   previous slide, Mr. Thompson.

03:05   2       A.    -- these paths don't always reflect how a user

03:05   3   got where they are from where they started.

03:05   4            And because they come from the database from a

03:05   5   data structure that was defined a while back, I sort of

03:05   6   took a little bit of poetic license and say the paths

03:05   7   were created a long time ago, but that's in computer

03:05   8   time, not necessarily in human time.  But they're

03:05   9   definitely not created as the menu system is navigated.

03:05   10  BY MR. JENSEN:

03:05   11      Q.    And what does that mean in the context of the

03:05   12  asserted claims in this case?

03:05   13      A.    It means that they can't be infringed because

03:05   14  all of the claims require an Active Path and an Active

03:06   15  Path is dynamically constructed.

03:06   16      Q.    Thank you.

03:06   17            All right.  So you've covered the old website

03:06   18  at this point.

03:06   19            And did you undertake an analysis of the

03:06   20  redesigned website?

03:06   21      A.    Yes.  I did.

03:06   22            MR. JENSEN:  Let's take a look at that.

03:06   23  BY MR. JENSEN:

03:06   24      Q.    And I think we've seen this slide before.  Why

03:06   25  don't we jump -- well, let me just ask this question:

03:06   1   Did the redesigned website operate the same as or

03:06   2   differently than the old website in relevant part to

03:06   3   this case?

03:06   4       A.    It operates differently.

03:06   5       Q.    Okay.  How so?

03:06   6       A.    As we're about to see, on the old website, if

03:06   7   you hovered over elements in the breadcrumb, you would

03:06   8   get a drop-down menu.  When you hover over elements in

03:06   9   the breadcrumb on the new website or the redesigned

03:06   10  website, you don't get a drop-down menu.

03:06   11              MR. JENSEN:  Mr. Thompson, can you pull

03:07   12  up the redesigned website in a web browser, please?

03:07   13              And this will be microchip.com.

03:07   14      A.    Internet's slow.

03:07   15              Okay.  There we are.

03:07   16              So we want to go to the Products one; is that

03:07   17  correct?

03:07   18  BY MR. JENSEN:

03:07   19      Q.    Take your pick.

03:07   20              THE WITNESS:  Let's go to Clock and

03:07   21  Timing.  Let's go to Atomic Clocks.  And let's go to

03:07   22  Embedded Atomic Oscillators.

03:07   23      A.    Hey.  Look at that.  Little chips that do

03:07   24  interesting things.

03:08   25              Notice that exactly what we clicked is exactly

03:08    1    what shows up in the breadcrumb that's beneath the top

03:08    2    nav there.

03:08    3           As Mr. Thompson is hovering the mouse over the

03:08    4    various elements of the breadcrumb, we'll notice two

03:08    5    things.  One of them is that nothing happens when we

03:08    6    hover over them in terms of menus jumping out.

03:08    7           The other thing is that the final entry in the

03:08    8    list is a -- what's called a "leaf note," and it

03:08    9    doesn't do anything.  It's just a document that we've

03:08   10    reached the end of the line as far as the breadcrumb

03:08   11    trails go.  And we don't see any brothers or sisters to

03:08   12    that web page in this display.

03:08   13    BY MR. JENSEN:

03:08   14       Q.    And did Mr. Sherwood testify that he believed

03:08   15    the redesigned website infringed the Caddo patents?

03:08   16       A.    At trial, he did not.

03:08   17       Q.    Okay.  And what conclusion did you reach as to

03:09   18    infringement of the redesigned website?

03:09   19                MR. JENSEN:  And you can take that down,

03:09   20    Mr. Thompson.

03:09   21       A.    I also reached the conclusion that it did not

03:09   22    infringe.

03:09   23    BY MR. JENSEN:

03:09   24       Q.    And in terms of the claim language, let's see

03:09   25    if we can take a look at what element it was that was

03:09  1    not satisfied.

03:09  2         A.    It's the one at the end of Claim 1 of the '301

03:09  3    that requires the user to be able to browse all items

03:09  4    on any level of the hierarchical information structure.

03:09  5              So basically what that means in English is if

03:09  6    you hover the mouse over one of the elements of the

03:09  7    breadcrumb, a menu's supposed to pop down.  And it

03:09  8    doesn't do that on the redesigned website.

03:09  9         Q.    And we're looking here at Claim 1 of the '301

03:09  10   patent?

03:09  11        A.    Yes.  That's right.

03:09  12        Q.    Do all of the other asserted claims in this

03:09  13   case across the six asserted patents have a -- have the

03:10  14   same or a similar requirement?

03:10  15        A.    Yes.  They do.

03:10  16        Q.    Okay.  And is your opinion as to

03:10  17   noninfringement the same for all of the asserted claims

03:10  18   in this case?

03:10  19        A.    It is.

03:10  20        Q.    Okay.

03:10  21        A.    And this is just showing you that the active

03:10  22   link opens up a hierarchical menu when you mouse over

03:10  23   the link itself, and then you can mouse around in the

03:10  24   cascade until you select something.  And that's what

03:10  25   the redesigned Microchip website does not have.

03:10   1        Q.    Okay.  So this is an example of something in

03:10   2   the patent that is not present in the redesigned

03:10   3   website?

03:10   4        A.    Correct.

03:10   5        Q.    And is it your opinion and testimony here

03:10   6   today, Mr. Tittel, that the all-elements rule is not

03:10   7   satisfied by the redesigned website?

03:11   8        A.    Yes.  As I just explained, because we can't

03:11   9   satisfy the requirements of the final term of the

03:11   10  claim, the claim is not infringed.

03:11   11       Q.    All right.  That was much shorter than the old

03:11   12  website analysis.

03:11   13             All right.  Let's see if we can finish up this

03:11   14  segment here by looking at the Forum website.

03:11   15       A.    Here we go.

03:11   16       Q.    And what are you showing on this slide?

03:11   17       A.    What I'm showing on this slide is, first of

03:11   18  all, that the method portion of the claim is not met by

03:11   19  Microchip; that other people are using the Forum site.

03:11   20             And so a method claim requires that the same

03:11   21  actor perform all steps of the method.  And if

03:11   22  Microchip is not the actor, Microchip cannot infringe.

03:11   23  So since Microchip is not the actor, they don't

03:12   24  infringe.

03:12   25       Q.    And I believe you testified earlier the Forum

03:12   1   website is a platform for kind of third-party users to

03:12   2   collaborate and communicate?

03:12   3       A.   Right.  It's a community site where people can

03:12   4   get together and dig into Microchip Technology's

03:12   5   software and related subject matter.

03:12   6       Q.   Okay.  And what is the second item that you

03:12   7   have highlighted?

03:12   8       A.   It's basically what I'd call the

03:12   9   correspondence item.  It speaks to the dynamic tracking

03:12   10   of the Active Path part of the patents, where it says

03:12   11   that as you select an item in one of the -- in either

03:12   12   the top nav or in the cascading menus, a corresponding

03:12   13   item must show up in the breadcrumb.

03:12   14           And, among other things, that means that the

03:12   15   same number of items that you select should be the same

03:12   16   number of items that show up in the breadcrumb.

03:12   17       Q.   All right.  Let's take a closer look at that.

03:13   18           MR. JENSEN:  And, Mr. Thompson, could you

03:13   19   pull up the Forum website, please?

03:13   20           But before you do, let me just pause

03:13   21   here.

03:13   22   BY MR. JENSEN:

03:13   23       Q.   And what aspect of the Forum website is it

03:13   24   that Mr. Sherwood kind of maps to the Active Path and

03:13   25   the correspondence requirement?

03:13   1       A.    Well, it's shown in red, boxed in red there,

03:13   2   right underneath the top nav.  And the elements that

03:13   3   are encircled in a red box are the ones that are

03:13   4   supposed to be an Active Path.

03:13   5       Q.    Okay.  All right.

03:13   6                 MR. JENSEN:  Let's go to the Forums

03:13   7   website, Mr. Thompson, please, at microchip.com/forums.

03:13   8   BY MR. JENSEN:

03:13   9       Q.    And it looks like across kind of the top

03:13  10   there, right underneath the Microchip logo, are kind of

03:14  11   three items.  It says Forums, Posts, and Page Extras.

03:14  12             Do you see those?

03:14  13       A.    Yes, sir.  I do.

03:14  14       Q.    Did Mr. Sherwood opine that the Posts or the

03:14  15   Page Extra items had anything to do with his opinions

03:14  16   in this case?

03:14  17       A.    Not that I'm aware of.

03:14  18       Q.    Did you investigate the Posts and the Page

03:14  19   Extras items?

03:14  20       A.    I did.

03:14  21       Q.    Okay.  And what conclusion did you reach as to

03:14  22   those two items in terms of your infringement analyses?

03:14  23       A.    I concluded that they didn't behave like, and

03:14  24   in one case, resemble the requirements of the patents.

03:14  25             Why don't we go to Page Extras and I'll show

03:14  1   you what I mean.  That's the one that doesn't resemble

03:14  2   the requirements of the patent.

03:14  3          If you go to Page Extras, you get something

03:14  4   that -- this is something called a "heat map," where

03:14  5   the size of the text tells you how often the topic

03:14  6   comes up.

03:15  7          And so, basically, what this shows is an

03:15  8   analysis of the various threads in the Forums, so that

03:15  9   you can see which ones are the most popular and you can

03:15  10  click on them if you want to investigate further.

03:15  11         So it's kind of a -- there's that thing on

03:15  12  Google where you say "random choice" or something like

03:15  13  that, and this is something similar.  Although, it is a

03:15  14  little bit less random.

03:15  15  Q.    So this really has nothing to do with the

03:15  16  issues in this case?

03:15  17  A.    No.  It does not.

03:15  18  Q.    Okay.

03:15  19         MR. JENSEN:  Let's take a quick peek at

03:15  20  Posts.

03:15  21  A.    What we see in Posts are, in this case,

03:15  22  latest -- there's different buttons at the top there,

03:15  23  as you can see.  The one that comes up by default is

03:15  24  Latest Posts, and these are just the most recent items

03:15  25  that have been added to the Forums.  And you can click

03:15  1    on them and then visit them.

03:15  2                   MR. JENSEN:  Yeah.  Mr. Thompson, why

03:15  3    don't you go down and just --

03:15  4         A.   Just click on the first one --

03:15  5                   (Simultaneous speakers.)

03:15  6                   MR. JENSEN:  -- down below.

03:15  7         A.   Yeah.  There you go.

03:16  8              Now, notice what the breadcrumb looks like as

03:16  9    a result of having picked two things.  How many items

03:16  10   do I count there?  I count one, two, three, four, five.

03:16  11   And we clicked two.  So something's fishy here.

03:16  12   BY MR. JENSEN:

03:16  13        Q.   Does that indicate that the Forum site has a

03:16  14   required correspondence in the claim?

03:16  15        A.   In this case it does not have the required

03:16  16   correspondence.

03:16  17        Q.   Okay.  Now, let's take a look at the Forums

03:16  18   item there.  And let's go ahead and, Mr. Tittel, why

03:16  19   don't you pick a navigation path?

03:16  20        A.   Yeah.

03:16  21                   THE WITNESS:  Go ahead and go to Clock

03:16  22   and Timing since we were looking at atomic clocks

03:16  23   before.  We might as well stay with time since it's on

03:16  24   everybody's mind.

03:16  25              Go ahead and pick Clock Solutions.  And

983

03:16   1   let's see what kind of posts we've got there.

03:16   2       A.    All right.  So we don't have that many, which

03:16   3   is good because we don't have to look at a lot of

03:16   4   stuff.

03:16   5                   THE WITNESS:  Now, pick the top one,

03:16   6   Mr. Thompson, and let's look at the --

03:16   7       A.    So, again, we've picked three things, and we

03:17   8   see five in the breadcrumb.

03:17   9   BY MR. JENSEN:

03:17   10      Q.    Now, let's do another example.  And this time

03:17   11  we won't make sort of the final selection there.

03:17   12                  MR. JENSEN:  So let's go to Forums.

03:17   13  BY MR. JENSEN:

03:17   14      Q.    And why don't you pick another path,

03:17   15  Mr. Tittel?

03:17   16                  THE WITNESS:  Let's do a 32-Bit

03:17   17  Microcontroller, PIC32 Topics.

03:17   18  BY MR. JENSEN:

03:17   19      Q.    So how many selections were made in that

03:17   20  process right there with the drop-down menu?

03:17   21      A.    Three.

03:17   22      Q.    And what -- was it three or two?

03:17   23      A.    No.  I'm sorry.  It's three.

03:17   24      Q.    I think I got -- I might have miscounted.

03:17   25  Let's go back to the homepage.  And then I should have

03:17  1   asked you to count in the first instance.

03:17  2       A.   Yeah.

03:17  3            THE WITNESS:  No, don't click that one.

03:17  4   And I'll show you why we don't want to click that one.

03:17  5   That's another thing we're going to talk about.  Click

03:17  6   on the Microchip at the top of the slide.

03:17  7   BY MR. JENSEN:

03:17  8       Q.   So we're at a clean homepage here; is that

03:18  9   right?

03:18  10      A.   Right.

03:18  11           THE WITNESS:  So go to Forums.  That's

03:18  12  one -- we're mousing over that.  And we're going to

03:18  13  32-Bit Microcontrollers and then we're sliding over to

03:18  14  General PIC32 Topics.

03:18  15  BY MR. JENSEN:

03:18  16      Q.   And how many links are there in the resulting

03:18  17  accused breadcrumb?

03:18  18      A.   Four.

03:18  19      Q.   And is that more, the same, or less than the

03:18  20  number of selections that were made?

03:18  21      A.   It's more.

03:18  22      Q.   Okay.  And what happens if we click on All

03:18  23  Forums?

03:18  24      A.   Yeah.  I was just going to ask the same

03:18  25  question.

985

03:18  1           THE WITNESS:  Let's go ahead and click on

03:18  2   All Forums, Mr. Thompson.  It's the second item on the

03:18  3   breadcrumb there on the top of the slide.

03:18  4           MR. JENSEN:  At the top?

03:18  5      A.    There we go.  Thank you.

03:18  6           Notice that what we get here is we don't get a

03:18  7   menu.  We get a web page.  And the web page has all of

03:18  8   the Forums.

03:18  9           THE WITNESS:  If you scroll down,

03:18  10  Mr. Thompson.

03:19  11     A.    I can show you that it has all of the Forums

03:19  12  on the Microchip Forums website.  It's not the way that

03:19  13  clicking an active link is supposed to work.  And when

03:19  14  you click an active link, you're supposed to get a

03:19  15  drop-down menu that lets you pick stuff.

03:19  16          This is giving you a huge honking list of

03:19  17  stuff that you have to scroll -- scroll through for

03:19  18  quite some while to see everything that's available.

03:19  19  BY MR. JENSEN:

03:19  20     Q.    All right.  Why don't we close out of that and

03:19  21  come back to the slide presentation and see if we can

03:19  22  just wrap up this segment.

03:19  23          And then I might request that we take a short

03:19  24  break.

03:19  25     A.    Thank you.

03:19   1        Q.   All right.  I think we can just tie this up,

03:19   2    and it'll be a good clean break point.

03:19   3             And so in terms of the asserted claims here --

03:19   4    and we've got Claim 1 of the '301 patent on the screen.

03:19   5    What conclusion did you reach by your analysis of the

03:19   6    Forum website?

03:20   7        A.   I reached the conclusion that Microchip does

03:20   8    not infringe the preamble, and that it's not -- that

03:20   9    the number of links that -- the number of items that

03:20  10    gets selected does not match the number of items that

03:20  11    gets produced in the breadcrumb, so that we do not have

03:20  12    one active link corresponding to each of the items

03:20  13    selected.

03:20  14             Furthermore, I also pointed out that, as such,

03:20  15    the All Forums element of the breadcrumb is not a

03:20  16    cascading menu and therefore is also not an active link

03:20  17    either.

03:20  18        Q.   So I believe that concludes the section on

03:20  19    your opinions as to noninfringement of the various

03:20  20    Microchip websites; is that correct?

03:20  21        A.   Yes, sir.  It is.

03:20  22        Q.   All right.

03:20  23             MR. JENSEN:  Would it be all right if we

03:20  24    took an afternoon break?

03:20  25             THE COURT:  Sure.

987

| | | |
|---|---|---|
| 03:20 | 1 | MR. JENSEN:  Thank you. |
| 03:21 | 2 | THE COURT:  Ladies and gentlemen of the |
| 03:21 | 3 | jury, if you would remember my instructions not to |
| 03:21 | 4 | discuss the case amongst yourselves, we'll be in recess |
| 03:21 | 5 | for about ten minutes. |
| 03:21 | 6 | THE BAILIFF:  All rise. |
| 03:21 | 7 | (Jury exited the courtroom.) |
| 03:21 | 8 | THE COURT:  Thank you.  You may be |
| 03:21 | 9 | seated. |
| 03:21 | 10 | Mr. Tittel, you may step down. |
| 03:21 | 11 | THE WITNESS:  Thank you, sir. |
| 03:21 | 12 | THE COURT:  Is there anything that we |
| 03:21 | 13 | need to take up? |
| 03:21 | 14 | MR. DEVLIN:  Not from the plaintiff. |
| 03:21 | 15 | THE COURT:  Counsel? |
| 03:21 | 16 | MR. JENSEN:  No, Your Honor. |
| 03:21 | 17 | THE COURT:  Very good. |
| 03:21 | 18 | And I'm not going to hold you to this. |
| 03:21 | 19 | How much -- about how much longer do you think you |
| 03:21 | 20 | have? |
| 03:21 | 21 | MR. JENSEN:  The good news is, I think |
| 03:21 | 22 | we're through the bulk of it.  We've got a few -- |
| 03:21 | 23 | THE COURT:  No.  I don't care. |
| 03:21 | 24 | MR. JENSEN:  Probably --  I mean, every |
| 03:21 | 25 | time I estimate -- |

988

03:21  1                    THE COURT:  An hour?

03:21  2                    MR. JENSEN:  45 minutes, roughly, would

03:21  3      be my guess.

03:21  4                    THE COURT:  All I care about -- my plan

03:21  5      would be, if we can, to finish him today.

03:21  6                    About how long -- unless you tell me you

03:22  7      have -- how much --

03:22  8                    MR. JENSEN:  And I'm happy to shorten

03:22  9      that.  I think --

03:22  10                    THE COURT:  No, no.  You don't need to do

03:22  11      that.

03:22  12                    MR. DEVLIN:  Yeah.  I understand that --

03:22  13                    THE COURT:  About how long --

03:22  14                    MR. DEVLIN:  -- I think we can probably

03:22  15      do that.  Unless -- I don't want to speak while the

03:22  16      witness is here.  I believe we can probably do that.

03:22  17                    THE COURT:  I just -- I prefer to get

03:22  18      witnesses done in one chunk --

03:22  19                    MR. DEVLIN:  Understood.

03:22  20                    THE COURT:  -- if we can.

03:22  21                    MR. JENSEN:  We'll keep that in mind.

03:22  22                    THE COURT:  Yeah.  I don't think it's

03:22  23      fair to the jury -- to him or the jury to be hanging

03:22  24      overnight in the middle of --

03:22  25                    Yes, sir.

—989—

| | | |
|---|---|---|
| 03:22 | 1 | MR. DEVLIN:  May I ask on a timing issue? |
| 03:22 | 2 | So, Your Honor, I'm looking at the clock.  If we can go |
| 03:22 | 3 | a little past 5:00 or -- |
| 03:22 | 4 | THE COURT:  Oh, no.  We're going to go |
| 03:22 | 5 | past 5:00. |
| 03:22 | 6 | MR. DEVLIN:  Oh, great.  Then we will |
| 03:22 | 7 | be -- |
| 03:22 | 8 | THE COURT:  No, no, no.  I'm -- that's |
| 03:22 | 9 | what I'm saying is we are going to go until we finish |
| 03:22 | 10 | with Mr. Tittel. |
| 03:22 | 11 | MR. DEVLIN:  Understood.  Got it.  Then |
| 03:22 | 12 | there's not going to be a -- first of all, there's not |
| 03:22 | 13 | going to be a problem when you put it that way anyway, |
| 03:22 | 14 | Your Honor. |
| 03:22 | 15 | THE COURT:  We will go until we finish |
| 03:22 | 16 | him. |
| 03:22 | 17 | Your next witness after him would be a |
| 03:22 | 18 | damages expert? |
| 03:22 | 19 | MR. JENSEN:  We might have a deposition |
| 03:22 | 20 | clip to play.  Let me check.  We've got like a |
| 03:22 | 21 | 20-minute deposition video.  But that's flexible. |
| 03:23 | 22 | THE COURT:  And then damages expert? |
| 03:23 | 23 | MR. JENSEN:  And then we have one more |
| 03:23 | 24 | fact witness.  It'll be relatively short. |
| 03:23 | 25 | THE COURT:  So we'll finish with the |

03:23  1   evidence tomorrow?

03:23  2                   MR. JENSEN:  Oh, absolutely.

03:23  3                   THE COURT:  Okay.  Very good.

03:23  4                   MR. DEVLIN:  Thank you, Your Honor.

03:23  5                   (Recess taken.)

03:42  6                   THE BAILIFF:  All rise.

03:42  7                   THE COURT:  Please remain standing.

03:43  8                   (Jury entered the courtroom.)

03:43  9                   THE COURT:  Thank you.  You may be

03:43  10  seated.

03:43  11                  Counsel?

03:43  12                  MR. JENSEN:  Mr. Thompson, could we pull

03:43  13  the slide deck back up?

03:43  14  BY MR. JENSEN:

03:43  15     Q.   And by way of preview, Mr. Tittel, we've

03:43  16  covered your noninfringement opinions.  I do have one

03:43  17  or two more questions on that.

03:43  18          And then I just wanted to forecast for the

03:43  19  jury that the last three sections will be nowhere near

03:43  20  as long as the prior sections.  Because I -- your

03:43  21  expectations may be different having heard from

03:43  22  Mr. Sherwood.

03:43  23          So to finish up on noninfringement,

03:43  24  Mr. Tittel, some of the slides we looked at focused on

03:43  25  the '301 patent, Claim 1, as an exemplary or

991

03:44   1    representative claim; is that correct?

03:44   2        A.    Yes.

03:44   3        Q.    Okay.  I just want to kind of check the box

03:44   4    and confirm that the elements and requirements we've

03:44   5    been talking about, in fact, are in all of the asserted

03:44   6    claims, and we did that for the Active Path, correct?

03:44   7        A.    That is my opinion.  Yes.

03:44   8        Q.    Okay.  So let's --

03:44   9              MR. JENSEN:  Mr. Thompson, could you pull

03:44   10   up the Demonstrative Slide 32 from Mr. Sherwood's

03:44   11   presentation?

03:44   12   BY MR. JENSEN:

03:44   13       Q.    And what is shown on this slide, Mr. Tittel?

03:44   14       A.    We're trying to show all of the independent

03:44   15   claims.

03:44   16       Q.    Okay.  And what aspect of the independent

03:44   17   claims is represented on this slide?

03:44   18       A.    The preamble, which includes the mention of

03:44   19   the method.

03:44   20       Q.    Okay.  And just for the record, I'll note that

03:44   21   this includes the preambles for Claim 1 of the '411

03:45   22   patent, Claim 1 of the '301 patent, Claim 1 of the '517

03:45   23   patent, Claim 1 of the '836 patent, Claim 8 -- or

03:45   24   Claim 1 of the '880 patent, and Claim 14 of the '127

03:45   25   patent.

03:45  1          And I believe there may be one more claim that

03:45  2  perhaps couldn't be squeezed onto the slide.

03:45  3          MR. JENSEN:  So I'll ask Mr. Thompson to

03:45  4  just pull up the '836 patent.

03:45  5      A.   Yes.  We need to look at Claim 8.

03:45  6          MR. JENSEN:  Yes.  And we'll turn to

03:45  7  Claim 8 of the '836 at the back.  And maybe just zoom

03:45  8  in there.

03:45  9      A.   Indeed, it is a method claim.

03:45 10  BY MR. JENSEN:

03:45 11      Q.   And what does that preamble read?

03:45 12      A.   The preamble reads:  A method for navigating

03:45 13  websites, including a plurality of hierarchically

03:45 14  organized web pages, said method comprising.

03:45 15      Q.   Okay.

03:45 16          MR. JENSEN:  We can take that exhibit

03:45 17  down, Mr. Thompson, and go to Demonstrative Slide 63 of

03:46 18  Mr. Sherwood's presentation.

03:46 19  BY MR. JENSEN:

03:46 20      Q.   And what is the title of this slide,

03:46 21  Mr. Tittel?

03:46 22      A.   Asserted Patents Claim Comparison.

03:46 23      Q.   And could you read -- since we started with

03:46 24  the '301 patent, could you just read what's labeled as

03:46 25  Claim 1.2 or Claim 1, Element 1.2 for the '301 patent?

03:46   1     A.    Certainly.

03:46   2          Dynamically constructing an Active Path as a

03:46   3  sequence of active links as items are selected using

03:46   4  the graphical user menu system, with one said active

03:46   5  link corresponding to each of the items selected, said

03:46   6  active links providing direct access to one of a

03:46   7  function, corresponding level and menu item without the

03:46   8  need to navigate using said graphical user menu system.

03:47   9     Q.    And this is the claim element that has the

03:47  10  Active Path requirement and the correspondence

03:47  11  requirement that you testified about?

03:47  12     A.    Yes, sir.

03:47  13     Q.    And do all of the independent claims that are

03:47  14  asserted in this case have the same or a substantially

03:47  15  similar requirement?

03:47  16     A.    They do.

03:47  17     Q.    And just for the record, I'll note which

03:47  18  patents and claims are listed on this slide.  It's

03:47  19  Claim 1 of the '411 patent, Claim 1 of the '301 patent,

03:47  20  Claim 1 of the '517 patent, Claim 8 of the '836 patent,

03:47  21  Claim 1 of the '880 patent, and Claim 14 of the '127

03:47  22  patent.

03:47  23          And I believe there is one claim from the '836

03:47  24  patent, an independent claim that's being asserted

03:47  25  which, again, for whatever reason, isn't shown on this

994

```
03:47    1    slide.
03:47    2                  MR. JENSEN:  So I'd ask Mr. Thompson to
03:47    3    just pull up the '836 patent.  And if we can go to
03:48    4    Claim 1.
03:48    5                  And let's go to the -- kind of the next
03:48    6    element in the claim.
03:48    7        A.    Yeah.  Okay.  He's --
03:48    8                  And you can see at the top of the lower box
03:48    9    that we have the corresponding requirement there.
03:48   10    BY MR. JENSEN:
03:48   11        Q.    And it also requires an Active Path as well?
03:48   12        A.    Yes, sir.  That's correct.
03:48   13        Q.    And it's got the correspondence limitation?
03:48   14        A.    Yes, sir.  That's correct.
03:48   15                  MR. JENSEN:  Thank you, Mr. Thompson.
03:48   16    You can pull that down.
03:48   17    BY MR. JENSEN:
03:48   18        Q.    All right.  Turning back to your slide
03:48   19    presentation, Mr. Tittel, what is the second topic that
03:48   20    we're going to address?
03:49   21        A.    We're going to look at noninfringing
03:49   22    alternatives for the old Microchip website.
03:49   23        Q.    And can you remind the jury, what is a
03:49   24    noninfringing alternative?  Or what does a
03:49   25    noninfringing alternative analysis entail?
```

995

03:49  1    A.    Well, it's what you could have picked instead

03:49  2    of concluding the hypothetical negotiation between

03:49  3    Caddo and Microchip.  So it is something that could

03:49  4    have been substituted for the completion of that

03:49  5    hypothetical negotiation.

03:49  6    Q.    And when you conduct a noninfringing

03:49  7    alternatives analysis, what assumptions or what

03:49  8    required considerations must be made?

03:49  9    A.    Well, the primary ones are that you have to

03:49  10   assume that, indeed, the accused instrumentalities do

03:50  11   infringe.  And the second thing that you have to ensure

03:50  12   is that the options that are presented as noninfringing

03:50  13   alternatives are commercially acceptable.

03:50  14        And what "commercially acceptable" means is

03:50  15   that they're not going to impose an undue burden on

03:50  16   costs, performance, and other factors related to

03:50  17   commercial acceptability.

03:50  18   Q.    And at what point in time is the noninfringing

03:50  19   alternative analysis assessed?

03:50  20   A.    Well, the maximum damages period, as we heard

03:50  21   from the Caddo damages expert, is six years.  So that

03:50  22   would take it back to 2014, based on the filing date of

03:50  23   the lawsuit.

03:50  24   Q.    And in your opinion, Mr. Tittel, from 2014 to

03:50  25   the present, what noninfringing alternatives were

```
03:50   1    available to Microchip?

03:50   2        A.    Well, I list a number of them on the next

03:51   3    slide.  And they include things like removing the

03:51   4    drop-down menu from the breadcrumb, which is the

03:51   5    redesigned website.

03:51   6              Removing breadcrumbs completely, as is the

03:51   7    case on the graphics and chip-making company

03:51   8    nvidia.com.

03:51   9              Replacing breadcrumbs with search-based

03:51   10   function and filters as on Amazon.

03:51   11             Or using some other kind of forum website

03:51   12   solution that does not use the breadcrumbs with

03:51   13   drop-down menus such as Forumbee.

03:51   14             We could actually talk about all of those

03:51   15   things, but we don't have to.  Because as you'll see on

03:51   16   the next slide, I'm going to raise the question of what

03:51   17   noninfringing alternative is microchip.com already

03:51   18   using?

03:51   19             And because the redesigned version of the

03:51   20   microchip.com website is not accused of infringing, and

03:51   21   they're using it already, they already have a

03:52   22   noninfringing alternative.

03:52   23             And because they've already spent probably

03:52   24   most of the money to implement this solution already,

03:52   25   and because as you heard from Ms. Mahar, they achieved
```

03:52   1   the improvement in load times and user feedback that

03:52   2   they were looking for, they've kind of already solved

03:52   3   the problem as far as noninfringing alternatives go.

03:52   4          One of the points that one might take from

03:52   5   this is that breadcrumbs with drop-downs are not

03:52   6   necessary for website navigation, at least as far as

03:52   7   Microchip is concerned.  And indeed, Digital Range Labs

03:52   8   advised Microchip to remove the drop-down menus in

03:52   9   2019.  And that's what Microchip did.

03:52   10      Q.   In your opinion, Mr. Tittel, is the

03:52   11  noninfringing alternative of a breadcrumb without a

03:52   12  drop-down a commercially acceptable alternative, such

03:53   13  as the redesigned website?

03:53   14      A.   I think I've already said that in different

03:53   15  terms, so I can only agree with you.

03:53   16      Q.   And would -- you mentioned that there could be

03:53   17  some cost associated with making changes to convert to

03:53   18  a noninfringing alternative; is that correct?

03:53   19      A.   Yes.

03:53   20      Q.   What kind of scope or scale of effort or, you

03:53   21  know, dollars and cents would be required to implement

03:53   22  such a change?

03:53   23          And let me make sure I'm asking the question

03:53   24  clearly.  I don't want to know how -- how hard would it

03:53   25  be to redesign your website from the ground up, as

03:53  1   Microchip did, but only to make the changes necessary

03:53  2   to remove a drop-down menu from a breadcrumb path?

03:53  3       A.    It would be a short and not terribly expensive

03:53  4   project.

03:53  5       Q.    And you mentioned an alternative sort of forum

03:53  6   solution.  Can you tell us a little bit about that?

03:53  7       A.    Yes.  I actually looked around at the

03:54  8   marketplace.  I didn't know about the Salesforce option

03:54  9   until I heard Mrs. Mahar's testimony earlier this

03:54  10  morning.  But I did find a number of third-party forum

03:54  11  websites that don't use breadcrumbs with drop-down

03:54  12  menus.

03:54  13          And it looked like Forumbee got good reviews

03:54  14  and provided the kind of scale that would be needed to

03:54  15  support the Microchip user community.  And it does

03:54  16  indeed serve as a low-cost alternative to the ASP

03:54  17  Playground version of the Forums.

03:54  18      Q.    So would the Forumbee software basically be

03:54  19  a -- like a software platform that a party could

03:54  20  license or buy and then implement themselves?

03:55  21      A.    They -- well, again, any time you buy a piece

03:55  22  of software that delivers content to users, you're

03:55  23  generally going to have to do some configuration work

03:55  24  to set it up.  You want to display your company logo,

03:55  25  you want to choose the color scheme, you want to name

999

03:55  1    things so that they will make sense to people.

03:55  2              And in this case I think it would be what you

03:55  3    call a "migration task."  Because you would be

03:55  4    migrating the way the Forums are set up in ASP

03:55  5    Playground to a similar structure that you would have

03:55  6    to define inside of the Forumbee environment.

03:55  7        Q.   And so this isn't like a software solution

03:55  8    that Microchip would have to develop in the first

03:55  9    instance.  They could buy it from somebody else,

03:55  10   configure it or tweak it, and then it would be ready to

03:55  11   go on their site?

03:55  12       A.   Right.  This is the kind of job that you could

03:55  13   probably automate reasonably easily and achieve in

03:56  14   weeks.

03:56  15       Q.   And what is it about the Forumbee solution

03:56  16   that makes it noninfringing?

03:56  17       A.   It doesn't have a drop-down menu with

03:56  18   breadcrumbs.

03:56  19       Q.   Does it have a breadcrumb menu and it's just

03:56  20   missing the drop-down?  Is that...

03:56  21       A.   I can't remember.

03:56  22       Q.   Fair enough.

03:56  23       A.   I can see now by looking at the web page that

03:56  24   it does have a breadcrumb.  So obviously it lacks a

03:56  25   drop-down menu.

03:56  1       Q.    It's been a long day.  I understand.

03:56  2       A.    Thank you for showing me that slide.

03:56  3       Q.    And I believe we heard Mr. Sherwood testify

03:56  4  yesterday that the Forumbee solution was available back

03:56  5  in 2014.

03:56  6             Do you recall that?

03:56  7       A.    I do.

03:56  8       Q.    And so that would have been an available

03:56  9  alternative at that point in time?

03:56  10      A.    Yes.

03:56  11      Q.    Are you aware of any companies that, in fact,

03:57  12  use Forumbee as a -- for their -- to host their forum?

03:57  13      A.    Well, there is an online education company

03:57  14  that does use Forumbee for its curriculum and for its

03:57  15  community.  So there's an example of the -- I think

03:57  16  it's Aviatrix, which means -- no insult intended --

03:57  17  lady flyer in Latin.  And they're using it for a pretty

03:57  18  sizable curriculum delivery to support a pretty sizable

03:57  19  online training effort.

03:57  20      Q.    So Forumbee is a real product that actual

03:57  21  people are using today and did use back in 2014?

03:57  22      A.    To the best of my knowledge, yes.

03:57  23      Q.    All right.  I think that brings us to Topic 3,

03:57  24  Comparable Licenses.

03:58  25             And just at a summary level, what were you

—1001—

03:58  1    asked to do on this topic?

03:58  2        A.    I was asked to look at the licenses that were

03:58  3    under consideration both from the Caddo side and from

03:58  4    the Microchip side, and to assess if they were

03:58  5    technically comparable or not.

03:58  6        Q.    And I think you used a word there I want to

03:58  7    follow up on, which was "technically comparable"; is

03:58  8    that right?

03:58  9        A.    Yes.  That's correct.

03:58  10       Q.    So you're not offering an opinion on whether

03:58  11   or not they're economically comparable; is that

03:58  12   correct?

03:58  13       A.    That's not my job as an expert.  My job is to

03:58  14   look at technical comparisons.  Economics, as they do

03:58  15   not in life, do not enter it into -- into it, in this

03:58  16   case.

03:58  17       Q.    And what are we looking at on this slide

03:58  18   titled "Caddo's Comparable Licenses"?

03:58  19       A.    These are licenses that Caddo has entered into

03:58  20   with other parties, and we heard about most of these

03:59  21   from the damages expert.

03:59  22       Q.    And -- excuse me -- looks like there's several

03:59  23   columns here.  The leftmost column looks like the

03:59  24   party, so the counterparty was Caddo.  And then the

03:59  25   other party is listed in the first column; is that

—1002—

03:59  1    correct?

03:59  2        A.    Yes.   That is correct.

03:59  3        Q.    And then there's a date column.  And the third

03:59  4    column is really where I want to focus, which is on the

03:59  5    technology column?

03:59  6        A.    That's right.

03:59  7        Q.    Okay.  And can you describe what's listed

03:59  8    there?

03:59  9        A.    Well, the reason why I selected Microsoft as

03:59  10   not technically comparable is because in this case, the

03:59  11   contested functionality had to do with, believe it or

03:59  12   not, the File Explorer in Windows.  And that's not a

03:59  13   website technology.  That's an operating system

03:59  14   technology.

03:59  15        And so even though there are lots of

03:59  16   similarities in behavior, it's not a comparable

04:00  17   technology because it doesn't involve a website.

04:00  18        Q.    And maybe just taking one step back to

04:00  19   something that perhaps is obvious but perhaps not.

04:00  20        Did all of the Caddo licenses listed here,

04:00  21   with ███████████████████████████████████████████

04:00  22   ██████████████████████████████████████ involve the Active

04:00  23   Path patents?

04:00  24        A.    Yes.  The '411 patent family of patents was

04:00  25   the subject of these agreements.

—1003—

| | | |
|---|---|---|
| 04:00 | 1 | Q.   And so they would be comparable in that |
| 04:00 | 2 | respect, from the perspective of being the same |
| 04:00 | 3 | patents? |
| 04:00 | 4 | A.   Right.  The same patents.  Right. |
| 04:00 | 5 | Q.   Understood. |
| 04:00 | 6 | Did you evaluate any Microchip licenses, |
| 04:00 | 7 | patent licenses? |
| 04:00 | 8 | A.   I did.  I looked at the license portfolio that |
| 04:00 | 9 | Microchip licensed from a company called ███████ |
| 04:00 | 10 | ██████████████████████████████████ ████ |
| 04:01 | 11 | ███████████████████████████████████ |
| 04:01 | 12 | ████████████████████████████████ |
| 04:01 | 13 | ███████████████████████████████ |
| 04:01 | 14 | ████████████████████████████████████ |
| 04:01 | 15 | █████████████ |
| 04:01 | 16 | And if we can go to the next slide, I'll show |
| 04:01 | 17 | you a picture there of MSN Home, where the MSN Money |
| 04:01 | 18 | site is, and it basically shows a picture of a -- this |
| 04:01 | 19 | is a -- not a horizontal graphical user menu that's |
| 04:01 | 20 | shown at the upper left, it's a vertical or left nav |
| 04:01 | 21 | menu. |
| 04:01 | 22 | But, indeed, if you hover over an entry in |
| 04:01 | 23 | that menu, you get another drop-down menu that comes |
| 04:02 | 24 | out of it.  And, in fact, in this case the Stock |
| 04:02 | 25 | Research item in the first-level menu has been selected |

| | | |
|---|---|---|
| 04:02 | 1 | and we see the different services -- information |
| 04:02 | 2 | services that do stock research that are available -- |
| 04:02 | 3 | that were available through the site at the time of the |
| 04:02 | 4 | illustration being made. |
| 04:02 | 5 | Q.    And what were some of the similarities that |
| 04:02 | 6 | you identified in terms of the ███ license and the |
| 04:02 | 7 | technology as it relates to the asserted patents and |
| 04:02 | 8 | technology at issue in this case? |
| 04:02 | 9 | A.    Well, in the ██████, they were directed |
| 04:02 | 10 | to, as Mr. Sherman (sic) observed, discussion site or |
| 04:02 | 11 | bulletin board techniques, but they also covered |
| 04:02 | 12 | website navigation techniques as well. |
| 04:03 | 13 | They both share a common concern with making |
| 04:03 | 14 | efficient use of screen real estate.  They both discuss |
| 04:03 | 15 | an interest in providing more intuitive user interface |
| 04:03 | 16 | options.  And they both talk about technology that |
| 04:03 | 17 | helps to make websites more visually appealing. |
| 04:03 | 18 | So I found the technologies to be comparable |
| 04:03 | 19 | for those reasons. |
| 04:03 | 20 | Q.    And I believe that brings us to the fourth |
| 04:03 | 21 | topic here of Patent Benefits. |
| 04:03 | 22 | A.    It does. |
| 04:03 | 23 | Q.    And what are you referring to here when you |
| 04:03 | 24 | say "patent benefits"? |
| 04:03 | 25 | And there's sort of a question posed:  Agree |

04:03  1  with alleged benefits of patents?

04:03  2      A.    Mr. Sherwood, in his testimony, talked about

04:03  3  the benefits of the '411 family of patents, and I'm

04:03  4  responding to his statements of those benefits.

04:04  5      Q.    By and large, did you agree with how he

04:04  6  characterized the benefits of the asserted patents?

04:04  7      A.    I think his statements put too much emphasis

04:04  8  on the Active Path, and I think they overvalue the

04:04  9  importance of navigation as a part of overall website

04:04  10  design.

04:04  11      Q.    Could you elaborate on that a little bit?

04:04  12      A.    Sure.  Since we've already moved to the next

04:04  13  slide, I can do that.

04:04  14          If -- let me say that when it comes to user

04:04  15  retention and engagement, as I was researching the

04:04  16  topic, I found an article that described 16 different

04:04  17  ways to improve user engagement on a website.  And

04:04  18  in -- of those 16 ways, only one of them mentioned user

04:05  19  website navigation.

04:05  20          And this is kind of characteristic of

04:05  21  the importance that Mr. Sherwood ascribes to navigation

04:05  22  as he's talking about overall website design.  He tends

04:05  23  to see it as a primary driver and a primary motivator

04:05  24  of what makes a good web design.

04:05  25          And when he was talking about the difference

04:05  1   between, for example, a good web design and a poor web

04:05  2   design being 100 percent, I couldn't help but get the

04:05  3   feeling that he was also communicating that a lot of

04:05  4   that 100 percent difference comes from the kind of

04:05  5   technologies that the Active Path patents deliver to

04:05  6   those who use them.

04:05  7          And I would simply like to observe that as

04:05  8   someone who has studied and worked with website design

04:05  9   for the past two and a half decades or more, that I do

04:05  10  agree that navigation is a component of website design,

04:06  11  but I do also observe that it's not the only component

04:06  12  of website design, and that its importance has to be

04:06  13  considered along with many other aspects of website

04:06  14  design.

04:06  15         And we heard Ms. Mahar talk about the things

04:06  16  that were driving the redesign of their website.  And

04:06  17  what they were concerned about was stability, usability

04:06  18  of the content system, ease of use for maintaining

04:06  19  websites, and, probably most important of all to them,

04:06  20  was the change in load time from 12 seconds to 3

04:06  21  seconds, which, as somebody who's been tracking stuff

04:06  22  on the web for many years, I can tell you is a pretty

04:06  23  big deal.  That's a 75 percent improvement or better in

04:06  24  page load time, and that is really, really significant.

04:07  25         And that slide that they showed from the

04:07  1    presentation that said what the value of improving page

04:07  2    load time was was significant, and I submit that, at

04:07  3    best, a very small portion of the improvement in load

04:07  4    time is going to come from navigation.

04:07  5           I must also observe that Microchip's site has

04:07  6    improved in performance and, according to Ms. Mahar,

04:07  7    improved in revenue generation since the accused

04:07  8    functionalities, which I've already shown really don't

04:07  9    match the Active Path, were taken out of the

04:07  10   microchip.com website by dropping the pull-down menus.

04:07  11   Q.   Mr. Tittel, I asked you a question, I think,

04:08  12   at the start of your testimony about, you know, when

04:08  13   was Google started.  And it was, I think, shortly after

04:08  14   or around the time that you were publishing your first

04:08  15   book.

04:08  16          Do you recall that?

04:08  17   A.   Yes.  My first book was '95 and Google was

04:08  18   '98.

04:08  19   Q.   In 1998, how big or how popular was Google?

04:08  20   A.   It attracted notice pretty much immediately,

04:08  21   but it was -- when it first started out, it was not --

04:08  22   it did not immediately break ahead of older established

04:08  23   search sites at the time, such as Yahoo, Expedia -- I'm

04:08  24   trying to think who else -- Alta Vista.

04:08  25          There were a number of other early search

1008

04:08  1    sites that had something of a presence in that space,

04:08  2    but I think it took three or perhaps four years for

04:08  3    Google to kind of eclipse everybody else.

04:09  4         Q.    And you're familiar with the Google website?

04:09  5         A.    Yes.

04:09  6         Q.    How frequently do you use it?

04:09  7         A.    At least dozens of times a day, if not more

04:09  8    than that.

04:09  9         Q.    And how has the -- I'll call it the advent of

04:09  10   search-based navigation on sites such as Google and

04:09  11   search engines, how has that changed over the last

04:09  12   20 years in the context of website navigation using,

04:09  13   you know, drop-down menus?

04:09  14        A.    Well, I think when the web got going, the way

04:09  15   that people interacted with information was to look at

04:09  16   the front page of the website, see what was there and

04:09  17   start poking around.

04:09  18             I think that, collectively, we've gotten past

04:09  19   the poking around stage.  And you'll notice that many

04:09  20   of Dr. Sherwood's arguments concerning the value of the

04:10  21   '411 family of patents sort of stressed the ability to

04:10  22   see more of what was going on around you and to be able

04:10  23   to more easily understand the structure of the website

04:10  24   and to explore things and find things by looking for

04:10  25   them.

-1009-

04:10  1      The point of search is to cut the exploration

04:10  2  out and, assuming that you know what you're looking

04:10  3  for, to be able to cut to the chase and get right to

04:10  4  where you're going.

04:10  5      That's not to say that navigation isn't

04:10  6  necessary or that it has no value.  But I will observe,

04:10  7  for example, that 60 percent of the traffic on

04:10  8  microchip.com comes from something called an "external

04:10  9  referrer."

04:10  10      What the heck does that mean?

04:10  11      It means that another website had a link in it

04:10  12  from which the visitor came to get to microchip.com.

04:11  13  And in most cases, when a visit comes from an external

04:11  14  referrer, it's probably from a search engine.  If not

04:11  15  Google, then some other search engine.

04:11  16      MR. JENSEN:  I pass the witness.

04:11  17          CROSS-EXAMINATION

04:11  18  BY MR. DEVLIN:

04:12  19      Q.  Good afternoon, Mr. Tittel.

04:12  20      A.  Good afternoon, Mr. Devlin.

04:12  21      Q.  Thank you for being here with us today.

04:12  22      You've worked as an expert in maybe 12 or 15

04:12  23  different patent cases; is that right?

04:12  24      A.  I'm sorry.  Would you repeat the question?

04:12  25      Q.  Sure.  I understand you've worked as an expert

—1010—

04:12    1    in patent cases maybe a dozen times, 15 times,

04:12    2    something like that; is that right?

04:12    3        A.    I've worked on 60 patent cases.  I've been

04:12    4    deposed in perhaps 15 of them, and I've appeared at

04:12    5    trial three times.  This is actually four times now.

04:12    6        Q.    I see.  Thank you.

04:12    7            So the -- as I understand it, at least as of

04:12    8    the time of your deposition, in the 12 to 15 cases that

04:12    9    you'd been deposed in or so, all of those were where

04:12   10    you were acting as an expert for the defendant, not the

04:12   11    patent owner; is that right?

04:12   12        A.    Yes.  That's correct.

04:12   13        Q.    And in this case, you're being paid $425 an

04:13   14    hour for your time; is that right?

04:13   15        A.    I have not charged $425 an hour for my time.

04:13   16    I only started doing that perhaps in, oh, maybe last

04:13   17    September or October.  Before that, my rate was 400 for

04:13   18    about four years before that, and then prior to that it

04:13   19    was $250 an hour.

04:13   20        Q.    Okay.  So during the pendency of this case, it

04:13   21    was in the 400/425 range?

04:13   22        A.    It was 425 for this case.

04:13   23        Q.    That's what I meant.

04:13   24        A.    Perhaps I didn't understand your question

04:13   25    correctly.  I apologize.

—1011—

04:13   1          Q.    No problem, sir.  Thank you.

04:13   2                I think to make things simpler, we're going to

04:13   3    kind of walk through some of your slides as we go, so

04:13   4    we can connect the dots between what I'm asking you

04:13   5    about and what you said on your direct testimony.

04:13   6                How's that sound?

04:13   7          A.    Let's do it.

04:13   8                (Simultaneous speakers.)

04:13   9          A.    I would ask you to approach the microphone

04:13   10   more closely because I'm having trouble hearing you.

04:13   11   BY MR. DEVLIN:

04:13   12         Q.    Okay.  I'll do that.  Let's see if we can --

04:14   13   how's that?  A little better?

04:14   14         A.    It is.  Yes.  Thank you.

04:14   15         Q.    I can just talk louder, if we want.  How's

04:14   16   that?

04:14   17         A.    Either way.  It's up to you.

04:14   18         Q.    Okay.  Maybe I'll do it that way.  It's more

04:14   19   natural.

04:14   20                Without going into the presentation yet, part

04:14   21   of the presentation was about the background of the

04:14   22   technology.

04:14   23                You remember that?

04:14   24         A.    Yes.

04:14   25         Q.    Okay.  And when you were talking about the

—1012—

04:14    1    background, you looked at the drop-down menus, you

04:14    2    looked at the breadcrumbs and so forth, right?

04:14    3        A.    Yes, sir.

04:14    4        Q.    And I guess the implication is the invention

04:14    5    is -- somehow this combination of these two elements,

04:14    6    that they're in the prior art.  Is that the

04:14    7    implication?

04:14    8        A.    I see them as the key components.

04:14    9        Q.    Okay.  Now, you were here during openings --

04:14   10    opening statements?

04:14   11        A.    I was.

04:14   12        Q.    And you heard that the defenses we were going

04:14   13    to hear were infringement, invalidity, and damages,

04:14   14    right?

04:14   15        A.    That is correct.  Yes.

04:15   16        Q.    You're the only technical expert we're going

04:15   17    to hear from Microchip, correct?

04:15   18        A.    That is correct.  Yes.

04:15   19        Q.    All right.  And so -- and you offered zero

04:15   20    testimony today on the issue of the validity of the

04:15   21    patents; is that right?

04:15   22        A.    That is correct.  Yes.

04:15   23        Q.    Okay.  Thank you.

04:15   24             And while I'm talking about it, there was a --

04:15   25    there was a slide?

—1013—

04:15  1                    MR. DEVLIN:  And maybe we can go to that.

04:15  2   It was Slide 22.  Do you have that, Mr. Gooden?

04:15  3                    There we go.

04:15  4   BY MR. DEVLIN:

04:15  5        Q.    Do you remember this one?

04:15  6        A.    I do.

04:15  7        Q.    And we were explaining to everybody that

04:15  8   there's these two groups of patents.  There's the

04:15  9   original and then the so-called CIPs, the

04:15 10   continuations-in-part.

04:15 11                    Does that ring a bell?

04:15 12        A.    It does.

04:15 13        Q.    That issue is only relevant to the issue of

04:16 14   validity, right?  In terms of priority dates and things

04:16 15   like that, correct?

04:16 16        A.    Yes.  That's correct.

04:16 17        Q.    Okay.  So we don't need to worry about this

04:16 18   issue anymore of the two different groups and so forth,

04:16 19   fair?

04:16 20        A.    Indeed.  I thought the jury might be

04:16 21   interested in seeing how the patents were related to

04:16 22   each other.

04:16 23        Q.    Fair enough.  I'm just -- I just want to make

04:16 24   it clear -- and I'm not criticizing you, sir.  I just

04:16 25   want to make it clear for everybody that it's actually

—1014—

04:16  1    not relevant to any of the issues that are actually

04:16  2    being decided here.  So they don't have to worry about

04:16  3    it anymore.  Is that okay?

04:16  4        A.    It's not only okay, but I did not testify any

04:16  5    further on that subject.  So there's really nothing to

04:16  6    deal with.

04:16  7        Q.    Perfect.  We're in agreement.  Thank you.

04:16  8            Before we go any further --

04:16  9            MR. DEVLIN:  And you can pull that down,

04:16  10   Mr. Gooden.

04:16  11   BY MR. DEVLIN:

04:16  12       Q.    I want to talk about one of the principles

04:16  13   that's pretty important.  First of all, with patent

04:16  14   claims, every word matters, right?

04:16  15       A.    Yes, sir.

04:16  16       Q.    Yeah.  Every word in those patent claims is

04:16  17   important, because that defines what each claim

04:16  18   requires to show infringement, correct?

04:17  19       A.    Yes.

04:17  20       Q.    Okay.  And then in the same way the Court's

04:17  21   claim construction is important because it really --

04:17  22   when the Court defines one of the terms in the claims,

04:17  23   then that's what you have to show is present to show

04:17  24   infringement.  You have to show that definition is

04:17  25   there, right?

—1015—

04:17    1        A.    Indeed.

04:17    2        Q.    Okay.  Great.

04:17    3              Now, let me talk a little bit more about the

04:17    4   patent claims.  There's somewhere -- and maybe we can

04:17    5   pull up -- let's pull up an example of your patent

04:17    6   claims.

04:17    7              MR. DEVLIN:  Let's go to the '301,

04:17    8   Claim 1, which was Slide 27, I believe, Mr. Gooden.

04:17    9   BY MR. DEVLIN:

04:17   10        Q.    Now, I want to just point everyone to

04:17   11   something.  So if you look in the yellow text in the

04:17   12   preamble, you see that at the top?

04:17   13        A.    I do.

04:17   14        Q.    Okay.  And right at the bottom of that text,

04:17   15   the fifth line down, it says:  Said method comprising

04:18   16   the steps of.

04:18   17              Do you see that?

04:18   18        A.    I do.

04:18   19        Q.    Okay.  Do you see that word "comprising"?

04:18   20        A.    Yes.

04:18   21        Q.    That's an important word, isn't it?

04:18   22        A.    It is.

04:18   23        Q.    And it's important because when a patent claim

04:18   24   uses that transition word, the word "comprising," what

04:18   25   it means is in order to show infringement, you have to

—1016—

04:18   1   demonstrate the presence of all the elements.  But at

04:18   2   the same time, if there are additional things going on

04:18   3   in the accused product or method, they're not relevant.

04:18   4   They don't negate infringement as long as all the claim

04:18   5   elements that are listed are there, right?

04:18   6       A.   Yes, sir.  That's correct.

04:18   7       Q.   Thank you.

04:18   8            Now, you can write a patent claim so that

04:19   9   that's not true.  You can write a patent claim so that

04:19   10  in order to infringe, you have everything in the claim

04:19   11  and nothing else.  So if there is something else

04:19   12  besides what's in the claim, that would negate

04:19   13  infringement, even if the claimed elements are there.

04:19   14            You know that, right?

04:19   15      A.   I would ask you to repeat it once again to

04:19   16  make sure that I parsed it correctly.

04:19   17      Q.   Sure.  You know what?  Let's work through an

04:19   18  example.  How's that?

04:19   19            Imagine there's a patent claim and it says a

04:19   20  horizontal surface made of wood and four vertical legs

04:19   21  holding that surface away from the ground.

04:19   22            Are you with me so far?

04:19   23      A.   Yes, sir.

04:19   24      Q.   Okay.  That's a table, right?

04:19   25      A.   Could be.

—1017—

04:19  1      Q.    Fair enough.  All right.

04:19  2            If the claim says that it's comprising those

04:19  3      things and I have a table with four legs and a fifth

04:20  4      leg in the middle, that meets that claim, right?

04:20  5            It's got the flat surface, it's got the four

04:20  6      legs.  The fifth leg doesn't matter, right?

04:20  7      A.    Correct.

04:20  8      Q.    Great.  If, on the other hand, the

04:20  9      transitional word in that claim was "consisting of,"

04:20  10     then -- and it said a flat surface and four legs, then

04:20  11     a table that had a flat surface and four legs and a

04:20  12     fifth leg in the middle would not infringe, right?

04:20  13     A.    Because it had an extra leg.  Yes.

04:20  14     Q.    Right.  It's got an extra thing in there

04:20  15     that's not actually recited in the body of the claim.

04:20  16           With me?

04:20  17     A.    Yes, sir.

04:20  18     Q.    Okay.  But all of these claims are comprising

04:20  19     claims, and so extra stuff doesn't negate infringement

04:20  20     as long as the elements are met, right?

04:20  21     A.    Yes, sir.

04:20  22     Q.    Thank you.  All right.  Let's keep that in

04:20  23     mind as we work forward through this.

04:21  24           Let's look at this '301 patent, Claim 1.  I

04:21  25     want to talk about it.

04:21  1              You talked here about this Active Path.  See
04:21  2  that?  Right in the middle.  It's in the orange, kind
04:21  3  of at the top?
04:21  4      A.    You mean Item No. 2 in sort of burnt orange?
04:21  5      Q.    That's actually a good question.  I was
04:21  6  looking at it in the claim.  But we're looking at it on
04:21  7  the left as well.
04:21  8              And I think, to hold right here, you were
04:21  9  talking through this.  And you were talking about 1 and
04:21 10  2.  And I wrote down what you said.  Actually, I
04:21 11  photographed it from the screen we have.  And then we
04:21 12  copied it down here.
04:21 13              See if this rings a bell.  You said:  The
04:21 14  second claim element, which is labeled 2 here on the
04:21 15  slide, talks about dynamically constructing an Active
04:21 16  Path.
04:21 17              And remember, that's something that the Court
04:22 18  gave us a definition for, which is:  A sequence of
04:22 19  active links as items are selected where there's a
04:22 20  one-to-one correspondence between the item that are
04:22 21  selected and the items that show up in the path, the
04:22 22  Active Path for the resulting breadcrumb.
04:22 23              Now, does that sound right?
04:22 24      A.    Well, actually I think you missed a comma in
04:22 25  that sentence.

—1019—

04:22   1          Q.    All right.

04:22   2          A.    Because I would have put a comma after the

04:22   3    sequence of active links and then continued on with the

04:22   4    rest of the sentence as a continuation of my statement

04:22   5    rather than construing the entire statement as a

04:22   6    redefinition of the Court's construction, which I would

04:22   7    never, ever presume to do.

04:22   8          Q.    Great.

04:22   9          So what we're seeing here on this slide as

04:22   10   Item No. 2 is something more specific than the Court's

04:22   11   construction, right?

04:22   12         A.    That language is not an attempt to restate the

04:23   13   Court's construction.  It's just supposed to summarize

04:23   14   the focus and thrust of the element.

04:23   15         Q.    Thanks.  Maybe my question wasn't clear.  Let

04:23   16   me ask it again.

04:23   17         This summary here, No. 2, it includes language

04:23   18   that is not in the Court's construction, right?  Of

04:23   19   Active Path?

04:23   20         A.    It is a description of an entire block of text

04:23   21   that includes the words "Active Path" as well as one,

04:23   22   two, three, four, five, six, seven, eight lines of

04:23   23   text.

04:23   24         Q.    All right.  Great.

04:23   25         Let me go back to it this way.

04:23   1                    MR. DEVLIN:  Let's go to Slide 26.  I

04:23   2   think it's back one.

04:23   3   BY MR. DEVLIN:

04:24   4       Q.    This is the Court's construction of Active

04:24   5   Path, right?

04:24   6       A.    Yes.

04:24   7       Q.    Okay.  It says:  A sequence of links

04:24   8   dynamically created as a menu system is navigated.

04:24   9             Did I read that right?

04:24   10      A.    You did.

04:24   11      Q.    Okay.  So the Court's construction of Active

04:24   12  Path itself, those words alone, "Active Path," do not

04:24   13  require anything about one-to-one correspondence.  It's

04:24   14  other words in that claim we were looking at that

04:24   15  require that one-to-one correspondence, right?

04:24   16      A.    Yes.  That's true.  And that is what I was

04:24   17  trying to communicate.

04:24   18      Q.    Thank you so much for clarifying that, sir.

04:24   19  Okay.

04:24   20            Now, let me talk about a related issue here

04:24   21  which is you used this --

04:24   22                    MR. DEVLIN:  Could we go back to 27, the

04:24   23  '301 patent, Claim 1.  Slide 27.

04:24   24                    Thank you.

04:24   25  BY MR. DEVLIN:

04:24  1        Q.   You looked at this '301 patent, Claim 1, as

04:25  2   representative in a way; is that fair?

04:25  3        A.   Yes.  It is.

04:25  4        Q.   Okay.  Great.

04:25  5             That's what Mr. Sherwood did.  That's what you

04:25  6   said, right?

04:25  7        A.   That's correct.

04:25  8        Q.   Okay.  But if I recall right, I think the

04:25  9   analysis with Mr. Sherwood was pretty precise.  And I

04:25  10  think what I said, and that he agreed to, went

04:25  11  something like this when we had those claim elements

04:25  12  all lined up.  That the other elements in those lists

04:25  13  were substantively identical or subsumed within the

04:25  14  claim element that Mr. Sherwood and I had just gone

04:25  15  through.

04:25  16             Remember those words "subsumed within"?

04:25  17        A.   I do.  Yes.

04:25  18        Q.   And at one point we clarified what that meant.

04:25  19  That meant that the claim element for which we had just

04:25  20  gone through the evidence was at least as detailed, it

04:25  21  might include more detail than one of the claims below,

04:25  22  right?

04:25  23        A.   Yes.  It's like the mathematical relationship

04:26  24  of a set where all the elements of a set are enclosed

04:26  25  in the elements of a larger set.

—1022—

04:26    1          Q.    Got you.

04:26    2               And I'm not going to go in that particular

04:26    3    direction, but I know what you're talking about.  And

04:26    4    so let me try to say it a little differently.  Okay?

04:26    5               Let's imagine that instead of all these words,

04:26    6    we had a -- two claims that look like this.  One was a

04:26    7    bag and the bag holds an apple, paper towels, and a

04:26    8    light bulb.  Okay?

04:26    9               And Mr. Sherwood goes along and he says, aha.

04:26   10    I prove an apple, I prove paper towels, and I prove a

04:26   11    light bulb.

04:26   12               Are you with me?

04:26   13               And then Mr. Sherwood goes, now, there's

04:26   14    another patent claim and that has an element that just

04:26   15    says apple.  And so I know if I've proven an apple and

04:26   16    I've also proven a paper towel and I've also proven up

04:26   17    a light bulb, then I've proven the apple.  So I can

04:26   18    check that one off too.

04:26   19               Sound right?

04:26   20          A.    Yes.  That's correct.

04:26   21          Q.    Okay.  But the opposite does not work, right?

04:27   22          A.    If you have to have three things and you only

04:27   23    have one, you don't have three things.

04:27   24          Q.    Okay.  And what's funny -- and I'm not going

04:27   25    to try to prove this to you, other than in a second

—1023—

04:27  1   with the same example, but noninfringement is sort of

04:27  2   the opposite, what you're talking about.  Let me tell

04:27  3   you what I mean.  Here's an example.

04:27  4         Mr. Sherwood proves apple, paper towel, and

04:27  5   light bulb.  And there's another claim out there that

04:27  6   just says apple.

04:27  7         You come on the stand and you say, there's no

04:27  8   paper towel.  And you put a lot of evidence in.  And

04:27  9   now we've joined that issue.

04:27  10        And if the jury believes you and there's no

04:27  11  paper towel there, that first claim is not infringed

04:27  12  because it was required in that claim, right?

04:27  13  A.    I'm not sure I understand your hypothetical.

04:27  14  Q.    Well, let's drill down on it.  Okay?

04:28  15        Imagine a patent claim like we've been talking

04:28  16  about.  It requires an apple, it requires a paper

04:28  17  towel, and it requires a light bulb.

04:28  18        And Mr. Sherwood has rendered an opinion and

04:28  19  shown evidence that there is an apple, there's a paper

04:28  20  towel, and there is a light bulb.

04:28  21        Are you with me so far?

04:28  22  A.    Yes.

04:28  23  Q.    Okay.  Great.

04:28  24        And now you get on the stand and say, aha.

04:28  25  Sherwood's got a problem.  That thing about paper

—1024—

| 04:28 | 1 | towel, I totally disagree.  Let me show y'all a bunch |
| 04:28 | 2 | of evidence.  And you do that. |
| 04:28 | 3 | With me so far? |
| 04:28 | 4 | A.    Okay. |
| 04:28 | 5 | Q.    All right.  At that point, the jury has a |
| 04:28 | 6 | decision to make about that claim:  Is Sherwood right |
| 04:28 | 7 | about the paper towel business or is Tittel right about |
| 04:28 | 8 | the paper towel business? |
| 04:28 | 9 | Are you with me so far? |
| 04:28 | 10 | MR. JENSEN:  Objection, Your Honor. |
| 04:28 | 11 | Relevance.  This sounds like a closing argument.  If he |
| 04:28 | 12 | wants to ask him something about the products or his |
| 04:28 | 13 | infringement opinions, he's welcome to.  But this -- |
| 04:28 | 14 | MR. DEVLIN:  This is absolutely his |
| 04:28 | 15 | infringement opinion.  And this is going to be done in |
| 04:28 | 16 | one minute and it is absolutely -- |
| 04:28 | 17 | THE COURT:  Overruled. |
| 04:28 | 18 | MR. DEVLIN:  Thank you. |
| 04:28 | 19 | BY MR. DEVLIN: |
| 04:29 | 20 | Q.    You with me so far? |
| 04:29 | 21 | The jury now has a decision to make:  Is the |
| 04:29 | 22 | paper towel there or if it's not? |
| 04:29 | 23 | And if it's not, there's no infringement of |
| 04:29 | 24 | that claim; if it is, there's infringement of that |
| 04:29 | 25 | claim. |

—1025—

04:29  1                   Are you with me so far?

04:29  2        A.    I understand what you're saying.  Yes.

04:29  3        Q.    Great.

04:29  4                   But let's assume the jury believes you, and

04:29  5   there's no paper towel.  What about that claim that

04:29  6   only required an apple?

04:29  7                   You haven't given any evidence at all that the

04:29  8   apple is missing.

04:29  9                   Are you understanding me now still?

04:29 10        A.    I understand what you're saying.  Yes.

04:29 11        Q.    Great.

04:29 12                   Let's see this one-to-one correspondence

04:29 13   issue.

04:29 14                   MR. DEVLIN:  Can we pull up the '880

04:29 15   patent, Claim 1?  I think it's Joint 4, maybe it's 5.

04:30 16                   Last page, I believe.  Next to last.

04:30 17                   All right.  It's right there, Claim 1,

04:30 18   left-hand column, two thirds of the way down.

04:30 19                   Thanks.  Let's pull that up.

04:30 20   BY MR. DEVLIN:

04:30 21        Q.    Okay.  So this claim has a method.  See there

04:30 22   at the top?

04:30 23        A.    I do.

04:30 24        Q.    What's our transition word, just out of

04:30 25   curiosity?

04:30   1       A.    If by "transition word" you mean the last word

04:30   2   before the next claim element begins, it would be

04:30   3   "comprising."

04:30   4       Q.    Great.   Yep.   That's it.   We got a comprising

04:30   5   claim.

04:30   6            And you know what, I want to put a pin in

04:30   7   something you just said, and I want to come back to it.

04:30   8   You said:   The last word before the next claim element.

04:30   9            Do you remember that coming out of your mouth?

04:30   10      A.    Well, Mr. Sherwood presented evidence for all

04:31   11  of the preambles.

04:31   12      Q.    Uh-huh.

04:31   13      A.    And the presumption when you present evidence

04:31   14  for a preamble is that it's limiting.   But the -- as I

04:31   15  understand it, the preamble of a patent need not be

04:31   16  limiting so that you could count it either as the first

04:31   17  claim element or as something that precedes the first

04:31   18  claim element.

04:31   19            I wasn't trying to say that I had construed

04:31   20  the preamble to be limiting or that this was

04:31   21  necessarily the second claim element.

04:31   22            And if you'll recall --

04:31   23      Q.    Hold on.   Hold on.   I'm sorry.   Because I

04:31   24  need -- that's not really an answer to my question.   I

04:31   25  promise you, we're going to get there.   That's why I

—1027—

04:31  1    was putting a pin in it.

04:31  2        A.    Okay.

04:31  3        Q.    All right.  We're going to get back there.

04:31  4              Okay.  Thank you.

04:31  5              So here, see the Active Path element?  It's

04:32  6    the second one down, "providing" and then "dynamically

04:32  7    constructing."

04:32  8              Do you see that?

04:32  9        A.    I do.

04:32  10       Q.    Says:  Dynamically constructing an Active Path

04:32  11   as a sequence of active links after an item of the

04:32  12   information structure has been selected, right?

04:32  13       A.    Yes.

04:32  14       Q.    Okay.  So there's nothing there about

04:32  15   one-to-one correspondence, right?

04:32  16             Just nothing there about one-to-one

04:32  17   correspondence, right?

04:32  18       A.    I see no language in that claim element that

04:32  19   specifically mentions one-to-one correspondence.

04:32  20       Q.    All right.  Thank you.

04:32  21       A.    However --

04:32  22       Q.    Go ahead.

04:32  23       A.    -- if you construct an Active Path according

04:32  24   to the Court's construction, then you will be in a

04:32  25   situation where each time you make a selection,

—1028—

04:32  1   there'll be an element added to the Active Path and,

04:33  2   perforce, I believe that implies a one-to-one

04:33  3   correspondence.

04:33  4       Q.    Well, then -- well, okay.

04:33  5             Let's go back to the '301 patent.

04:33  6                   MR. DEVLIN:  Mr. Gooden, I'm not sure --

04:33  7   we may come back to this.  You might capture that.

04:33  8   That -- we can go back to the slide deck to the '301

04:33  9   patent.

04:33  10            Thank you, Mr. Gooden.

04:33  11  BY MR. DEVLIN:

04:33  12      Q.    So if you're right, then this language about

04:33  13  there being a one-to-one correspondence in the '301

04:33  14  patent claim, that's sort of redundant, right?

04:34  15  Wouldn't even need to be there?

04:34  16      A.    I didn't hear a question in there.

04:34  17      Q.    Your interpretation of Active Path, which

04:34  18  itself, those words alone, would require one-to-one

04:34  19  correspondence, would make the actual recitation of

04:34  20  that requirement in the '301 claim element redundant,

04:34  21  totally unnecessary.  Those words would have no

04:34  22  meaning, because it would already be built into the

04:34  23  construction.

04:35  24            That would be a problem from a claim

04:35  25  interpretation perspective, right?

—1029—

```
04:35   1        A.    I don't know if it would be a problem from a
04:35   2   claim construction perspective because I'm not a patent
04:35   3   attorney.  But it seems to me that I have seen plenty
04:35   4   of patents where, either logically or mathematically,
04:35   5   concomitant relationships are present in more than one
04:35   6   string of words.
04:35   7                  MR. DEVLIN:  Let's go back to the Court's
04:35   8   claim construction, if we could.  26, I believe.
04:35   9                  Actually, sorry.  Go back to that slide,
04:35  10   27, and just hold it.
04:35  11   BY MR. DEVLIN:
04:35  12        Q.    Okay.  What you have here in that item -- so
04:35  13   we got a split image here.  Your slide's on the
04:36  14   right-hand side.
04:36  15                  See it?
04:36  16        A.    Yes, sir.
04:36  17        Q.    Okay.  And on the left-hand side of your slide
04:36  18   is your summary of the claim language, right?
04:36  19        A.    Yes, sir.
04:36  20        Q.    Okay.  And you're not saying that that Item 2
04:36  21   is the Court's claim construction, correct?
04:36  22        A.    I've already said that that is the case.  Yes.
04:36  23        Q.    Okay.  And that's because it has extra words,
04:36  24   one-to-one correspondence, among other things perhaps,
04:36  25   right?
```

04:36    1              MR. JENSEN:  Objection.  Asked and

04:36    2    answered.

04:36    3              THE COURT:  Sustained.

04:36    4    BY MR. DEVLIN:

04:36    5        Q.   Let's examine, while we're at it, the actual

04:36    6    language of the --

04:36    7              MR. DEVLIN:  We can take the '880 claim

04:36    8    down, Mr. Gooden.  Thank you.

04:36    9    BY MR. DEVLIN:

04:36   10        Q.   Let's look -- and I know this is dense, but

04:36   11    these issues matter, right?  I mean, words matter.

04:36   12              So let's get on to this claim element, and

04:37   13    let's look at -- what we're going to look at is what

04:37   14    the one-to-one language in the '301 patent actually

04:37   15    says.

04:37   16              It says that -- first of all, it doesn't say

04:37   17    one-to-one.  That phrasing isn't right in the claim

04:37   18    itself, right?  Doesn't say one-to-one like your dashed

04:37   19    on the left-hand side?

04:37   20        A.   It says:  One said active link corresponding

04:37   21    to each of the items selected.

04:37   22              I have a hard time not reading that as -- with

04:37   23    the "one" in the first clause and the "each" in the

04:37   24    second clause -- as anything other than a one-to-one

04:37   25    correspondence.

—1031—

04:37  1       Q.    Okay.  Let me get -- let me work through an

04:37  2   example.

04:37  3                 MR. DEVLIN:  Let's go to the Forum

04:37  4   website.  Can we do that live?  Thank you.

04:37  5   BY MR. DEVLIN:

04:37  6       Q.    And I think you did this.

04:37  7             I want to try to understand what you said

04:37  8   about the Forum website, and then we'll talk about it,

04:38  9   okay?

04:38 10             And so what you said is if we click on

04:38 11   Forums --

04:38 12                 MR. DEVLIN:  And just -- if you can

04:38 13   follow along, Mr. Gooden.  If we can click on Forums.

04:38 14                 Thanks.

04:38 15   BY MR. DEVLIN:

04:38 16       Q.    And now we're going to go down and go to 8-Bit

04:38 17   Microcontrollers.  That's a selection.  Is that what

04:38 18   you're saying?

04:38 19       A.    You're going to click on it --

04:38 20       Q.    No.  No.  We're not going to -- sorry.  We're

04:38 21   going to -- we've hovered over it, and we've opened up

04:38 22   a window to the right, right?

04:38 23       A.    Right.

04:38 24       Q.    And now let's go hover over to the right in

04:38 25   the third one there.

—1032—

04:38   1              Now, is that two selections?

04:38   2      A.    Correct.

04:38   3      Q.    Okay.  And do one more.  So now we're in the

04:38   4  third level.  And so that's three selections is what

04:38   5  you're saying, right?

04:38   6      A.    Yes, sir.

04:38   7      Q.    Okay.

04:38   8              MR. DEVLIN:  So click on that,

04:38   9  Mr. Gooden.

04:38   10 BY MR. DEVLIN:

04:38   11     Q.    So we did -- let's see.  We did three

04:38   12 selections?

04:38   13     A.    Right.

04:38   14     Q.    Okay.  Three selections.

04:38   15             And your issue is that there's now in that,

04:38   16 what we're calling the Active Path, what you'd say:

04:38   17 No.  No.  That's got five links there and we only made

04:38   18 three selections, right?

04:39   19             Is that what you're saying?

04:39   20     A.    That is correct.  Yes, sir.

04:39   21     Q.    Okay.  Now, it is true, though, that within

04:39   22 those five things, one of those things corresponds to

04:39   23 the first selection we made, right?

04:39   24     A.    I'm afraid I don't understand what you're

04:39   25 saying.

1033

04:39  1          Q.    Sure.

04:39  2                    MR. DEVLIN:  If you could touch on Forums

04:39  3    again, Mr. Gooden.

04:39  4                    Great.  And scroll down to the third one

04:39  5    down.

04:39  6    BY MR. DEVLIN:

04:39  7          Q.    So the first selection was 8-Bit

04:39  8    Microcontrollers.

04:39  9                Do you see that?

04:39  10         A.    I do.

04:39  11                   MR. DEVLIN:  Now if you can just hover

04:39  12   off that, Mr. Gooden.  No clicking.

04:39  13                   Thanks.

04:39  14   BY MR. DEVLIN:

04:39  15         Q.    And you see there's an active link there that

04:39  16   says 8-Bit Microcontrollers, right?

04:39  17         A.    I do.

04:39  18         Q.    So that active link corresponds to that

04:39  19   selection.  With me so far?

04:39  20         A.    I am.

04:39  21         Q.    Great.

04:39  22                   MR. DEVLIN:  Let's look at Forums again

04:39  23   and go to this --

04:39  24   BY MR. DEVLIN:

04:40  25         Q.    This is now the second selection we made,

04:40   1    Peripherals, Core Independent Peripherals.

04:40   2            Do you see that?

04:40   3        A.    I do.

04:40   4        Q.    Okay.

04:40   5                MR. DEVLIN:  If you could hover off that.

04:40   6    BY MR. DEVLIN:

04:40   7        Q.    In our active set of links here we have one

04:40   8    that corresponds to that.  Peripherals, Core

04:40   9    Independent Peripherals.

04:40  10            Do you see that?

04:40  11        A.    I do.

04:40  12        Q.    Okay.  And then we made a third selection,

04:40  13    Timing and Measurements with some stuff.

04:40  14                MR. DEVLIN:  And you can slide off that,

04:40  15    Mr. Gooden.

04:40  16    BY MR. DEVLIN:

04:40  17        Q.    And we have -- one of our active paths

04:40  18    corresponds to that, right?

04:40  19        A.    That's correct.  Yes.

04:40  20        Q.    Okay.

04:40  21            I want to read the claim language again

04:40  22    specifically.  It says:  Dynamically constructing an

04:40  23    Active Path as a sequence of active links as items are

04:40  24    selected, using the graphical user menu system.

04:40  25            So far so good.

—1035—

04:40  1        And then it says:  With one said active link
04:41  2    corresponding to each of the items selected.
04:41  3        Okay?  So what we just looked at is we found
04:41  4    one of the active links that corresponded to each of
04:41  5    the three items selected, right?
04:41  6    A.    That is correct.  Yes.
04:41  7    Q.    And then we have two extra things:  A link
04:41  8    that says All Forums and a link that says Home, right?
04:41  9    A.    That is correct.  Yes.
04:41  10    Q.    What do those extra things remind you of in
04:41  11    our table example?
04:41  12    A.    The fifth leg.
04:41  13    Q.    There you go.  Exactly.
04:41  14        Thank you.
04:41  15            MR. DEVLIN:  You can take that down,
04:41  16    Mr. Gooden.
04:41  17    BY MR. DEVLIN:
04:42  18    Q.    Let's go back to this issue of preambles.
04:42  19    Remember we were talking about that earlier?
04:42  20    A.    I do.
04:42  21    Q.    Now, you know that in some cases a preamble
04:42  22    can be -- we use the word "limiting" and sometimes it's
04:42  23    not limiting; is that fair?
04:42  24    A.    That's what the patent code says.
04:42  25    Q.    Yeah.  The rules of the game in the patent

04:42   1    world are sometimes the preamble counts and sometimes

04:42   2    it doesn't count, right?

04:42   3         A.    Yes, sir.

04:42   4         Q.    And if it's not limiting, meaning it doesn't

04:42   5    count, the -- I think the normal way of saying that is

04:42   6    it just doesn't matter.  It doesn't matter for

04:42   7    infringement at all, whether it's there or not, right?

04:42   8    That's what limiting means?

04:42   9         A.    Yes, sir.

04:42   10        Q.    Okay.  So sometimes the preamble matters and

04:42   11   it counts and you need to look at it for infringement,

04:42   12   and sometimes you don't.  Okay.

04:42   13              You said there's a presumption because

04:42   14   Mr. Sherwood looked at evidence for it, therefore it's

04:43   15   limiting, it counts.

04:43   16              That's what you said earlier?  Did I

04:43   17   understand you right, sir?

04:43   18        A.    I think you did.  And I think that's a

04:43   19   reasonable assumption --

04:43   20        Q.    Okay.

04:43   21        A.    -- to make, based on what Mr. Sherwood did.

04:43   22        Q.    What if the law is the opposite?  That the

04:43   23   default is the preamble's not limiting and that the

04:43   24   Court can define it as limiting in certain

04:43   25   circumstances, but that's not what happened here?  What

04:43  1    if that were the situation?

04:43  2        A.    If that were the situation, then it would be

04:43  3    up to the attorneys to decide what to do about it,

04:43  4    rather than a technical expert.

04:43  5        Q.    Okay.  But so the preamble wouldn't matter.

04:43  6    That was the point.

04:43  7        A.    I don't presume to pronounce on that.  If you

04:43  8    as a patent attorney tell me that's how it is, then

04:43  9    I'll let you hash it out with Mr. Jensen.

04:44  10       Q.    That's a good point.  Let me try to ask it --

04:44  11   the question differently.  I do want to give you a fair

04:44  12   question.

04:44  13             MR. JENSEN:  Your Honor, this is getting

04:44  14   into claim construction here.  It has nothing to do

04:44  15   with the, you know, operation of the products.  If he

04:44  16   wants to argue about whether the preamble is limiting

04:44  17   or not, the time to have done that was claim

04:44  18   construction.

04:44  19             THE COURT:  Yeah.  Mr. Devlin, so I think

04:44  20   we've done all we -- you can on that issue.

04:44  21             MR. DEVLIN:  Yeah.  And, Your Honor, I

04:44  22   just agreed that I asked him the wrong question.  And I

04:44  23   got an objection before my next question.  So I just

04:44  24   want to ask the next question which I think will be

04:44  25   better.  If I may, Your Honor.

04:44   1              Thank you.

04:44   2    BY MR. DEVLIN:

04:44   3        Q.   So did you consider, in rendering your

04:44   4    opinions, the situation where the preamble were not

04:44   5    limiting?  Is that something that you considered at all

04:44   6    when you were rendering your opinions?

04:44   7        A.   When I made the arguments, I was trying to

04:44   8    cover all the bases.  So the arguments I presented

04:44   9    assumed that if it were limiting, it would count.  And

04:45  10    if it were not limiting, then it wouldn't.

04:45  11        Q.   Okay.  Thank you.  Thank you very much.  I

04:45  12    appreciate that.

04:45  13              MR. DEVLIN:  And thank you for the

04:45  14    Court's indulgence.

04:45  15              Let's go to your Slide 43.

04:45  16    BY MR. DEVLIN:

04:45  17        Q.   Now, here you're outlining your

04:45  18    noninfringement arguments, right?

04:45  19        A.   More or less.  Yes.

04:45  20        Q.   Okay.  And let me say that more precisely.

04:45  21    You're outlining the noninfringement arguments that

04:45  22    you're going to present here in your testimony?

04:45  23        A.   Yes.

04:45  24        Q.   Okay.  Thank you.

04:45  25              And you've got one argument for the old

| | | |
|---|---|---|
| 04:45 | 1 | website, sometimes called the original website, one for |
| 04:45 | 2 | the Forum, and one for redesign? |
| 04:45 | 3 | A.   Well, actually, the first argument is sort of |
| 04:45 | 4 | an umbrella item and it relates to the preamble.  But |
| 04:46 | 5 | as you've already pointed out, that may not count. |
| 04:46 | 6 | Q.   Great. |
| 04:46 | 7 | And that's what I was getting at.  So that's |
| 04:46 | 8 | not your decision and I get that.  We'll figure that |
| 04:46 | 9 | out later amongst ourselves.  Thank you, sir.  But |
| 04:46 | 10 | that's what I was -- that's awesome.  Thanks for -- I |
| 04:46 | 11 | appreciate your help. |
| 04:46 | 12 | Okay.  As to the other three, I just want to |
| 04:46 | 13 | confirm that they're each unique to each of the |
| 04:46 | 14 | websites.  So the orange argument is only relevant to |
| 04:46 | 15 | the old website, and the green argument is only |
| 04:46 | 16 | relevant to the Forum website, and the blue argument is |
| 04:46 | 17 | only relevant to the redesigned website.  Did I |
| 04:46 | 18 | understand your analysis correctly? |
| 04:46 | 19 | A.   That is the correct analogy.  And I will also |
| 04:46 | 20 | add that the blue item is no longer a consideration. |
| 04:46 | 21 | Q.   Okay.  Great. |
| 04:46 | 22 | And, in fact, I'm only going to focus on the |
| 04:46 | 23 | orange and the green. |
| 04:46 | 24 | A.   Very good. |
| 04:46 | 25 | Q.   So we got that going for us. |

04:46  1          Now, the Forum, the text that you

04:46  2    highlighted -- I'm going to deal with that one first,

04:47  3    if that's okay.

04:47  4          The text that you highlighted was:  With one

04:47  5    said active link corresponding to each of the items

04:47  6    selected...

04:47  7          And so forth.

04:47  8          Do you see that?

04:47  9    A.    Yes, sir.

04:47  10   Q.    Okay.  And that gets to the one-to-one

04:47  11   correspondence that we were just talking about,

04:47  12   correct?

04:47  13   A.    It does.

04:47  14   Q.    And that's the issue we just dealt with, with

04:47  15   the three links versus the five links, and the four

04:47  16   legs and the one leg -- the fifth leg of the table.

04:47  17   Remember that?  So I'm not going to touch it again as

04:47  18   long as we're in agreement that that's what we just

04:47  19   dealt with.

04:47  20   A.    It is, except for one thing.  And when you

04:47  21   create --

04:47  22         And if you would have your Mr. Gooden bring up

04:47  23   the Forum site again, I'll show you what I'm talking

04:47  24   about.

04:47  25   Q.    Well, tell me what you're getting at and then

—1041—

04:47  1    I'll --

04:47  2        A.    If you click on the All Forums link, you do

04:47  3    not get a cascading menu.  You get a web page.

04:47  4        Q.    I'm with you.

04:48  5              MR. DEVLIN:  Let's go there and talk

04:48  6    about it for a second.

04:48  7    BY MR. DEVLIN:

04:48  8        Q.    All right.  So let's do what we did before

04:48  9    which was that we go to the Forums.

04:48  10       A.    We've got a breadcrumb up.  We can just click

04:48  11   on the All Forums item in the breadcrumb.

04:48  12       Q.    Well, I'd like to create it so we know where

04:48  13   we're going and what we're doing.  Is that okay?

04:48  14       A.    It's your moment -- I mean your PC.  You're

04:48  15   driving.

04:48  16       Q.    All righty.

04:48  17             MR. DEVLIN:  Let's go down to the same

04:48  18   thing we did.  8-Bit Microcontrollers, Peripherals,

04:48  19   Core Peripherals, and then Timing and Measurements.

04:48  20   BY MR. DEVLIN:

04:48  21       Q.    Okay.  And now we see these five links again,

04:48  22   right?

04:48  23       A.    Yes, sir.

04:48  24       Q.    Same as before.  And we've established that

04:48  25   each of those links corresponds to one of the three

—1042—

04:48   1    selections we made.

04:48   2           There's three links in there -- there's two

04:49   3    extra things, but three of those links correspond to

04:49   4    the three selections we made, right?

04:49   5       A.    That is correct.  Yeah.

04:49   6       Q.    And now the All Forums is extra, right?

04:49   7       A.    In the figures in the patent, the starting

04:49   8    element counts as part of the Active Path.

04:49   9       Q.    I'm glad you said that, sir.

04:49   10          Are the figures of the patent what are

04:49   11   infringed?

04:49   12      A.    No.  I'm just pointing out an example.

04:49   13      Q.    Okay.  But the patent's not limited to the

04:49   14   examples of the figures, right?

04:49   15      A.    Of course not.

04:49   16      Q.    Thank you.

04:49   17          So let's get back to the claims.

04:49   18          Now, the All Forums here, I would agree with

04:49   19   you, I have not pointed and -- or I didn't point to the

04:49   20   All Forums link when I lined up the selections with the

04:49   21   active links earlier, one and two and three.  I didn't

04:49   22   point to that.  I agree with you, because I think it's

04:50   23   extra.

04:50   24          Do you see what I mean?

04:50   25      A.    I do see what you mean.  But I think that at

04:50   1    least in terms of the figures, the patent teaches

04:50   2    otherwise.

04:50   3        Q.    Well, you know what, I might not disagree with

04:50   4    you if we were analyzing the figures.

04:50   5        A.    Okay.

04:50   6        Q.    All right.  But we're not, are we?  We're

04:50   7    analyzing the claims?

04:50   8        A.    We're analyzing the entire patent.  Yes.

04:50   9        Q.    What are infringed are the claims?

04:50   10       A.    Well, that's true.  Yes.

04:50   11       Q.    All right.

04:50   12                  MR. DEVLIN:  Let's go back to 43 for a

04:50   13   second.

04:50   14                  Thank you, Mr. Gooden.

04:50   15   BY MR. DEVLIN:

04:50   16       Q.    Okay.  That was the green and the Forums.

04:50   17   Let's go into the orange.

04:50   18                  The orange has those words "dynamically

04:50   19   constructing an Active Path," right?

04:50   20       A.    It does.

04:50   21       Q.    Now, sometimes the claims say "automatically

04:51   22   constructing," right?

04:51   23       A.    I'd have to review the -- I can't remember if

04:51   24   that's the -- I know there is an area where dynamically

04:51   25   and automatically tend to serve interchangeable roles,

—1044—

04:51  1    but I can't remember if this is the context in which

04:51  2    that occurs.

04:51  3            If I may be allowed to review the

04:51  4    patents-in-suit, I can verify that pretty quickly.

04:51  5        Q.   Well, let me just see if I can find us an

04:51  6    example on that.

04:51  7        A.   Didn't Mr. -- did Mr. Sherwood, per chance, do

04:51  8    a 1[b] analysis that would perhaps show us?

04:51  9            MR. DEVLIN:  Let's go to the '411 patent.

04:51  10   That's Joint Exhibit 1.

04:52  11           If we can go to Claim 1 there, and pull

04:52  12   up -- yeah.

04:52  13           What I want to do, Mr. Gooden, is

04:52  14   actually pull up from the start of Claim 1 to the

04:52  15   bottom of that column.

04:52  16           And then if you could tack on the other

04:52  17   language that continues onto the next column -- yeah --

04:52  18   that finishes -- sorry.  No.  I mean, just the

04:52  19   "automatically."

04:52  20           Thank you.  There you go.

04:52  21           Thank you.

04:52  22   BY MR. DEVLIN:

04:52  23       Q.   Can you see that, sir?  Is that big enough for

04:52  24   you?

04:52  25       A.   I actually could read the other one, but this

—1045—

04:52   1   is greater.

04:52   2       Q.    Okay.  Excellent.

04:52   3           So this is Claim 1 of the '411 patent also

04:52   4   asserted.  And you see where it says "automatically

04:52   5   constructing"?

04:52   6       A.    Yes, sir.

04:52   7       Q.    Now, it's your understanding that the accused

04:53   8   functionalities include automatically constructing an

04:53   9   Active Path and everything that comes after that,

04:53   10  right?

04:53   11      A.    Wow.  I'm sorry.  I may be suffering from a

04:53   12  momentary lapse, but I didn't really understand that

04:53   13  question.

04:53   14          Would you mind asking me again?

04:53   15      Q.    Sure.

04:53   16          There's a claim element here that begins with

04:53   17  the words "automatically constructing."

04:53   18          Do you see that?

04:53   19      A.    Yes.  That would be in your parlance, Claim

04:53   20  Element 1[b].

04:53   21      Q.    Thanks.

04:53   22          And that claim element has other verbiage that

04:53   23  goes down to -- right before the word "and" at the

04:53   24  bottom of what's been pulled up.

04:53   25          Do you see that?

| | | |
|---|---|---|
| 04:53 | 1 | A.    I do see it. |
| 04:53 | 2 | Q.    And it's your understanding that the accused |
| 04:53 | 3 | functionalities include automatically constructing an |
| 04:53 | 4 | Active Path and everything that comes after that, |
| 04:53 | 5 | right? |
| 04:53 | 6 | A.    If you're asking me to agree that the accused |
| 04:54 | 7 | functionality includes all of that capability, I have |
| 04:54 | 8 | already testified that the old website lacks an Active |
| 04:54 | 9 | Path for the reasons that I explained in my testimony. |
| 04:54 | 10 | So I can't agree with a statement that the |
| 04:54 | 11 | accused functionality contains this, because I've |
| 04:54 | 12 | already maintained explicitly otherwise. |
| 04:54 | 13 | Q.    Okay.  You were deposed in this case, right? |
| 04:54 | 14 | A.    I was. |
| 04:54 | 15 | Q.    And during your deposition you were |
| 04:54 | 16 | represented by counsel, right, or counsel for Microchip |
| 04:54 | 17 | was there defending it for you? |
| 04:54 | 18 | A.    Yes.  That's correct. |
| 04:54 | 19 | Q.    And you swore an oath to tell the truth? |
| 04:54 | 20 | A.    I did. |
| 04:54 | 21 | Q.    And it was transcribed by a court reporter? |
| 04:54 | 22 | A.    It was. |
| 04:54 | 23 | Q.    Okay. |
| 04:54 | 24 | MR. DEVLIN:  Can we see Mr. Tittel's |
| 04:55 | 25 | February 10th transcript at 39, Lines 14 to 18? |

—1047—

04:55   1                    Actually, you can bring up 39, Lines 4

04:55   2   through 18, please.

04:55   3                    4 through 18.  Thank you.

04:55   4   BY MR. DEVLIN:

04:55   5       Q.   All right.  You see here the question starts

04:55   6   talking out about the '411 patent.

04:55   7            Do you see that?

04:55   8       A.   I do see that.

04:55   9       Q.   Okay.  And then there's a question about the

04:55   10  menu system, right?  That's the first question and the

04:55   11  first four lines.

04:55   12      A.   Are we looking at Page 39?

04:55   13      Q.   We're looking at Page 39.

04:55   14           It says:  So let me just talk about the '411

04:55   15  patent --

04:55   16      A.   Oh, yeah.  I'm just getting oriented.  I do

04:55   17  see what you're talking about.  Yes, sir.

04:55   18      Q.   Okay.  And then -- so -- and I'm focusing on

04:56   19  the fact that there you're looking at the '411 patent,

04:56   20  right?

04:56   21      A.   Yes, sir.  That's correct.

04:56   22      Q.   Okay.  And then the next question, which

04:56   23  starts around --

04:56   24                    THE COURT:  Counsel, you don't use the

04:56   25  deposition to question him.  Ask him a question.  If

04:56   1   the answer's different, then we can talk about the

04:56   2   deposition.  Otherwise, it's irrelevant.

04:56   3                  MR. DEVLIN:  Thank you, Your Honor.

04:56   4   BY MR. DEVLIN:

04:56   5       Q.   Question:  Is it your understanding that the

04:56   6   accused functionalities also include automatically

04:56   7   constructing an Active Path and everything that comes

04:56   8   after that?

04:56   9                  There was an objection.

04:56  10                  Witness says:  Yes.

04:56  11                  THE COURT:  Counsel, you do not read the

04:56  12   deposition.  Ask him a question.  If he gives a

04:56  13   different answer here, then you tell the jury about the

04:56  14   deposition.

04:56  15                  Ask him a question and see how he answers

04:56  16   here.  It's hearsay until you do that.

04:56  17                  MR. DEVLIN:  Yes, Your Honor.

04:56  18                  So I previously asked him right here:  It

04:56  19   is your understanding that the accused functionalities

04:56  20   also include automatically constructing an Active Path

04:57  21   and everything that comes after that in the claim?

04:57  22                  He disagreed with that.

04:57  23                  And I'm sorry I took so long with this

04:57  24   impeachment evidence.

04:57  25   BY MR. DEVLIN:

—1049—

04:57   1          Q.    In your deposition, I'm going to just read

04:57   2    from the deposition:  Is it your understanding that the

04:57   3    accused functionalities also include automatically

04:57   4    constructing an Active Path and everything that comes

04:57   5    after that?

04:57   6                 Answer:  Yes.  It is.

04:57   7                 Did I read that right, sir?

04:57   8          A.    You did read it right.  And I made a mistake

04:57   9    in that testimony.  I misunderstood at the time --

04:57   10                THE COURT:  Mr. Tittel, you answered his

04:57   11   question.  If you want to explain it, your counsel will

04:57   12   have an opportunity to let you do that.

04:57   13                THE WITNESS:  Sorry, Your Honor.  Yes.

04:57   14   BY MR. DEVLIN:

04:57   15         Q.    Thank you.

04:57   16                MR. DEVLIN:  And my apologies, Your

04:57   17   Honor.  I was taking too long.

04:57   18   BY MR. DEVLIN:

04:57   19         Q.    Okay.  So but now you disagree with it --

04:57   20   we'll just -- you made a mistake in your deposition is

04:57   21   your point and you're disagreeing with the presence of

04:57   22   that element in the accused functionality, right?

04:57   23         A.    That's what I testified earlier today.

04:57   24         Q.    Okay.  Fine.

04:57   25                MR. DEVLIN:  Let's go to your 43 again.

04:58    1    Sorry.

04:58    2                    There we are.

04:58    3    BY MR. DEVLIN:

04:58    4       Q.    And we're talking about this dynamically

04:58    5    constructing an Active Path.

04:58    6                    MR. DEVLIN:  And if we can go to 49, I

04:58    7    think you expound on this a little bit.

04:58    8    BY MR. DEVLIN:

04:58    9       Q.    All right.  And what you were talking about is

04:58   10    there's something called a static path and there's

04:58   11    something called a dynamic path, right?

04:58   12       A.    I was trying to explain the distinction

04:58   13    between those two things.

04:58   14       Q.    Let me make sure I understood you and then we

04:58   15    can ask a few questions.

04:58   16                    So as I understand it, the dynamic path is

04:58   17    something where you're -- the web page or software's

04:58   18    tracking the user's movements and it's constructing the

04:58   19    Active Path in real time as it's following the user's

04:58   20    movements through some menu or something.

04:58   21                    Is that how I understood it?

04:58   22       A.    No.  It's not.  It doesn't --

04:58   23       Q.    Okay.  Tell me what you mean.

04:58   24       A.    It doesn't mean that -- you can only move on a

04:59   25    breadcrumb trail when you transition from one web page

—1051—

04:59  1    to another.

04:59  2          So it's not the navigating of the cascading

04:59  3    menus that causes the additions to the links in the

04:59  4    breadcrumb.  It's the selection -- excuse me -- it's

04:59  5    the selection of another web page as you're moving

04:59  6    around in the website that causes a message to go back

04:59  7    to the server, and for a response to come back with an

04:59  8    updated breadcrumb string in it.

04:59  9          I'm not trying to say that the breadcrumb will

04:59  10   change as the user navigates cascading menus on the

04:59  11   client, because what the breadcrumb trail reflects is a

04:59  12   trail of web pages.  It's not a trail of mouse -- of

04:59  13   menu navigation.

04:59  14         It's not until you click and make a selection

05:00  15   that you're going to alter the breadcrumb trail, either

05:00  16   to truncate it if you move up the trail when you make

05:00  17   your selection or to add to it if you move down the

05:00  18   trail when you make a selection.

05:00  19   Q.    Okay.  I definitely understood you.  Let's use

05:00  20   an example I think that'll help.

05:00  21         Let's go to Forum website, and I want to

05:00  22   understand what's not dynamic about it, okay?

05:00  23   A.    I didn't say Forum wasn't dynamic.

05:00  24   Q.    Oh, I see.  I'm sorry.  I understand.

05:00  25   A.    I thought we were talking about the old

—1052—

05:00    1    website.

05:00    2        Q.    My fault.  The old website.

05:00    3              So let me ask you:  If a user hovers over a

05:00    4    top nav --

05:00    5        A.    Yes.

05:00    6        Q.    -- and then they -- and the hover opens up a

05:00    7    list of items.

05:00    8        A.    Correct.

05:00    9        Q.    They hover over one underneath it, and that

05:00   10    opens another list, subordinate list.

05:00   11              You with me?

05:00   12        A.    Yes.

05:00   13        Q.    And then they go in that subordinate list and

05:00   14    they select.

05:00   15        A.    Right.

05:00   16        Q.    Okay.  And then imagine then an Active Path is

05:01   17    created -- you go to a new web page with that selection

05:01   18    and an Active Path is created.

05:01   19              Do you see what I'm saying?

05:01   20        A.    Yes.  But between the clicking of the

05:01   21    selection and the appearance of the web page on the

05:01   22    client, what happens is you post back to the server.

05:01   23    And the information that you just selected is used to

05:01   24    create a return page that includes some form of

05:01   25    information to describe a breadcrumb.

—1053—

05:01  1                In an infringing implementation, that would

05:01  2   happen on a step-by-step basis to reflect every actual

05:01  3   quick selection that the user had made.

05:01  4                And in the microchip.com old website, what I

05:01  5   showed you was that there was a data block where all

05:01  6   that information had been set up in advance and put in

05:01  7   a database.  And that's what was getting downloaded to

05:02  8   the client when the page got sent back.

05:02  9        Q.    So if I understand you -- and thank you for

05:02  10   that clarification -- it's that what we're -- what I've

05:02  11   been calling the Active Path in that example, that

05:02  12   exact sequence of links is already preset and it's in

05:02  13   the code?

05:02  14        A.    No.  I'm not saying that exact sequence of

05:02  15   links is preset in the code.  I'm saying that some

05:02  16   sequence of links is already preset in the code.  And

05:02  17   as Ms. Mahar testified, and I confirmed through my own

05:02  18   observations, sometimes it matches and sometimes it

05:02  19   doesn't.

05:02  20                And the reason why --

05:02  21                THE COURT:  Mr. Tittel, this is going to

05:02  22   go a lot better for all of us if you would just answer

05:02  23   Mr. Devlin's questions.  If your lawyer wants to have

05:02  24   you explain the answers, that's fine.  But for right

05:02  25   now, Mr. Devlin is asking you questions that can be

—1054—

05:02  1    answered with a yes or no, relatively speaking, and I'd

05:02  2    appreciate it if you would do that.  And we can move

05:02  3    on.

05:02  4                THE WITNESS:  Very good, sir.

05:03  5    BY MR. DEVLIN:

05:03  6       Q.   All right.  So let me ask you this:  I think I

05:03  7    may have you now, and I hope I do.  If, in the example

05:03  8    I gave through that navigation by browsing and then the

05:03  9    click, if everything -- and then if everything lined

05:03  10   up, if the -- if the links that were in the path did

05:03  11   line up with the selections made, would that count?

05:03  12   Would that meet the claim of Active Path?

05:03  13      A.   No, sir.  It wouldn't.  And the definition of

05:03  14   Active Path is dynamically constructed.  This -- the

05:03  15   whole path for the resulting target page that goes back

05:03  16   to the client is in a database.

05:03  17             So it has nothing to do with what the client

05:03  18   just did.  It's a path that's stored in toto elsewhere

05:03  19   that's delivered when the page gets downloaded.

05:03  20      Q.   That's what I thought I asked you earlier.  So

05:03  21   the path is already there somewhere stored in the

05:04  22   database?

05:04  23      A.   Yes, sir.

05:04  24      Q.   Okay.  And that's the issue?

05:04  25      A.   Yes, sir.

05:04  1      Q.    Okay.  Thank you.  All right.

05:04  2            Let's look at the '411 patent for a second.

05:04  3                  MR. DEVLIN:  And if we could go to

05:04  4      Column 2, please, Mr. Gooden.  And if we could pull up

05:04  5      the paragraph that is on the right-hand column.  And

05:04  6      you can start at "Summary of the Invention" and go down

05:04  7      to the paragraph that ends around Line 43.

05:04  8                        Yeah.  Great.  Thanks.

05:04  9                  And if you could highlight, on the

05:04  10     right-hand side it says:  An Active Path.  About

05:04  11     halfway down.  Yeah.  An Active Path.

05:04  12     BY MR. DEVLIN:

05:04  13     Q.    So this is a summary of the invention section

05:04  14     of the '411 patent.  And this is part of the

05:04  15     specification, the descriptive part, right, sir?

05:05  16     A.    That's what it looks like.  Yes, sir.

05:05  17     Q.    Okay.  And this is summarizing the invention.

05:05  18     And it says here:  An Active Path is dynamically

05:05  19     constructed as a sequence of active links as items are

05:05  20     selected using the graphical user menu system, with one

05:05  21     active link corresponding to each of the items

05:05  22     selected.

05:05  23            Is that the language that you were talking

05:05  24     about?  Or is that the idea you're getting at?

05:05  25     A.    That is the idea that I'm getting at.  But, of

—1056—

05:05    1    course, I also included the Court's construction in my

05:05    2    consideration.

05:05    3        Q.    Understood.

05:05    4                MR. DEVLIN:  Mr. Gooden, if we could keep

05:05    5    that and scroll down.  Right.  And just -- perfect.

05:05    6                Thanks.

05:05    7    BY MR. DEVLIN:

05:05    8        Q.    So the next paragraph says:  According to a

05:05    9    further aspect of the invention, predefined shortcuts

05:05   10    are provided which enable direct access to a given menu

05:05   11    item.

05:05   12                So we're talking about shortcuts there.

05:05   13                Do you see that?

05:05   14        A.    I do.

05:05   15        Q.    Okay.  In this example it goes on:  The Active

05:06   16    Path is dynamically constructed when one of the

05:06   17    predefined shortcuts are executed.

05:06   18                Do you see that?

05:06   19        A.    I do.

05:06   20        Q.    Now, a shortcut is just something the user can

05:06   21    click on, right?

05:06   22        A.    It could be a key sequence as well.

05:06   23        Q.    Could be a key sequence.  In other words, like

05:06   24    a Control-F or whatever, right?

05:06   25        A.    Absolutely.

—1057—

05:06  1     Q.   Okay.  Well, it could be on the screen just

05:06  2  something that you clicked on.  Or key sequence.  I'll

05:06  3  take that too.

05:06  4           Neither of those has anything to do with any

05:06  5  menu selection that a user would have made, right?

05:06  6     A.   I still see in that same section of language,

05:07  7  in the area just beyond what's highlighted, that it --

05:07  8  that one active link corresponds to each of the menu

05:07  9  items necessary to access the given menu item using the

05:07 10  graphical menu system.

05:07 11     Q.   We'll get there.  What I'm talking about is

05:07 12  what's highlighted now.

05:07 13     A.   Okay.

05:07 14     Q.   If an active link is created using a shortcut,

05:07 15  using a key stroke, Control-S or whatever, then that

05:07 16  active link would not be necessarily connected to

05:07 17  anything that the user had done to navigate.  It's a

05:07 18  shortcut.

05:07 19     A.   Yes.  That's correct.

05:07 20     Q.   Okay.  And if it doesn't matter what the user

05:07 21  did to get there, but the shortcut is going to pull up

05:08 22  a given active link, then that given active link has to

05:08 23  be stored somewhere, right?  Or a set of active links,

05:08 24  that has to be stored.  For a shortcut to consistently

05:08 25  pull up a given set of active links, they have to be

```
05:08   1   stored somewhere, right?

05:08   2       A.    Yes.  That's correct.

05:08   3       Q.    Thank you.

05:08   4             I want to talk briefly without actually going

05:08   5   to it for speed here.  You talked -- you worked through

05:09   6   that video that you and, I think, one of the folks at

05:09   7   the law firm had created.  And that's what we've been

05:09   8   looking at, right?

05:09   9       A.    Mr. Bonini.  Yes.

05:09  10       Q.    And part of the issue of that video is that's

05:09  11   an example where the links that were in the Active Path

05:09  12   did not line up with the selections made.  Remember

05:09  13   that?

05:09  14       A.    I do.

05:09  15       Q.    Okay.  For that particular one.

05:09  16             And then we saw some other evidence, this DRL

05:09  17   report that said that often happens.  Remember that?

05:09  18       A.    I do.

05:09  19       Q.    And then Ms. Mahar said, yeah, that --

05:09  20   sometimes we -- we got that wrong, but sometimes we got

05:09  21   it right.  Remember that?

05:09  22       A.    I do.

05:09  23       Q.    And you said that there are some paths that

05:09  24   you could take through the menu system and get an

05:09  25   active link and it would line up right here, right?
```

05:09  1      A.    Yes.  That would be because the contents of

05:09  2   the database reflected the user's behavior.

05:09  3      Q.    Okay.  And I think you said it was -- you

05:09  4   might have won the scratch-off when that happened.

05:09  5   It's a pretty rare event or were you trying to --

05:09  6      A.    I was just being whimsical.  Sorry.

05:09  7      Q.    Okay.  No problem.  I didn't know what you

05:10  8   meant by that.

05:10  9          I think I recall that you actually did look at

05:10  10  this a little bit.  And you found -- and it was an

05:10  11  estimate through some work you did on the Wayback

05:10  12  Machine and, you know, investigating -- I would say

05:10  13  playing around, but I don't mean that in a pejorative

05:10  14  way.  But working around on the website.

05:10  15          And you found that it might have been up to 25

05:10  16  to 50 percent of paths that were created, using the

05:10  17  hierarchical menu structure, didn't line up.  Do you

05:10  18  remember that?

05:10  19     A.    I don't remember giving a specific number, but

05:10  20  if you -- if that's what you have in my report, then I

05:10  21  will -- I'll stand by my report.

05:10  22     Q.    Okay.  I have -- I have it elsewhere.  And if

05:10  23  you think that's a fair number, I'll live with it.  If

05:10  24  we can agree now that that sounds okay.

05:10  25     A.    I would put that as a deliberately

05:10  1   conservative estimate because it's basically a wild

05:10  2   guess.

05:10  3        Q.   Okay.  Fair enough.

05:10  4             But let's say it's 50 percent are wrong.

05:11  5   How's that?  So more than 25.  At the top end,

05:11  6   50 percent are wrong.  You with me with that

05:11  7   assumption?

05:11  8        A.   You mean between 25 and 50.

05:11  9        Q.   What I'm going to do is I'm going to take your

05:11  10  highest number.  Just assume that it's 50 percent of

05:11  11  them are -- end up not aligned.  They're incorrect.

05:11  12  They don't match up.

05:11  13       A.   I don't know that I can agree with that

05:11  14  because I just don't have the data.

05:11  15       Q.   Fair enough.  And for efficiency, I'm going to

05:11  16  step past that.

05:11  17            But we agree that there are some paths that

05:11  18  one can follow on the website where it would align?

05:11  19       A.   At the time that we're talking about, which I

05:11  20  believe would be when Mr. Sherwood was making his

05:11  21  analysis in December and I was doing the follow-up in

05:11  22  January?

05:11  23       Q.   Right.

05:11  24       A.   Is that correct?

05:11  25       Q.   Okay.  Exactly.

05:11    1        A.    Yes, sir.

05:11    2        Q.    And before that too, whenever this original

05:11    3   website of the main -- the main website, that's what

05:11    4   we're talking about, right?

05:11    5        A.    Well, I would suggest actually looking at the

05:12    6   burndown chart that was prepared and tracking the curve

05:12    7   on the burndown chart to see if it might shed any light

05:12    8   on it.  Because the people running the project would be

05:12    9   the ones most likely to make a better educated guess

05:12   10   than I did.

05:12   11        Q.    I'm going to move us along and just go back

05:12   12   and start from the point where we agree there are some

05:12   13   of the paths that one would take through the

05:12   14   hierarchical structure.  And they would create active

05:12   15   links where things would line up.  Some of those

05:12   16   existed, right?

05:12   17        A.    Agreed.

05:12   18        Q.    Okay.  And we're dealing with comprising

05:12   19   claims, right?

05:12   20        A.    Yes, sir.

05:12   21        Q.    Okay.  And so if I can follow a menu structure

05:12   22   and I can get an Active Path where they do align, that

05:12   23   instance is infringement, assuming all the other

05:12   24   elements are met, right?

05:12   25        A.    I don't agree.  Because I have shown that the

—1062—

05:12  1    items in the breadcrumb come from a database and do not

05:12  2    track user activity.

05:13  3        Q.   Okay.  We just talked about that database

05:13  4    issue, I think.  So I'm going to set that aside, okay?

05:13  5            What I'm talking about is this particular

05:13  6    instance, you're saying that "also" means that

05:13  7    something's not infringing, and that's where they don't

05:13  8    line up.

05:13  9            Are you with me now?

05:13  10           I just want to talk about that issue in

05:13  11   isolation.

05:13  12           Are you with me?

05:13  13       A.   I think my arguments cover all comers.  And

05:13  14   that they speak to both the trails that match and the

05:13  15   trails that don't match.

05:13  16       Q.   I get that you think that, but that's not your

05:13  17   or my choice.  That's the jury's choice.  And if they

05:13  18   think that that one argument's wrong about the database

05:13  19   and how things are stored, then another way they could

05:13  20   find something not infringing is if they don't line up,

05:13  21   right?

05:13  22       A.   If they don't line up, it's clear that the

05:14  23   path the user took is not the path that's reflected in

05:14  24   the breadcrumb.

05:14  25       Q.   Okay.  But that issue doesn't exist when they

| | | |
|---|---|---|
| 05:14 | 1 | do line up.  That's all I'm saying, right? |
| 05:14 | 2 | A.    No problem.  I agree. |
| 05:14 | 3 | Q.    All righty.  Thank you. |
| 05:14 | 4 | You were on the Forum section and you looked |
| 05:14 | 5 | at -- there were the two other tabs at the top like the |
| 05:14 | 6 | Page Extras and the Posts. |
| 05:14 | 7 | You with me? |
| 05:14 | 8 | A.    Yes, sir. |
| 05:14 | 9 | Q.    Okay.  If there's infringement otherwise by |
| 05:14 | 10 | the Forum section, not including those things, because |
| 05:14 | 11 | these are comprising claims, what those things do don't |
| 05:14 | 12 | matter, right? |
| 05:14 | 13 | A.    I would submit that that was a legal decision |
| 05:14 | 14 | to be made by the attorneys.  If their lack of |
| 05:14 | 15 | infringement doesn't have a bearing, then it doesn't |
| 05:15 | 16 | have a bearing. |
| 05:15 | 17 | Q.    That's my point.  If the fact that those |
| 05:15 | 18 | things don't infringe doesn't matter, then they don't |
| 05:15 | 19 | matter.  You agree with that? |
| 05:15 | 20 | Great. |
| 05:15 | 21 | Wait.  I didn't actually hear you say "yes" on |
| 05:15 | 22 | the record.  You do agree with that, right? |
| 05:15 | 23 | A.    Yes.  I was trying to say the same thing.  I'm |
| 05:15 | 24 | sorry. |
| 05:15 | 25 | Q.    All righty.  Thank you. |

—1064—

05:15  1          Did you ever look into investigating any

05:15  2  feedback that the redesigned website got from users?

05:15  3          Did you take anything like that into account

05:15  4  in your analysis or opinions in this case?

05:15  5      A.   No, sir.  I did not.

05:15  6      Q.   Okay.  Just so we're clear -- and I know you

05:16  7  might not think this means that much, but I just want

05:16  8  to make sure we're all clear where things of facts

05:16  9  are -- the patents that are the subject of the ████

05:16  10  license, they don't have an Active Path as these

05:16  11  patents talk about it, right?

05:16  12      A.   When I said the technologies were

05:16  13  comparable -- okay.  Let me answer your question.

05:16  14      Q.   Exactly.  Yeah.  I'm just trying to get at

05:16  15  that fact.

05:16  16          They don't have an Active Path?

05:16  17      A.   No.

05:16  18      Q.   No.  You agree with me that they don't have an

05:16  19  Active Path?

05:16  20      A.   Correct.

05:16  21      Q.   We're in agreement.  Okay.  Thank you.

05:16  22          Sorry for the double negative there.

05:16  23          Talking about the benefits and the sort of the

05:16  24  timing of sales going up and so forth, we heard that,

05:16  25  when we moved from the original website to the

| 05:16 | 1 | redesigned website, right? |
| 05:16 | 2 | A.    Yes, sir. |
| 05:16 | 3 | Q.    Okay.  That move solved a lot of preexisting |
| 05:17 | 4 | problems that we heard about, code instability, slow |
| 05:17 | 5 | loads, et cetera, right? |
| 05:17 | 6 | A.    That's -- so Ms. Mahar testified.  Yes. |
| 05:17 | 7 | Q.    All right.  Thank you. |
| 05:17 | 8 | You mentioned something about external |
| 05:17 | 9 | referrals from search pages to the microchip.com |
| 05:17 | 10 | website, right? |
| 05:17 | 11 | A.    Yes, sir. |
| 05:17 | 12 | Q.    Some of those might bring someone to |
| 05:17 | 13 | particular pages within the site, correct?  Some of |
| 05:17 | 14 | those referrals? |
| 05:17 | 15 | A.    I think that would probably be the majority. |
| 05:17 | 16 | Q.    And then some would bring you just to the |
| 05:17 | 17 | basic microchip.com site, right? |
| 05:17 | 18 | A.    Yes. |
| 05:17 | 19 | Q.    Okay. |
| 05:17 | 20 | MR. DEVLIN:  May I have just a moment, |
| 05:17 | 21 | Your Honor, to confer with my team? |
| 05:17 | 22 | Thank you. |
| 05:18 | 23 | All right.  One more item. |
| 05:18 | 24 | May I approach, Your Honor? |
| 05:18 | 25 | Thank you. |

05:18    1    BY MR. DEVLIN:

05:18    2        Q.    I just wanted to confirm one thing.

05:18    3             What I'm handing you, sir, that's the

05:18    4    infringement -- Mr. Sherwood's infringement reports,

05:18    5    okay?

05:18    6        A.    Yes, sir.

05:18    7        Q.    All right.  I'm going to --

05:18    8        A.    If I don't need it any more, you can take it

05:18    9    away.

05:18   10        Q.    I wanted to get back to my microphone here.

05:18   11    So -- I'm sorry.  I'm looking for something.

05:18   12             MR. DEVLIN:  May I approach again, Your

05:18   13    Honor?  I apologize.

05:18   14             Thank you, sir.

05:18   15        A.    Did I turn to the correct page?

05:18   16    BY MR. DEVLIN:

05:18   17        Q.    You did, sir.

05:19   18             MR. JENSEN:  Mr. Devlin, what report is

05:19   19    that, the --

05:19   20             MR. DEVLIN:  The infringement report of

05:19   21    Mr. Sherwood.

05:19   22             MR. JENSEN:  Okay.  Do you have a copy of

05:19   23    that?

05:19   24             MR. DEVLIN:  I don't.  I just have one

05:19   25    for the witness.

—1067—

05:19  1    BY MR. DEVLIN:

05:19  2        Q.    Okay.  You're looking at Page 65 of

05:19  3    Mr. Sherwood's report.

05:19  4              Do you see that?

05:19  5        A.    It's the right-hand page of the two-page, but

05:19  6    I see.  Yes.

05:19  7        Q.    Great.  Thanks.

05:19  8              And that is talking about some of the pages

05:19  9    that he looked at right at the time he was issuing his

05:19  10   report that -- and this was sort of November/December

05:19  11   of last fall, right?

05:19  12       A.    Yes, sir.  That's correct.

05:19  13       Q.    And he's looking at some of the pages that

05:19  14   still had the old -- or original website structure, not

05:20  15   the redesigned website structure, right?

05:20  16       A.    Yes.  That's correct.

05:20  17       Q.    And then he bullets some right there, some

05:20  18   examples?

05:20  19       A.    Right.  There's a list at the end of Paragraph

05:20  20   149.

05:20  21       Q.    Yeah.  Could you read the second example into

05:20  22   the record?

05:20  23       A.    Www.microchip.com/development-tools.

05:20  24       Q.    Great.  Thanks.  Great.

05:20  25              MR. DEVLIN:  Your Honor, pass the

—1068—

05:20  1  witness.  Thank you.

05:20  2         THE COURT:  Counsel?

05:20  3               REDIRECT EXAMINATION

05:20  4  BY MR. JENSEN:

05:20  5     Q.   Mr. Tittel, do you recall being asked some

05:21  6  questions about this concept of a "predefined

05:21  7  shortcut"?

05:21  8     A.   I do.

05:21  9     Q.   And there was a suggestion by Mr. Devlin that

05:21  10  if you use a predefined shortcut, there was no need to

05:21  11  create an Active Path?

05:21  12    A.   I don't believe he actually said that, but I

05:21  13  did gather that understanding from what he did say.

05:21  14         MR. JENSEN:  Let's take a look, if we

05:21  15  could, Mr. Thompson, at -- you can pull up the '411

05:21  16  patent, Claim 2.

05:21  17         Okay.  And it's not on my monitor for

05:21  18  some reason, but I can see it over here.  And let's

05:21  19  zoom out a little bit and start with Claim 1.

05:21  20  BY MR. JENSEN:

05:21  21    Q.   And Claim 1 of the '411 patent is an

05:21  22  independent claim; is that correct, Mr. Tittel?

05:21  23    A.   It is.

05:21  24    Q.   Okay.  And Claim 2 is a dependent claim?

05:22  25    A.   Yes.  I believe it depends on Claim 1.

05:22    1       Q.    Okay.  And what does that mean in terms of an

05:22    2    infringement analysis if a claim is a dependent claim?

05:22    3       A.    If the parent claim on which the dependent

05:22    4    claim depends is found not to infringe, then the

05:22    5    dependent claim cannot infringe.

05:22    6       Q.    And is that because the dependent claim can

05:22    7    only add additional requirements to an independent

05:22    8    claim?

05:22    9       A.    Yes.

05:22   10       Q.    And if we look at Claim 2 here, and I believe

05:22   11    there's a typo in the patent itself, but Claim 2 says

05:22   12    it's a method for navigating according to Claim 1,

05:22   13    correct?

05:22   14       A.    It does.

05:22   15       Q.    And then it says "providing," and I believe

05:22   16    that should say, "predefined shortcuts"?

05:22   17       A.    Yes, sir.

05:22   18       Q.    Does the additional requirement of Claim 2, to

05:22   19    provide a predefined shortcut, mean that it was not

05:23   20    necessary in Claim 1 to first automatically construct

05:23   21    an Active Path as a sequence of hierarchical active

05:23   22    links as items are selected?

05:23   23       A.    Yes, sir.  Purely from a logical perspective,

05:23   24    when I was asked the question, I was thinking, but you

05:23   25    still have to create the path in the first place.

—1070—

05:23   1          Q.    So the discussion you had with Mr. Devlin

05:23   2    about predefined shortcuts has no bearing whatsoever on

05:23   3    your noninfringement opinions in this case?

05:23   4          A.    That's correct.

05:23   5          Q.    And for completeness, let's look at two other

05:23   6    claims.  And I believe these are the only two other

05:23   7    claims that require a predefined shortcut.

05:23   8                MR. JENSEN:  That would be the '301

05:23   9    patent, Claim 2, Mr. Thompson.

05:23   10   BY MR. JENSEN:

05:24   11         Q.    And is Claim 2 an independent (sic) claim that

05:24   12   depends from Claim 1?

05:24   13         A.    It is.

05:24   14         Q.    Okay.  And Claim 2 is the claim that requires

05:24   15   providing a -- again, an error in the patent, but

05:24   16   providing a predefined shortcut?

05:24   17         A.    It is.

05:24   18         Q.    Okay.

05:24   19                MR. JENSEN:  And last but not least,

05:24   20   let's go to the '836 patent, Claim 2.

05:24   21   BY MR. JENSEN:

05:24   22         Q.    And it looks like they fixed the misspelling

05:24   23   by this point in the patent prosecution.

05:24   24                But, again, is Claim 2 a dependent claim that

05:24   25   depends on Claim 1?

05:24  1      A.    It is.

05:24  2      Q.    Okay.  And there's nothing in Claim 1 of any

05:24  3  of the asserted patents that requires or does not

05:25  4  require -- well, strike that.

05:25  5          Let me ask the question this way:  Are there

05:25  6  any independent claims that are asserted in this case

05:25  7  that would allow for infringement of the independent

05:25  8  claim simply by having a predefined shortcut without

05:25  9  automatically constructing an active -- or dynamically

05:25  10  constructing an Active Path?

05:25  11     A.    No, sir.

05:25  12     Q.    Okay.

05:25  13              MR. JENSEN:  You can take that down,

05:25  14  Mr. Thompson.

05:25  15  BY MR. JENSEN:

05:25  16     Q.    I believe there was a question about something

05:25  17  you had said in your deposition that you wanted to

05:25  18  clarify.

05:25  19          Before I give you an opportunity to do that,

05:25  20  let me just ask:  How many times were you deposed in

05:25  21  this litigation?

05:25  22     A.    Twice.

05:25  23     Q.    Twice.

05:25  24          For approximately how long?

05:25  25     A.    I think it was seven hours over a 10-hour

05:25  1    period the first day and seven hours over a 11-hour

05:25  2    period in the second day.

05:25  3        Q.    And it was an attorney for Caddo that was

05:26  4    asking you questions during those two days?

05:26  5        A.    Yes.  That's correct.

05:26  6        Q.    And it looked like I was distracted at the

05:26  7    time the question was being asked by Mr. Devlin.  But

05:26  8    it sounded like there may have been a misstatement or a

05:26  9    mistake at one point in your --

05:26  10       A.    I totally mis --

05:26  11       Q.    -- at one point in that 14 hours of

05:26  12   deposition?

05:26  13       A.    Yes.  I totally misunderstood what was going

05:26  14   on.  And if you look at your comment in the record, it

05:26  15   speaks directly to that.

05:26  16       Q.    Was there any further clarification you wanted

05:26  17   to make?  Or you've done it.  You said you made a

05:26  18   mistake at some point, and --

05:26  19       A.    I thought he was talking about the patent.

05:26  20   And he was talking about the Microchip systems.  I did

05:26  21   miss the boat.

05:26  22       Q.    Okay.  And that was because it sounds like you

05:26  23   may have misunderstood the question?

05:26  24       A.    I did.

05:26  25       Q.    Okay.  So Mr. Devlin showed you the Forum

—1073—

05:26   1   website a few minutes ago.  And you did some exercises

05:27   2   and navigated the menu structure there and looked at

05:27   3   the resulting path.

05:27   4          Do you recall that?

05:27   5       A.   I do.

05:27   6       Q.   And there were a number of questions about the

05:27   7   correspondence between the resulting items in the menu

05:27   8   path and the route that was selected?

05:27   9       A.   Yes.  That's correct.

05:27   10      Q.   And as part of that discussion, he was trying

05:27   11  to get at this idea of a one-to-one correspondence and

05:27   12  whether or not that impacted your noninfringement

05:27   13  analyses?

05:27   14      A.   Yes.

05:27   15      Q.   And I believe his suggestion was that because

05:27   16  these claims are comprising claims, that if there were

05:27   17  extra links at the beginning such as the Home link or

05:27   18  the Forums link, that somehow that didn't matter or

05:27   19  those don't count?

05:27   20      A.   That is what he said.

05:27   21      Q.   Okay.  And do you recall, one way or the

05:27   22  other, whether when Mr. Sherwood was testifying --

05:27   23  putting aside anything Mr. Devlin said -- but when

05:27   24  Mr. Sherwood was testifying, did he point to the Home

05:28   25  link and all of the links in that path on the Forum

05:28  1   site and the old Microchip site and identify those as

05:28  2   the Active Path?

05:28  3       A.    Would you repeat the question?

05:28  4       Q.    Yeah.

05:28  5              MR. JENSEN:  Let's pull up the Forum site

05:28  6   and we can do this by way of example and we'll try to

05:28  7   get through this as quickly as we can.

05:28  8              So let's go to the Forums there at the

05:28  9   top.  And we'll just pick a -- we'll pick a path.

05:28  10  Let's go to Microprocessors.

05:28  11             THE COURT:  Counsel, we're going to take

05:28  12  a very short break.  And then we'll finish with

05:28  13  Mr. Tittel.

05:28  14             MR. JENSEN:  Very good.

05:28  15             THE BAILIFF:  All rise.

05:29  16             (Jury exited the courtroom.)

05:29  17             THE COURT:  Thank you.  You may be

05:29  18  seated.

05:29  19             A juror needed a break.

05:29  20             MR. JENSEN:  Understood.

05:29  21             This is probably five minutes or less.

05:29  22  We're real close.

05:29  23             THE COURT:  Mr. Devlin?

05:29  24             MR. DEVLIN:  I've just -- so far I'm just

05:29  25  going to address one point quickly and I'll be done.

| | | |
|---|---|---|
| 05:29 | 1 | Thank you, Your Honor. |
| 05:29 | 2 | THE COURT:  As soon as -- if y'all will |
| 05:29 | 3 | just wait here, as soon as the jury's ready to come |
| 05:29 | 4 | back in, we'll bring them back in. |
| 05:29 | 5 | Mr. Tittel, you can step down. |
| 05:29 | 6 | (Recess taken.) |
| 05:35 | 7 | THE BAILIFF:  All rise. |
| 05:35 | 8 | THE COURT:  Please remain standing for |
| 05:35 | 9 | the jury. |
| 05:35 | 10 | (Jury entered the courtroom.) |
| 05:35 | 11 | THE COURT:  Thank you.  You may be |
| 05:35 | 12 | seated. |
| 05:35 | 13 | Counsel? |
| 05:35 | 14 | MR. JENSEN:  Mr. Thompson, could you |
| 05:35 | 15 | bring the Forum site back up?  All right. |
| 05:35 | 16 | And we were just going to make a |
| 05:35 | 17 | selection here and do an example.  We went to |
| 05:36 | 18 | Microprocessors and General MPU Topics. |
| 05:36 | 19 | And is there a way to turn this on?  I |
| 05:36 | 20 | wanted to highlight something.  Maybe Mr. Thompson can |
| 05:36 | 21 | help me here. |
| 05:36 | 22 | BY MR. JENSEN: |
| 05:36 | 23 | Q.   So in the resulting page that loaded, |
| 05:36 | 24 | Mr. Tittel, do you see the path, Home, All Forums, |
| 05:36 | 25 | Microprocessors, General MPU Topics? |

—1076—

05:36   1        A.    I do.

05:36   2        Q.    Okay.  And how many links are in that path?

05:36   3        A.    Four.

05:36   4        Q.    Okay.  And when Mr. Sherwood was testifying,

05:36   5   did he identify that entire path as being the Active

05:36   6   Path where each one of those links would be an active

05:36   7   link?

05:36   8        A.    Yes.

05:36   9        Q.    Okay.  So when Mr. Sherwood was testifying, he

05:36  10   defined Active Path as the entire sequence of links.

05:36  11   He didn't pick and choose which ones counted and which

05:36  12   ones didn't, did he?

05:36  13        A.    Not that I noticed.  No.

05:37  14        Q.    Okay.  And, in fact --

05:37  15              MR. JENSEN:  You can take that down,

05:37  16   Mr. Thompson.  And I'd like for you to bring up the

05:37  17   Demonstrative No. 135 from Mr. Sherwood's presentation.

05:37  18   BY MR. JENSEN:

05:37  19        Q.    And was there a suggestion or was it your

05:37  20   understanding, Mr. Tittel, that there was a suggestion

05:37  21   by Mr. Devlin that somehow the Home link just doesn't

05:37  22   matter.  It doesn't count.  It's extra because these

05:37  23   are comprising claims?

05:37  24        A.    That was my understanding.  Yes.

05:37  25        Q.    Okay.  And what we're looking at here is a

—1077—

05:37   1    demonstrative from Mr. Sherwood that, I believe, was

05:37   2    annotated by him or his lawyers and used in his

05:37   3    examination and testimony here.

05:37   4            Do you recall seeing this slide?

05:37   5    A.    Yes.  I do.

05:37   6    Q.    And if we look down at the bottom there, do

05:38   7    you see those numbers, 1, 2, and 3?

05:38   8    A.    I do.

05:38   9    Q.    Okay.  And is it your understanding that those

05:38   10   are the annotations that were added by Mr. Sherwood?

05:38   11   Or were those on the website originally?

05:38   12   A.    No.  They would pretty much have to be

05:38   13   annotations.

05:38   14   Q.    Okay.  And in this instance, did Mr. Sherwood

05:38   15   identify the Home link as being part of the Active

05:38   16   Path?

05:38   17   A.    It sure looks like it to me.  Yes.

05:38   18   Q.    Okay.

05:38   19            MR. JENSEN:  No further questions.

05:38   20            MR. DEVLIN:  No questions, Your Honor.

05:38   21   Thank you.

05:38   22            THE COURT:  Could I have counsel up here

05:38   23   for just a second?

05:38   24            (Bench conference.)

05:38   25            THE COURT:  I think I know the answer to

—1078—

| | | |
|---|---|---|
| 05:38 | 1 | this, but I didn't want to -- he's done, right? |
| 05:38 | 2 | MR. JENSEN:  Yes. |
| 05:38 | 3 | THE COURT:  Okay.  So I can dismiss him. |
| 05:38 | 4 | MR. JENSEN:  Uh-huh. |
| 05:38 | 5 | THE COURT:  So okay.  That's all.  I |
| 05:39 | 6 | didn't want to ask in front of the jury. |
| 05:39 | 7 | (Bench conference concludes.) |
| 05:39 | 8 | THE COURT:  Thank you, Mr. Tittel.  You |
| 05:39 | 9 | may be excused. |
| 05:39 | 10 | By that, you are free to leave, but |
| 05:39 | 11 | you're also welcome to stay and watch the rest of the |
| 05:39 | 12 | trial.  I'm not asking you to leave, but you're not |
| 05:39 | 13 | bound by the Court's rules. |
| 05:39 | 14 | Ladies and gentlemen of the jury, we're |
| 05:39 | 15 | done for the afternoon.  And so remembering my |
| 05:39 | 16 | instructions not to discuss the case amongst |
| 05:39 | 17 | yourselves, if you'd be so kind as to be here by |
| 05:39 | 18 | 8:30 -- or I'm sorry.  8:45 tomorrow.  We will start at |
| 05:39 | 19 | 9 o'clock. |
| 05:39 | 20 | THE BAILIFF:  All rise. |
| 05:39 | 21 | (Jury exited the courtroom.) |
| 05:39 | 22 | THE COURT:  Thank you.  You may be |
| 05:40 | 23 | seated. |
| 05:40 | 24 | So for the defendant, we have what left? |
| 05:40 | 25 | MR. JENSEN:  I believe we have a |

05:40  1   deposition clip to play.  We've got one fact witness,

05:40  2   Dr. Wolf.  And then our damages expert.

05:40  3              THE COURT:  Okay.  And so generally

05:40  4   speaking, but I'll -- y'all are trying the case.  I

05:40  5   will seriously invite you to tell me your thoughts.

05:40  6              What I would suggest we do is finish the

05:40  7   case.  And then whenever it finishes -- we'll know more

05:40  8   in the morning.  Let's -- whenever we finish with the

05:40  9   evidence, then we'll take up the jury charge.  I'll let

05:40  10  the jury go for whatever period of time it takes.

05:40  11             Generally speaking, if it's too late in

05:40  12  the afternoon before I finish with the charge, the

05:40  13  charge will take me about an hour to read.  So if it's

05:41  14  too late in the afternoon for me, meaning 4:00 or

05:41  15  later, I have you all do the closing arguments when the

05:41  16  jury's fresh the next day.  And so that's probably what

05:41  17  we'll plan on doing.

05:41  18             If we finish dramatically early tomorrow

05:41  19  with the damages and everything else, and we can get

05:41  20  the -- and the charge conference goes quickly and all

05:41  21  that, and we can get done.

05:41  22             But for right now, I think the best laid

05:41  23  plans, unless you all have some objection to it, would

05:41  24  be to get it -- whatever we need to get done tomorrow,

05:41  25  including me reading the charge.  Whenever I finish

1080

| | | |
|---|---|---|
| 05:41 | 1 | with that, we can give the jury off the rest of the |
| 05:41 | 2 | day, and then you all can do the closing arguments |
| 05:41 | 3 | Friday morning.  If that works for you all. |
| 05:41 | 4 | MR. DEVLIN:  Certainly works for |
| 05:41 | 5 | plaintiff, Your Honor. |
| 05:41 | 6 | MR. JENSEN:  I believe that's fine with |
| 05:41 | 7 | us as well. |
| 05:41 | 8 | THE COURT:  I'm inviting -- if -- it's |
| 05:41 | 9 | you all's trial.  If you think there's -- |
| 05:41 | 10 | MR. JENSEN:  Yeah.  I think we should |
| 05:41 | 11 | look at how long is our deposition clip.  I don't |
| 05:42 | 12 | recall.  I'd like to check in.  And given everything |
| 05:42 | 13 | that's happened, how long -- |
| 05:42 | 14 | THE COURT:  Well, I'd like y'all to leave |
| 05:42 | 15 | tonight knowing whether you're going to have to do the |
| 05:42 | 16 | closing argument tomorrow or not.  I mean, I don't want |
| 05:42 | 17 | you all -- |
| 05:42 | 18 | MR. JENSEN:  May we have like one minute |
| 05:42 | 19 | just to confer amongst ourselves?  I think we can |
| 05:42 | 20 | resolve this. |
| 05:42 | 21 | THE COURT:  Sure. |
| 05:42 | 22 | MR. JENSEN:  Yeah.  I think Friday |
| 05:42 | 23 | morning's going to be best. |
| 05:42 | 24 | THE COURT:  I think so too. |
| 05:42 | 25 | Okay.  Is there anything we need to take |

05:42   1   up?

05:42   2                   MR. DEVLIN:  Nothing for plaintiff, Your

05:42   3   Honor.  Thank you.

05:42   4                   MR. JENSEN:  Nothing for defendant.

05:42   5                   THE COURT:  Okay.

05:42   6                   Now, let's talk about the charge

05:42   7   conference.  Have you all submitted your proposed

05:42   8   charges?  I should know that, but I don't.

05:42   9                   MR. DEVLIN:  Yes.  There's been a

05:42   10  submission and, you know -- there's submissions.

05:42   11                  THE COURT:  Okay.  So what I would

05:42   12  recommend you do is, if you think you've done all you

05:42   13  can to bridge the gap, that's fine.

05:42   14                  If you haven't, occasionally people will

05:43   15  keep working and they'll get more stuff done.

05:43   16                  The way I do my charge conference is the

05:43   17  only people that need to be here for the charge

05:43   18  conference are the attorneys who are directly involved

05:43   19  in -- everyone's welcome, but I always hated it when I

05:43   20  had nothing to do with the charge and I had to sit

05:43   21  there and waste time.  There's other stuff -- there's

05:43   22  other stuff you all can be doing.

05:43   23                  So whoever wants to stay for the charge

05:43   24  conference can stay.  You're not required to.  The

05:43   25  charge conference is off the record.  And then we -- I

05:43   1   tell you what we're going to do.  And then once you

05:43   2   all -- I will tell you exactly what I'm going to do.

05:43   3          I'll give you a chance to put on the

05:43   4   record anything you're unhappy about, either that I've

05:43   5   put in you didn't want, I didn't put in that you did

05:43   6   want, whatever that is.  That will be on the record,

05:43   7   but the charge conference -- there will be -- it will

05:43   8   be informal.  I mean, you don't have to wear coats and

05:44   9   ties and all of that.  It will probably be in here.

05:44   10          So I'm just trying to think if there's

05:44   11   anything else.

05:44   12          Now, I've done, I think, 13 or 14 patent

05:44   13   jury trials now.  Almost for sure the winning argument

05:44   14   from someone will be:  This is the way you've done it

05:44   15   before.

05:44   16          And if someone wants something different,

05:44   17   the burden will be on them to say why the case is

05:44   18   unique, and I would -- if you want me to do something

05:44   19   that is different from every other thing I've done.

05:44   20          And also remember this.  The charge is

05:44   21   unbelievably long.  Regardless, it takes me an hour to

05:44   22   read.  So, again, the tie will always go to me reading

05:44   23   less.  If you all are trying to persuade me:  No, I

05:44   24   really -- I really -- you really need to add more

05:44   25   language, that's rarely successful.

05:44   1          But it's not that I don't have an open

05:45   2    mind.  It's just, you know, we've done this a bunch now

05:45   3    and I think we've got the charge in pretty good shape.

05:45   4          So having said all that, if you all will

05:45   5    be here tomorrow morning by 8:30 if you have issues; by

05:45   6    9:00 if you don't, we'll finish up with the deposition,

05:45   7    the fact witness, the damages expert, you all will both

05:45   8    rest.

05:45   9          We will give the jury a break of whatever

05:45   10   time we think we need to get the charge done.  We'll

05:45   11   have the jury come back.  I'll charge them.  They'll

05:45   12   have the rest of the day off, and we'll do closing

05:45   13   arguments at 9:00 on Friday morning.

05:45   14          I will be able to stay in Waco until

05:45   15   about 1:00 or 2:00 on Friday.  If the verdict comes in

05:45   16   after that, one of the magistrate judges will be able

05:45   17   to take the verdict and read it.

05:45   18          And so there'll be someone here to cover

05:45   19   for my absence if it's just receiving a verdict.

05:45   20          Anything else we need to take up?

05:45   21          MR. JENSEN:  Just one question about

05:45   22   closings, Your Honor.  You gave us some guidance at the

05:46   23   start of the trial with respect to the length of the

05:46   24   openings.  I think it would be helpful for us to have a

05:46   25   sense of kind of the rules of the road, as it were, for

|       |    |                                                              |
|-------|----|--------------------------------------------------------------|
| 05:46 | 1  | closings.                                                    |
| 05:46 | 2  | THE COURT:  You have 30 minutes.                             |
| 05:46 | 3  | MR. JENSEN:  Okay.  Since we did not put                     |
| 05:46 | 4  | on an invalidity defense, does that mean that the            |
| 05:46 | 5  | plaintiff does not get a rebuttal closing argument?          |
| 05:46 | 6  | THE COURT:  No.  The plaintiff has the                       |
| 05:46 | 7  | burden, they are going to get to close.  I mean, the         |
| 05:46 | 8  | plaintiff has the burden, so they get to open and            |
| 05:46 | 9  | close.                                                       |
| 05:46 | 10 | MR. JENSEN:  And does that count against                     |
| 05:46 | 11 | the 30 minutes?                                              |
| 05:46 | 12 | THE COURT:  They've got 30 minutes.                          |
| 05:46 | 13 | Now, what I don't want -- no one's ever                      |
| 05:46 | 14 | done this, you know, I don't want a 3-minute opening         |
| 05:46 | 15 | and a 27-minute closing.  It needs to be a full -- I'm       |
| 05:46 | 16 | not going to -- you know, there's no 13-minute mark.         |
| 05:46 | 17 | I'm just -- I want a full opening and then you'll get a      |
| 05:46 | 18 | full closing.                                                |
| 05:46 | 19 | And for what it's worth, it may be worth                     |
| 05:46 | 20 | nothing, I know how I felt when I was practicing, how        |
| 05:47 | 21 | important I thought closings were.  I have now               |
| 05:47 | 22 | interviewed 36 juries and asked them the question every      |
| 05:47 | 23 | time:  What difference did the closing argument make?        |
| 05:47 | 24 | And I've had 100 percent of the time,                        |
| 05:47 | 25 | 100 percent of the jurors say it made no difference at       |

05:47  1    all and we could have skipped it.

05:47  2              So when you all are sitting there

05:47  3    thinking:  Oh, but we need more than 30 minutes.  We

05:47  4    can't do it in 30 minutes.

05:47  5              My -- the reason I put you at 30 minutes

05:47  6    is my general sense is that that hour is an hour that

05:47  7    you have seven impatient people who would really rather

05:47  8    just be going back to the jury room and deliberating.

05:47  9              Now, this might be the exception.  We'll

05:47  10   see.  You all might be so.  I know both -- I'm assuming

05:47  11   you two are doing the closing arguments.  You all might

05:47  12   be the first time the jurors break into tears and say

05:47  13   that persuaded me and I was going to do something

05:47  14   different.

05:47  15             But that's my experience from 36 trials,

05:48  16   is the closing arguments have not been very persuasive.

05:48  17             That's for what it's worth.  Again,

05:48  18   that's for what it's worth.

05:48  19             Kristie reminded me, if the plaintiff --

05:48  20   I'm sorry -- if the defendant wants to make -- they did

05:48  21   not make their motion for -- I postponed the motion for

05:48  22   directed verdict when the plaintiffs closed.

05:48  23             If you all want to put that on the record

05:48  24   at this time or tomorrow morning, either one, that will

05:48  25   be fine.

05:48   1                    MR. JENSEN:  I think we'd prefer to do it

05:48   2   tomorrow morning, if that's all right, Your Honor?

05:48   3   First thing.

05:48   4                    THE COURT:  If Mr. Devlin's fine with it,

05:48   5   and he hasn't complained so far.

05:48   6                    MR. DEVLIN:  No objections.  Thank you.

05:48   7                    THE COURT:  Okay.  Y'all have a good

05:48   8   evening.

05:48   9                    THE BAILIFF:  All rise.

05:48   10                   (Hearing adjourned.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1   UNITED STATES DISTRICT COURT )

2   WESTERN DISTRICT OF TEXAS      )

3

4      I, Kristie M. Davis, Official Court Reporter for the

5   United States District Court, Western District of

6   Texas, do certify that the foregoing is a correct

7   transcript from the record of proceedings in the

8   above-entitled matter.

9      I certify that the transcript fees and format comply

10  with those prescribed by the Court and Judicial

11  Conference of the United States.

12     Certified to by me this 2nd day of July 2022.

13

14                              /s/ Kristie M. Davis
                                KRISTIE M. DAVIS
15                              Official Court Reporter
                                800-Franklin Avenue
16                              Waco, Texas 76701
                                (254) 340-6114
17                              kmdaviscsr@yahoo.com

18

19

20

21

22

23

24

25

05:49