—1087—

07:53

1                    IN THE UNITED STATES DISTRICT COURT
                     FOR THE WESTERN DISTRICT OF TEXAS
2                              WACO DIVISION

3    CADDO SYSTEMS, INC.,        *
     511 TECHNOLOGIES, INC.      *
4                                *        June 9, 2022
     VS.                         *
5                                * CIVIL ACTION NO. W-20-CV-245
                                 *
6    MICROCHIP TECHNOLOGY        *
        INCORPORATED             *
7
                     BEFORE THE HONORABLE ALAN D ALBRIGHT
8                            TRIAL PROCEEDINGS
                              Volume 4 of 5
9
     APPEARANCES:
10
     For the Plaintiffs: Timothy Devlin, Esq.
11                       Alex Chan, Esq.
                         Veronica McCarty, Esq.
12                       James Lennon, Esq.
                         Devlin Law Firm, LLC
13                       1526 Gilpin Avenue
                         Wilmington, DE 19806
14
     For the Defendant:  Travis Jensen, Esq.
15                       Jason K. Yu, Esq.
                         Evan Brewer, Esq.
16                       Orrick, Herrington & Sutcliffe LLP
                         1000 Marsh Road
17                       Menlo Park, CA 94025-1015

18                       Claudia Wilson Frost, Esq.
                         Orrick, Herrington & Sutcliffe LLP
19                       609 Main, 40th Floor
                         Houston, TX 77002
20
                         Jeff Quilici, Esq.
21                       Orrick, Herrington & Sutcliffe LLP
                         300 West 6th Street, Suite 1850
22                       Austin, TX 78701

23                       Darryl Adams, Esq.
                         Brian Banner, Esq.
24                       Slayden Grubert Beard PLLC
                         401 Congress Ave., Ste. 1650
25                       Austin, TX 78701

1088

| | | |
|---|---|---|
| | 1 | Court Reporter:        Kristie M. Davis, CRR, RMR |
| | | PO Box 20994 |
| | 2 | Waco, Texas 76702-0994 |
| | | (254) 340-6114 |
| | 3 | |
| | 4 | Proceedings recorded by mechanical stenography; |
| 01:27 | 5 | transcript produced by computer-aided transcription. |
| 01:27 | 6 | (Hearing begins.) |
| 08:33 | 7 | THE BAILIFF:  All rise. |
| 08:33 | 8 | THE COURT:  Good morning, everyone.  You |
| 08:33 | 9 | may be seated. |
| 08:33 | 10 | My understanding is we have one issue to |
| 08:33 | 11 | take up, which is the admissibility of a website.  I'll |
| 08:33 | 12 | hear from whoever wants to take that up. |
| 08:33 | 13 | MR. DEVLIN:  Good morning, Your Honor. |
| 08:33 | 14 | So we're talking about the Forum website. |
| 08:34 | 15 | And this was something that was listed on defendant's |
| 08:34 | 16 | exhibit list.  It's something that both parties have |
| 08:34 | 17 | used.  We -- in the course of the procedures that are |
| 08:34 | 18 | in the pretrial order in this case, we noticed it to |
| 08:34 | 19 | them before we used it.  They did not object.  We used |
| 08:34 | 20 | it in open court.  They've used it in open court. |
| 08:34 | 21 | It is -- as this pretrial order is |
| 08:34 | 22 | written, as we have cleared with the Court here -- and |
| 08:34 | 23 | we understand the Court may have procedures that vary |
| 08:34 | 24 | in other cases.  But in this case we have followed the |
| 08:34 | 25 | procedure to the letter. |

08:34  1          Now, we recognize that handing the jury a

08:34  2  computer that's connected to the Internet is not going

08:34  3  to work here.  And so what we've done instead is

08:34  4  proposed to them -- well, we've actually given -- made

08:34  5  it an open question.  We're happy to talk with you

08:34  6  about how to get this, something that reflects the

08:34  7  evidence, back into the jury room.

08:34  8          What we did last night, as a proposal

08:34  9  from our end, was we created a video, similar to the

08:34  10 other videos that are in evidence and that the jury has

08:34  11 seen, that captures what the jury has seen in this case

08:35  12 from our side and from their side.  We did our best to

08:35  13 make it neutral, but said to them, if you have a video

08:35  14 or you want to make one or edit it, just let us know.

08:35  15         So this -- this -- this Forum website has

08:35  16 been used by both parties.  It's not formally admitted,

08:35  17 but it is in evidence according to the procedures of

08:35  18 this case.  And we are happy to try to figure out a way

08:35  19 to get a reasonable part of it, what's actually been

08:35  20 shown and used in court, in front of the jury.

08:35  21         The defendants have said, well, it's not

08:35  22 really an exhibit, it's a demonstrative, even though

08:35  23 the pretrial order says that demonstratives don't have

08:35  24 to be listed on the exhibit list.  Anyway, they said

08:35  25 that they refuse at all to have anything with respec

08:35   1   to the Forum website go back to the jury.

08:35   2              It's a problem for multiple reasons.  The

08:35   3   main one, Your Honor, is that it's there and been used

08:35   4   with the jury.

08:35   5              But there's another issue which is that

08:35   6   we did have screenshots of the Forum as a backup if we

08:35   7   needed them on the exhibit list.  And we didn't use

08:35   8   those because we all agreed with the procedures here.

08:36   9   And we noticed it to them as an exhibit we were going

08:36   10  to use, and they didn't object.  And now we've

08:36   11  presented a whole case using that evidence.

08:36   12             So we just want to get it back there with

08:36   13  the jury in some reasonable way that reflects the need

08:36   14  to have them have the information, but also doesn't

08:36   15  open up the world to them through Internet access.

08:36   16             THE COURT:  Is this defendant -- is this

08:36   17  Defendant 478?

08:36   18             MR. DEVLIN:  Yes, Your Honor.  Thank you.

08:36   19             THE COURT:  Yeah.  I'm not going to

08:36   20  permit them to have this.

08:36   21             They've seen what they've seen during

08:36   22  trial.  You can talk about it during closing arguments.

08:36   23  But I see no way of giving them access to this.  And

08:36   24  it's -- to me it's like any other demonstrative that's

08:36   25  been used.

| | | |
|---|---|---|
| 08:36 | 1 | So I'm not going to -- whatever you've |
| 08:36 | 2 | shown them during trial is what they'll have to take |
| 08:36 | 3 | back to the jury. |
| 08:36 | 4 | MR. DEVLIN:  But you don't mean a video |
| 08:36 | 5 | of that; you just mean their memory. |
| 08:36 | 6 | THE COURT:  Their memory. |
| 08:36 | 7 | MR. DEVLIN:  Okay.  Can we -- the only |
| 08:36 | 8 | procedural issue I have, and this may not matter, but |
| 08:37 | 9 | it may matter in the future whether the information was |
| 08:37 | 10 | formally in evidence or not. |
| 08:37 | 11 | And so if we can -- one thing I want to |
| 08:37 | 12 | do is not to have them be able to argue on some appeal |
| 08:37 | 13 | that somehow this wasn't evidence at all.  I get that |
| 08:37 | 14 | it doesn't want to go back with them, but... |
| 08:37 | 15 | THE COURT:  I don't understand how they |
| 08:37 | 16 | would be able to do it.  I mean, it's -- you all, both, |
| 08:37 | 17 | as you said, both used it, talked about it, and treated |
| 08:37 | 18 | it like a demonstrative.  And you're free to argue |
| 08:37 | 19 | about it in closing arguments and say whatever you |
| 08:37 | 20 | think the evidence supports about it. |
| 08:37 | 21 | MR. DEVLIN:  Great.  Thank you, Your |
| 08:37 | 22 | Honor. |
| 08:37 | 23 | THE COURT:  I can't imagine how they |
| 08:37 | 24 | could -- |
| 08:37 | 25 | Yes, ma'am? |

08:37  1                    DEPUTY CLERK:  I believe it was

08:37  2  officially admitted at one point.

08:37  3                    THE COURT:  I think what happened was

08:37  4  there was a -- there's a discrepancy.  I think

08:37  5  Mr. Devlin thought -- and correct me.  I think what

08:37  6  happened was Mr. Devlin said something like, I think we

08:37  7  have agreement on this, and then defendant said, well,

08:37  8  we have one exception, and this is it.  And that's why

08:37  9  we're taking it up now.

08:37  10                   MR. DEVLIN:  Yes.

08:38  11                   THE COURT:  So it was not -- I think even

08:38  12  Mr. Devlin said everything's admitted, subject to us

08:38  13  resolving this issue.

08:38  14                   MR. DEVLIN:  That's right, Your Honor.

08:38  15  And we have no -- we certainly agree with that

08:38  16  procedure, and that's accurate.

08:38  17                   Is there any issue -- we would like to

08:38  18  perhaps show some of the same stuff we've shown in the

08:38  19  closing arguments.  And just make sure we can do that.

08:38  20                   THE COURT:  Well, and what I have no

08:38  21  problem with you all doing is putting into the

08:38  22  record -- well, no.  It can't be an exhibit or they

08:38  23  wouldn't be -- but certainly it can be marked in some

08:38  24  way as a demonstrative exhibit just for your purposes

08:38  25  of showing on appeal that it actually was discussed

| | | |
|---|---|---|
| 08:38 | 1 | during trial. |
| 08:38 | 2 | MR. DEVLIN:  Thank you, Your Honor. |
| 08:38 | 3 | We'll work with them on that.  And then we'll treat it |
| 08:38 | 4 | that way during closings also. |
| 08:38 | 5 | THE COURT:  Okay. |
| 08:38 | 6 | MR. DEVLIN:  Thank you. |
| 08:38 | 7 | (Off-the-record discussion.) |
| 08:38 | 8 | THE COURT:  Okay.  Well, you can mark it |
| 08:38 | 9 | as a court exhibit, and it will stay in the file but it |
| 08:38 | 10 | won't go to the jury. |
| 08:38 | 11 | MR. DEVLIN:  Great.  Thank you.  Thank |
| 08:38 | 12 | you.  That's exactly what I would suggest also. |
| 08:38 | 13 | THE COURT:  Anything else? |
| 08:38 | 14 | MR. DEVLIN:  Nothing from plaintiff. |
| 08:38 | 15 | MR. ADAMS:  Yes, Your Honor.  I just want |
| 08:39 | 16 | to follow up, a clarification.  I'm not sure what's |
| 08:39 | 17 | going to become a court exhibit. |
| 08:39 | 18 | THE COURT:  Whatever you -- I think what |
| 08:39 | 19 | Mr. Devlin was telling me was whatever was marked as |
| 08:39 | 20 | that exhibit number. |
| 08:39 | 21 | MR. ADAMS:  There is no DTX-478, Your |
| 08:39 | 22 | Honor.  If you turn to -- if you turn to Jen right now |
| 08:39 | 23 | and said, enter DTX-478, there is no DTX-478.  It was |
| 08:39 | 24 | marked purely as an identifier for demonstratives.  It |
| 08:39 | 25 | wasn't submitted to jurors.  There's no way -- there's |

08:39  1    no record of what 478 is.

08:39  2                    So I don't know what can be put in.

08:39  3    Caddo made a video last night and sent it to us and

08:39  4    wanted -- wants to get it into evidence.  It's not a

08:39  5    video that was played to the jury.  It's not a court

08:39  6    exhibit.  It is just no -- this doesn't exist.  478 is

08:39  7    not an exhibit.  It's never been submitted by an

08:39  8    exhibit to this Court.

08:40  9                    THE COURT:  Well, whatever -- however you

08:40  10   all discussed what it was during the course of trial is

08:40  11   in the record.

08:40  12                    MR. ADAMS:  I completely agree, Your

08:40  13   Honor.  Whatever's in the record is in the record.  And

08:40  14   it will -- not disputing that.  But there's no exhibit

08:40  15   to create a court exhibit with this, as far as we're

08:40  16   concerned.

08:40  17                    THE COURT:  I got it.  Anything else we

08:40  18   need to take up?  Okay.

08:40  19                    Once all the -- William, are the jurors

08:40  20   here?

08:40  21                    (Off-the-record discussion.)

08:40  22                    THE COURT:  As soon as all seven jurors

08:40  23   are here, if you all will just stay put, we'll get

08:40  24   started.

08:40  25                    Yes, sir.

—1095—

08:40    1                         MR. ADAMS:  Your Honor, I apologize.  The

08:40    2    formality of reading in the Rule 50, we're not reading

08:40    3    in full motions, but reading --

08:40    4                         THE COURT:  Why don't we do that now?

08:40    5                         MR. ADAMS:  Thank you, Your Honor.

08:40    6                         THE COURT:  Yes, sir.  Good morning.

08:40    7                         MR. QUILICI:  Good morning, Your Honor.

08:40    8    May it please the Court.  Jeff Quilici on behalf of

08:41    9    Microchip.

08:41   10                         As Your Honor may know, we filed on the

08:41   11    record a Rule 50(a) motion which Your Honor can peruse

08:41   12    at his convenience.  I just want to read in a few

08:41   13    bullets onto the record at this point.

08:41   14                         Microchip moves for judgment as a matter

08:41   15    of law after the close of Caddo's case-in-chief.

08:41   16                         Caddo has presented its evidence on

08:41   17    liability and damages in the case, kept its case open

08:41   18    through Ms. Mahar's testimony only with respect to the

08:41   19    limited issue of willfulness.  But the evidence

08:41   20    presented in that case confirms that there is no

08:41   21    reasonable basis for a jury to rule in Caddo's favor on

08:41   22    infringement, willfulness, or damages.

08:41   23                         On literal infringement, each independent

08:41   24    claim recites an Active Path which this Court has

08:41   25    construed to mean:  A sequence of links dynamically

08:41 1   created as a menu system is navigated.

08:41 2          But Mr. Sherwood did not apply that

08:41 3   construction in his analysis.  Specifically, neither he

08:41 4   nor Caddo offered any substantial evidence that the

08:41 5   Forum website or the main website creates links in an

08:42 6   alleged Active Path, either dynamically or as a menu

08:42 7   system is navigated.

08:42 8          Caddo also has presented no evidence that

08:42 9   Microchip itself directly infringes.  Specifically,

08:42 10  Microchip cannot directly infringe a method claim

08:42 11  unless it performs all the steps of the method.

08:42 12         Each independent claim recites a method

08:42 13  for navigating within either a website or a menu or an

08:42 14  information system which the parties have treated as

08:42 15  equivalent to one of those two.

08:42 16         Caddo has presented no evidence that

08:42 17  Microchip or its websites navigate anything, only that

08:42 18  users of those websites do so.

08:42 19         And as to specific limitations reciting

08:42 20  preselecting, rolling over, or provisional selection in

08:42 21  the '411, '517, '880, and '127 patents, Mr. Sherwood

08:42 22  testified that all of those limitations mean mousing

08:42 23  over an active link in an Active Path.  But there has

08:42 24  been no evidence presented that Microchip or its

08:42 25  websites mouse over anything; again, only that users of

1097

08:43   1   those websites do.

08:43   2            To the extent that Caddo seeks to rely on

08:43   3   a joint infringement theory, which I'll point out was

08:43   4   not pled or in any of the contentions in this case,

08:43   5   Caddo has not presented any evidence that Microchip

08:43   6   exercises direction and control over those users, that

08:43   7   it has formed a joint enterprise with those users, or

08:43   8   that it conditions the receipt of any benefit on the

08:43   9   performance of the -- for example, the navigating

08:43   10  within a website step.

08:43   11           For example, it is possible to reach any

08:43   12  of the web pages that have been discussed in the case

08:43   13  through a third-party search engine such as Google.  It

08:43   14  would not require navigating within any of Microchip's

08:43   15  websites.

08:43   16           Moving on to indirect infringement.  To

08:43   17  the extent that that is still in the case, and I'm not

08:43   18  sure where we stand on the jury instructions there.

08:43   19  We'll take that up later.

08:43   20           But indirect infringement requires proof

08:43   21  that a third party directly infringes.  Caddo has

08:43   22  offered no proof that any third party performed each

08:44   23  and every step of any of the method claims asserted

08:44   24  here, nor could it.

08:44   25           Some of the claims -- excuse me.  Each of

—1098—

08:44  1    the claims recites at least steps of providing a

08:44  2    graphical menu and constructing an Active Path.  And

08:44  3    there's no evidence that's been presented that any

08:44  4    third party performs those steps.

08:44  5              In addition, both contributory and

08:44  6    induced infringement require knowledge of the

08:44  7    patent-in-suit and knowledge of patent infringement.

08:44  8              Caddo has not introduced evidence in its

08:44  9    case-in-chief that would establish that intent on

08:44  10   behalf of -- on behalf of Microchip.  At most it's

08:44  11   shown that Microchip was aware of the asserted patents,

08:44  12   and even then only after the filing of the lawsuit.

08:44  13             Similarly, on the subject of willfulness,

08:44  14   Caddo has provided no evidence from which a specific

08:44  15   intent to infringe could be inferred.

08:44  16             Indeed, the only theory they offered at

08:44  17   the pretrial conference in opposition to a motion for

08:44  18   summary judgment on this subject was that Caddo (sic)

08:45  19   had implemented infringing features in its redesigned

08:45  20   website post suit.

08:45  21             Caddo has dropped that infringement

08:45  22   theory from the case entirely, and the willfulness

08:45  23   claim should fall along with it.

08:45  24             Finally, on the subject of damages, just

08:45  25   a few points, Your Honor, because I know we want to

08:45  1    move on to the jury.

08:45  2                    Mr. Blok's damages testimony is flawed in

08:45  3    several different ways.  It's not supported by

08:45  4    substantial evidence.  It fails to include an

08:45  5    apportionment analysis.  It inappropriately bases

08:45  6    damages on the entire value of sales of certain

08:45  7    Microchip products.  It includes damages based on sales

08:45  8    that are untethered to direct infringement in the

08:45  9    United States, but rather seeks to encompass worldwide

08:45  10   sales.  And offers no damages calculation for direct or

08:45  11   indirect infringement in certain ways.

08:45  12                   Very briefly, on the apportionment point,

08:45  13   neither of Caddo's experts attempted to apportion the

08:45  14   supposed value of website navigation between Caddo's

08:45  15   asserted patents and the unpatented features of Caddo's

08:46  16   websites (sic), or for that matter, the unpatented

08:46  17   features of the products on which they seek to base

08:46  18   their royalty calculations.

08:46  19                   Yeah.  Neither of the experts considered

08:46  20   whether Microchip's products have noninfringing aspects

08:46  21   or components, that Microchip made substantial

08:46  22   contributions to that technology, or that the Microchip

08:46  23   products contain technologies that are not covered by

08:46  24   the asserted patents or, indeed, by any value of the

08:46  25   websites, whatsoever.

| | | |
|---|---|---|
| 08:46 | 1 | In addition, as I noted, Caddo also used |
| 08:46 | 2 | Microchip's worldwide sales as its royalty base, but |
| 08:46 | 3 | the jury may not award damages on sales where the act |
| 08:46 | 4 | of direct infringement takes place abroad or, in the |
| 08:46 | 5 | case of a method claim, where any of the steps of the |
| 08:46 | 6 | method take place abroad. |
| 08:47 | 7 | In addition, there has been no evidence |
| 08:47 | 8 | presented that the users who are buying products |
| 08:47 | 9 | outside the United States actually performed any method |
| 08:47 | 10 | steps within the United States. |
| 08:47 | 11 | And during Mr. Blok's testimony, he was |
| 08:47 | 12 | asked directly whether there was evidence that the |
| 08:47 | 13 | $215,000-per-day number that he used was limited to |
| 08:47 | 14 | U.S. sales, and he assured that there was no such |
| 08:47 | 15 | evidence. |
| 08:47 | 16 | Excuse me.  He claimed that there was |
| 08:47 | 17 | evidence, but no such evidence has been presented to |
| 08:47 | 18 | the jury. |
| 08:47 | 19 | My apologies for that misstatement. |
| 08:47 | 20 | To the extent that Caddo attempts to rely |
| 08:47 | 21 | on testing or some other use of the Microchip websites |
| 08:47 | 22 | by Microchip employees, it has presented no damages |
| 08:47 | 23 | model that would tie any revenue to such use by |
| 08:47 | 24 | Microchip itself. |
| 08:47 | 25 | And to the extent, again, that Caddo |

08:47   1   relies on indirect infringements, its damages model

08:48   2   would be limited to the period after the filing of this

08:48   3   lawsuit because that's the only period in which

08:48   4   knowledge has been alleged.  But no damages presented

08:48   5   by Caddo during its case actually quantify the damages

08:48   6   during that period alone.

08:48   7                And I would like to make one

08:48   8   clarification on the no evidence points I made earlier.

08:48   9                In addition to the other point that I've

08:48   10  made, there's been no evidence of Microchip itself

08:48   11  browsing, which would cover the claims in the '301 and

08:48   12  the '836 patent.

08:48   13               Thank you, Your Honor.

08:48   14               THE COURT:  Could I have a response from

08:48   15  the plaintiff just with the limited issue to evidence

08:48   16  of willfulness?

08:48   17               MR. DEVLIN:  Thank you, Your Honor.

08:48   18               And I'll just note, voluntarily, that on

08:48   19  the indirect claims, we've actually -- and I think they

08:48   20  know this -- removed those from our proposed verdict

08:48   21  forms.  So we're not going to proceed on indirect

08:48   22  infringement, just direct infringement to ease things

08:48   23  up.

08:48   24               So on the willfulness issue, we

08:49   25  understand that just continuing to do certain activity

—1102—

08:49    1    after you've been accused in a lawsuit is not enough.

08:49    2    But here there are other factors, one of which is that

08:49    3    they were in the midst of a redesign and could have

08:49    4    easily removed all this functionality and they didn't.

08:49    5              And it wasn't just that they took a long

08:49    6    time.  There's other evidence in the record that there

08:49    7    were pages of this website that were -- multiple pages,

08:49    8    hundred pages, Mr. Sherwood testified to, that even as

08:49    9    of December of this year, which is long after they were

08:49   10    supposedly done -- done their redesign, according to

08:49   11    Ms. Mahar, long after that there were multiple,

08:49   12    multiple pages that did infringe.

08:49   13              And these are ones -- not these PDFs, but

08:49   14    pages that actually had active links that he looked at.

08:49   15    And then we saw with Ms. Mahar that one of those pages

08:49   16    was -- that link was not -- page was not redesigned,

08:49   17    but it was stripped out sometime just before this

08:49   18    trial -- well, sometime between the last six months and

08:50   19    before this trial.

08:50   20              But done so in a way that I think is

08:50   21    suspicious and gets to their intent, because it was not

08:50   22    part of the normal redesign but looks to be an effort

08:50   23    to change the facts right as we're heading into a jury

08:50   24    trial.

08:50   25              And now, the jury -- there's a few

08:50  1   inferences there, Your Honor, obviously.  The jury can

08:50  2   make those, though, and that's the issue.  And that's

08:50  3   why we think willfulness can stay in.  We think there's

08:50  4   evidence that's in here from which a reasonable jury

08:50  5   can draw reasonable inferences that there's something

08:50  6   more going on than just a planned redesign.

08:50  7            That's where we are, Your Honor.  Thank

08:50  8   you.

08:50  9            MR. ADAMS:  Your Honor, if I may respond.

08:50  10            THE COURT:  Sure.

08:50  11            MR. ADAMS:  First of all, Your Honor,

08:50  12   let's be clear, this is not a case where there was

08:50  13   presuit notice.  So there's no -- there's no presuit.

08:50  14            So now we're dealing with potential

08:50  15   willful infringement during the pendency of the trial,

08:50  16   which requires some kind of egregious conduct.

08:51  17            Microchip has aggressively defended

08:51  18   itself.  It's certainly its position, always has been,

08:51  19   that it doesn't infringe these patents.

08:51  20            It's not required to design around to

08:51  21   avoid willful infringement.  There has been no

08:51  22   egregious misconduct by Microchip during this that

08:51  23   would justify post-trial willfulness.  And they have

08:51  24   not pointed to any, simply redesigning the website

08:51  25   slower than they would have liked.

08:51  1          Even if we hadn't redesigned the website

08:51  2   at all, Your Honor, there would be no basis for willful

08:51  3   infringement post trial.

08:51  4          THE COURT:  Mr. Devlin?

08:51  5          MR. DEVLIN:  I think everything that

08:51  6   Mr. Adams just said is a reasonable conclusion that

08:51  7   could be drawn from the evidence.  But there's also a

08:51  8   reasonable conclusion that could be drawn from the

08:52  9   evidence that they intended to keep certain pages live,

08:52  10  using the infringing functionality, they kept it far

08:52  11  longer than they've testified, and it got removed in a

08:52  12  way that they say never happened, reasonably recently,

08:52  13  before this trial.

08:52  14         That is also a reasonable conclusion and

08:52  15  that's willfulness.

08:52  16         Thank you.

08:52  17         MR. ADAMS:  Your Honor, just briefly.

08:52  18  Again, Mr. Devlin starts with the presumption that we

08:52  19  were required to redesign around their patent in order

08:52  20  to avoid willfulness.  His only complaint is we didn't

08:52  21  redesign fast enough.

08:52  22         Again, if we had not redesigned at all --

08:52  23  and by the way, the redesign started before this --

08:52  24  there would be no basis for post trial willful

08:52  25  infringement.

```
08:52    1                  MR. DEVLIN:  And, Your Honor, I hate to
08:52    2    stand up and make an argument a third time, but what we
08:52    3    just heard is not the argument I made.  It's not just
08:52    4    about timing.
08:53    5                  There's evidence that shows that there
08:53    6    was use going on outside this normal timing in ways
08:53    7    that are different than what we heard as testified and
08:53    8    in ways that have been disguised.  That's the issue.
08:53    9                  Thank you.
08:53   10                  THE COURT:  Okay.  I'm going to overrule
08:53   11    all the defendant's motions.
08:53   12                  Is the jury here?
08:53   13                  (Off-the-record discussion.)
08:53   14                  THE COURT:  Okay.  As soon as the jury's
08:53   15    here, we'll get started.
08:53   16                  THE BAILIFF:  All rise.
08:53   17                  (Recess taken.)
09:04   18                  THE BAILIFF:  All rise.
09:04   19                  THE COURT:  Please remain standing for
09:04   20    the jury.
09:04   21                  (Jury entered the courtroom.)
09:04   22                  THE COURT:  Thank you.  You may be
09:04   23    seated.
09:04   24                  Counsel, you may call your next witness.
09:04   25                  MR. JENSEN:  Thank you, Your Honor.
```

—1106—

09:04    1            Microchip calls Mr. Cody Miller of
09:04    2    Dynamic Range Labs, and we will be playing his
09:04    3    deposition testimony by video.
09:04    4            THE COURT:  Very good.
09:05    5            MR. JENSEN:  I'll mention for the Court
09:05    6    and the jurors that the video clip is about 22 minutes,
09:05    7    25 minutes, something in that range.
09:05    8            THE COURT:  And say again who this
09:05    9    witness is.
09:05   10            MR. JENSEN:  This is a video deposition
09:05   11    of Mr. Cody Miller from Dynamic Range Labs.
09:05   12            THE COURT:  Okay.  Thank you, sir.
09:05   13    (Video Deposition of Cody Miller played as follows.)
09:05   14       Q.   Can I ask you to state your name and address
09:05   15    for the record?
09:05   16       A.   Yeah.  Cody Miller, and my address is 2657
09:05   17    South Andros, A-n-d-r-o-s, Way, Meridian, Idaho 83642.
09:06   18       Q.   So who do you work for, Mr. Miller?
09:06   19       A.   I'm the owner of Dynamic Range Labs.
09:06   20       Q.   Great.  For the rest of this deposition, I'm
09:06   21    going to refer to Dynamic Range Labs as "DRL."
09:06   22       A.   Okay.
09:06   23       Q.   What are your general responsibilities as
09:06   24    founder?
09:06   25       A.   Run the company.

09:06  1      Q.    Okay.  Mr. Miller, do you recognize this

09:06  2  document, what's been prelabeled as Exhibit 3?

09:06  3      A.    I believe it's the Master Services Agreement

09:06  4  that Microchip may have sent me.  I don't know for

09:06  5  sure.  But -- I haven't reviewed that for a few years,

09:06  6  but I believe that's probably what this is.

09:06  7      Q.    Okay.  What was the scope of services that DRL

09:06  8  was providing to Microchip covered in this Master

09:06  9  Services Agreement?

09:06  10      A.    We were -- the project that we implemented

09:07  11  with Microchip was to redesign their website and

09:07  12  implement a more stable website for them, and I think

09:07  13  it was over 18 months.

09:07  14      Q.    When you say "redesign their website," are you

09:07  15  referring to www.microchip.com?

09:07  16      A.    Yes.

09:07  17      Q.    I'm going to move on to what's been premarked

09:07  18  as Exhibit 4.

09:07  19            Mr. Miller, do you recognize this document?

09:07  20      A.    Yes.

09:07  21      Q.    What is this document?

09:07  22      A.    I believe this is the details around the

09:07  23  statement of work for the website redesign.

09:07  24      Q.    Do you know what the total bill to Microchip

09:07  25  at the end of this project was?

—1108—

09:07  1        A.    I would assume it's the 2.8 million,

09:07  2   2.85 million.

09:07  3        Q.    Do you know how many hours of total labor this

09:08  4   project approximately represents?

09:08  5        A.    A lot.  I don't know what the number is, but

09:08  6   it was a lot.

09:08  7        Q.    Over 50 hours?

09:08  8        A.    Way more.  You're talking the whole project?

09:08  9        Q.    Yeah.  The whole project.

09:08  10       A.    Yeah.  No.  It was, you know, 18 months or --

09:08  11  I'm just looking here -- maybe longer than 18 months of

09:08  12  huge teams.  So many hours.

09:08  13       Q.    How many people were on these teams?

09:08  14       A.    I don't know the exact number.  I would -- it

09:08  15  probably depended on the phase, but it could be as many

09:08  16  as 20 at one time, could be 10, depending on what was

09:08  17  needing to be accomplished in the phase.

09:08  18       Q.    Sure.  How many of these hours would have been

09:08  19  dedicated to redesigning microchip.com's user

09:08  20  interface?

09:08  21       A.    I don't know the specifics on how many but

09:09  22  some portion.

09:09  23       Q.    A large portion?

09:09  24       A.    I would say less than 25 percent, but this is

09:09  25  a guess.  I'm actually speculating.  I'm not sure what

−1109−

09:09   1    it would have been.

09:09   2         Q.    25 percent or less.  Is that a fair estimate?

09:09   3         A.    Yes.  There's usually a project manager and

09:09   4    one or two designers.  Depends on the phase of the

09:09   5    project.  So it might drop down to just one person part

09:09   6    time at some other phase of the project.  So...

09:09   7         Q.    So no more than, it sounds like, five people,

09:09   8    but no less than one depending on the phase?

09:09   9         A.    There might be a phase where it's all complete

09:09   10   and there's no one on.

09:09   11        Q.    Okay.  But no more than five at any given

09:09   12   time?

09:09   13        A.    Focused on user interface?

09:10   14        Q.    Yes.

09:10   15        A.    The UX design?  Yeah.  I would agree with

09:10   16   that.

09:10   17        Q.    So it's a total website makeover?

09:10   18        A.    I believe so.  Yes.

09:10   19        Q.    Do you know why -- scratch that.

09:10   20              Have you seen the Forum section of

09:10   21   microchip.com?  So that would be the

09:10   22   microchip.com/forum section.

09:10   23        A.    I have not.

09:10   24        Q.    Do you remember if Microchip asked DRL not to

09:10   25   redesign that section of the website?

-1110-

09:10  1      A.    I don't remember anything about the Forum.

09:10  2      Q.    Do you remember working on it at all?

09:10  3      A.    I don't remember if we worked on that.

09:10  4      Q.    Do you have any reason to believe that DRL did

09:10  5  not work on the microchip.com Forum website?

09:10  6      A.    Until you had mentioned it, I didn't realize

09:11  7  that there was a Forum on microchip.com.  So I'm just

09:11  8  not aware.

09:11  9      Q.    So I'm referring to the

09:11  10  www.microchip.com/forums section of the website.

09:11  11           Do you remember ever being --

09:11  12      A.    No.

09:11  13      Q.    -- asked?

09:11  14      A.    No.  I'm unfamiliar with this.

09:11  15      Q.    When did DRL first hear about breadcrumbs in

09:11  16  connection with a Microchip redesign?

09:11  17      A.    I'm not sure.  You're asking when did we first

09:11  18  discuss it?

09:11  19      Q.    Yes.

09:11  20      A.    Yeah.  I was never involved in any discussions

09:11  21  around breadcrumbs.  But like you mentioned, through

09:11  22  the design process, we reviewed the design together.

09:11  23  And so I'm sure it came up when we were reviewing the

09:12  24  designs.

09:12  25      Q.    So in the design phase of the project, it

—1111—

09:12  1   would have come up?

09:12  2       A.    Yeah.

09:12  3       Q.    Have you ever heard of breadcrumbs with

09:12  4   drop-down menus embedded in them?

09:12  5       A.    No.

09:12  6       Q.    Do you remember the user interface of

09:12  7   microchip.com's website contributing to any of the

09:12  8   problems that were the basis for the redesign, the

09:12  9   bases that you previously described?

09:12  10      A.    My impression was that it was the original

09:12  11  CMS.  I think it was Sitefinity was the -- the tool

09:12  12  was -- had been modified a lot, and there was just

09:12  13  instability and buggy code in it.

09:12  14           That's what I remember.  I don't know if it

09:13  15  was any particular function on the site, as it was more

09:13  16  like bugs had been introduced to the site.  So...

09:13  17      Q.    So you don't remember it being any particular

09:13  18  function, though, of the user interface?

09:13  19      A.    Yeah.  Not that I'm aware of.

09:13  20      Q.    Does that include the breadcrumb

09:13  21  functionality?  You're not aware of the breadcrumb

09:13  22  functionality causing any issues?

09:13  23      A.    Yeah.  Not that I'm aware of.  I don't even

09:13  24  remember if it had a breadcrumb.  So...

09:13  25      Q.    Could you see the combination of the

09:13    1    breadcrumb and the navigational elements we just

09:13    2    discussed, like the drop-down menu, being useful to a

09:13    3    user in navigating a website?

09:13    4        A.    My preference on site navigation is I like

09:13    5    mega menus, bigger.  I like clear, concise navigation

09:13    6    at the top.  I'm not a fan of drop-downs in menus.  I

09:13    7    would much rather have like a mega menu show up and you

09:14    8    can see everything than a drop-down.

09:14    9            My experience with drop-downs is unless

09:14   10    someone hovers over or clicks on a drop-down, they --

09:14   11    that's the only way they know the option exists there.

09:14   12    Where if it's -- if those selectable items aren't

09:14   13    hidden in a drop-down menu, they're more exposed.

09:14   14            So I would say my recommendation wouldn't

09:14   15    probably be to put any drop-downs in a breadcrumb.

09:14   16    So...

09:14   17        Q.    Correct.

09:14   18        A.    I don't think I've ever done that before, but

09:14   19    maybe there's some sites that do that.  I'm just not

09:14   20    familiar with that.  So...

09:14   21        Q.    Wouldn't your preference, though, be that the

09:14   22    menu itself doesn't take up too much website real

09:14   23    estate?

09:14   24        A.    Yeah.  That's what's sweet about a mega menu.

09:14   25    So a mega menu, when you hover over the element at the

09:14    1    top, it opens up a bigger view of more menu options.

09:15    2            And let me see.  I don't know if we

09:15    3    implemented on Microchip.  It depends on the -- yeah.

09:15    4    We have a mega menu on Microchip's website today.

09:15    5            So as you hover over, you see all the options

09:15    6    you might want to select in the site menu.

09:15    7        Q.    Would a breadcrumb -- would a breadcrumb with

09:15    8    a drop-down menu that you had to hover over or click

09:15    9    over, would that also accomplish that goal?

09:15   10        A.    You know, I normally think -- I normally don't

09:15   11    mix the two, right?  To me a breadcrumb is like what

09:15   12    you said before, it's like where I am.  It's like a

09:15   13    sign to tell you where you're at, where the navigation

09:15   14    up above is more around selecting where to go.  So --

09:15   15    from my opinion.

09:15   16        Q.    So you're not used to like combining the two

09:15   17    of a breadcrumb helping you select where to go?

09:15   18        A.    Yeah.  No.

09:15   19        Q.    Could you see, though, that that would be

09:15   20    useful if the breadcrumb could help you select where to

09:16   21    go?

09:16   22        A.    Yeah.  I think you mentioned that before.  I

09:16   23    don't think it would be my opinion.  That wouldn't be

09:16   24    my recommendation.

09:16   25        Q.    Have you ever heard of the patents-in-suit?

09:16   1          A.     The what?

09:16   2          Q.     The patents in this case, in Caddo

09:16   3   v. Microchip.

09:16   4          A.     I've never read them.

09:16   5          Q.     Did you talk -- did the patents ever come up

09:16   6   during the redesign of Microchip's website?

09:16   7          A.     No.  Not that I'm aware of.  In any of my

09:16   8   conversations, I never had a conversation about

09:16   9   patents.

09:16   10         Q.     Did Microchip ever mention any noninfringement

09:16   11  defenses during the redesign process?

09:16   12         A.     Not that I'm aware of.

09:16   13         Q.     Did Microchip ever mention wanting to design

09:16   14  around any patents during the redesign?

09:16   15         A.     Not that I was involved in.  And not that I'm

09:16   16  aware of with my employees.  So...

09:16   17         Q.     If that conversation were to have been had,

09:16   18  who would have had it?  Would that have been you?

09:17   19         A.     I'm sure my team would have talked to me about

09:17   20  it if something like that came up.  So...

09:17   21         Q.     So I'm on Microchip.com/en-us-products.  And

09:17   22  this is one of DRL's redesigned website pages; is that

09:17   23  fair?

09:17   24         A.     Yeah.

09:17   25         Q.     And if I hover my mouse over Education, I can

-1115-

09:17  1    select the Microchip and Technical Learning Center, I

09:17  2    can select the Microchip Livestream Events; is that

09:17  3    fair?

09:17  4         A.    That's fair.

09:17  5         Q.    And if I select that, this is an old -- and

09:17  6    you're saying I'm taken to

09:17  7    https://www.microchip.com/training/microchip-live

09:17  8    stream/.  And if I understand you correctly, this is

09:17  9    not a website that was redesigned by DRL; is that

09:18  10   correct?

09:18  11        A.    Correct.

09:18  12        Q.    But it is available currently through

09:18  13   Microchip's current website navigation?

09:18  14        A.    Yes.

09:18  15        Q.    We'll actually go now to Exhibit 10.

09:18  16        Which -- do you recognize this document,

09:18  17   Mr. Miller?

09:18  18        A.    Yes.

09:18  19        Q.    What is this document?

09:18  20        A.    The Phase 1 deliverable document.

09:18  21        Q.    And who prepared this document?

09:18  22        A.    It would have been the team working on the

09:18  23   project.  I'm guessing at the time it was maybe an

09:18  24   employee named Greg.  I can't remember his last name.

09:18  25   And Ricky.  I think both have left the company now.

—1116—

09:18  1    But they were probably some of the early people

09:18  2    involved in the Phase 1 deliverables.

09:18  3         Q.    And was this document kept as part of DRL's

09:19  4    ordinary course of business?

09:19  5         A.    Yes.

09:19  6         Q.    I'm going to take you to Page 8 of this

09:19  7    document.  It's been Bates labeled as 4029.

09:19  8         A.    Okay.

09:19  9         Q.    This diagram shows there's a first level, a

09:19  10   second level, a third level, and notes.

09:19  11        A.    Uh-huh.

09:19  12        Q.    What's your understanding of what these levels

09:19  13   are?

09:19  14        A.    This would be the content hierarchy of the

09:19  15   website with categories of content.  So...

09:19  16        Q.    But in the -- do you remember the example from

09:19  17   one of the legacy pages we just went over?

09:19  18        A.    Uh-huh.

09:19  19        Q.    Was it possible to go forward using the

09:19  20   breadcrumb in that legacy page?

09:19  21        A.    Yeah.  In that example that you showed, it

09:19  22   looked like you could click other pages.

09:19  23        Q.    Can you see that feature being valuable or

09:19  24   helping a user in their trackable journey?

09:20  25        A.    You know, my opinion is that that's not a good

—1117—

09:20  1    design element.  You know, I would move towards more

09:20  2    common best practice site navigation techniques.  And

09:20  3    if it's duplicative of what's already in the site

09:20  4    navigation, then I would see it as redundant.

09:20  5        Q.   Do you recall earlier being shown a document

09:20  6    that had, I think it was a $2.85 million estimate for

09:20  7    the Microchip website redesign?

09:20  8        A.   Yes.

09:20  9        Q.   How much, if any, of that money was paid for

09:20  10   the breadcrumb feature?

09:20  11       A.   I -- it's hard for me to say, but very little.

09:20  12   The breadcrumb implementation, I'm not even sure what

09:20  13   phase it was in, but it would have been a minor part of

09:20  14   the project.

09:21  15       Q.   First, let me ask:  Are you familiar with the

09:21  16   Google website?

09:21  17       A.   With Google?  Yes.

09:21  18       Q.   Is it fair to say that that's one of the most

09:21  19   commonly frequented websites in the world?

09:21  20       A.   Yes.

09:21  21       Q.   I'm going to go to the google.com website.

09:21  22            Do you see that?

09:21  23       A.   Yes.

09:21  24       Q.   Do you see any breadcrumbs on this website?

09:21  25       A.   Not yet.

-1118-

09:21  1       Q.    What about if I search for your company,

09:21  2  Dynamic Range Labs?

09:21  3             Did I spell that correct?

09:21  4       A.    Yes.

09:21  5       Q.    And what appeared on the screen?

09:21  6       A.    The search results for Dynamic Range Labs.

09:21  7  You have your site nav at the top, and you have the

09:21  8  search results.

09:21  9       Q.    Would you consider anything shown on this web

09:21  10  page to be a breadcrumb?

09:21  11      A.    No.

09:22  12      Q.    Does Dynamic Range Labs have a website?

09:22  13      A.    Yes.

09:22  14      Q.    And what is the URL of that website?

09:22  15      A.    Dynamicrangelabs.com.

09:22  16      Q.    Do you think Dynamic Range Labs' website is a

09:22  17  good website?

09:22  18      A.    It's -- it's an okay site.

09:22  19      Q.    Fair enough.

09:22  20             I'm going to click on the link here.  And tell

09:22  21  me if this is the Dynamic Range Labs website.

09:22  22      A.    Yes.

09:22  23      Q.    Do you see any breadcrumbs on the Dynamic

09:22  24  Range Labs website?

09:22  25      A.    No.

09:22  1          Q.    And there's a top nav here up on the upper

09:22  2    right-hand side with a drop-down menu?

09:22  3          A.    Uh-huh.

09:22  4          Q.    Is that a breadcrumb?

09:22  5          A.    No.

09:22  6          Q.    So I'm just going to hover over the Services

09:22  7    item, and I'll click on Strategy.

09:23  8                What happened?

09:23  9          A.    We went to a subsection of the website on

09:23  10   services and strategy.

09:23  11         Q.    Is there a breadcrumb trail displayed on this

09:23  12   website?

09:23  13         A.    No.

09:23  14         Q.    Let me go to -- I'll just pick a site.

09:23  15   CNN.com.  Is that a site you've ever visited before?

09:23  16         A.    Yes.

09:23  17         Q.    Okay.  Is there a breadcrumb on this website?

09:23  18         A.    I don't see a breadcrumb now.

09:23  19         Q.    I'm going to click on the Business tab.

09:23  20                Did that take me to the Business web page of

09:23  21   CNN.com?

09:23  22         A.    Yes.

09:23  23         Q.    Do you see a breadcrumb on this website?

09:24  24         A.    No.  I don't see a breadcrumb.

09:24  25         Q.    I'm going to go, to be fair and balanced, to

09:24    1    the foxnews.com website.

09:24    2              Do you see that on the screen?

09:24    3    A.    Yes.

09:24    4    Q.    Do you see a breadcrumb on this website?

09:24    5    A.    No.  I don't.

09:24    6    Q.    I'll click on the Business tab of the Fox News

09:24    7    website.

09:24    8              Do you see a breadcrumb trail on the resulting

09:24    9    web page that was loaded?

09:24   10    A.    No.  I don't.

09:24   11    Q.    I just wanted to make sure that I understand

09:24   12    your testimony, Mr. Miller.

09:24   13              Did you ever intend to say at any point during

09:24   14    your testimony today that the presence of a breadcrumb

09:24   15    is necessary to have a good website?

09:24   16    A.    Yeah.  I may have said that.  And I think

09:25   17    there's some value in a breadcrumb, but maybe it's not

09:25   18    always necessary.  And I would say it doesn't -- there

09:25   19    are great websites.  I would say CNN's a great website,

09:25   20    and it doesn't have a breadcrumb.  So yeah.

09:25   21    Q.    Let me ask you even a more specific question.

09:25   22    Is it necessary, in your view, to have a drop-down

09:25   23    breadcrumb to have a good website?

09:25   24    A.    No.  I think I mentioned earlier that I prefer

09:25   25    navigation to be in the menu up above and that a

09:25  1   drop-down in a breadcrumb I would consider not the best

09:25  2   UI/UX sort of element there, design element.

09:26  3       Q.    Has DRL ever performed any study or analysis

09:26  4   to try and determine the value of a drop-down

09:26  5   breadcrumb feature?

09:26  6       A.    No.

09:26  7       Q.    So this is the same Exhibit 10 that

09:26  8   Ms. McCarty asked you about earlier.  I'm going to

09:26  9   direct your attention to Page 8, which bears the Bates

09:26  10  number ending in 4029.

09:26  11      A.    Uh-huh.

09:26  12      Q.    Do you see that page?

09:26  13      A.    Yes.

09:26  14      Q.    Do you recall being asked about this page

09:26  15  earlier today in your testimony?

09:26  16      A.    Yes.

09:26  17      Q.    To the best of your knowledge, do the various

09:26  18  levels shown on this page relate to the top navigation

09:26  19  menu of the microchip.com website?

09:26  20      A.    Yes.

09:26  21      Q.    Okay.  To the best of your knowledge, are

09:27  22  these various headings or levels that are shown here

09:27  23  accessible via a drop-down menu as part of a breadcrumb

09:27  24  on the redesigned Microchip website?

09:27  25      A.    No.

1122

09:27  1     Q.   Mr. Miller, does DRL ascribe any particular

09:27  2   value to a drop-down breadcrumb feature?

09:27  3     A.   No.

09:27  4     Q.   Do you remember a line of questioning where

09:27  5   Mr. Jensen took you to Google?

09:27  6     A.   Yeah.

09:27  7     Q.   And the DRL web page?

09:27  8     A.   Yeah.

09:27  9     Q.   And the Fox and CNN web pages?

09:27  10    A.   Yes.

09:27  11    Q.   Now, Google is not -- google.com is not

09:27  12   microchip.com, right?

09:27  13    A.   Right.

09:27  14    Q.   And DRL is not Microchip; is that right?

09:27  15    A.   Right.

09:27  16    Q.   Do you know how many users visit DRL monthly?

09:27  17    A.   A small amount.  I can confidently say

09:28  18   probably less than a thousand a month.

09:28  19    Q.   And Microchip has far more visitors than that

09:28  20   a month; is that fair?

09:28  21    A.   Yes.

09:28  22    Q.   And Fox and CNN, they're not microchip.com,

09:28  23   right?

09:28  24    A.   Different companies.  Yes.

09:28  25    Q.   And Microchip isn't a news website; is that

—1123—

09:28   1    right?

09:28   2        A.    That's right.

09:28   3        Q.    So would you agree that the use of breadcrumb

09:28   4    is dependent on the application or the design of the

09:28   5    website?

09:28   6        A.    You know, I would say they are different types

09:28   7    of websites.  I think an argument could be made that a

09:28   8    news site could have a breadcrumb, but maybe it's more

09:28   9    preference, right?

09:28   10        I think people look to navigate content on any

09:28   11   site, and -- and, you know, my personal preference

09:29   12   might be that a breadcrumb adds some value but maybe

09:29   13   it's not -- as was pointed out, there are plenty of

09:29   14   sites that could have a breadcrumb that probably don't.

09:29   15   So...

09:29   16        Q.    No.  That's fair.

09:29   17        So to follow that, is it fair to say that the

09:29   18   use of breadcrumb depends on who is applying it and who

09:29   19   is designing the website?

09:29   20        A.    Yeah.  Sure.

09:29   21        Q.    And you talked briefly about DRL customers

09:29   22   asking you about breadcrumb.

09:29   23        Do you remember that line of questioning?

09:29   24        A.    I think the question was if we'd ever been

09:29   25   asked about breadcrumb with a drop-down menu by a

—1124—

09:29  1    customer, and I said no.

09:29  2             And to be honest, I don't recall really having

09:29  3    conversations around breadcrumbs with any of our

09:29  4    clients.  I don't think it's a common -- it's a small

09:30  5    nuance in a web redesign that might come up during a

09:30  6    design, but it's not something I would have a

09:30  7    conversation with someone about.  So...

09:30  8       Q.    So you don't recall if Microchip ever asked

09:30  9    you to specifically implement breadcrumb in the

09:30  10   website?

09:30  11      A.    I'm sure they did not.  Like, I did not have

09:30  12   any conversations about that with them.

09:30  13             (End video.)

09:30  14             MS. FROST:  Your Honor, Microchip calls

09:30  15   Dr. Mark Wolf as its next witness.

09:30  16             He's out in the hall.  May we go get him,

09:30  17   please?

09:30  18             THE COURT:  Of course.

09:30  19             (The witness was sworn.)

09:30  20                  DIRECT EXAMINATION

09:30  21   BY MS. FROST:

09:31  22      Q.    Good morning.

09:31  23      A.    Good morning.

09:31  24      Q.    Would you please state your name for the

09:31  25   record, and introduce yourself to the jury and the

1125

09:31  1    Judge?

09:31  2        A.    Sure.  My name's Mark Wolf.

09:32  3        Q.    Please briefly describe for everyone your

09:32  4    educational background, starting with undergraduate

09:32  5    school.

09:32  6        A.    Sure.  I have a bachelor's degree in

09:32  7    psychology from George Washington University and a

09:32  8    master's and Ph.D. in industrial organizational

09:32  9    psychology from Georgia Tech.

09:32  10       Q.    Where do you live, Dr. Wolf?

09:32  11       A.    Tempe, Arizona.

09:32  12       Q.    By whom are you employed?

09:32  13       A.    Microchip Technology.

09:32  14       Q.    How long have you worked for Microchip

09:32  15   Technology?

09:32  16       A.    A little over four years.

09:32  17       Q.    And what's your job title there, please?

09:32  18       A.    Marketing analytics manager.

09:32  19       Q.    What do you do as a marketing analytics

09:32  20   manager at Microchip?

09:32  21       A.    I oversee two functions for corporate

09:32  22   marketing.  One is analytics; the other is SEO.

09:32  23       Q.    What does your marketing analytics function

09:32  24   consist of?

09:32  25       A.    For our analytics, there are several aspects

—1126—

09:33    1    to it in support of the business:  Create and share

09:33    2    reports, analyze data, share data.  Also get a lot of

09:33    3    requests for reports and data that I fulfill.

09:33    4        Q.    In your marketing analytics function, why do

09:33    5    you analyze data and generate these sorts of reports?

09:33    6        A.    To evaluate -- for the most part, it's to

09:33    7    evaluate how our marketing efforts are performing.

09:33    8        Q.    You said you receive requests from folks in

09:33    9    the business, right?

09:33   10        A.    That's correct.  Yes.

09:33   11        Q.    Can you give the Court and jury an example of

09:33   12    what such a request might be?

09:33   13        A.    Sure.  A common request is someone will ask

09:33   14    for a specific web page, how many people are visiting

09:33   15    that web page.

09:33   16        Q.    And what's your understanding, at a high

09:33   17    level, as to how the business folks use those reports

09:33   18    and analytics that you provide?

09:33   19        A.    Sure.  They use it to evaluate how their

09:34   20    marketing efforts are performing.  Could be other

09:34   21    reasons, but that's one of the primary reasons.

09:34   22        Q.    Approximately how many requests like this do

09:34   23    you receive on a weekly basis?

09:34   24        A.    10 to 15.

09:34   25        Q.    Do you have any people who work with you in

—1127—

09:34   1    performing your marketing analytics function?

09:34   2        A.    Yeah.  I have two direct reports.

09:34   3        Q.    Let's talk about your other corporate

09:34   4    function, SEO.

09:34   5        A.    Yeah.  That's search engine optimization.

09:34   6        Q.    And I believe the jury has heard a little bit

09:34   7    about SEO during the trial.  And I know you haven't

09:34   8    been in the courtroom, so...

09:34   9            But can you remind the jury and us briefly

09:34   10   about what SEO is and does?

09:34   11       A.    Yeah.  One of the common things for SEO is you

09:34   12   have a website and you look at the pages on the website

09:34   13   and you see if you can optimize those pages so they

09:34   14   rank higher in search engines like Google.

09:34   15       Q.    And what do you do in your SEO function?

09:35   16       A.    Sure.  I look at microchip.com and see if

09:35   17   there are any pages that we can optimize for search

09:35   18   engines.  We generally want our pages to rank as high

09:35   19   as possible in the search engines.

09:35   20       Q.    So you want it to come up first in a Google

09:35   21   search?

09:35   22       A.    Yes.

09:35   23       Q.    How many folks work with you in carrying out

09:35   24   your SEO function?

09:35   25       A.    I have four direct reports.

—1128—

09:35     1          Q.     As a general matter, high level, what type of

09:35     2     information do you have available to you for performing

09:35     3     your data gathering and analytics?

09:35     4          A.     Sure.  I have access to -- one of the primary

09:35     5     sources is Google Analytics, although I do have other

09:35     6     tools and data sources available.

09:35     7          Q.     What Microchip websites do you primarily work

09:35     8     with in performing your data analytics function?

09:35     9          A.     Primarily, it's microchip.com and, to a lesser

09:35    10     extent, microchipdirect.com.

09:36    11          Q.     And what's your level of familiarity with

09:36    12     those websites and their functionality?

09:36    13          A.     Sure.  Quite familiar with microchip.com, and

09:36    14     to a lesser extent, microchipdirect.com.

09:36    15          Q.     If the jury's heard testimony that

09:36    16     microchip.com and microchipdirect.com are separate

09:36    17     websites with separate purposes, would that be

09:36    18     consistent with your understanding?

09:36    19          A.     Yes.  That's true.

09:36    20          Q.     Dr. Wolf, did there come a time when you were

09:36    21     asked to provide some data analytics for this case?

09:36    22          A.     Yes.

09:36    23          Q.     What type of data analytics were you asked to

09:36    24     provide?  Can you give us some examples?

09:36    25          A.     Yeah.  I can provide three examples.  One is a

09:36   1   traffic source analysis of Microchip Direct.  This was

09:36   2   looking at where traffic was coming from when going to

09:36   3   microchipdirect.com.  Another one was a worldwide

09:36   4   versus U.S. revenue comparison analysis, and a third

09:36   5   one was a use case, the two-page visit analysis.

09:37   6       Q.   Let's talk first about the microchipdirect.com

09:37   7   traffic source analysis, okay?

09:37   8       A.   Okay.

09:37   9       Q.   What was your objective in making that

09:37   10  analysis?

09:37   11      A.   Sure.  The objective was to associate -- was

09:37   12  to evaluate a revenue figure that I was given.

09:37   13      Q.   Were you looking to determine where users to

09:37   14  Microchip Direct were coming from in your traffic

09:37   15  analysis?

09:37   16      A.   Yes.  So the way that that was done is we

09:37   17  looked at everyone that was coming from microchip.com

09:37   18  and went to microchipdirect.com and then looked at

09:37   19  the -- the overall revenue figure was the worldwide

09:37   20  figure.  And then the -- then I also restricted it to

09:38   21  just users who had made purchases from the United

09:38   22  States, and that represented the United States revenue

09:38   23  figure.

09:38   24      Q.   Okay.  I think we're talking about your -- I

09:38   25  think we're out of order.  I may have confused you.

—1130—

| | | |
|---|---|---|
| 09:38 | 1 | Let's talk about your traffic source analysis. |
| 09:38 | 2 | A.    Okay. |
| 09:38 | 3 | Q.    People coming to microchipdirect.com. |
| 09:38 | 4 | Can we talk about that first? |
| 09:38 | 5 | A.    Yeah, yeah, yeah. |
| 09:38 | 6 | Q.    All right.  So let's go back and ask:  What's |
| 09:38 | 7 | your objective in making the microchipdirect.com |
| 09:38 | 8 | traffic source analysis?  Were you trying to determine |
| 09:38 | 9 | where users to Microchip Direct were coming from? |
| 09:38 | 10 | A.    Yeah, yeah.  We were looking for where users |
| 09:38 | 11 | who are going to Microchip Direct were coming from. |
| 09:38 | 12 | Q.    And was your analysis focused on U.S. users? |
| 09:38 | 13 | A.    Yes. |
| 09:38 | 14 | Q.    And what did you find as a result of your |
| 09:38 | 15 | analysis? |
| 09:38 | 16 | A.    We found that most people were going to |
| 09:38 | 17 | microchipdirect.com from a source other than |
| 09:38 | 18 | microchip.com. |
| 09:38 | 19 | Q.    Since most users at microchipdirect.com were |
| 09:39 | 20 | not coming from microchip.com, as you just told us, |
| 09:39 | 21 | where were they coming from? |
| 09:39 | 22 | Can you please provide us some examples? |
| 09:39 | 23 | A.    Yeah.  Sure.  Some common examples of how |
| 09:39 | 24 | people get to microchipdirect.com are:  They could |
| 09:39 | 25 | conduct a Google search.  They could type the URL into |

-1131-

09:39  1    the browser.  Or they could -- in their browser they

09:39  2    could create a shortcut when they're on a

09:39  3    microchipdirect.com page.

09:39  4        Q.   How do you know that most users arrive at

09:39  5    microchipdirect.com from sources other than

09:39  6    microchip.com like the examples you just gave?

09:39  7        A.   I analyzed it.

09:39  8        Q.   How did you analyze it?

09:39  9        A.   I used an analytics tool.

09:39  10       Q.   Which one?

09:39  11       A.   Google Analytics.

09:39  12       Q.   Please turn in the binder -- I put before you

09:39  13   a binder of some documents.

09:39  14            Could you please turn to Exhibit D-465, which

09:40  15   is a tab in the binder.

09:40  16       A.   Yes.

09:40  17       Q.   What is D-465?  Can you identify it briefly?

09:40  18       A.   Yes.  Yeah.  This is a series of analyses that

09:40  19   I performed as part of this case.

09:40  20       Q.   Does your traffic source analysis we've just

09:40  21   been talking about appear in Exhibit 465 at Pages 11

09:40  22   through 14?

09:40  23       A.   Yes.

09:40  24            MS. FROST:  We offer Exhibit D-465, Your

09:40  25   Honor.

-1132-

```
09:40   1                      MR. CHAN:  No objection, Your Honor.
09:40   2                      THE COURT:  It'll be admitted.
09:40   3                      MS. FROST:  Mr. Thompson, could you
09:40   4    please display Exhibit 465 at Page 11?
09:40   5    BY MS. FROST:
09:41   6        Q.    What do we see on the screen, Dr. Wolf?
09:41   7        A.    Sure.  This is showing the number of users
09:41   8    that -- from -- who made purchases -- or, sorry.
09:41   9    Number of users from the United States on
09:41  10    microchip.com -- sorry, sorry.
09:41  11             The number of users who came from
09:41  12    microchip.com on their way to Microchip Direct.
09:41  13        Q.    Okay.  So this is --
09:41  14        A.    This is the first one.
09:41  15        Q.    This is the traffic analysis.  So it's telling
09:41  16    you how many people came from microchip.com to
09:41  17    microchipdirect.com --
09:41  18        A.    So the first --
09:41  19        Q.    -- or other sources?
09:41  20        A.    Yeah.  The first one is the overall -- this
09:41  21    page, I believe, is the overall, the -- and then the
09:41  22    following page is those who came from microchip.com.
09:41  23        Q.    All right.  Let's look at just Page 11 for the
09:41  24    moment.
09:41  25        A.    Okay.
```

09:41   1       Q.    Okay.   What time period does your traffic

09:42   2   source analysis cover?

09:42   3       A.    Sure.   It's from -- August 2018 through

09:42   4   October 2021.

09:42   5       Q.    Stated as a percentage, if you can, what were

09:42   6   the results of your analysis of how people arrived at

09:42   7   microchipdirect.com?

09:42   8       A.    It shows that most people came to

09:42   9   microchipdirect.com from a source other than

09:42   10  microchip.com.

09:42   11      Q.    And can you state that as a percentage?

09:42   12      A.    Yeah.   83 percent went to microchipdirect.com

09:42   13  from a source other than microchip.com.

09:42   14      Q.    Would that include Google?   What other

09:42   15  sources?

09:42   16      A.    Yeah.   That'll include some of the sources

09:42   17  that I listed before, among others.   It could include

09:42   18  Google, people typing in the URL into their browser, or

09:42   19  people sharing a short -- saving a shortcut on their

09:42   20  browser and then later accessing that shortcut.

09:42   21      Q.    What's a common way to get to

09:42   22  microchipdirect.com through Google?

09:43   23      A.    Through Google?   You could just type in

09:43   24  Microchip Direct into the Google search engine, and

09:43   25  then Microchip Direct would be the first search result.

—1134—

09:43  1    And then just click on it.

09:43  2            This would be for people that are already

09:43  3    familiar with Microchip Direct and are just using

09:43  4    Google to access the website.

09:43  5    Q.   You told us that a user can go directly to

09:43  6    microchipdirect.com, didn't you?

09:43  7    A.   Yes.

09:43  8    Q.   Okay.  Can you describe how a user could go

09:43  9    directly to microchipdirect.com?

09:43  10   A.   Yes.  So two methods.  One is they could open

09:43  11   their browser and type in the URL.  So

09:43  12   www.microchipdirect.com.

09:43  13           Another one is the shortcut method.  They

09:43  14   could be on a Microchip Direct page, save a page as a

09:43  15   shortcut in their browser, and then later when they

09:43  16   access that shortcut, that would be a direct method.

09:44  17   Q.   Okay.  We've talked about the 83 percent that

09:44  18   come to microchipdirect.com through sources other than

09:44  19   microchip.com.

09:44  20           Let's talk about those who come to

09:44  21   microchipdirect.com from microchip.com.  Okay?

09:44  22   A.   Okay.

09:44  23   Q.   All right.  How many U.S. users get to

09:44  24   microchipdirect.com by way of microchip.com?

09:44  25   A.   17 percent.

09:44    1        Q.    And how do you know that?

09:44    2        A.    That's part of this analysis as well.

09:44    3        Q.    How can users get from microchip.com to

09:44    4    microchipdirect.com?

09:44    5        A.    A common method is that someone could land on

09:44    6    the homepage and then immediately click on the Order

09:44    7    Now link or one of the two shopping cart icons.  All of

09:44    8    these appear at the top of the homepage.

09:44    9        Q.    And if you click on any one of those, where do

09:44   10    you go?

09:44   11        A.    You would immediately go to

09:44   12    microchipdirect.com.

09:44   13        Q.    You weren't here when Ms. Mahar gave a

09:44   14    demonstration of how to use the shopping cart on the

09:45   15    new website, were you?

09:45   16        A.    No.  I was not.

09:45   17        Q.    Okay.  What version of the microchip.com

09:45   18    website would have been in use during 2019?

09:45   19        A.    The old version.

09:45   20        Q.    Could a user have gotten from microchip.com to

09:45   21    microchipdirect.com through clicking on a shopping cart

09:45   22    icon or link on the homepage on the old website?

09:45   23        A.    There was a shopping cart icon on the homepage

09:45   24    of the old website.

09:45   25        Q.    Okay.  So the three ways to get to

09:45  1    microchipdirect.com that we've been discussing:  Using

09:45  2    Google or a search engine, one way.  Typing in the URL

09:45  3    or making a shortcut, going directly.  Or using the

09:45  4    shopping cart icon on the microchip.com homepage.

09:45  5          Which one of those uses a breadcrumb?

09:45  6    A.    None of them.

09:45  7    Q.    All right.  Separate from the user traffic

09:46  8    analysis -- we've concluded with that -- did you

09:46  9    receive a request for traffic analytics from an expert

09:46  10   for Microchip in this case?

09:46  11   A.    I did.

09:46  12   Q.    And who was the expert who made the request?

09:46  13   A.    Mr. Jordan.

09:46  14   Q.    Did you provide the information he requested?

09:46  15   A.    Yes.  I did.

09:46  16   Q.    And what did you provide him?

09:46  17   A.    The information requested was how much revenue

09:46  18   was generated from those who came from the Microchip

09:46  19   Forums website and went to microchipdirect.com and made

09:46  20   a purchase on microchipdirect.com.

09:46  21   Q.    Was it for a particular period of time?

09:46  22   A.    Yes.  That was for 2021, the full calendar

09:46  23   year.

09:46  24   Q.    All right.  Previously you gave us three

09:46  25   examples of data analytics you were asked to provide in

—1137—

09:46  1   this case.  We've talked about the first traffic source

09:46  2   example.

09:46  3           Let's now talk about the worldwide versus U.S.

09:47  4   sales revenue comparison that you did.  Okay?

09:47  5       A.   Okay.

09:47  6       Q.   All right.  First, what were you asked to do?

09:47  7       A.   That was the one where I was asked to evaluate

09:47  8   a revenue figure.

09:47  9       Q.   Okay.  The jury's heard about a

09:47  10  $215,000-per-day revenue number taken from a slide in a

09:47  11  Microchip presentation.  Is that the number that you

09:47  12  are referring to?

09:47  13      A.   Yes.

09:47  14      Q.   How did you become familiar with that number?

09:47  15      A.   Through this lawsuit.

09:47  16      Q.   Were you involved in creating the number?

09:47  17      A.   No.

09:47  18      Q.   Do you know who was?

09:47  19      A.   No.

09:47  20      Q.   Have you seen a Microchip presentation that

09:47  21  contains the $215,000-per-day revenue number?

09:47  22      A.   Yes.  I believe it was shared with me at my

09:47  23  deposition.

09:47  24      Q.   What, if anything, can you tell about the date

09:47  25  of the presentation that you saw?

—1138—

09:47    1       A.    Sure.  Grace Ramon was listed as the presenter

09:47    2    of the presentation.  She left Microchip in April 2019.

09:48    3    Therefore, we know that that $215-per-day (sic) revenue

09:48    4    figure was presented on or before April 2019.

09:48    5       Q.    What significance, if any, did the data, the

09:48    6    presentation have in your analysis?

09:48    7       A.    It informed what the dates or the most

09:48    8    relevant timeline of the data should be.

09:48    9       Q.    Were you able to perform the worldwide versus

09:48   10    U.S. sales and revenue comparison?

09:48   11       A.    Yes.  I was.

09:48   12       Q.    Are you in finance, Dr. Wolf?

09:48   13       A.    I'm not in finance.

09:48   14       Q.    Okay.  So how are you able to perform a U.S.

09:48   15    versus worldwide sales and revenue comparison?

09:48   16       A.    We added e-commerce tracking to Microchip

09:48   17    Direct.

09:48   18       Q.    When did you do that?

09:48   19       A.    I should say we added e-commerce tracking to

09:48   20    Google -- through Google Analytics to Microchip Direct.

09:49   21             That was done in August 2019.

09:49   22       Q.    And what do the e-commerce analytics allow you

09:49   23    to do with respect to microchipdirect.com?

09:49   24       A.    They allow me to see all revenue from product

09:49   25    purchases made on microchipdirect.com.

—1139—

09:49  1       Q.    What more did you need to do to provide your

09:49  2  U.S. and worldwide sales analysis besides use the

09:49  3  e-commerce analytics?

09:49  4       A.    Nothing.

09:49  5       Q.    Okay.  So what types of sales and revenue did

09:49  6  you compare in your analysis?

09:49  7       A.    Sure.  This is the one where -- so we looked

09:49  8  at for -- this is the one where people were coming from

09:49  9  microchip.com and went to Microchip Direct and made a

09:49  10  purchase.  The overall figure was the worldwide revenue

09:49  11  figure.

09:49  12          And then I also restricted it to just the

09:49  13  United States.  And for people who made their purchases

09:50  14  from the United States, that was -- those represented

09:50  15  the United States revenue figures.

09:50  16       Q.    Okay.  So you were able to discern a worldwide

09:50  17  figure, and then what part of that worldwide figure

09:50  18  would be attributable to the United States?

09:50  19       A.    Yes.

09:50  20       Q.    Okay.  Who made the determination -- or who

09:50  21  makes the determination as to how a sale is classified

09:50  22  using these e-commerce analytics?

09:50  23       A.    Sure.  It's based on the IP address of the

09:50  24  person who makes the purchase.  Google Analytics

09:50  25  processes the IP address and derives their location

-1140-

09:50  1    based on their IP address.

09:50  2        Q.    So it's classified "U.S." or "other" by Google

09:50  3    Analytics?

09:50  4        A.    Yeah.  Roughly.

09:50  5        Q.    And Google Analytics -- well, you didn't make

09:50  6    the determination or classification yourself, did you?

09:50  7        A.    That's correct.  Yeah.

09:50  8              Google Analytics is the one that processes the

09:50  9    data and derives the location.  I did not take part in

09:51  10   determining the location of the users that made the

09:51  11   purchase.

09:51  12       Q.    Okay.  So what form did the results of your

09:51  13   worldwide sales versus U.S. sales data comparison take?

09:51  14       A.    An Excel spreadsheet.

09:51  15       Q.    Please turn in your binder to --

09:51  16              MS. FROST:  And we can show on the

09:51  17   screen, Mr. Thompson.

09:51  18   BY MS. FROST:

09:51  19       Q.    -- Exhibit D-467, which has been previously

09:51  20   admitted.

09:51  21              Is that your worldwide and U.S. sales

09:51  22   analysis?

09:51  23       A.    Yes.

09:51  24       Q.    What period of time does your analysis cover?

09:51  25       A.    It goes from September 2019 to December 2021.

—1141—

09:51  1      Q.    Why did you choose September 2019 as the start

09:51  2   date?

09:51  3      A.    So as I testified earlier, the e-commerce

09:51  4   tracking was set up in August of -- September 2019.  So

09:51  5   the first full month of data that we had available was

09:51  6   September of 2019.

09:51  7      Q.    Was the data, the presentation we've just been

09:52  8   talking about, important in your determination of a

09:52  9   start date?

09:52  10     A.    Yes.  So it was important because we know that

09:52  11  the revenue figure, as I testified earlier, would have

09:52  12  been presented in April 2019 or earlier.  So it would

09:52  13  be best to have revenue figures as close as possible to

09:52  14  when that revenue figure was presented.

09:52  15     Q.    All right.  So just to be clear, the revenue

09:52  16  data in your analysis here comes from revenue generated

09:52  17  from sales on microchipdirect.com, right?

09:52  18     A.    That's correct.

09:52  19     Q.    And does the data in your analysis here cover

09:52  20  the revenue generated by that 17 percent of the people

09:52  21  who you told us before got to microchipdirect.com

09:52  22  through microchip.com?

09:52  23     A.    That's correct.

09:52  24     Q.    And did -- does this include those people who

09:52  25  got to microchipdirect.com by landing on the homepage

—1142—

09:52   1    at microchip.com and then clicking on a shopping cart

09:53   2    or other icon on that page?

09:53   3        A.    So yes.  This includes people that landed on

09:53   4    microchip.com and then immediately clicked on the Order

09:53   5    Now or one of the shopping cart icons at the top and

09:53   6    then made a purchase on microchipdirect.com.

09:53   7        Q.    And did any of those users who clicked on the

09:53   8    shopping cart icon like you described use a breadcrumb?

09:53   9        A.    No.

09:53   10       Q.    All right.  Ms. Mahar testified yesterday that

09:53   11   implementation of the new website began in June 2020

09:53   12   and continued until completed.

09:53   13            Is that consistent with your understanding?

09:53   14       A.    Yes.

09:53   15       Q.    Accordingly, does your analysis here include

09:53   16   sales from -- or revenue from microchipdirect.com that

09:53   17   occurred while both the old and the new microchip.com

09:53   18   websites were in use?

09:53   19       A.    Yes.  That's included as well.

09:53   20       Q.    What website would have been in use for the

09:53   21   period of your analysis from September 2019 to

09:54   22   June 2020?

09:54   23       A.    That would have been the old website.

09:54   24       Q.    Okay.  When was the migration of the old to

09:54   25   the new website substantially completed?

09:54  1        A.    That would have been May 2021.

09:54  2        Q.    Do you know what the website use would have

09:54  3   been like in the period after June 2020 and before

09:54  4   May 2021 of your analysis in that yellow highlighted

09:54  5   period?

09:54  6        A.    Yeah.   So between these two time periods, it

09:54  7   would have been a mixture of the old pages and the new

09:54  8   pages.   As we approach May 2021, you would have -- they

09:54  9   would have been able to access less of the old pages as

09:54  10   they would have been replaced by the new pages.

09:54  11        Q.    Okay.   Just to summarize this.   So below the

09:54  12   June 2020 line on Exhibit 467 is when the old website

09:54  13   was in place, right?

09:55  14        A.    That's correct.

09:55  15        Q.    And between the June 2020 line and the

09:55  16   May 2021 line was the transition period between the old

09:55  17   and the new websites that you just described, right?

09:55  18        A.    That's correct.

09:55  19        Q.    And after the May -- or on top of the May 2021

09:55  20   line is after substantial completion of the transition

09:55  21   to the new website had occurred.

09:55  22              Did I get it right?

09:55  23        A.    That's correct.

09:55  24        Q.    Okay.   At a high level, what did your

09:55  25   worldwide sales versus U.S. sales revenue data

09:55  1   comparison show about microchipdirect.com sales in

09:55  2   general during the analysis period?

09:55  3       A.    I mean, generally the data shows that a

09:55  4   substantial portion of the revenue generated on

09:55  5   microchipdirect.com from when the source is -- sorry --

09:55  6   revenue generated on microchipdirect.com when the

09:55  7   source is microchip.com is foreign.

09:55  8       Q.    Okay.  So a large component in the sales of --

09:56  9   revenue was foreign.

09:56  10                  MS. FROST:  Do you mind putting that

09:56  11   exhibit back up, please, Mr. Thompson?

09:56  12   BY MS. FROST:

09:56  13       Q.    Stated as a percentage, if you can, what

09:56  14   percent of the sales revenue you analyzed was from

09:56  15   foreign non-U.S. sales?  So what percentage of this

09:56  16   revenue?

09:56  17       A.    81 percent.

09:56  18       Q.    What percent of the revenue, therefore, you

09:56  19   analyzed was U.S. sales revenue?

09:56  20       A.    19 percent.

09:56  21       Q.    Was the 81 percent and 19 percent non-U.S. and

09:56  22   U.S. calculation made based on the entire amount of

09:56  23   revenue and for the entire time period covered in

09:56  24   Exhibit 467?

09:56  25       A.    Yes.  It's the entire timeline.

—1145—

09:56    1        Q.    Okay.   Now, let me ask you:  What, if

09:56    2    anything, did the results of your worldwide analysis

09:56    3    signify to you with regard to the $215,000-per-day

09:56    4    revenue number you started with?

09:56    5        A.    Sure.   So for this, I just looked at the most

09:56    6    recent time frame, the 2019 data, that's shown in the

09:57    7    table here because it's closest in time to when that

09:57    8    other revenue figure would have been presented.   And it

09:57    9    shows that that $215,000-per-day revenue figure is even

09:57   10    much higher than the worldwide revenue figure

09:57   11    percentage here.

09:57   12             The other thing that we can conclude is

09:57   13    that -- the other thing is that there's -- there's no

09:57   14    way that it can be a U.S.-only number.   It has to be a

09:57   15    worldwide number.   I mean, it's even higher than the

09:57   16    worldwide -- than what we would calculate here for the

09:57   17    2019.   So it can't possibly be U.S. only.

09:57   18        Q.    Okay.   So let's unpack that just a minute.

09:57   19             So what you're saying is that the -- are you

09:57   20    saying that the $215,000-per-day revenue number had to

09:58   21    be a worldwide revenue number?

09:58   22        A.    It has to be a worldwide.   Can't possibly be

09:58   23    U.S. only.

09:58   24        Q.    And looking at the data that you

09:58   25    specifically -- the actual data that you analyzed, are

−1146−

09:58    1    you suggesting that the magnitude of that

09:58    2    $215,000-per-day revenue number was too high?

09:58    3        A.    I think it's even higher than the 2019 data

09:58    4    here.  So it -- it seems -- it does seem to be too

09:58    5    high.

09:58    6        Q.    And why did you look at the 2019 data again?

09:58    7        A.    So it's the closest in time.  So I wanted to

09:58    8    use the data that was closest in time to when that

09:58    9    revenue figure would have been presented.

09:58   10        Q.    Okay.  All right.  Let's --

09:58   11              MS. FROST:  You can take that down,

09:58   12    Mr. Thompson.  Thank you.

09:58   13    BY MS. FROST:

09:58   14        Q.    Let's talk next about the use case that you

09:58   15    said you created in this case.  Okay?

09:58   16        A.    Okay.

09:58   17        Q.    All right.  This is the third example.  We're

09:58   18    in the home stretch.

09:58   19              First, what were you asked to do?

09:58   20        A.    So I was asked to identify all those who might

09:59   21    have made a purchase on microchipdirect.com using the

09:59   22    breadcrumb feature on microchip.com.

09:59   23        Q.    Were you trying to provide an amount of

09:59   24    revenue that could have been generated by sales made at

09:59   25    Microchip --

—1147—

09:59  1      A.    Yeah.  So we were looking --

09:59  2      Q.    -- Direct -- sorry.  Go ahead.

09:59  3            No.  Go ahead.

09:59  4      A.    Yes.  So we were looking at the revenue to

09:59  5   determine the number of -- the sales, I guess outcome

09:59  6   you'd say, from microchipdirect.com.

09:59  7      Q.    So how did you go about responding to the

09:59  8   request and providing the information about that?

09:59  9      A.    I created a use case.

09:59  10     Q.    What is a "use case," as you use that term?

09:59  11     A.    Sure.  Here we're defining use case as a

09:59  12  scenario in which users on the website perform specific

09:59  13  actions.

09:59  14     Q.    Okay.  You sometimes refer to a use case in

10:00  15  your parlance as a "segment"?

10:00  16     A.    Yeah.  In the past, it was referred to as a

10:00  17  segment.

10:00  18     Q.    And what was the purpose of the use case that

10:00  19  you created?

10:00  20     A.    The purpose of the use case was to identify --

10:00  21  was to associate the amount of revenue on

10:00  22  microchipdirect.com with all those who might have used

10:00  23  the breadcrumb feature on microchip.com.

10:00  24     Q.    And what were these people who were using

10:00  25  the -- might have used the breadcrumb feature on

10:00    1   microchip.com doing?  Were they going to make a

10:00    2   purchase on Microchip Direct or...

10:00    3       A.   For all the people that were using -- so I was

10:00    4   attempting to identify anyone who might have used the

10:00    5   breadcrumb feature.  After that -- I mean, the use case

10:00    6   then looked at the amount of revenue that could have

10:00    7   been generated from anyone who might have used the

10:00    8   breadcrumb feature.

10:01    9            I guess I'd add, you know, just because

10:01   10   someone uses the breadcrumb feature, I don't know what

10:01   11   they do afterwards.  But the purpose of the analysis

10:01   12   was to identify any revenue that might have been

10:01   13   associated with the people who might have used the

10:01   14   breadcrumb feature.

10:01   15       Q.   Okay.  And so because you had to -- you were

10:01   16   looking at revenue, you had to see what those users did

10:01   17   on microchipdirect.com?

10:01   18       A.   Yes.  So the breadcrumb feature is on

10:01   19   microchip.com and the e-commerce -- or where you make

10:01   20   the purchases on microchipdirect.com.  So I had to look

10:01   21   at data across two separate websites.

10:01   22       Q.   Okay.  So let me see if I understand what

10:01   23   you're saying -- telling us.

10:01   24            What you were trying to do is to determine all

10:01   25   who might have used the breadcrumb feature on

1149

10:01  1   microchip.com on their way to make a purchase at

10:01  2   microchipdirect.com?

10:01  3        A.    Yeah.  On their way to make a purchase.

10:01  4              So yeah.  I was looking at -- I was trying to

10:01  5   associate the amount of revenue for those who used the

10:01  6   breadcrumb feature on microchip.com with those on their

10:02  7   way to make a purchase at microchipdirect.com.

10:02  8        Q.    All right.  So why did you need to create a

10:02  9   use case in order to provide the requested data?

10:02  10       A.    Sure.  So we don't have functionality -- or we

10:02  11  don't have analytics set up that isolates use of the

10:02  12  breadcrumb feature.

10:02  13       Q.    So why were you not able to isolate the

10:02  14  breadcrumb feature?

10:02  15       A.    Sure.  The way the analytics is set up is I

10:02  16  can only see the next page that someone goes to.  So in

10:02  17  the case where a page has a link that goes -- has more

10:02  18  than one link that goes to the same next page, I'm not

10:02  19  able to tell if they clicked on that link from the top

10:02  20  level navigation, the breadcrumb feature, or the body

10:02  21  of the page.

10:02  22       Q.    So you're able to track the next page someone

10:02  23  would go to but not the link they used to get there.

10:03  24              Do I get it?

10:03  25       A.    That's correct.  If the link appears more than

—1150—

10:03  1    once on the page and it goes to the same next page, I

10:03  2    don't know which of those links they clicked.

10:03  3         Q.   Why, if you know, does Microchip not maintain

10:03  4    analytics to track breadcrumb use on the websites?

10:03  5         A.   It was --

10:03  6         Q.   The website?

10:03  7         A.   Oh, sorry.

10:03  8              It was never considered important.  We never

10:03  9    received any requests for data from the breadcrumb

10:03  10   feature or a request to track the breadcrumb feature.

10:03  11        Q.   Who decides what features to track at

10:03  12   Microchip?  And on what basis do they decide?

10:03  13        A.   So it's largely my team.  And I guess I should

10:03  14   add we never received -- I never received any requests

10:03  15   from Microchip employees to track that feature.

10:03  16              So it's my team and it's based on the requests

10:03  17   we get.

10:03  18        Q.   So let's talk about the use case that you

10:04  19   created.

10:04  20              First, can you please tell us how you are

10:04  21   going to refer to it so you and I are communicating and

10:04  22   jury understands what we're talking about?

10:04  23              What do you call it?

10:04  24        A.   We'll just generally call the use case the

10:04  25   two-page visit analysis.

-1151-

10:04  1      Q.    Okay.  So what was your objective in using the

10:04  2  two-page visit use case?

10:04  3      A.    Sure.  Again, the purpose was to identify --

10:04  4  to associate the amount of revenue with anyone who

10:04  5  might have used their breadcrumb feature on

10:04  6  microchip.com on their way to making a purchase at

10:04  7  microchipdirect.com.

10:04  8      Q.    Was your two-page use case analysis

10:04  9  over-inclusive or under-inclusive?

10:04  10      A.    It was over-inclusive.

10:04  11      Q.    Why do you say it was over-inclusive?

10:04  12      A.    For the reasons that I've just described, I

10:04  13  can't tell whether or not -- when the link -- when

10:04  14  there's a link to the same next page more than once on

10:04  15  a page, I can't tell which one they clicked.

10:04  16            So it's possible that instead of the

10:05  17  breadcrumb, they could have clicked on the top-level

10:05  18  navigation or the -- a link in the body of the page.

10:05  19  So I'm not able to determine which of those links were

10:05  20  clicked on.  So it could include any of those links.

10:05  21      Q.    Okay.  So you included all of those users

10:05  22  because you couldn't tell which one of the links they

10:05  23  actually used, right?

10:05  24      A.    Yeah.  Based on how the analytics is set up, I

10:05  25  had to use -- I used all the links.

—1152—

10:05  1          Q.    Okay.  So there could be people in your use

10:05  2    case who didn't use a breadcrumb at all, right?

10:05  3          A.    That's correct.

10:05  4          Q.    Did you reach any conclusions as a result of

10:05  5    your two-page visit use case analysis?

10:05  6          A.    Yes.

10:05  7          Q.    And what form did your conclusions take?

10:05  8          A.    In an Excel spreadsheet.

10:05  9          Q.    Okay.  Is that Excel spreadsheet part of D-465

10:05  10   in front of you which we were talking about earlier?

10:05  11   And I'll turn your attention to Pages 19 through 23.

10:06  12         A.    Yes.

10:06  13               MS. FROST:  And, Mr. Thompson, if you

10:06  14   want to bring up Page 19, please, of that exhibit.

10:06  15   BY MS. FROST:

10:06  16         Q.    What does your report show?

10:06  17         A.    Sure.  It shows, for people making purchases

10:06  18   in the United States, anyone who might have used the

10:06  19   breadcrumb feature on their way to making a purchase on

10:06  20   Microchip Direct.  And then it shows revenue

10:06  21   figures for that.

10:06  22         Q.    All right.

10:06  23         A.    And e-commerce data.

10:06  24         Q.    Great.  Thanks.

10:06  25               Let's take a look at the results briefly.

10:06  1          First, what parts of the Pages 19 to 23 that

10:06  2  contains your two-page use case analysis pertain to the

10:06  3  old website?

10:06  4      A.    Sure.  It's 19 and 20.

10:06  5      Q.    Okay.  Let's look at -- we're looking, I

10:07  6  believe, at 19 here; is that right?

10:07  7      A.    Yes.  This is 19.

10:07  8      Q.    All right.  First, where on the page here is

10:07  9  the two-page use case you'd been telling us about?

10:07 10      A.    So it's the first part on the left side, under

10:07 11  the -- where it says:  Two design center page visits.

10:07 12      Q.    Okay.  So the data on the right side of the

10:07 13  page --

10:07 14              MS. FROST:  Which we can take down.

10:07 15              Highlight, Mr. Thompson.

10:07 16  BY MS. FROST:

10:07 17      Q.    -- that's not part of the two-page use case,

10:07 18  is it?

10:07 19      A.    That's not part of the two-page visit analysis

10:07 20  use case.

10:07 21      Q.    Great.  Is the data presented on the two-page

10:07 22  use case analysis on a per-month basis?

10:07 23      A.    Yes.

10:07 24      Q.    Let's run through the spreadsheet very

10:07 25  quickly, focusing on one month.  Okay?

—1154—

| | | |
|---|---|---|
| 10:07 | 1 | A.    Okay. |
| 10:07 | 2 | Q.    And would October 2019 be a representative |
| 10:07 | 3 | month we could use? |
| 10:07 | 4 | A.    Yes.  That's the first row of data. |
| 10:08 | 5 | Q.    Okay.  So let's go from reading left to right |
| 10:08 | 6 | across the top.  Tell us, please, what country the |
| 10:08 | 7 | first column Country signifies. |
| 10:08 | 8 | A.    Sure.  Country indicates that the person who |
| 10:08 | 9 | made the purchase made the purchase from the United |
| 10:08 | 10 | States.  That's, again, based on their -- the IP |
| 10:08 | 11 | address of the person that made the purchase. |
| 10:08 | 12 | Q.    Okay.  And, again, is that a Google Analytics |
| 10:08 | 13 | determination? |
| 10:08 | 14 | A.    Yes.  So, again, Google Analytics processes |
| 10:08 | 15 | the IP address to determine the location of the user. |
| 10:08 | 16 | Q.    Okay.  Moving to the right.  We have Date 1 |
| 10:08 | 17 | and Date 2. |
| 10:08 | 18 |      What is that? |
| 10:08 | 19 | A.    Sure.  I know it's not visible here.  Date 1 |
| 10:08 | 20 | is the first day of the month.  Date 2 is the end date |
| 10:08 | 21 | of the month.  So this is just representing that |
| 10:08 | 22 | there's a full month of data for each row.  As we |
| 10:08 | 23 | discussed, it's broken out monthly. |
| 10:08 | 24 | Q.    Okay.  Next, moving over to the right, is |
| 10:08 | 25 | Product Revenue. |

```
10:08   1              What does Product Revenue signify or
10:09   2    represent?
10:09   3         A.    Product Revenue is the overall total amount of
10:09   4    revenue from product purchases made on
10:09   5    microchipdirect.com.
10:09   6         Q.    And is this revenue from all the products
10:09   7    purchased in your use case for that month that's being
10:09   8    shown there?
10:09   9         A.    Yeah.  This would be for the use case if we're
10:09   10   looking at the first row for October.  This would be
10:09   11   all the product revenue from October for people that
10:09   12   met the conditions of the use case.
10:09   13        Q.    Okay.  So let's look at Unique Purchases.
10:09   14              What does that signify?
10:09   15        A.    Unique purchases is the total number of
10:09   16   products.  So you might think of it as product types.
10:09   17              So an example here is that if you have six
10:09   18   baseballs and two bats and that's the purchase, they're
10:09   19   two different product types, balls and bats.  So that
10:09   20   would be two here for unique purchases.
10:09   21        Q.    And the Quantity column?  What does that
10:10   22   represent?
10:10   23        A.    Quantity is the number of units purchased.
10:10   24              So going back to the example of six balls and
10:10   25   two bats, there would be -- that would result in a
```

—1156—

10:10  1   quantity or a number of units of eight.

10:10  2        Q.    Okay.  Average Price, the next column.  What

10:10  3   is that?

10:10  4        A.    Average Price is the average price of the

10:10  5   units or quantity here.

10:10  6        Q.    And finally on the Average Quantity, what does

10:10  7   that column represent?

10:10  8        A.    Sure.  Average Quantity is the average number

10:10  9   of units per product.

10:10  10        So going back to my example of six balls and

10:10  11   two bats, we have two products and eight units.  So it

10:10  12   would be eight divided by two is four.  So in this case

10:10  13   it would be an average quantity of four.

10:10  14        Q.    Okay.  Let's go back to Product Revenue for

10:10  15   just a minute.  I just want to make sure we're clear

10:11  16   here.  Is the product revenue of $353.46 shown under

10:11  17   Product Revenue for October 2019, is that the amount of

10:11  18   revenue that could have been generated by sales made at

10:11  19   microchipdirect.com from the use of the breadcrumb

10:11  20   feature on microchip.com?

10:11  21        A.    It includes anyone who might have used the

10:11  22   breadcrumb feature.  And just to be clear, anyone who

10:11  23   did use the breadcrumb feature is included here.

10:11  24        We just -- since it's over-inclusive, we're

10:11  25   not sure if they used a different link to get to -- to

—1157—

10:11  1   satisfy the conditions of the use case and then make a

10:11  2   purchase.

10:11  3       Q.    Okay.  But that's the revenue number that you

10:11  4   isolated that was attributable to all the people who

10:11  5   might be using a breadcrumb feature on microchip.com in

10:12  6   the process of getting to microchipdirect.com to make a

10:12  7   purchase, right?

10:12  8       A.    That's correct.

10:12  9       Q.    Okay.  How did you create this spreadsheet?

10:12  10      A.    I used a default report from the e-commerce

10:12  11  tracking and Google Analytics for -- from -- when

10:12  12  looking at microchipdirect.com.

10:12  13      Q.    Is the terminology used on this spreadsheet

10:12  14  like Unique Purchaser and so forth, is that your

10:12  15  terminology?  Or is that from Google Analytics?

10:12  16      A.    That comes from Google Analytics.

10:12  17      Q.    I notice on Page 19 some fields that have no

10:12  18  data.  Like I think February 2021, for example.

10:12  19            Do you see that?

10:12  20      A.    Yes.

10:12  21      Q.    Why do those fields not have any data?

10:12  22      A.    These people did not meet the conditions for

10:12  23  the use case and, therefore, there's no revenue.

10:12  24      Q.    So there's no revenue that was generated from

10:12  25  anyone who might have used the breadcrumb feature on

10:13   1    microchip.com on their way to make a purchase on
10:13   2    microchipdirect.com in that month or those months?
10:13   3        A.    That's correct.
10:13   4        Q.    Okay.  Dr. Wolf, I think that's all I have for
10:13   5    you right now.  Thank you.
10:13   6              MS. FROST:  Pass the witness.
10:13   7              THE WITNESS:  Thank you.
10:13   8                    CROSS-EXAMINATION
10:13   9    BY MR. CHAN:
10:13  10        Q.    Good afternoon, Dr. Wolf.
10:13  11        A.    Hi, Mr. Chan.
10:13  12        Q.    Have we met before?
10:13  13        A.    Yes.  You conducted my deposition, I'm going
10:13  14    to say, over -- a little over seven months ago.
10:13  15        Q.    Good to see you again.
10:13  16        A.    You too.
10:13  17        Q.    I have a couple of questions.  And let's start
10:13  18    with what you just testified to about the spreadsheets.
10:13  19              Now, these spreadsheets that you generated are
10:13  20    for Active Path, correct?
10:14  21        A.    I don't know what you mean by "Active Path."
10:14  22              MS. FROST:  Objection, Your Honor.
10:14  23    BY MR. CHAN:
10:14  24        Q.    Are they for the breadcrumb?
10:14  25              MS. FROST:  Objection, Your Honor.

1159

| | | |
|---|---|---|
| 10:14 | 1 | Calling for claim construction and -- |
| 10:14 | 2 | THE COURT:  Overruled. |
| 10:14 | 3 | BY MR. CHAN: |
| 10:14 | 4 | Q.    You may answer. |
| 10:14 | 5 | A.    Some of them are for the breadcrumb feature. |
| 10:14 | 6 | Q.    Okay.  So how often during your career have |
| 10:14 | 7 | you made spreadsheets for Active Path? |
| 10:14 | 8 | A.    Again, I don't know what you mean by "Active |
| 10:14 | 9 | Path." |
| 10:14 | 10 | Q.    Are you aware Active Path is part of this |
| 10:14 | 11 | case? |
| 10:14 | 12 | A.    I am now. |
| 10:14 | 13 | Q.    Okay.  Are you aware of the term "breadcrumb"? |
| 10:14 | 14 | A.    Yes. |
| 10:14 | 15 | Q.    Okay.  How often during your career have you |
| 10:14 | 16 | made spreadsheets for breadcrumb? |
| 10:14 | 17 | A.    Outside of -- outside of this case, never. |
| 10:14 | 18 | Q.    Okay.  Now, let's talk about the timeline. |
| 10:14 | 19 | Before I took your deposition, you produced |
| 10:14 | 20 | some spreadsheets, correct? |
| 10:15 | 21 | Do you remember that? |
| 10:15 | 22 | A.    Yes. |
| 10:15 | 23 | Q.    To be clear, they're not the spreadsheets that |
| 10:15 | 24 | you testified to today; am I correct? |
| 10:15 | 25 | A.    No. |

—1160—

10:15   1        Q.    No, as in they are the same?  Or they're

10:15   2   different?

10:15   3        A.    They're different.

10:15   4        Q.    Okay.  Now, I took your deposition.  You never

10:15   5   made those available for your deposition.  So now after

10:15   6   I took your deposition, you then produced them,

10:15   7   correct?

10:15   8               THE COURT:  Counsel, when he produced

10:15   9   anything is of no concern to the jury.  You need to

10:15   10  move on to something else.

10:15   11              MR. CHAN:  Understood.  Thank you, Your

10:15   12  Honor.

10:15   13  BY MR. CHAN:

10:15   14       Q.    Now, these spreadsheets were not created in

10:15   15  Microchip's ordinary course of business; am I correct?

10:15   16       A.    They were created from -- as I understand it,

10:16   17  many of these spreadsheets were created based on a

10:16   18  broad request of data made by the plaintiffs.

10:16   19       Q.    Okay.  So I understand.

10:16   20              But these spreadsheets are not kept in the

10:16   21  ordinary course of business at Microchip; am I correct?

10:16   22       A.    I don't know whether I would classify that

10:16   23  work as ordinary course of business or not.

10:16   24       Q.    Well, would it be safe to say that you

10:16   25  prepared them just for this litigation?

```
10:16   1        A.    Yes.  Yeah.  These -- these were prepared for
10:16   2   this case.
10:16   3        Q.    Okay.  Is my understanding correct that
10:16   4   Microchip uses Google Analytics, which I believe you
10:16   5   already testified to, to track web traffic on the
10:16   6   websites?
10:16   7        A.    Yeah.  We use Google Analytics to track
10:16   8   behaviors performed on our websites.
10:16   9        Q.    Okay.  So these analytics are provided by
10:16  10   Google?
10:17  11        A.    I mean, some are.
10:17  12        Q.    Okay.  Which one is provided by Google?
10:17  13        A.    You want me to go through them?
10:17  14        Q.    Sure.
10:17  15        A.    Okay.  I think it's most.
10:17  16              So let's see.  Looking at Exhibit D-465 --
10:17  17        Q.    Okay.
10:17  18        A.    -- Page 1, Google; Page 2, Google; Page 3,
10:17  19   Google; Page 4, Google --
10:17  20        Q.    How about this?  Let me make this easy.  Which
10:17  21   one did you prepare that is not prepared or provided by
10:17  22   Google?
10:17  23        A.    Okay.  It's Page 9 and Page 10.  That's it.
10:18  24   Page 9 and 10 of D-465.
10:18  25        Q.    And 9 and 10 reflect the -- what do they
```

-1162-

10:18  1    reflect?

10:18  2         A.    Okay.   These reflect file downloads from

10:18  3    microchip.com.   So the number of times that files were

10:18  4    downloaded.

10:18  5         Q.    So other than file downloads, everything is

10:18  6    provided by Google?

10:18  7         A.    Yes.   That's correct.

10:18  8         Q.    Okay.   Dr. Wolf, you don't track the analytics

10:18  9    such as what products are sold on microchip.com,

10:18  10   correct?

10:18  11        A.    So we don't sell products on microchip.com.   I

10:18  12   don't understand the question.

10:18  13        Q.    I think you testified for a shopping cart,

10:18  14   right?

10:18  15        A.    We have -- there is a shopping cart icon on

10:19  16   microchip.com.   But I still don't follow the earlier

10:19  17   question where you're asking --

10:19  18        Q.    What if I say you don't track any products,

10:19  19   you know, being clicked on or selected and then put in

10:19  20   the shopping cart?

10:19  21        A.    Oh, I understand the question.   No.

10:19  22        Q.    Okay.   Let's talk about these spreadsheets.

10:19  23              In generating these spreadsheets, you applied

10:19  24   certain methodologies, correct?

10:19  25        A.    I don't know what you mean by methodology.

1163

| | | |
|---|---|---|
| 10:19 | 1 | Q.    Well, I think earlier you testified to the |
| 10:19 | 2 | work constraint? |
| 10:19 | 3 | A.    A constraint. |
| 10:19 | 4 | Q.    Right?  So you -- |
| 10:19 | 5 | A.    Yeah.  It had to meet the constraints of the |
| 10:19 | 6 | use case?  Or a segment, is what we've discussed in the |
| 10:19 | 7 | past. |
| 10:19 | 8 | Q.    Okay.  So you apply certain constraints to the |
| 10:19 | 9 | analytics in coming up with the data in these |
| 10:19 | 10 | spreadsheets? |
| 10:19 | 11 | A.    For the use case.  I guess all of them have |
| 10:19 | 12 | some kind of constraint.  Yeah.  Yeah.  That's -- oh, |
| 10:19 | 13 | well, there might be some -- well, for Google |
| 10:20 | 14 | Analytics.  I think it's true in all cases. |
| 10:20 | 15 | Q.    Okay.  You didn't approach anyone to confirm |
| 10:20 | 16 | whether your constraints were accurate; am I right? |
| 10:20 | 17 | A.    Let me think about that.  I mean, we did |
| 10:20 | 18 | discuss these during the deposition, but I did not -- |
| 10:20 | 19 | otherwise I would hesitate to answer, because it would |
| 10:20 | 20 | call for privileged information. |
| 10:20 | 21 | Q.    Okay.  But outside of your lawyers, you |
| 10:20 | 22 | haven't confirmed with anyone that your constraints are |
| 10:20 | 23 | accurate? |
| 10:20 | 24 | A.    Other than the questions that you asked me at |
| 10:20 | 25 | the deposition, no. |

—1164—

10:20  1        Q.    But we already established that the
10:20  2   spreadsheets that we talked about at your deposition
10:20  3   are not the same as these spreadsheets, correct?
10:20  4        A.    They -- so what happened there is there was a
10:20  5   lot of spreadsheets provided before.  And these are
10:21  6   just revisions of what was provided at the -- what was
10:21  7   available at the deposition, I believe, except for
10:21  8   maybe -- well, let's say for 465, the entirety of the
10:21  9   series of analyses from 465, this was all requested
10:21  10  by -- was part of a broad request from the plaintiffs.
10:21  11  So I'm not --
10:21  12       Q.    Sir, I'm just looking for a yes or no.  So
10:21  13  these are two different sets of spreadsheets, and you
10:21  14  didn't verify with anyone that the constraints applied
10:21  15  to the new spreadsheets are accurate; am I correct?
10:21  16       A.    So they largely include the --
10:21  17       Q.    You can qualify your answer when your
10:21  18  counsel --
10:21  19              THE COURT:  Counsel, let him -- I'll
10:21  20  direct him.  You don't tell the witness how to answer.
10:21  21  I'll take care of the courtroom.
10:21  22              MR. CHAN:  Yes, Your Honor.
10:21  23       A.    So these spreadsheets largely have -- are --
10:21  24  just include revisions, as I understand it, that were
10:21  25  requested by the plaintiffs.  They're largely similar

—1165—

10:22  1     to versions that were available before the deposition.

10:22  2     BY MR. CHAN:

10:22  3         Q.    Okay.  You didn't verify with anyone outside

10:22  4     of Microchip that the constraints that you used to

10:22  5     derive the spreadsheets are accepted practices; am I

10:22  6     correct?

10:22  7         A.    So no.  I didn't verify with another Microchip

10:22  8     employee that the -- about the constraints applied here

10:22  9     in these analyses.

10:22  10        Q.    What about outside of Microchip?

10:22  11        A.    Well, again, these were presented at the

10:22  12    deposition and they are largely -- they're revisions of

10:22  13    previous analyses.  And the revisions were requested,

10:22  14    as I understand it, from the plaintiffs.

10:22  15        Q.    Well, did you produce DTX-467 at your

10:22  16    deposition?

10:22  17        A.    That's the exception.  That was -- I don't

10:22  18    recall that we reviewed that during the deposition.

10:22  19        Q.    Okay.  At least for DTX-467 you didn't verify

10:22  20    with anyone that the constraints you applied were

10:23  21    accepted practices?

10:23  22        A.    Let me think.  If we're -- since I was

10:23  23    referring to the previous exhibit for this one, again,

10:23  24    I would hesitate to answer.  Because you said anyone.

10:23  25    You know, because it would call for privileged

10:23  1    information.

10:23  2        Q.    But you would agree with me that your choices

10:23  3    of data and the assumptions applied affects the results

10:23  4    in these spreadsheets, correct?

10:23  5        A.    For -- we're talking about D-467 or all of

10:23  6    them?

10:23  7        Q.    All the spreadsheets.

10:23  8        A.    Yeah.  I would say that these -- this data has

10:23  9    a bearing in this case.

10:23  10       Q.    So I don't think I got the answer that I

10:23  11   wanted, but --

10:23  12       A.    Oh.  Sorry.

10:23  13       Q.    So would you agree with me that the choices of

10:23  14   data and the assumptions applied to these spreadsheets

10:23  15   affect the results?

10:23  16       A.    Yes.  That is true.

10:23  17       Q.    Now, Google didn't produce the results in

10:24  18   these spreadsheets, right?

10:24  19       A.    The results in these spreadsheets come from

10:24  20   Google Analytics.

10:24  21       Q.    You mean the raw data came from Google?

10:24  22       A.    Yes.

10:24  23       Q.    But the results, that is the results of the

10:24  24   constraint you applied, didn't come from Google; am I

10:24  25   right?

—1167—

10:24  1       A.     I don't understand the distinction you're

10:24  2   drawing there.

10:24  3       Q.     Okay.  Would you agree with me how you choose

10:24  4   to analyze the raw data from Google affects the results

10:24  5   in these spreadsheets?

10:24  6       A.     Yes.

10:24  7       Q.     Okay.  Now, earlier you testified to the

10:24  8   revenues in DTX-467.  And I believe you said they

10:24  9   include sales for the old website; is that correct?

10:24  10      A.     I'm sorry.  I didn't catch that first part.

10:24  11      Q.     Sure.  Let me repeat myself.

10:24  12             So earlier you testified to Defendant

10:24  13  Exhibit 467, that it includes revenues from the old

10:24  14  website.

10:24  15             Do you remember that?

10:24  16      A.     Oh, yes.  Yes.  I understand.

10:25  17      Q.     Okay.  When I took your deposition, isn't it

10:25  18  true that you said --

10:25  19             THE COURT:  Counsel.

10:25  20             MR. CHAN:  Let me rephrase.

10:25  21  BY MR. CHAN:

10:25  22      Q.     Did you ever have access to the old websites?

10:25  23      A.     Yes.

10:25  24             MR. CHAN:  Mr. Gooden, can you pull up

10:25  25  PTX-44.045, Page 157, Lines 4 to 8 for the jury,

1168

| | | |
|---|---|---|
| 10:25 | 1 | please? |
| 10:25 | 2 | Sure.  PTX-44.045 at 157, Lines 4 to 8. |
| 10:25 | 3 | BY MR. CHAN: |
| 10:26 | 4 | Q.   I asked you:  So in connection with the |
| 10:26 | 5 | preparation of this spreadsheet, did you not analyze |
| 10:26 | 6 | the old website? |
| 10:26 | 7 | Your response:  I don't have access to the old |
| 10:26 | 8 | website.  It doesn't exist anymore. |
| 10:26 | 9 | Was that your testimony under oath? |
| 10:26 | 10 | A.   Yes.  That's correct. |
| 10:26 | 11 | MS. FROST:  Your Honor, I don't think the |
| 10:26 | 12 | witness has a copy of his deposition at the bench. |
| 10:26 | 13 | THE COURT:  Let's just keep going ahead. |
| 10:26 | 14 | That's fine. |
| 10:26 | 15 | Is there some other part of the |
| 10:26 | 16 | deposition you want to read in that you think needs to |
| 10:26 | 17 | complete -- |
| 10:26 | 18 | MS. FROST:  No, Your Honor.  I was just |
| 10:26 | 19 | mentioning that. |
| 10:26 | 20 | THE COURT:  Okay. |
| 10:26 | 21 | MR. CHAN:  May I approach, Your Honor? |
| 10:26 | 22 | THE COURT:  Yes. |
| 10:26 | 23 | MR. CHAN:  Thank you. |
| 10:26 | 24 | BY MR. CHAN: |
| 10:27 | 25 | Q.   Dr. Wolf, am I also correct that these |

—1169—

```
10:27   1    spreadsheets don't include any data for the Forum
10:27   2    section?
10:27   3        A.    Yes.  That's correct.  Well -- yes.  Yes.
10:27   4    That's correct.
10:27   5        Q.    Thank you.
10:27   6              Now, Microchip deleted all its analytics in
10:27   7    December 2019 because of privacy concern; is that
10:27   8    correct?
10:27   9        A.    No.  That's not correct.
10:27  10        Q.    Well, did you not test --
10:28  11              MR. CHAN:  Mr. Gooden, can you pull up
10:28  12    PTX-44.074 at Page 273, Lines 8 to 12?
10:28  13    BY MR. CHAN:
10:28  14        Q.    I asked you:  Do you know of the approximate
10:28  15    time frame of when Microchip complied with Google's
10:28  16    requirement to remove certain data?
10:28  17              Your response:  Yes.  The data deletion was
10:28  18    performed on -- and I should say in December 2019.
10:28  19              MS. FROST:  Your Honor, I object.  That's
10:28  20    improper impeachment.  It's hearsay.
10:28  21              THE COURT:  Overruled.
10:28  22    BY MR. CHAN:
10:28  23        Q.    That was your testimony, correct?
10:28  24        A.    Yeah.  So let me describe what happened.
10:29  25    So --
```

—1170—

10:29   1                    THE COURT:  No.

10:29   2                    THE WITNESS:  No?  I'm sorry.

10:29   3                    THE COURT:  Just -- your lawyers will be

10:29   4       able to -- if they feel like you need to give an

10:29   5       explanation, they'll be able to do that.

10:29   6       BY MR. CHAN:

10:29   7          Q.    So would it be accurate to say these

10:29   8       spreadsheets don't capture all the data for the past

10:29   9       six years before the suit was filed?

10:29   10         A.    So we could go through these spreadsheets.

10:29   11      The data deletion I don't believe impacted any of these

10:29   12      spreadsheets.

10:29   13         Q.    So your testimony is even though there's

10:29   14      missing data, your spreadsheets were still accurate?

10:29   15         A.    I believe you're taking the comment or the

10:29   16      testimony I made there out of context.  There are other

10:29   17      constraints, one of which I've already testified to

10:29   18      regarding when we set up e-commerce tracking, that

10:29   19      prevented us from tracking that data.

10:29   20                    We could go through each one, one by one, but

10:29   21      I don't believe that that data removal affected any of

10:30   22      the data in any of these spreadsheets.

10:30   23         Q.    Okay.  Let's talk about microchip.com.  I

10:30   24      think you gave a lot of testimonies on that.

10:30   25                    So let's talk about another way someone can go

—1171—

10:30   1    from microchip.com to microchipdirect.com, fair?

10:30   2        A.    Okay.

10:30   3        Q.    A user can spend a lot of time navigating

10:30   4    around microchip.com.

10:30   5              Are we on the same page?

10:30   6        A.    Theoretically.

10:30   7        Q.    They can explore the websites, right?

10:30   8        A.    Theoretically.

10:30   9        Q.    They can follow the navigation, right?

10:30  10        A.    When you say "follow the navigation," I'm not

10:30  11    sure which feature --

10:30  12        Q.    They can follow top navigation, right, or the

10:30  13    Active Path?

10:30  14        A.    Again, I'm not familiar with what "Active

10:30  15    Path" means.  They can click on links from the

10:30  16    top-level navigation.

10:30  17        Q.    Okay.  Let's use this top navigation example.

10:30  18              They can follow the top navigation, correct?

10:30  19        A.    I would say they'd be clicking on links from

10:30  20    the top-level navigation.  I don't know what you mean

10:31  21    by "following" it.

10:31  22        Q.    Okay.  When they're clicking on the top

10:31  23    navigation, it generates links.

10:31  24              Is that your understanding?

10:31  25        A.    I wouldn't characterize it as generating

−1172−

10:31  1    links.  You know, they can access a menu of available

10:31  2    links.

10:31  3         Q.   Okay.  Microchip would create those links for

10:31  4    the users?

10:31  5         A.   Yes.

10:31  6         Q.   Okay.  For example, it could include drop-down

10:31  7    menus?

10:31  8         A.   Yeah.  The top-level navigation is a series of

10:31  9    drop-down menus.

10:31  10        Q.   Okay.  Now, they can spend a lot of time on

10:31  11   the website learning about products, right?

10:31  12        A.   Theoretically.  Yeah.

10:31  13        Q.   And then they can set that aside, go get

10:31  14   coffee, right, go to bed, then write a report and then

10:31  15   share with a team, right?

10:31  16             All of which, you know, happens during part of

10:31  17   this navigation, fair?

10:32  18             Are we on the same page?

10:32  19        A.   Yeah.  I just find the characterization of

10:32  20   them leaving the website and then getting coffee and

10:32  21   coming back as part of the navigation as -- it's just

10:32  22   an odd way to state that.  I don't really follow --

10:32  23        Q.   You would agree with me that users can

10:32  24   actually do something else in the middle of navigating

10:32  25   the website?

10:32   1          A.     Yeah.   Yeah.

10:32   2          Q.     Okay.   And sometime later that user or someone

10:32   3     else -- okay.   Let's talk about that.

10:32   4                 At that point in time, they can leave the

10:32   5     website, period, right?   It's not part of the

10:32   6     navigation, correct?

10:32   7                      MS. FROST:   Your Honor, this is all

10:32   8     calling for speculation.   Objection.

10:32   9                      THE COURT:   He's asking him whether he

10:32   10    knows or not.   Overruled.

10:32   11         A.    I'm having trouble following the

10:32   12    characterization of them leaving the website as part of

10:32   13    them navigating the website.

10:33   14                 So the way I would describe it, someone can

10:33   15    access the website and then they can leave the website.

10:33   16    I mean, that's possible.

10:33   17         Q.    And they can also use the website, navigate

10:33   18    around the website, and then leave the website, right?

10:33   19         A.     Yes.   Yeah.   That's correct.

10:33   20         Q.    And that would not be part of your navigation

10:33   21    data in your spreadsheets?

10:33   22         A.    We can see the behaviors that they performed

10:33   23    on the website, and we can see the page that they

10:33   24    exited from the website.   Once they're on another

10:33   25    website, we can't track what they do on that other

10:33    1    website.

10:33    2        Q.    Okay.  Let me make sure I understand.

10:33    3            Let's go back to the same scenario, a user can

10:33    4    browse around a website, navigate, right?  We're all

10:33    5    clear of that.

10:33    6            And then sometime later, those users can go to

10:33    7    microchipdirect.com, fair?

10:33    8        A.    Yes.  Yeah.  Yeah.

10:33    9        Q.    And they can get there through Google, right?

10:33   10        A.    I think it -- either they would navigate from

10:33   11    microchip.com to microchipdirect.com, or they would use

10:34   12    Google to go to microchipdirect.com.

10:34   13        Q.    Okay.

10:34   14        A.    I mean, it's possible they could do both, I

10:34   15    suppose.  But that's -- it doesn't make sense to me

10:34   16    that someone would do both.

10:34   17        Q.    Okay.  But you're not disputing that they can,

10:34   18    you know, go to microchipdirect.com through Google then

10:34   19    at that point in time?

10:34   20        A.    No.  I mean, they would be -- it just -- it

10:34   21    would be an odd use case for someone to be on

10:34   22    microchip.com and then to decide to use Google to go to

10:34   23    microchipdirect.com to access microchipdirect.com.  You

10:34   24    know, it's not something I've ever seen.

10:34   25        Q.    Okay.  And then at that point in time, they

10:34    1    can buy stuff on microchipdirect.com, right?

10:34    2         A.    Once you're on microchipdirect.com, you can

10:34    3    buy stuff.

10:34    4         Q.    And that user is not captured in these

10:34    5    spreadsheets; am I correct?

10:34    6         A.    So the scenario that you're sharing is that

10:35    7    someone's on microchip.com and then they use Google to

10:35    8    go to microchipdirect.com to make a purchase, and then

10:35    9    is that included in these spreadsheets?  No.

10:35   10         Q.    Okay.  And, again, if I'm on

10:35   11    microchipdirect.com, navigate, and then suddenly leave,

10:35   12    that data is also not part of the spreadsheets; am I

10:35   13    right?

10:35   14         A.    If you're on microchipdirect.com and you

10:35   15    leave, we don't have -- I don't think we have something

10:35   16    specifically showing that.

10:35   17         Q.    Okay.  Now, you mentioned e-commerce tracking

10:35   18    software for microchipdirect.com.

10:35   19               Do you remember that?

10:35   20         A.    Yes.

10:35   21         Q.    There's -- no such software exists for

10:35   22    microchip.com, right?

10:35   23         A.    So, I mean, you can add e-commerce tracking to

10:35   24    any -- it would be called property, but we'll call it

10:36   25    any website for -- through Google Analytics.  It

—1176—

10:36  1    wouldn't make sense to add e-commerce tracking for a

10:36  2    website that doesn't, you know, doesn't sell products.

10:36  3          So, I mean, it's certainly available, but it

10:36  4    doesn't make sense to set it up.

10:36  5    Q.    Dr. Wolf, you don't know how revenues in

10:36  6    DTX-467 -- this is the second exhibit that you talked

10:36  7    about earlier -- relate to infringement in this case;

10:36  8    am I right?

10:36  9    A.    The avenues, you said?

10:36  10   Q.    The revenues.

10:36  11   A.    Oh, the revenues.

10:36  12   Q.    Right.

10:36  13         You don't know how the revenues in DTX-467

10:36  14   relate to infringement in this case, correct?

10:36  15   A.    No.

10:36  16   Q.    Okay.  So you haven't considered that web

10:36  17   servers are located or maintained in the U.S. before

10:36  18   generating this data; am I right?

10:37  19   A.    I don't know what you're referring to, so I

10:37  20   don't feel I can agree about the server part of this

10:37  21   statement.

10:37  22   Q.    Okay.  You haven't spoken with Ms. Mahar about

10:37  23   where the servers are located; am I right?

10:37  24   A.    No.

10:37  25   Q.    So when generating this data, you have no idea

—1177—

10:37   1   how they relate to infringement in this case?

10:37   2       A.    That's correct.  Yes.

10:37   3       Q.    Okay.  Just to confirm, you're not a legal or

10:37   4   damages expert, correct?

10:37   5       A.    No.  I'm not an expert in legal or damages.

10:37   6       Q.    You're not a patent expert either, right?

10:37   7       A.    No.

10:37   8       Q.    And it's safe to say that you don't really

10:37   9   understand the legal basis of the claims of patent

10:37   10  infringement in this litigation; am I right?

10:37   11      A.    That is correct.

10:37   12      Q.    Okay.

10:37   13             MR. CHAN:  No further questions.  I pass

10:37   14  the witness.

10:37   15             MS. FROST:  I have just a few.

10:37   16                 REDIRECT EXAMINATION

10:37   17  BY MS. FROST:

10:38   18      Q.    Dr. Wolf, did you need to verify your

10:38   19  constraints that you were using in your analytics

10:38   20  function here with anybody?

10:38   21      A.    No.  Largely they were based on the requests I

10:38   22  received, as I understand it, requests from the

10:38   23  plaintiffs.

10:38   24      Q.    And isn't the type of analysis that you

10:38   25  performed and analytics that you provided in response

—1178—

| | | |
|---|---|---|
| 10:38 | 1 | to those requests what you do every day, all the time? |
| 10:38 | 2 | A.    Yes. |
| 10:38 | 3 | Q.    Okay. |
| 10:38 | 4 | A.    I use Google Analytics a lot. |
| 10:38 | 5 | Q.    And if there was some suggestion that you took |
| 10:38 | 6 | the data from Google Analytics and then manipulated it |
| 10:38 | 7 | or interpreted it for making these spreadsheets, that |
| 10:38 | 8 | wouldn't be accurate, would it? |
| 10:38 | 9 | A.    That's not accurate.  In fact, I tried to |
| 10:39 | 10 | minimize anything that I needed to do.  And whenever |
| 10:39 | 11 | possible, I just tried to download the data from Google |
| 10:39 | 12 | Analytics so that it could be shared with as little |
| 10:39 | 13 | manipulation of the data that I had to perform.  I |
| 10:39 | 14 | tried to minimize that as much as possible. |
| 10:39 | 15 | Q.    And so did -- in, for example, your use case, |
| 10:39 | 16 | did you not just copy or cut and paste from Google |
| 10:39 | 17 | Analytics to create that analysis spreadsheet? |
| 10:39 | 18 | A.    Yes.  That was copy and paste. |
| 10:39 | 19 | Q.    And Mr. Chan asked you something about whether |
| 10:39 | 20 | the spreadsheets that you were using today were the |
| 10:39 | 21 | same or different than the ones that you used in your |
| 10:39 | 22 | deposition. |
| 10:39 | 23 | Isn't it a fact that those spreadsheets that |
| 10:39 | 24 | you used today were updates of the spreadsheets you |
| 10:39 | 25 | used in the deposition? |

—1179—

10:39  1      A.    Yes.  I mean, they were largely updates of

10:39  2   what had been provided.  Yes.

10:39  3      Q.    Okay.  And do you recall at any time being

10:39  4   asked to update that information by Mr. Chan himself?

10:40  5      A.    He did request that frequently during the

10:40  6   deposition.

10:40  7      Q.    So let's talk about one more thing, and that

10:40  8   is your access to the website, the 2018 old website.

10:40  9          The questions you were asked today by Mr. Chan

10:40  10  and the deposition testimony he showed you dealt with

10:40  11  whether you had analyzed the old website, right?

10:40  12     A.    Yes.  That's correct.

10:40  13     Q.    Okay.  And the question here was whether you

10:40  14  had access to the old data.

10:40  15          It's a different question, isn't it?

10:40  16     A.    That's correct.  Yes.

10:40  17     Q.    I think that's all I have.  Thank you,

10:40  18  Dr. Wolf.

10:40  19                MS. FROST:  Pass the witness, Your Honor.

10:40  20                MR. CHAN:  No further questions.

10:40  21                THE COURT:  You may step down, sir.

10:40  22                May he be released?

10:40  23                MS. FROST:  Yes.  He may.

10:40  24                THE COURT:  They get to tell me.

10:41  25                MR. DEVLIN:  Yes, Your Honor.  Thank you.

―1180―

```
10:41   1              THE COURT:  You're free to stay in the
10:41   2    courtroom now, or you're free to go about your
10:41   3    business, whatever you care to do.
10:41   4              THE WITNESS:  Thank you, Your Honor.
10:41   5              THE COURT:  Ladies and gentlemen of the
10:41   6    jury, we're going to take our morning recess of 10 or
10:41   7    15 minutes.  And then we will resume.
10:41   8              Please remember my instructions not to
10:41   9    discuss the case amongst yourselves.
10:41  10              THE BAILIFF:  All rise.
10:41  11              (Jury exited the courtroom.)
10:41  12              THE COURT:  Thank you.  You may be
10:41  13    seated.
10:41  14              Is there anything we need to take up?
10:41  15    The next witness will be the damages expert?
10:41  16              MR. JENSEN:  We intend to play a short
10:41  17    video clip and call Mr. Moehrle.  I think we have
10:41  18    something to discuss with the plaintiff about that.
10:41  19              THE COURT:  About how long is the depo?
10:41  20              MR. JENSEN:  It's six, seven minutes.
10:41  21              THE COURT:  Okay.
10:41  22              MR. DEVLIN:  There's a little
10:41  23    miscommunication we're going to talk about on the
10:41  24    break, Your Honor.
10:41  25              THE COURT:  Okay.  And after the
```

1181

| | | |
|---|---|---|
| 10:41 | 1 | deposition? |
| 10:42 | 2 | MR. JENSEN:  Yes.  Then our damages |
| 10:42 | 3 | expert. |
| 10:42 | 4 | THE COURT:  Okay.  And then that's your |
| 10:42 | 5 | last witness? |
| 10:42 | 6 | MR. JENSEN:  That's correct. |
| 10:42 | 7 | THE COURT:  Okay.  And then what we'll do |
| 10:42 | 8 | this afternoon is we will -- |
| 10:42 | 9 | So about how long will your damages |
| 10:42 | 10 | witness be? |
| 10:42 | 11 | MR. ADAMS:  Hour, I believe, Your Honor. |
| 10:42 | 12 | THE COURT:  Okay.  I'm going to give the |
| 10:42 | 13 | jury probably two hours for lunch.  And that way we can |
| 10:42 | 14 | work on the jury charge at lunch.  And then we'll |
| 10:42 | 15 | finish up with your witness.  I'll read the charge to |
| 10:42 | 16 | them, and then we'll dismiss them for the day. |
| 10:42 | 17 | And we'll do the closing arguments |
| 10:42 | 18 | tomorrow.  I think that's probably the way it works out |
| 10:42 | 19 | best. |
| 10:42 | 20 | Mr. Adams? |
| 10:42 | 21 | MR. ADAMS:  Your Honor, can I make one |
| 10:42 | 22 | inquiry?  I don't propose to do Mr. Melsheimer's job, |
| 10:43 | 23 | but by our count, plaintiff has about 12 and a half |
| 10:43 | 24 | minutes left of their allotted time.  And just guidance |
| 10:43 | 25 | about how to deal with that. |

                                                                    —1182—

10:43   1                    THE COURT:  It would be difficult for me

10:43   2   to say that either side has done a very good job in

10:43   3   terms of using their time wisely.  I'll say that.  Lot

10:43   4   of time wasted, in my opinion.  Which isn't directly

10:44   5   responsive but is related.

10:44   6                    I will permit the plaintiff to have --

10:44   7   you have a total of 30 minutes left --

10:44   8                    MR. DEVLIN:  Thank you, Your Honor.

10:44   9                    THE COURT:  -- to use.

10:44   10                    Anything else?

10:44   11                    MR. DEVLIN:  Nothing from plaintiff.

10:44   12   Thank you.

10:44   13                    THE BAILIFF:  All rise.

10:44   14                    (Recess taken.)

11:01   15                    THE BAILIFF:  All rise.

11:01   16                    THE COURT:  Please remain standing for

11:01   17   the jury.

11:01   18                    (Jury entered the courtroom.)

11:01   19                    THE COURT:  Thank you.  You may be

11:01   20   seated.

11:01   21                    Counsel, you may call your next witness.

11:02   22                    MR. JENSEN:  Yes.  Microchip calls

11:02   23   Mr. Armin Moehrle by video deposition.

11:02   24                    And I believe this segment is ten minutes

11:02   25   or less.

—1183—

11:02  1    (Video Deposition of Armin Moehrle played as follows.)

11:02  2    Q.    Who is Mr. Spark?

11:02  3    A.    Mr. Spark is a software engineer.

11:02  4    Q.    Do you know him?

11:02  5    A.    Yes.

11:02  6    Q.    When did you first come to know Mr. Spark?

11:02  7    A.    He was a colleague at Motorola.

11:02  8    Q.    And what time frame was that?

11:02  9    A.    When I was at Motorola.

11:02 10    Q.    So this is like roughly 20 years ago?

11:02 11    A.    Yes.

11:02 12    Q.    Is he a friend of yours?

11:02 13    A.    I guess.  Yes.

11:02 14    Q.    Have you kept in touch --

11:03 15    A.    I mean, it depends on how you define -- it

11:03 16 depends on how you define "friend."

11:03 17    Q.    Have you kept in touch with Mr. Spark over the

11:03 18 years?

11:03 19    A.    Yes.

11:03 20    Q.    Is it your testimony that when this patent

11:03 21 application was filed, that a drop-down menu was new,

11:03 22 that you invented a drop-down menu and nobody else had

11:03 23 done it before?

11:03 24    A.    No.

11:03 25    Q.    Okay.  So you agree with me that the

—1184—

11:03  1    functionality of a pull-down or a drop-down menu was

11:03  2    known in the prior art when you filed this patent

11:03  3    application?

11:03  4        A.    Yes.

11:03  5        Q.    So let me ask you:  Are you familiar with the

11:03  6    term "breadcrumb"?

11:03  7        A.    Yes.

11:03  8        Q.    What is your understanding of the term

11:03  9    "breadcrumb" as that term was used in 2002?

11:04  10       A.    A breadcrumb is a graphical means of

11:04  11   displaying the sequence of pages that a user has

11:04  12   visited previously.

11:04  13       Q.    Was the concept of a breadcrumb known in the

11:04  14   prior art in 2002?

11:04  15       A.    Yes.

11:04  16       Q.    Let's do another example here.  Let me just --

11:04  17   I'm going to reload a fresh version of the

11:04  18   microchip.com homepage.  And this time I'll go to Tools

11:04  19   and Software, Embedded Software Center, and click on

11:04  20   the MPLab® Connect Configurator link.  Okay.

11:05  21             All right.  Do you see the resulting web page

11:05  22   that loaded, Mr. Moehrle?

11:05  23       A.    Yep.

11:05  24       Q.    Okay.  And do you see that there's a new path

11:05  25   or menu that appears?  I was trying to highlight it,

―1185―

11:05  1    but it doesn't want to let me.

11:05  2        A.    Yeah.

11:05  3        Q.    And can you read -- what is the path that is

11:05  4    now displayed there, starting with Home?

11:05  5        A.    It says Home, Interface and Connectivity, USB,

11:05  6    MPLab® Connect Configurator.

11:05  7        Q.    Okay.  Is that the same as the path that I

11:05  8    just navigated to load this page?

11:05  9        A.    I don't actually remember the actual path, but

11:05  10   it probably is.  I don't know.

11:05  11       Q.    Well, let's take a look at that because I

11:05  12   think this is important.

11:05  13            But first let me ask:  Do you see that

11:05  14   there -- for example, there's a USB link in this path?

11:05  15       A.    Yep.

11:05  16       Q.    Okay.  Well, let me go back to the Microchip

11:06  17   homepage.  And I want you to watch carefully and see if

11:06  18   at any point in the navigation I select something that

11:06  19   has USB in it.

11:06  20       A.    Okay.

11:06  21       Q.    So I'm going to go to Tools and Software.

11:06  22            Do you see that?

11:06  23            Embedded Software Center.

11:06  24       A.    Yeah.

11:06  25       Q.    And MPLab® Connect Configurator.  And I just

—1186—

11:06  1    clicked on that link.

11:06  2        A.    Yeah.

11:06  3        Q.    At any point did I navigate through something

11:06  4    called USB?

11:06  5        A.    You did not.

11:06  6        Q.    Would you consider the path that's shown here

11:06  7    Home, Interface and Connectivity, USB, MPLab® Connect

11:06  8    Configurator, to be a breadcrumb?

11:06  9        A.    It really depends on the definition of the

11:06  10   breadcrumb.  So I have to defer to the Court because --

11:07  11   and the specification, because it -- well, also, as we

11:07  12   discussed earlier, the breadcrumb is an aspect of the

11:07  13   invention, but it's not the entire invention, right?

11:07  14   So it's -- it's -- it's like the concept of -- well,

11:07  15   I -- what I'm trying to say, it really depends on the

11:07  16   definition of the breadcrumb.

11:07  17       Q.    Yeah.  Using your definition of breadcrumb, is

11:07  18   what's shown on -- on the screen right now a breadcrumb

11:07  19   trail?

11:07  20       A.    No.  So, for example, one definition of the

11:07  21   breadcrumb, as I mentioned earlier, is that it is a

11:07  22   sequence of -- it is a sequence of links to pages

11:08  23   previously visited by the user.

11:08  24            It's one definition of a breadcrumb.  There

11:08  25   are many definitions of a breadcrumb trail.

—1187—

11:08   1      Q.   Okay.  Let's use the definition that you just

11:08   2   provided --

11:08   3      A.   Yeah.

11:08   4      Q.   -- right?  Which means it's -- it's a sequence

11:08   5   of links that the user visited.

11:08   6      A.   Yeah.

11:08   7      Q.   Did I visit a USB page or link?

11:08   8      A.   You did not visit a USB page.

11:08   9      Q.   Okay.  So given that, and using your

11:08  10   definition of a breadcrumb, would you agree that the

11:08  11   path that is shown currently on the screen is not a

11:08  12   breadcrumb?

11:08  13      A.   Given that example definition, this would not

11:08  14   be a breadcrumb.  Yes.

11:08  15      Q.   Do you recall having approved Caddo entering

11:08  16   this license agreement with ███

11:08  17      A.   I would assume so, or else Alan would have not

11:09  18   probably executed it.

11:09  19      Q.   Do you know what entities were granted a

11:09  20   license pursuant to this agreement for which ████████

11:09  21   was paid?

11:09  22      A.   In one of the appendices I think there was a

11:09  23   list.  Exhibit A, initial licensees.

11:09  24      Q.   And how many initial licensees are listed in

11:09  25   Exhibit A?

11:09  1      A.   █████

11:09  2      Q.   And we just went through the ███ agreement,

11:09  3  correct?

11:09  4      A.   Yes.

11:09  5      Q.   And do you remember how many entities in the

11:09  6  ███ agreement?

11:09  7      A.   And I believe it was ████ is that correct?

11:09  8      Q.   Is it your understanding that each one of

11:09  9  those entities has a license to your asserted patents?

11:09  10      A.   That is my understanding.

11:10  11           (End video.)

11:10  12           MR. BREWER:  Your Honor, plaintiff calls

11:10  13  its next and -- Microchip calls its next and last

11:10  14  witness, Jared Jordan.

11:10  15           (The witness was sworn.)

11:10  16                DIRECT EXAMINATION

11:10  17  BY MR. BREWER:

11:11  18      Q.   Good morning, Mr. Jordan.  Before we get

11:11  19  going, can you please state your full name for the

11:11  20  record?

11:11  21      A.   Yes.  It's Jared Clyde Jordan.

11:11  22      Q.   Have you prepared some materials to assist in

11:11  23  explaining your work in this case?

11:11  24      A.   I have.  A slide deck.

11:11  25      Q.   Is that what's shown on the screen here?

-1189-

11:11   1        A.    It is.

11:11   2        Q.    Mr. Jordan, can you please explain to the jury

11:11   3   your role in this case?

11:11   4        A.    Sure.  It's really twofold.  One is to provide

11:11   5   my own expert opinion on damages, assuming, just like

11:11   6   Mr. Blok did, that the patents are found to be not

11:11   7   invalid and are infringed by Microchip.

11:11   8              And then two is to evaluate Mr. Blok's

11:11   9   analysis that he conducted as well.

11:11   10       Q.    So just like Mr. Block, you're assuming

11:11   11  infringement here.  What should the jury take that to

11:11   12  mean?

11:11   13       A.    You shouldn't take anything from that

11:11   14  assumption.  That is part of our job as the damages

11:11   15  experts, is to assume infringement.

11:12   16       Q.    And if there is no infringement, there's no

11:12   17  damages?

11:12   18       A.    That's correct.

11:12   19       Q.    So to be totally clear, your assignment is not

11:12   20  to tell the jury whether or not Microchip or Caddo did

11:12   21  any wrong; is that right?

11:12   22       A.    That's correct.

11:12   23       Q.    Who do you work for?

11:12   24       A.    I'm a partner at Weaver & Tidwell.

11:12   25       Q.    What does Weaver & Tidwell do?

11:12  1          A.    Weaver & Tidwell's an accounting firm that's

11:12  2    been around for over 70 years.  We provide traditional

11:12  3    audit or assurance and tax services as well as advisory

11:12  4    services, which include serving as expert witnesses in

11:12  5    litigation matters.

11:12  6          Q.    How many years' experience do you have in this

11:12  7    field?

11:12  8          A.    Personally, I have around 22 or 23 years.

11:12  9          Q.    And how long have you been at Weaver?

11:12  10         A.    I've been at Weaver for a little over three

11:12  11    years now.

11:12  12         Q.    Where were you prior to that?

11:12  13         A.    Prior to Weaver, I was at a small boutique

11:12  14    consulting firm called HSSK, which was based in Texas.

11:12  15    It had offices in Austin, Houston, and Dallas.  And

11:13  16    approximately three years ago, we merged HSSK into

11:13  17    Weaver.

11:13  18         Q.    And what's your educational background?

11:13  19         A.    I graduated from the University of Texas at

11:13  20    Austin with a degree in finance.

11:13  21         Q.    And do you hold any professional

11:13  22    certifications?

11:13  23         A.    I do.  I'm a certified fraud examiner.

11:13  24         Q.    During the past 20, 22 years, what types of

11:13  25    cases have you worked on as an expert?

11:13    1          A.     A wide variety.  I've worked in matters such

11:13    2    as this, where there's allegations of infringement of

11:13    3    intellectual property, including patent damages.  I've

11:13    4    also worked on general breach of contract damage

11:13    5    matters.

11:13    6          In addition to those, I've worked in matters

11:13    7    involving forensic accounting or fraud investigations

11:13    8    for large cities, municipalities, government entities,

11:13    9    school districts around the state of Texas; also have

11:13    10   provided the services to large publicly traded

11:14    11   corporations as well as small privately held companies.

11:14    12         Q.     So it sounds like not all of your work is

11:14    13   serving as an expert witness in litigation?

11:14    14         A.     That's correct.

11:14    15         Q.     Have you previously been retained to evaluate

11:14    16   and calculate damages resulting from allegations of

11:14    17   infringement, such as patent infringement?

11:14    18         A.     Yes.

11:14    19         Q.     Do you work only with law firms?

11:14    20         A.     No.  In a lot of my work, whether it's the

11:14    21   forensic accounting/corporate investigation-type work,

11:14    22   or also provide valuation services, those are often

11:14    23   done directly with clients such that I mentioned, like

11:14    24   cities or school districts, directly with the company

11:14    25   or individuals as well.

—1192—

11:14  1        Q.    So both in and outside litigation, have your

11:14  2   matters required the assessment of intellectual

11:14  3   property and license -- licenses?

11:14  4        A.    Yes.  They have.

11:14  5        Q.    And have you represented both plaintiffs and

11:14  6   defendants?

11:14  7        A.    Yes.

11:15  8        Q.    You're being compensated for your time in this

11:15  9   case, correct?

11:15  10       A.    My firm is.  Yes.

11:15  11       Q.    And for how much?

11:15  12       A.    $500 an hour.

11:15  13       Q.    Does your fee depend in any way, at all, on

11:15  14   the outcome of this case or on the opinions you

11:15  15   reached?

11:15  16       A.    No.  It does not.

11:15  17       Q.    So in the event that the jury finds that

11:15  18   Microchip does not infringe Caddo's patents, what would

11:15  19   be your opinion of damages?

11:15  20       A.    There'd be no damages.

11:15  21       Q.    In performing your analysis in this case, what

11:15  22   types of information did you rely on?

11:15  23       A.    A variety of types, each of which is a type

11:15  24   that I've relied on for years, providing these types of

11:15  25   services in litigation matters and outside of

| | | |
|---|---|---|
| 11:15 | 1 | litigation as well. |
| 11:15 | 2 | That information includes evidence such as: |
| 11:15 | 3 | E-mails; financial reports, like Dr. Wolf was just |
| 11:15 | 4 | discussing; presentations; internal and external |
| 11:16 | 5 | correspondence; publicly available information about |
| 11:16 | 6 | Microchip and other companies involved in this matter, |
| 11:16 | 7 | such as ▮▮▮▮▮▮▮▮; the patents themselves; the |
| 11:16 | 8 | various license agreements that you've heard about and |
| 11:16 | 9 | we'll be talking about more today; certain legal |
| 11:16 | 10 | standards or case law that provides guidance on how to |
| 11:16 | 11 | approach calculating patent damages; the witness |
| 11:16 | 12 | testimony that we've heard this week, as well as |
| 11:16 | 13 | previous witness testimony through depositions; the |
| 11:16 | 14 | technical reports of Mr. Tittel and Mr. Sherwood; and |
| 11:16 | 15 | then, of course, Mr. Blok's report and his analysis as |
| 11:16 | 16 | well. |
| 11:16 | 17 | Q.   And the opinions that you're going to provide |
| 11:16 | 18 | today, would you say that you have now considered all |
| 11:16 | 19 | of the testimony and evidence that you've heard from |
| 11:16 | 20 | both sides? |
| 11:16 | 21 | A.   Yes. |
| 11:16 | 22 | Q.   Are your opinions and conclusions based on |
| 11:17 | 23 | your independent and objective review and analysis of |
| 11:17 | 24 | all that information? |
| 11:17 | 25 | A.   Yes.  They are. |

—1194—

11:17   1                    MR. BREWER:  Your Honor, at this time we

11:17   2    would proffer Mr. Jordan as an expert on patent

11:17   3    damages.

11:17   4                    MR. DEVLIN:  No objection.

11:17   5                    THE COURT:  He'll be admitted.

11:17   6    BY MR. BREWER:

11:17   7        Q.   Can you please give us a summary of your

11:17   8    opinions?

11:17   9        A.   Sure.  And we'll be talking about these, you

11:17   10   know, throughout the day today, and I'll start with the

11:17   11   first one.

11:17   12           At the highest level, Mr. Blok's determination

11:17   13   of a reasonable royalty based on the two figures that

11:17   14   he highlighted during his testimony, the 5 percent and

11:17   15   the 215K or $215,000 per day, is flawed, and he failed

11:17   16   to follow many of the rules that you need to follow

11:17   17   when calculating patent damages.

11:17   18       Q.   What was the result of Mr. Blok's use of

11:17   19   these -- just these two data points?

11:17   20       A.   Well, those two data points are really the two

11:18   21   inputs that go into his calculation.  If you recall

11:18   22   from his presentation, he had two numbers and you

11:18   23   multiplied them together and it equaled the damages.

11:18   24           The use of those two numbers results in a

11:18   25   significantly overstated damages amount, which we'll be

11:18  1    talking about in more detail.

11:18  2        Q.    What's your opinion of the appropriate measure

11:18  3    of damages in this case if the jury is to find that

11:18  4    Microchip infringes?

11:18  5        A.    Yes.  At a very high level, and we'll also be

11:18  6    talking about this more, that in a hypothetical

11:18  7    negotiation in March of 2014, Mr. Moehrle and Microchip

11:18  8    would have agreed to a lump-sum damage -- royalty of

11:18  9    $20,000.

11:18  10       Q.    We heard Mr. Blok talk a bit about this

11:18  11   hypothetical negotiation idea.

11:18  12             Can you give us a little bit of your

11:18  13   explanation of how that works?

11:18  14       A.    Sure.  The hypothetical negotiation is

11:19  15   something that you typically use in patent damages

11:19  16   matters.  Mr. Blok's description of it was fairly

11:19  17   accurate.

11:19  18             You're trying to assess what Microchip would

11:19  19   pay and what Mr. Moehrle would accept for these patents

11:19  20   and, just like Mr. Blok talked about, with full

11:19  21   disclosure.  All of the cards are on the table.

11:19  22             So pretend like you're playing blackjack or

11:19  23   poker.  It'd be like playing those games with all of

11:19  24   the cards face up.  Each party has information that

11:19  25   would be relevant to that negotiation.

11:19   1         Q.    In performing this hypothetical negotiation

11:19   2    analysis, are there established rules that a damages

11:19   3    expert needs to follow?

11:19   4         A.    That's right.  Rules or standards.  Mr. Blok

11:19   5    discussed these as well.  They're called the

11:19   6    Georgia-Pacific factors.  I factored those into my

11:19   7    analysis also.

11:19   8         Q.    And have you formed an opinion as to whether

11:19   9    Mr. Blok violated or followed those rules?

11:20  10         A.    Mr. Blok failed to follow some of the rules

11:20  11    related to calculating patent damages.

11:20  12         Q.    And what did Mr. Blok's failure to follow

11:20  13    those rules do to his damages opinion?

11:20  14         A.    Again, it resulted in a significantly inflated

11:20  15    damages amount.

11:20  16         Q.    What's the first rule that Mr. Blok did not

11:20  17    follow?

11:20  18         A.    Mr. Blok failed to isolate the value of the

11:20  19    patents.

11:20  20         Q.    Why is it important to isolate the value of

11:20  21    the patents?

11:20  22         A.    Well, you heard Mr. Blok talk about it as

11:20  23    well.  The -- identifying the incremental value of the

11:20  24    patents, or the accused breadcrumb in this case, is

11:20  25    fundamental to what you need to do to appropriately

11:20   1    calculate damages.  That's called apportionment in the

11:20   2    patent damages world.

11:20   3        Q.   Can you give us an example of why that's

11:20   4    important?

11:20   5        A.   Yes.  And this is a fairly simple example, but

11:20   6    it's a good, kind of level set for us as we're talking

11:21   7    through this today.  And I'm going to use wheels on a

11:21   8    car as the example.

11:21   9             So if you're calculating damages and if you

11:21   10   have a patent on a new wheel design, you only get

11:21   11   damages on how much better that new wheel design is

11:21   12   over the existing design or an alternative design.  And

11:21   13   you absolutely do not get damages on the entire car.

11:21   14       Q.   How did Mr. Blok violate this rule?

11:21   15       A.   He's basing his damage calculation on the

11:21   16   entire value of the car.

11:21   17       Q.   What sorts of things did he include that

11:21   18   don't -- aren't attributable to the asserted patents?

11:21   19       A.   Sure.  And I was using car there instead of

11:21   20   the accused -- the breadcrumb.

11:21   21            But his analysis improperly includes the total

11:21   22   semiconductor value.  It also includes the use of

11:21   23   nonaccused or noninfringing websites, as well as the

11:22   24   use of nonaccused or noninfringing features on those

11:22   25   websites.

—1198—

11:22   1          Q.    I understand you prepared a demonstrative to

11:22   2    illustrate how Mr. Blok failed to apportion; is that

11:22   3    right?

11:22   4          A.    That's right.  Before we look at this, I'm

11:22   5    going to apologize.  It's a little busy, but I think it

11:22   6    does help tell or communicate what I'm trying to

11:22   7    deliver today.

11:22   8                It's that simply the accused breadcrumb

11:22   9    feature, which I've identified it in the bottom center

11:22   10   of this screen, is just a small sliver of the overall

11:22   11   picture of what goes into the manufacturing and sale of

11:22   12   microchips.  And those microchips are identified at the

11:22   13   top left.

11:22   14         Q.    So how does Mr. Blok account for all of this?

11:22   15         A.    He doesn't.

11:22   16         Q.    Is his use of semiconductor sales revenue

11:22   17   consistent with the evidence?

11:22   18         A.    No.  It's not.

11:22   19         Q.    So he -- by using semiconductor sales revenue,

11:23   20   he's claiming everything in this image, right?  Is that

11:23   21   what you're saying?

11:23   22         A.    Essentially, yes.

11:23   23         Q.    And what's accused is just the breadcrumb

11:23   24   feature, which is a feature that's on only some of

11:23   25   Microchip's websites; is that right?

11:23  1       A.    That's right.  That accused feature is only on

11:23  2   a couple of the websites, allegedly.

11:23  3       Q.    So what about for the websites that actually

11:23  4   do have a breadcrumb?

11:23  5       A.    I'm sorry.  Can you repeat that?

11:23  6       Q.    What about for the Microchip websites that

11:23  7   actually do have a breadcrumb?  How does Mr. Blok

11:23  8   account for those?

11:23  9       A.    He really doesn't.  He assumes that the

11:23  10  breadcrumb on microchip.com is involved in all of the

11:23  11  Microchip Direct revenue when customers previously used

11:23  12  microchip.com.

11:23  13      Q.    And so we heard a little earlier about -- from

11:24  14  Dr. Wolf.  What proportion of users of Microchip's

11:24  15  websites actually use this breadcrumb feature?

11:24  16      A.    It's a small, small portion.  And we have to

11:24  17  keep in mind that the breadcrumb is not required to

11:24  18  purchase -- use of the accused breadcrumb is not

11:24  19  required to purchase a semiconductor that Microchip

11:24  20  makes.

11:24  21      Q.    If customers aren't using the breadcrumb, what

11:24  22  are they doing?

11:24  23      A.    Well, Dr. Wolf talked about some of the

11:24  24  different ways.  You know, I've identified some here.

11:24  25  Customers can go to the homepage and order now, either

—1200—

11:24   1   through the basket or the button that actually says

11:24   2   Order Now.

11:24   3            They can use internal search and then order.

11:24   4   They can use an external site such as Google and then

11:24   5   click Order Now.

11:24   6            They can also use top navigation to get there.

11:25   7        Q.   Do any of those methods use the accused

11:25   8   breadcrumb?

11:25   9        A.   It's my understanding they do not.

11:25   10       Q.   What about the Forum?

11:25   11       A.   Well, as we've heard testimony this week, and

11:25   12   my understanding based on my analysis before this week,

11:25   13   was that the Forum is simply a discussion board where

11:25   14   customers can discuss Microchip products.

11:25   15            We also know that Microchip Forum website

11:25   16   drives almost no revenue whatsoever.  The information

11:25   17   that Dr. Wolf provided to me indicated that in the most

11:25   18   recent calendar year, 2021, that the -- only $70 could

11:25   19   be attributed to the Forum website.

11:25   20       Q.   For the entire year?

11:25   21       A.   For the entire year.

11:25   22       Q.   So it's fair to say that very, very few people

11:25   23   go from the Microchip Forum website to go buy anything?

11:25   24       A.   That's correct.

11:26   25       Q.   So, Mr. Blok, we heard, suggests that we start

—1201—

11:26   1   with this $600 million pot of gold, right?  And then we

11:26   2   use that to determine damages?

11:26   3       A.   That's right.  That is his starting point.

11:26   4   That's a function of the $215,000 per day and the

11:26   5   length of the damage period.  And if you recall, he has

11:26   6   two different damage periods.  2014 to 2021 and then

11:26   7   2018 to 2021, approximate dates.

11:26   8       Q.   But that $600 million number doesn't isolate

11:26   9   the value of the patents, does it?

11:26   10      A.   No.  It does not isolate the incremental value

11:26   11  of the patents.  Just like Mr. Blok said you should do,

11:26   12  he did not do it.

11:26   13      Q.   So even if you were to accept Mr. Blok's

11:26   14  methodology, you would have to correct for those flaws,

11:26   15  right?

11:26   16      A.   Yes.  And I want to be clear here.  As I

11:26   17  stated at the beginning in the summary of my opinions,

11:27   18  I've done an independent analysis of Mr. Blok's.  And

11:27   19  we're going to talk more about that later and how I

11:27   20  arrived at the lump-sum royalty of $20,000.

11:27   21           But I have taken Mr. Blok's analysis using

11:27   22  those two data points and made, at a minimum, some

11:27   23  adjustments to those, so that you can see what would

11:27   24  need to be done if you started with those numbers.

11:27   25      Q.   How did you determine the first way to adjust

—1202—

11:27  1    this number, to isolate for the value of the patents?

11:27  2        A.    I utilized the information that Dr. Wolf

11:27  3    provided, that he discussed this morning about the

11:27  4    two-click or the use case analysis that he discussed

11:27  5    based on information from Google Analytics.

11:27  6        Q.    Did that use case analysis, let's call it,

11:27  7    indicate what proportion of customers actually used the

11:27  8    breadcrumb?

11:27  9        A.    Yes.  It was a very small portion.

11:28  10   Approximately .5 percent.  It was actually less than

11:28  11   that.

11:28  12       Q.    So if you take this .5 percent that's

11:28  13   attributable to users who use the breadcrumb and you

11:28  14   apply that and you, I guess, factor the rest of it out

11:28  15   of Mr. Blok's analysis, what's the result?

11:28  16       A.    This is the apportionment part of what a

11:28  17   patent damages expert needs to do.  You would -- again,

11:28  18   we're trying to isolate the value, or the incremental

11:28  19   value, of those patents.

11:28  20            So you would take the 604.6 million and

11:28  21   multiply it by the .5 percent which represents the

11:28  22   users that actually used that functionality or may have

11:28  23   used that functionality.  That would result in a little

11:28  24   over $3 million.

11:28  25       Q.    And did you perform this same adjustment for

11:28  1   Mr. Blok's second damages period?

11:28  2       A.    I did.  That's for the 2018 to 2021 period I

11:29  3   noted earlier.

11:29  4       Q.    Did Mr. Blok consider the data that Mr. --

11:29  5   that Dr. Wolf discussed earlier today?

11:29  6       A.    No.

11:29  7       Q.    So after we factored out all of the use of

11:29  8   Microchip's websites and features that have nothing to

11:29  9   do with the breadcrumb, what do we have to do next?

11:29  10      A.    Well, it's the second rule that Mr. Blok

11:29  11  failed to follow.  You should only consider U.S. sales.

11:29  12  You must exclude the foreign sales.

11:29  13      Q.    How did Mr. Blok violate this rule?

11:29  14      A.    Well, as you can see from this demonstrative,

11:29  15  Microchip sells microchips and other products all over

11:29  16  the world:  Europe, South America, Asian Pacific

11:29  17  region.  And what you need to do is isolate just for

11:29  18  the United States sales.

11:29  19      Q.    How much did Dr. Blok's number increase by

11:30  20  including all those foreign sales?

11:30  21      A.    Well, as you heard Dr. Wolf testify to

11:30  22  earlier, it had an 81 percent impact.  So you need to

11:30  23  adjust the numbers further for the two -- identify just

11:30  24  the U.S. sales.

11:30  25      Q.    If you do that and you sort of apply it to the

—1204—

11:30    1    number that we've already reached, where we've isolated

11:30    2    the value of the patents, what's the result?

11:30    3        A.    It's a much, much lower number.  So we do the

11:30    4    same step that I did earlier and you get to the 3 --

11:30    5    little over $3 million.

11:30    6            And then you apply 19 percent to that amount

11:30    7    to get an isolated number that includes just the

11:30    8    incremental value associated with the patents, as well

11:30    9    as the U.S. sales only.

11:30   10        Q.    And you can perform -- well, first, for the

11:30   11    first damages period, what's the result if you perform

11:31   12    both of those adjustments?

11:31   13        A.    For the 2014 to 2021 period, it would be

11:31   14    $575,000 in revenue.

11:31   15        Q.    And you can perform that same adjustment for

11:31   16    the second damages period, correct?

11:31   17        A.    That's correct.  I followed the same

11:31   18    methodology.

11:31   19        Q.    And I want to make clear that these damages

11:31   20    periods are alternates, right?

11:31   21        A.    Yes.  These are Mr. Blok's two different

11:31   22    damage periods.

11:31   23        Q.    And for the shorter damages period, what is

11:31   24    the result once you do those adjustments?

11:31   25        A.    It's $243,000 of revenue.

11:31  1      Q.    What's the next rule that Mr. Blok did not

11:31  2   follow?

11:31  3      A.    He failed to fairly look at the licensing

11:31  4   history between the parties.

11:31  5      Q.    How did he violate this rule?

11:31  6      A.    Quite simply, he ignores the real-world

11:31  7   amounts that Caddo was willing to license these patents

11:32  8   to to other companies.  And then he also didn't

11:32  9   properly consider Microchip's license with a third

11:32  10  party, █████████

11:32  11     Q.    So how many relevant licenses are there here?

11:32  12     A.    There's six, if you include the Microchip

11:32  13  license with ██████████

11:32  14     Q.    And how many did Mr. Blok consider?

11:32  15     A.    One -- part of one.

11:32  16     Q.    Why is this important?

11:32  17     A.    Well, comparable licenses is something you

11:32  18  always look at when calculating patent damages, if

11:32  19  they're available.  They typically indicate -- or

11:32  20  provide a very good indication of the value of the

11:32  21  patents.

11:32  22            And in this case it -- as I mentioned

11:32  23  previously, it gives you the amounts that Caddo has

11:32  24  been willing to license these patents for in the past

11:32  25  in the real world.

11:32  1          And then also it gives you the information

11:32  2   about what ███████ has been willing to pay for other

11:33  3   similar technology or patents.

11:33  4          Q.   You said ████████   But I just want to make sure

11:33  5   you meant Microchip?

11:33  6          A.   Thank you.  Yes.

11:33  7          Q.   Why do you do this kind of comparison?

11:33  8          A.   Well, this is another example that we can talk

11:33  9   through.  You know, if you're buying a home, you really

11:33  10  want to understand what is the market?  What are the

11:33  11  comparables that are out there?  You know, typically

11:33  12  you would pull comparables that were in the same

11:33  13  neighborhood, typically the same size, the same layout.

11:33  14          And that will help you provide a range of

11:33  15  how -- what's historically happened associated with

11:33  16  sales in that area.  It gives you good comparables.  At

11:33  17  a minimum it gives you a range of the potential values.

11:33  18          Q.   Are all comparable licenses equally relevant?

11:33  19          A.   No.  They're not.

11:33  20          Q.   Can you give an example of what would make a

11:34  21  comparable license more or less relevant?

11:34  22          A.   One example would be a non-litigation license.

11:34  23  That's typically more relevant than a litigation

11:34  24  license.

11:34  25          Q.   Why is that?

─1207─

11:34  1          A.    Well, there's -- whenever you have a

11:34  2   litigation license, there's costs that both parties may

11:34  3   be factoring into any type of settlement associated

11:34  4   with litigation.

11:34  5          Q.    Has Caddo ever licensed the patents at issue

11:34  6   in this case in a non-litigation context?

11:34  7          A.    Yes.

11:34  8          Q.    What was that context?

11:34  9          A.    That was in -- with a company called ███

11:34  10         Q.    Who is ███

11:34  11         A.    ███ is an agent for companies that negotiate

11:34  12   license agreements on behalf of them.

11:34  13         Q.    And so ███ licensed these patents from Caddo

11:34  14   for its customers?

11:34  15         A.    Yes.

11:34  16         Q.    The same patents at issue in this case?

11:34  17         A.    Yes.

11:34  18         Q.    How many companies did ███ license these

11:35  19   patents for?

11:35  20         A.    ███    This is just the first couple of pages,

11:35  21   an Exhibit A to that license that totals around ███ I

11:35  22   believe.

11:35  23         Q.    Who are some of ███████ that got rights to

11:35  24   these patents from that license?

11:35  25         A.    Some of the largest companies and most

-1208-

| | | |
|---|---|---|
| 11:35 | 1 | well-known companies in the world. █████████ |
| 11:35 | 2 | ████████████     ████████████████ |
| 11:35 | 3 | ██████████   █████████████████ |
| 11:35 | 4 | █████ |
| 11:35 | 5 | █   ████████████████████████ |
| 11:35 | 6 | ███████████████████████████ |
| 11:35 | 7 | █   ██████████████ |
| 11:35 | 8 | █   █████████ |
| 11:35 | 9 | A.     That's correct. |
| 11:35 | 10 | Q.     How does that work? |
| 11:35 | 11 | A.     Well, the way you get to the $████ number is |
| 11:35 | 12 | that this license agreement -- as you saw on a previous |
| 11:36 | 13 | slide, and we'll talk more about it -- was for $████ |
| 11:36 | 14 | to license these to ████ companies.  And so if you |
| 11:36 | 15 | do the math, it's a little bit more than $████ per |
| 11:36 | 16 | company. |
| 11:36 | 17 | Q.     Do you know, based on just public information, |
| 11:36 | 18 | about what ████ yearly revenues were when they got |
| 11:36 | 19 | rights to these patents? |
| 11:36 | 20 | A.     Yes.  I mean, during this period it was north |
| 11:36 | 21 | of ████████ in revenue per year. |
| 11:36 | 22 | Q.     Did ████ obtain rights for any of Microchip's |
| 11:36 | 23 | competitors? |
| 11:36 | 24 | A.     Yes.  There's several semiconductors on this |
| 11:36 | 25 | demonstrative, ██████████████.  They |

—1209—

| | | |
|---|---|---|
| 11:36 | 1 | manufacture microchips as well. |
| 11:36 | 2 | Q.    And those were also effectively for $ █████ |
| 11:36 | 3 | each? |
| 11:36 | 4 | A.    Yes. |
| 11:36 | 5 | Q.    What conclusion do you draw from the ███ |
| 11:36 | 6 | license? |
| 11:36 | 7 | A.    Well, first, it's a comparable license.  It's |
| 11:36 | 8 | also a non-litigation license, so it gives you a better |
| 11:37 | 9 | indication of what Caddo would be willing to license |
| 11:37 | 10 | those patents for. |
| 11:37 | 11 | In the real world, Caddo licensed those |
| 11:37 | 12 | payments for █████████████████████████████ |
| 11:37 | 13 | ██████ |
| 11:37 | 14 | Q.    And in this case they're demanding |
| 11:37 | 15 | $30 million; is that right? |
| 11:37 | 16 | A.    For one company.  Yes. |
| 11:37 | 17 | Q.    So that's effectively ██ times that? |
| 11:37 | 18 | A.    That's right. |
| 11:37 | 19 | Q.    Did you consider any other comparable |
| 11:37 | 20 | licenses? |
| 11:37 | 21 | A.    I did.  There were five others. |
| 11:37 | 22 | Q.    Let's just go through those real quick. |
| 11:37 | 23 | The first is for ██████  How much was the |
| 11:37 | 24 | royalty payment for ████████████ |
| 11:37 | 25 | ███ ██████████ lump-sum payment. |

| | | |
|---|---|---|
| 11:37 | 1 | Q.   And Mr. Blok excludes this license from his |
| 11:37 | 2 | consideration? |
| 11:37 | 3 | A.   He does. |
| 11:37 | 4 | Q.   The next license is for ███ |
| 11:37 | 5 | How much was the royalty payment for ███ |
| 11:37 | 6 | ██ ████████ |
| 11:37 | 7 | Q.   Caddo also licensed these to ██████ |
| 11:38 | 8 | A.   That's correct. |
| 11:38 | 9 | Q.   How much was the royalty payment for ██████ |
| 11:38 | 10 | ██ ██████ |
| 11:38 | 11 | Q.   And Caddo also licensed these to ██████ |
| 11:38 | 12 | ██████  We've heard a little bit about that already. |
| 11:38 | 13 | How much was the royalty payment there? |
| 11:38 | 14 | A.   ██████ |
| 11:38 | 15 | Q.   So even when there was litigation like here, |
| 11:38 | 16 | what's the most that Caddo has charged for these |
| 11:38 | 17 | patents? |
| 11:38 | 18 | A.   ██████████████. |
| 11:38 | 19 | Q.   Did you consider any comparable Microchip |
| 11:38 | 20 | licenses? |
| 11:38 | 21 | A.   Yes.  That was the ████ license that I |
| 11:38 | 22 | mentioned earlier. |
| 11:38 | 23 | Q.   What was your conclusion regarding the ████ |
| 11:38 | 24 | license? |
| 11:38 | 25 | A.   It was a comparable license, as you heard |

—1211—

| | | |
|---|---|---|
| 11:38 | 1 | Mr. Tittel testify to yesterday.  There was -- I can't |
| 11:38 | 2 | remember the exact number of patents, but there were |
| 11:38 | 3 | three different patent families within that license. |
| 11:38 | 4 | And it's his opinion that at least one of those |
| 11:38 | 5 | families is similar website-related technology. |
| 11:39 | 6 |      Q.    Are there any other reasons why you thought |
| 11:39 | 7 | that the ███ license was particularly relevant here? |
| 11:39 | 8 |      A.    Yes.  Because it is the only license where we |
| 11:39 | 9 | have a party, an actual party, to the hypothetical |
| 11:39 | 10 | negotiation.  That would be Microchip. |
| 11:39 | 11 |      Q.    None of the other licenses we've discussed |
| 11:39 | 12 | have a party to that hypothetical negotiation? |
| 11:39 | 13 |      A.    That's correct.  Because the hypothetical |
| 11:39 | 14 | negotiation that would have occurred in March of 2014 |
| 11:39 | 15 | would have been between Mr. Moehrle, as an individual, |
| 11:39 | 16 | and Microchip. |
| 11:39 | 17 |      Q.    What do you conclude based on all of these |
| 11:39 | 18 | comparable licenses? |
| 11:39 | 19 |      A.    Well, first, they are comparable licenses and |
| 11:39 | 20 | should be considered in any type of patent damages |
| 11:39 | 21 | analysis. |
| 11:39 | 22 |      The comparable license lump-sum royalties |
| 11:39 | 23 | range from ███████████████████ license, |
| 11:39 | 24 | which is the one that Mr. Blok relied upon, up to |
| 11:39 | 25 | ███████████████ license. |

—1212—

```
11:40    1              And then also the non-litigation license with
11:40    2    ██  has an effective lump-sum royalty of a little over
11:40    3    $██  per licensee.
11:40    4         Q.   And so what you have here is you're comparing
11:40    5    the $30 million that Caddo's asking from Microchip to
11:40    6    what it's charged others in the past?
11:40    7         A.   That's correct.  Essentially, Caddo is seeking
11:40    8    ██  times more than the ████████████  license of
11:40    9    ██████████████  times more than the ██  license of
11:40   10    the $████
11:40   11         Q.   So to sum up this point, what impact did
11:40   12    Mr. Blok's failure to fairly look at the licensing
11:40   13    history have on his analysis?
11:41   14         A.    It makes his analysis unreliable and
11:41   15    unreasonable.  There are comparable licenses out there
11:41   16    that he simply ignored.  While he did consider the
11:41   17    ██████████  license, he picked one -- or at most
11:41   18    ignored the lump-sum royalty amount of $██████
11:41   19         Q.    Let's talk a little bit more about that
11:41   20    ██████████  license.
11:41   21              What's the next rule that --
11:41   22              THE COURT:  Counsel, I'm trying to find a
11:41   23    place for you to break.  I thought this might be a good
11:41   24    one because you just finished, but if you want to keep
11:41   25    going for a while.
```

11:41  1          MR. BREWER:  That's perfectly fine, if

11:41  2   you want to break now.

11:41  3          THE COURT:  Ladies and gentlemen of the

11:41  4   jury, we're going to take our afternoon -- afternoon --

11:41  5   our lunch break.  That means y'all have to come back.

11:41  6   And so I believe that we've ordered lunch for you.  But

11:41  7   we need to do a little bit of work.

11:41  8          At the end of the trial, before you do --

11:41  9   begin your deliberations, I'm going to have to read to

11:42  10  you a charge, which is the instructions on the law.

11:42  11  It's about 40 or 50 pages long.  You'll each get a

11:42  12  copy.  I have to read it to you.

11:42  13         We're going to need to do a little bit of

11:42  14  work on it ourselves here.  So what I would suggest we

11:42  15  do is you all have lunch.  It's here.  If you all want

11:42  16  to leave the courthouse and wander, do whatever you'd

11:42  17  like to do, but we'll probably get started about 1:45.

11:42  18         We'll finish with this witness, who I

11:42  19  believe is the last witness, and then I'm going to read

11:42  20  you the charge.  It takes me about an hour to read you

11:42  21  the charge.  Then we'll be done for the day.

11:42  22         And we will start with closing arguments

11:42  23  tomorrow morning at 9 o'clock, and then you'll begin

11:42  24  your deliberations and take as much time as you care

11:42  25  to.

| | | |
|---|---|---|
| 11:42 | 1 | So have lunch.  Enjoy.  If you're back |
| 11:42 | 2 | sooner than 1:45, that's fine too.  We'll work as |
| 11:43 | 3 | quickly as we can.  And if you don't mind waiting, in |
| 11:43 | 4 | fact, I'd say be back by 1:30 and that way we'll get |
| 11:43 | 5 | started just as soon as we can. |
| 11:43 | 6 | Thank you for the morning.  Please |
| 11:43 | 7 | remember my instructions not to discuss the case |
| 11:43 | 8 | amongst yourselves.  You are dismissed. |
| 11:43 | 9 | THE BAILIFF:  All rise. |
| 11:43 | 10 | (Jury exited the courtroom.) |
| 11:43 | 11 | THE COURT:  Thank you.  You may be |
| 11:43 | 12 | seated. |
| 11:43 | 13 | Sir, you may step down if you want to, if |
| 11:43 | 14 | you can figure out how to get out of there. |
| 11:43 | 15 | And so is there anything that we need to |
| 11:43 | 16 | take up? |
| 11:43 | 17 | MR. DEVLIN:  Not from the plaintiff, Your |
| 11:43 | 18 | Honor.  Thank you. |
| 11:43 | 19 | MR. JENSEN:  We just needed to move the |
| 11:43 | 20 | admission of one exhibit.  It's Joint Exhibit 115. |
| 11:43 | 21 | THE COURT:  It'll be admitted. |
| 11:43 | 22 | MR. DEVLIN:  No objection. |
| 11:43 | 23 | THE COURT:  I'll do my best to be back |
| 11:43 | 24 | right around 1 o'clock.  We will take up the issues on |
| 11:43 | 25 | the jury charge.  And then as soon as we're done with |

—1215—

```
11:43    1    that, we'll bring the jury back in.

11:44    2                    So y'all have a good lunch.

11:44    3                    MR. DEVLIN:  Thank you, Your Honor.

11:44    4                    THE BAILIFF:  All rise.

11:44    5                    (Recess taken.)

11:44    6                    THE COURT:  We're on the record.

01:28    7                    We're taking up what is currently Jury

01:28    8    Instruction No. 22, license and release as defenses of

01:28    9    infringement.  The defendant has proposed language

01:28   10    that -- it will be in the record because they've

01:28   11    submitted this to the Court.

01:28   12                    I'll hear from defense counsel as to why

01:28   13    I should give this instruction, and then I'll hear from

01:28   14    plaintiffs' counsel as to why I should not.

01:28   15                    Let me ask you this, Mr. Devlin:  Is

01:28   16    your -- and it's fine if it's both, is your objection

01:28   17    both, A, it shouldn't be in there at all, and -- but if

01:28   18    it is in there, B, this isn't how it should be in

01:28   19    there?

01:28   20                    MR. DEVLIN:  Both, Your Honor.  And as to

01:28   21    B, we -- just to catch up to where we are, we got their

01:28   22    thing last night, and then this morning we found one we

01:28   23    liked and we just kind of gave that to them.

01:28   24                    So there may be some, you know, five

01:28   25    minutes of horse trading.  We can narrow some of the
```

—1216—

01:28  1   issues if we get to B, but hopefully -- I don't think

01:28  2   we should get to B.

01:29  3                    (Simultaneous speakers.)

01:29  4                    THE COURT:  Why don't you confer right

01:29  5   now, and I'll just sit here?

01:29  6                    MR. DEVLIN:  Well, I think if you decide

01:29  7   A in our favor, B's irrelevant.

01:29  8                    THE COURT:  Oh, I'm sorry.  I got you.

01:29  9   Yeah.

01:29  10                   Go ahead.  If you'll go ahead and argue,

01:29  11  please.

01:29  12                   MR. QUILICI:  Yes, Your Honor.

01:29  13                   And I don't want to put words into my

01:29  14  friend's-across-the-aisle's mouth, but the -- I believe

01:29  15  the issue here is whether or not the license defense is

01:29  16  in the case.

01:29  17                   It was pled.  It was in the contentions.

01:29  18  And it was -- there was a motion to exclude the license

01:29  19  defense, and my understanding was that Your Honor

01:29  20  denied that motion at the pretrial conference.

01:29  21                   So as far as we're concerned, the license

01:29  22  defense is in the case.

01:29  23                   THE COURT:  Tell me this -- I don't think

01:29  24  Mr. Devlin's going to dispute that it was pled.

01:29  25                   So tell me, generally speaking, if

—1217—

01:29   1    someone put evidence in at trial --

01:29   2                      MR. QUILICI:  Uh-huh.

01:29   3                      THE COURT:  -- at this point I give an

01:29   4    instruction, if it was unobjected to -- and I didn't

01:30   5    hear objections about this during the trial.

01:30   6                      So tell me what evidence you have that

01:30   7    would support me giving an instruction with regard to

01:30   8    the license.

01:30   9                      MR. QUILICI:  We've put into evidence the

01:30   10   Microsoft license.  We put into evidence, I believe

01:30   11   through Ms. Mahar, that components of both of the --

01:30   12   the two accused websites that are at issue here are

01:30   13   combined with Microsoft software that is licensed under

01:30   14   that license and that the license, which speaks for

01:30   15   itself, expressly contemplates that software that is

01:30   16   combined with that is covered.

01:30   17                      THE COURT:  And remind me, were there any

01:30   18   objections to the admissibility of that during the

01:30   19   trial?

01:30   20                      MR. QUILICI:  I don't specifically recall

01:30   21   any objections.

01:30   22                      THE COURT:  I don't remember them.  So

01:30   23   okay.

01:30   24                      So, Mr. Devlin, there's evidence in the

01:30   25   record that supports this -- me giving this

—1218—

```
01:30   1    instruction.  Why shouldn't I?
01:30   2                    I mean, let me put it this way.  Maybe
01:30   3    this will help you.  And I could be wrong; you can tell
01:30   4    me I'm wrong in the way I'm thinking.
01:31   5                    But to me the way I see this is you're --
01:31   6    by fighting over this instruction, you're actually
01:31   7    asking me to give a directed verdict in your favor, and
01:31   8    which I --
01:31   9                    MR. DEVLIN:  That's exactly right.
01:31  10                    THE COURT:  So we're on the same page
01:31  11    there.  So explain why you think you're entitled to a
01:31  12    directed verdict on this.
01:31  13                    MR. DEVLIN:  So in this case, obviously,
01:31  14    the defendant is raising a license defense.  And as an
01:31  15    example of how complex this is, what you just heard
01:31  16    from defense counsel omitted the fact that there are
01:31  17    enumerated exceptions to the downstream effect of the
01:31  18    license in the Microsoft agreement itself.
01:31  19                    These are complex terms that someone
01:31  20    should talk about, if they want to raise this defense,
01:31  21    address them, explain exactly how what the technology
01:31  22    they're using fits within the license is outside the
01:31  23    exceptions that are expressly related in the license.
01:31  24                    This is a complex technology agreement.
01:31  25                    THE COURT:  Let me switch back to
```

—1219—

01:31    1    opposing counsel for just a second.

01:32    2                    I don't recall you -- I don't

01:32    3    specifically recall Microsoft coming in through your

01:32    4    corporate representative, but I'm going to assume it

01:32    5    did.  That's fine.

01:32    6                    Who on your side -- and it'd be even

01:32    7    better if it were an expert.  Who on your side

01:32    8    articulated for the jury that the Microsoft license

01:32    9    gave them a release?

01:32    10                   Who -- in other words, I got that the

01:32    11   Microsoft license may be in evidence and that you all

01:32    12   on closing argument might like to argue something that

01:32    13   was in the Microsoft license gives you a release, but

01:32    14   what evidence was admitted during the trial where

01:32    15   someone on the witness stand put into evidence for the

01:32    16   jury the reasons why they believed that the Microsoft

01:32    17   license released your client?

01:33    18                   That's up to anyone.

01:33    19                   MR. JENSEN:  That would be Ms. Nanci

01:33    20   Mahar.  She did not analyze the license --

01:33    21                   THE COURT:  No.  I mean, she put the

01:33    22   license in.  But I'm saying --

01:33    23                   MR. JENSEN:  The license came in through

01:33    24   their witnesses, the license itself.  Ms. Mahar

01:33    25   testified as to the use of Microsoft products and

—1220—

01:33   1   services for hosting the website, for implementing the

01:33   2   website.  They're built on the .net platform.

01:33   3                   And all of those things are encompassed,

01:33   4   I would submit, by not a convoluted complex license

01:33   5   agreement.  You look at the definitions, it's all

01:33   6   entities worldwide, anywhere, any which way, in any

01:33   7   combination whatsoever.

01:33   8                   THE COURT:  So now let me flip back --

01:33   9   and thank you, sir.

01:33  10                   Let me flip back to you, Mr. Devlin.  I

01:33  11   do remember -- and I remember thinking that's why they

01:33  12   were putting the evidence in.

01:33  13                   That evidence is in the record.  Why

01:33  14   wouldn't the defendant be entitled -- and it was

01:33  15   unobjected to, I think.  Why wouldn't the defendant be

01:33  16   able to tell the jury that, A, the license is in.  And

01:33  17   that they heard testimony from a corporate

01:34  18   representative, exactly what we just heard.  And

01:34  19   because of that there may be a release.  The jury will

01:34  20   have the license and they can make that determination

01:34  21   based on the evidence -- the unobjected-to evidence

01:34  22   that was put in?

01:34  23                   MR. DEVLIN:  So just so we understand why

01:34  24   we did what we did here, the only disclosure of a

01:34  25   license defense in this case has been a bare assertion

01:34  1    that they're licensed through Microsoft, period.

01:34  2                    It came in in an amended answer and it

01:34  3    came in a contention about a paragraph or two long.

01:34  4                    THE COURT:  And then did you send them

01:34  5    discovery saying, oh, I see you put this in.  Please

01:34  6    articulate --

01:34  7                    MR. DEVLIN:  I can't remember if we did

01:34  8    that or not, but they never articulated it.

01:34  9                    THE COURT:  Well, they're not going to --

01:34  10                   MR. JENSEN:  I can provide you an

01:34  11   interrogatory response where we set this forward in our

01:34  12   supplemental response --

01:34  13                   THE COURT:  You actually did?  That was

01:34  14   asked and you did provide this information?

01:34  15                   MR. JENSEN:  That's correct.  Two times.

01:34  16   With respect to the main website during discovery,

01:34  17   after the --

01:34  18                   (Simultaneous speakers.)

01:35  19                   THE COURT:  I got it.  I got it.

01:35  20                   MR. DEVLIN:  So one other piece of --

01:35  21                   THE COURT:  I'm going to overrule.  This

01:35  22   is -- I'm going to put this in.

01:35  23                   You can go ahead and say whatever else

01:35  24   you want on the record.

01:35  25                   MR. DEVLIN:  Sure.  Ms. Mahar, in her

—1222—

| | | |
|---|---|---|
| 01:35 | 1 | deposition, said she was not aware of these licenses. |
| 01:35 | 2 | THE COURT:  That doesn't matter. |
| 01:35 | 3 | MR. DEVLIN:  Okay. |
| 01:35 | 4 | THE COURT:  I mean, that might have been |
| 01:35 | 5 | interesting if you'd taken her on voir dire and gotten |
| 01:35 | 6 | her to admit that.  And we might have had a different |
| 01:35 | 7 | outcome with it being in the record. |
| 01:35 | 8 | But that doesn't matter to me now. |
| 01:35 | 9 | MR. DEVLIN:  Thank you. |
| 01:35 | 10 | THE COURT:  Because that's -- there's no |
| 01:35 | 11 | evidence of that at trial.  I don't think. |
| 01:35 | 12 | MR. DEVLIN:  Excuse me? |
| 01:35 | 13 | THE COURT:  There's no evidence of that |
| 01:35 | 14 | at trial.  Did you ask her that at trial? |
| 01:35 | 15 | MR. DEVLIN:  No.  There's no evidence |
| 01:35 | 16 | that she even talked about the license, so I didn't ask |
| 01:35 | 17 | her about it. |
| 01:35 | 18 | So I understand Your Honor's point, and |
| 01:35 | 19 | we'll go forward. |
| 01:35 | 20 | THE COURT:  Okay.  So now having said -- |
| 01:35 | 21 | now having said I'm going to allow something that looks |
| 01:35 | 22 | like Instruction No. 22 in, do you think that you all |
| 01:35 | 23 | can work out what -- |
| 01:35 | 24 | And you're on the record -- actually, |
| 01:35 | 25 | Mr. Devlin, you can repeat it if you want to.  But |

—1223—

01:35  1    you're on the record right now, and your objection to

01:36  2    this particular part of the charge will be in the

01:36  3    record already.

01:36  4              And so right now what if you all can come

01:36  5    up with language that you agree to while maintaining

01:36  6    your objection that any language go in.  I'm happy for

01:36  7    you to do that, or I'm happy to hear you argue about

01:36  8    what I should do.

01:36  9              MR. DEVLIN:  That sounds great, Your

01:36  10   Honor.  If we could take a break and we'll talk for

01:36  11   five or ten minutes.

01:36  12             THE COURT:  Sure.  I'll tell you what.

01:36  13   If you all work that out, great.  Let me know.

01:36  14             If you don't work it out, let Jeff know,

01:36  15   and I'll get it resolved.  And then I'll come back in.

01:36  16   We will -- I'll bring the jury in.  We will finish up

01:36  17   with your witness.

01:36  18             And then once you get the completed

01:36  19   charge in a clean fashion, at the end of the evidence

01:36  20   I'll send the jury out.  I'll let you make all your

01:37  21   objections on the record for both sides.  I'll bring

01:37  22   the jury back in.  I'll read the charge and then we'll

01:37  23   be done.

01:37  24             Does that work for you, Mr. Devlin?

01:37  25             MR. DEVLIN:  Absolutely, Your Honor.

—1224—

01:37   1                    THE COURT:  Does that work for you guys?

01:37   2                    MR. QUILICI:  Yes.

01:37   3                    THE COURT:  Okay.  If you take -- try not

01:37   4    to take more than about ten minutes, just because we

01:37   5    have the jury waiting.  But other than that, if you'd

01:37   6    just let Jeff know.

01:37   7                    (Recess taken.)

02:08   8                    THE BAILIFF:  All rise.

02:08   9                    THE COURT:  Please remain standing for

02:08   10   the jury.

02:08   11                   (Jury entered the courtroom.)

02:09   12                   THE COURT:  Thank you.  You may be

02:09   13   seated.

02:09   14                   Counsel?

02:09   15   BY MR. BREWER:

02:09   16       Q.    Welcome back, Mr. Jordan.  Before the lunch

02:10   17   break we were discussing Mr. Blok's failure to fairly

02:10   18   look at the licensing history, right?

02:10   19       A.    That's correct.

02:10   20                   MR. BREWER:  Can we put back up the

02:10   21   slides that were on before lunch, please?

02:10   22   BY MR. BREWER:

02:10   23       Q.    And we ran through the other licenses and

02:10   24   royalties, right?

02:10   25       A.    That's right.

—1225—

```
02:10   1        Q.    What impact did Mr. Blok's failure to fairly
02:10   2   look at the licensing history have on his analysis?
02:10   3        A.    It resulted in a significantly inflated damage
02:10   4   amount, especially when you look at it relative to the
02:10   5   comparable licenses that we discussed prior to lunch.
02:10   6        Q.    What's the next rule that Mr. Blok failed to
02:10   7   follow when he rendered his damages opinion?
02:10   8        A.    He failed to base the royalty on verified
02:10   9   facts.
02:10  10        Q.    How so?
02:10  11        A.    Well, we've talked a lot before lunch about
02:11  12   the two data inputs that flow into his calculation of
02:11  13   the $30 million.  That's the 5 percent royalty rate and
02:11  14   the $215,000 per day.  Those are the two drivers of his
02:11  15   analysis.
02:11  16             And we've talked a little bit about those so
02:11  17   far and we covered some of that.  But I want to
02:11  18   highlight a few other areas where he ignored other
02:11  19   evidence that's probative.
02:11  20        Q.    What is problematic about his use of the
02:11  21   5 percent from ███████████████
02:11  22        A.    Well, he essentially cherry-picked that number
02:11  23   out of the ███████████ license agreement and
02:11  24   ignored other -- or appears to have ignored other areas
02:11  25   within the agreement.
```

02:11  1      Q.    And if you look at ████████████ as a whole,

02:11  2  what do you find?

02:11  3      A.    Well, simply when you look at the ██████

02:11  4  ██████ license agreement, it was for an $██████

02:12  5  royalty.  We talked about that a little bit earlier.

02:12  6          And the length of that license agreement was

02:12  7  for 12 years.  So essentially those patents were being

02:12  8  licensed for less than $█████ per year.

02:12  9          ██████████████ is a web services company.

02:12  10  The website is the product.  Microchip's product is not

02:12  11  the website.  It's the microchips themselves.

02:12  12          And it's my understanding that ████████████

02:12  13  can make unlimited use of those patents for that

02:12  14  $█████ lump-sum payment.

02:12  15      Q.    Did Mr. Blok compare ██████████████ as a

02:12  16  company with Microchip as a company?

02:12  17      A.    Not really.

02:12  18      Q.    Did you?

02:12  19      A.    I did.  And like I mentioned, they're two

02:12  20  different types of companies.  ██████████████ is a web

02:12  21  services company and Microchip sells microchips.

02:12  22      Q.    What about the 215,000-a-day figure?  What's

02:13  23  problematic about that?

02:13  24      A.    Well, again, we talked about several things

02:13  25  earlier today about the issues with that and the

—1227—

02:13  1    apportionment that needs to be done, and then the

02:13  2    adjustment that would need to be made to isolate the

02:13  3    U.S. sales.

02:13  4            But beyond that, you know, Mr. Blok's analysis

02:13  5    takes that 2019 number, from April 2019, and applies it

02:13  6    all the way back to 2014 and then all the way forward

02:13  7    to 2021 as well.

02:13  8    Q.    Why is that problematic?

02:13  9    A.    Well, when you look at the historical period

02:13  10   first, we know from Ms. Mahar's testimony earlier this

02:13  11   week, when you look back to 2014 -- and what I've

02:13  12   highlighted on this demonstrative is that Microchip was

02:13  13   very acquisitive during this time period and acquired

02:13  14   multiple companies.  She also noted that the revenues

02:13  15   tripled during that time period.

02:13  16           So looking retroactively, applying that

02:14  17   $215,000 retroactively all the way back to 2014 isn't

02:14  18   reasonable.

02:14  19   Q.    And what about going forward to 2021?  Was

02:14  20   there anything wrong with that?

02:14  21   A.    Yes.  A similar concept.  Mr. Blok didn't

02:14  22   properly account for -- and it's illustrated here on

02:14  23   this burndown chart -- how Caddo is not accusing the

02:14  24   redesigned website of infringing.

02:14  25           And what we know is from, you know, late

02:14   1    October 2020 moving forward into 2021, the number of

02:14   2    web pages that had the accused breadcrumb was

02:14   3    decreasing significantly, as illustrated in this chart.

02:14   4    Failing to account for that is also another issue in

02:14   5    his analysis.

02:14   6        Q.    So in other words, the old website, which is

02:14   7    what's accused on microchip.com, was disappearing over

02:15   8    this period.  And yet he assumed that it was still --

02:15   9    that $215,000-a-day number was constant throughout the

02:15   10   period?

02:15   11       A.    That's correct.

02:15   12       Q.    What about the Forum?

02:15   13       A.    We touched on this a little bit earlier.  I've

02:15   14   identified no evidence that indicates the Microchip

02:15   15   Forum website drives any revenue.  As we've talked

02:15   16   about, the Forums website is a discussion board, a

02:15   17   community discussion board for customers.

02:15   18             I've touched on Dr. Wolf's analysis that

02:15   19   indicated the previous calendar year of 2021, the

02:15   20   revenue attributed to the Forums through Microchip

02:15   21   Direct was $70.  And the fact that Microchip paid only

02:15   22   $400 a year for the use of this technology.

02:15   23       Q.    And yet Mr. Blok assumes that throughout the

02:16   24   period during which only the Forum website is accused,

02:16   25   somehow it was responsible for $215,000 a day of

-1229-

02:16  1   revenues?

02:16  2       A.    That's right.  If you look at that 2014 to

02:16  3   2018 time period, which is when -- 2018 is when the

02:16  4   accused -- the old website was put in place, the only

02:16  5   accused website was the Forums during that period.  So

02:16  6   he's attributing the $215,000 per day to the Forums for

02:16  7   that four- or five-year period.

02:16  8       Q.    What's the last rule that Mr. Blok failed to

02:16  9   follow?

02:16  10      A.    He failed to properly consider the

02:16  11  noninfringing alternatives that were available at the

02:16  12  time of the hypothetical negotiation and throughout the

02:16  13  time period of infringement -- alleged infringement.

02:16  14  Excuse me.

02:16  15      Q.    How does the presence of noninfringing

02:17  16  alternatives affect the damages analysis?

02:17  17      A.    Well, again, at the hypothetical negotiation,

02:17  18  you're trying to determine what each party -- well, in

02:17  19  this case, what Microchip would be willing to pay and

02:17  20  what Mr. Moehrle would be willing to accept, and you

02:17  21  need to factor in to both of their minds what

02:17  22  noninfringing available alternatives there were.  And

02:17  23  that would include any websites that Microchip could

02:17  24  have used instead of the alleged infringed website.

02:17  25      Q.    Can you give some examples of the

—1230—

02:17  1    noninfringing alternatives that you considered?

02:17  2        A.    Yes.  And these were ones that Mr. Tittel

02:17  3    identified and discussed yesterday during his

02:17  4    testimony.

02:17  5            The first would be a top navigation with the

02:17  6    breadcrumb but with no drop-down.  That is what's on

02:17  7    the redesigned website that's not accused.

02:17  8            A top navigation menu without a breadcrumb --

02:17  9    that's what's on Microchip Direct, the e-commerce site,

02:18  10   right now.  That website is also not accused.

02:18  11           Other established software platforms, like we

02:18  12   talked about Forumbee.  That is an alternative for the

02:18  13   Forums website.

02:18  14           Search, I know we spent a lot of time with

02:18  15   Mr. Tittel on that.  Google, as well as Amazon, employs

02:18  16   search functionality.

02:18  17           A tabbed approach is a functionality that

02:18  18   Amazon has used.

02:18  19           And then also the left navigation menu that

02:18  20   existed on microchip.com prior to September 2018,

02:18  21   that's also not accused.

02:18  22       Q.    And you relied on Mr. Tittel's opinion that

02:18  23   these constitute noninfringing alternatives; isn't that

02:18  24   right?

02:18  25       A.    That's right.

—1231—

02:18  1          Q.    And you were here earlier this week for

02:18  2    Mr. Sherwood's testimony; isn't that right?

02:18  3          A.    I was.

02:18  4          Q.    Do you know whether Mr. Sherwood had any

02:19  5    specific opinions about these particular noninfringing

02:19  6    alternatives?

02:19  7          A.    He essentially says that there are no

02:19  8    noninfringing alternatives available.

02:19  9          Q.    Do you know why he says that?

02:19  10         A.    I don't -- I don't completely understand it

02:19  11   from a technical perspective.

02:19  12         Q.    And what about the Forum?

02:19  13         A.    Well, the Forum, I touched on this a few

02:19  14   minutes ago.  The Forumbee is a noninfringing

02:19  15   alternative that Mr. Tittel did identify in his

02:19  16   analysis.

02:19  17               And what we know about the Forumbee website

02:19  18   back in 2014, at the time of the hypothetical

02:19  19   negotiation, was that it could be licensed for $199 per

02:19  20   month.  So over a 12-month period that would be

02:19  21   approximately $2,300.

02:19  22               And from March 2004 to the -- I'm sorry --

02:20  23   2014 to the expiration of the patents, which is about

02:20  24   nine and a half years, that would be approximately

02:20  25   $21,000.

02:20   1          So at the time of the hypothetical

02:20   2   negotiation, Microchip would have had Forumbee as an

02:20   3   available alternative for approximately $21,000 that

02:20   4   they could have changed to instead of paying this

02:20   5   $30 million license amount or reasonable royalty that

02:20   6   Mr. Blok has calculated.

02:20   7       Q.   And this Forumbee software was available in

02:20   8   2014?

02:20   9       A.   Yes.

02:20  10       Q.   Is that your understanding?

02:20  11       A.   That's my understanding.

02:20  12       Q.   Do you know if it's still available?

02:20  13       A.   That's also my understanding.  Yes.

02:20  14       Q.   And in 2014, Microchip -- do you know what

02:20  15   company provided the software that Microchip used to

02:20  16   provide its Forum website?

02:20  17       A.   Yes.  It's a company called ASP Playground.

02:20  18       Q.   Do you know whether that company's still

02:21  19   around?

02:21  20       A.   My understanding from Ms. Mahar's testimony is

02:21  21   that that company is either going out of business or is

02:21  22   already out of business, and that they're no longer

02:21  23   going to be hosting or providing updates for that

02:21  24   software or website functionality.

02:21  25       Q.   Can you tell us how the presence of these

—1233—

02:21    1    noninfringing alternatives affected your analysis?

02:21    2        A.    Yes.  As I've talked about several times

02:21    3    today, that information is extremely probative and

02:21    4    highly relevant to the hypothetical negotiation.

02:21    5            It is an alternative that Microchip could have

02:21    6    turned to at that time for an alternate price instead

02:21    7    of paying this $30 million royalty that Mr. Blok has

02:21    8    calculated.

02:21    9        Q.    What was your conclusion about what would have

02:21   10    happened -- or what would have been the case had

02:22   11    Mr. Blok followed all of these rules?

02:22   12        A.    He would have come to a fundamentally

02:22   13    different answer in his analysis.

02:22   14        Q.    And you did your own separate independent

02:22   15    analysis, correct?

02:22   16        A.    I did.  Yes.

02:22   17        Q.    What was the result of that analysis?

02:22   18        A.    Well, if you follow the rules and apply the

02:22   19    Georgia Pacific factors the way you're supposed to, we

02:22   20    would look at the hypothetical negotiation in March of

02:22   21    2014.

02:22   22            And the basic question is:  What would

02:22   23    Mr. Moehrle and Microchip have agreed to from a royalty

02:22   24    perspective?

02:22   25            You should consider that the Forums was the

```
02:22    1    only use or alleged infringement at that time in 2014
02:22    2    and consider that there may be future use on the main
02:22    3    or -- I'm sorry -- the old microchip.com website from
02:22    4    the 2018 to 2020 time period until the redesign began.
02:23    5        Q.    So in performing your own analysis of what a
02:23    6    reasonable royalty would be in this case, what was your
02:23    7    starting point at the hypothetical negotiation?
02:23    8        A.    It goes back to what value do the patents
02:23    9    provide or the incremental value of the accused
02:23   10    functionality.
02:23   11        Q.    How do you figure that out?
02:23   12        A.    Well, we talked a lot earlier about looking at
02:23   13    the comparable licenses, which is something that I did
02:23   14    do and did consider in my analysis.  I looked at all
02:23   15    ███ of the comparable analyses.
02:23   16           The ███ agreement that included licenses
02:23   17    for -- or the right to use the patents for ████
02:23   18    different companies, including ████████████
02:23   19    ████████████████████████████████████████████
02:23   20    ███████████████.
02:23   21           I looked at the other comparable licenses that
02:23   22    ranged on the high end with ████████████
02:23   23    ████ all the way down to the ███████████
02:24   24    ████████████████████
02:24   25           Then I also considered the ████ agreement
```

02:24   1    between Microchip and ████ for similar technology, as

02:24   2    Mr. Tittel explained yesterday.  That amount was for

02:24   3    $█████

02:24   4           Using that information, just like we talked

02:24   5    about earlier, when you're trying to understand the

02:24   6    right price for a home to pay, you're looking at

02:24   7    comparables and trying to find a range of reasonable

02:24   8    values.  That's how I used these comparable licenses.

02:24   9      Q.    What was the next step in your analysis?

02:24  10      A.    I also looked at the alternatives, like we

02:24  11    just talked about.

02:24  12           For the Forum website at the hypothetical

02:24  13    negotiation, Mr. Tittel identified that as a

02:24  14    noninfringing alternative.  And like we just talked

02:24  15    about, at that time Microchip could have turned to

02:24  16    Forumbee for approximately $21,000 for the life of

02:24  17    the patents.  That's consistent with the comparable

02:25  18    licenses that we just talked about.

02:25  19           As far as microchip.com, we talked about the

02:25  20    available noninfringing alternatives there, the

02:25  21    redesigned website, microchip.com, the legacy website

02:25  22    that was in place in -- before the old website, and

02:25  23    then other noninfringing alternatives.

02:25  24           Those were all alternatives that Microchip

02:25  25    could turn to as well.

—1236—

02:25   1        Q.    What was your conclusion regarding the

02:25   2   reasonable royalty that the parties would have agreed

02:25   3   to at the hypothetical negotiation in March 2014 when

02:25   4   you apply those Georgia-Pacific factors and follow the

02:25   5   rules?

02:25   6        A.    Yeah.  If you properly apply the

02:25   7   Georgia-Pacific factors, look at all the comparable

02:25   8   licenses, factor in apportionment properly, I

02:25   9   quantified a $20,000 lump-sum payment is the

02:26  10   appropriate reasonable royalty, should you find that

02:26  11   the patents infringed and were invalid.

02:26  12        Q.    Now, yesterday Mr. Blok told me that if he was

02:26  13   wrong about his use of those -- of that 5 percent or

02:26  14   that $215,000 a day, we could fix his analysis.

02:26  15             Do you recall that?

02:26  16        A.    I do.  I was here for that.  Yes.

02:26  17        Q.    How would we fix what needs fixing?

02:26  18        A.    Well, and I want to be clear.  We just -- my

02:26  19   analysis is different than the way Mr. Blok approached

02:26  20   it.  I don't believe using those two data points and

02:26  21   calculating the reasonable royalty the way he did is

02:26  22   the correct way to approach this.

02:26  23             But even if we were to assume that his

02:26  24   5 percent royalty rate is the correct royalty rate to

02:26  25   apply in a mathematical formula, you still must isolate

02:27   1    the incremental value of the patents to the website and

02:27   2    to Microchip.

02:27   3        Q.   So what would be the first step?

02:27   4        A.   This is the same apportionment adjustment and

02:27   5    then an adjustment for the U.S. sales that we discussed

02:27   6    this morning.  You would need to make those adjustments

02:27   7    and then apply the 5 percent.

02:27   8            So you would start -- for the larger damage

02:27   9    period, from 2014 to 2021, look at the accused revenues

02:27   10   of 604 million and isolate the sales following the

02:27   11   breadcrumb use that Dr. Wolf talked about earlier.  And

02:27   12   that would get you to the little bit over $3 million.

02:27   13       Q.   And what was the next step?

02:27   14       A.   You would then need to isolate just the U.S.

02:27   15   sales.  And we did that -- and I did that by applying

02:27   16   the 19 percent.  That gets you to $575,000 for the 2014

02:27   17   to 2021 time period.

02:28   18       Q.   And the same analysis applies to his other

02:28   19   damages period; is that right?

02:28   20       A.   That's correct.  The 2018 to 2021 damage

02:28   21   period, you would apply the 5.5 percent to isolate the

02:28   22   incremental value; then you would apply the 19 percent

02:28   23   to isolate the U.S. sales.  And that arrived -- you

02:28   24   arrive at a $243,000 number.

02:28   25       Q.   So after you've done those two steps to

—1238—

02:28  1    isolate the value of these patents and remove the

02:28  2    foreign sales, what next?

02:28  3         A.    Well, then -- again, and I don't agree with

02:28  4    the 5 percent, but you could apply that 5 percent to

02:28  5    both the $575,000 amount, which again is after you've

02:28  6    apportioned that amount to isolate the value of the

02:28  7    patents and isolated it to be just U.S. sales, and then

02:28  8    that's for the larger damage period.

02:29  9              You'd apply the same adjustments for the

02:29  10   smaller damage period, or the shorter damage period,

02:29  11   and apply the 5 percent to those.  And you get a

02:29  12   lump-sum royalty range of $28,750 to $12,150 for the

02:29  13   shorter damage period.

02:29  14        Q.    How do these numbers compare with the result

02:29  15   that Mr. Blok reached?

02:29  16        A.    They're significantly lower than what his

02:29  17   analysis results in.

02:29  18        Q.    Are these numbers consistent with your

02:29  19   analysis?

02:29  20        A.    They are.

02:29  21        Q.    Do these numbers confirm the way that you

02:29  22   approached the problem?

02:29  23        A.    Yes.  If you look at these two numbers, my

02:29  24   $20,000 lump-sum royalty calculation falls pretty much

02:29  25   in the middle of these.

—1239—

02:29  1           When you look at these amounts relative to the

02:29  2  ███ agreement that includes the $ ███ license to the

02:30  3  ███ companies; you look at the ███ agreement that

02:30  4  Microchip entered into with them for similar website

02:30  5  technology, that was $ ███ and then you also look at

02:30  6  the fact the other comparable licenses with ██████

02:30  7  ██████, they're all within this range of values,

02:30  8  all significantly less than what Mr. Blok calculated

02:30  9  from $30 million in damages.

02:30  10          Q.   Mr. Jordan, what is your ultimate conclusion

02:30  11  regarding the appropriate reasonable royalty in this

02:30  12  case?

02:30  13          A.   Well, when you follow the rules, when you

02:30  14  appropriately apply the Georgia-Pacific factors, when

02:30  15  you properly consider all of the information, the

02:30  16  comparable licenses with Caddo, the comparable ███

02:30  17  license, when you factor in the noninfringing

02:30  18  alternatives available like Forumbee and the other

02:30  19  available websites to Microchip, the correct answer is

02:30  20  a $20,000 lump-sum royalty payment.

02:31  21          Q.   Two last questions:  First, if the jury finds

02:31  22  there's no infringement in this case, what's the

02:31  23  appropriate measure of damages?

02:31  24          A.   There are no damages.

02:31  25          Q.   And if Microchip was licensed to use these

1240

02:31  1   patents for any part of the damages period, what's the

02:31  2   appropriate damages for that part?

02:31  3       A.    For that part it'd also be zero.

02:31  4                 MR. BREWER:  Pass the witness.

02:31  5                       CROSS-EXAMINATION

02:31  6   BY MR. DEVLIN:

02:32  7       Q.    Good afternoon, Mr. Jordan.

02:32  8       A.    Good afternoon.

02:32  9       Q.    Good to see you.

02:32  10           So I want to talk about the two issues that

02:32  11  you were talking about with respect to Mr. Blok's

02:32  12  opinions.  So we've got a royalty rate and we've got a

02:32  13  royalty base, right?

02:32  14      A.    Yes.  Those are both in his analysis.

02:32  15      Q.    Right.  And that's typical.  You have a rate

02:32  16  and a base.  You multiply those and then you get

02:33  17  damages when you're using a rate like that to calculate

02:33  18  what damages are, right?

02:33  19      A.    I'm not sure I would agree with that.

02:33  20      Q.    Okay.  So in any event, that's what happened

02:33  21  here.  He has a royalty base that he works from and

02:33  22  then a royalty rate that he applies to that base, okay?

02:33  23      A.    It's a fair way to characterize his analysis.

02:33  24      Q.    Thanks.

02:33  25           I want to talk about the base first, okay?

—1241—

02:33   1                    MR. DEVLIN:  And if we could look at

02:33   2   Plaintiffs' 96 at Page 36, Mr. Gooden, when you get

02:33   3   that up.  Plaintiffs' 96.

02:33   4                    And if we could pull up that block of

02:33   5   text right there.  Thank you.

02:33   6        A.    Mr. Devlin, is it in this binder?

02:33   7   BY MR. DEVLIN:

02:33   8        Q.    Well, it's on the screen there if you don't

02:33   9   mind --

02:33   10                   (Simultaneous speakers.)

02:33   11       A.    Oh, okay.  I'm sorry.

02:33   12   BY MR. DEVLIN:

02:33   13       Q.    Thank you.  And, yeah, you should be able to

02:33   14   see everything on the screen hopefully.

02:33   15                   So this is the source of the royalty base

02:34   16   number that Mr. Blok uses.  We all agree on that,

02:34   17   right?

02:34   18       A.    That's correct.

02:34   19       Q.    Okay.  And here what it says is that

02:34   20   microchip.com drives $215,000 of revenue per day

02:34   21   through the e-commerce portal.

02:34   22                   Do you see that?

02:34   23       A.    Yes.

02:34   24       Q.    So what that number drives, let's talk about

02:34   25   that word -- I mean "drives."  People use that word

02:34  1    about driving revenue.  You've heard that used

02:34  2    generally, right?

02:34  3         A.    Yes.

02:34  4         Q.    You could have an advertisement on TV that

02:34  5    would drive revenue for an automaker, right?

02:34  6         A.    That's one way you could characterize it.

02:34  7         Q.    A billboard can drive revenue, right?

02:34  8         A.    It could.

02:34  9         Q.    People doing research on a website could drive

02:34  10   revenue, right?

02:34  11        A.    I could see a scenario where that might

02:34  12   happen.

02:34  13        Q.    Let's talk about one.  You heard Ms. Mahar say

02:34  14   that the purpose, the main purpose of the microchip.com

02:34  15   website was to provide information for people, right?

02:34  16        A.    I believe that's one of the purposes of it.

02:35  17   Yes.

02:35  18        Q.    Okay.  She said the primary purpose.

02:35  19              Do you remember that?

02:35  20        A.    I don't recall specifically.

02:35  21        Q.    Okay.  We'll look at -- maybe see that

02:35  22   sometime else.

02:35  23              But one of the things you also saw is you have

02:35  24   these various customers.  You might have seen it during

02:35  25   Mr. Sherwood's testimony when we saw those sample

02:35  1   customers from Microchip.  Remember that?  People who

02:35  2   might go to the website, do some research.  Remember

02:35  3   those?

02:35  4       A.    Oh, the ones with the -- the fictitious ones

02:35  5   with --

02:35  6       Q.    Exactly.  Yeah.  Okay.  And you also heard

02:35  7   from Ms. Mahar that there are a lot of large sales that

02:35  8   Microchip has with different corporate customers,

02:35  9   right?

02:35  10      A.    I believe those were the ones she identified

02:35  11  that came through outside the website channels.

02:35  12      Q.    Okay.  So -- and that's interesting that you

02:35  13  say that, because obviously people who are going to

02:35  14  make very large sales, millions of dollars, tens of

02:35  15  millions of dollars, even hundreds of thousands of

02:36  16  dollars, they're going to do some research before they

02:36  17  make those purchases, right?

02:36  18      A.    Well, there's lots of different ways to

02:36  19  conduct research.  Especially in situations where

02:36  20  you're bulk ordering.

02:36  21      Q.    I totally agree with you.  And there's one

02:36  22  huge repository of information about Microchip's

02:36  23  products that's available at anyone's fingerprints at

02:36  24  any time.  And we know what that is, right?  What's

02:36  25  that?

1244

02:36  1      A.    Again, it's my understanding that the

02:36  2  microchip.com website does have information on it about

02:36  3  the products.

02:36  4      Q.    Okay.  Lots of products, thousands of

02:36  5  products, right?

02:36  6      A.    I personally don't have knowledge about the

02:36  7  number of products on Microchip's website.  I

02:36  8  understand that -- I believe Ms. Mahar did testify to

02:36  9  that.  Yes.

02:36  10     Q.    Great.

02:36  11     A.    That there was a significant number of

02:36  12  products.

02:36  13     Q.    It was 26,000 pages.

02:36  14           Do you remember that?

02:36  15     A.    I'm sorry, Mr. Devlin.  I don't recall that

02:36  16  number specifically.

02:36  17     Q.    No problem.

02:36  18           Did you ever consider a use case where someone

02:36  19  is going to do a major purchase and they're going to

02:37  20  start researching that over the course of days or weeks

02:37  21  or months?

02:37  22           Ever think about that?

02:37  23     A.    That's not a scenario that I considered as

02:37  24  part of my analysis.

02:37  25     Q.    All right.  And then having done that, they

1245

02:37  1   can collect information, talk to people in their

02:37  2   industry, call up salespeople as well and get some more

02:37  3   information.  And then, ultimately, make a purchase,

02:37  4   right?  That could happen?

02:37  5        A.    Of course that could happen.

02:37  6        Q.    Thank you.

02:37  7              Sometimes they might make that purchase by

02:37  8   going to microchipdirect.com and making a purchase,

02:37  9   right?

02:37  10       A.    That's not my understanding.  Again, based on

02:37  11   information from Ms. Mahar, and I believe Mr. Wolf in

02:37  12   past conversations as well, is that if customers are

02:37  13   buying significant quantities of products or are repeat

02:37  14   customers, they have direct salespeople that they work

02:37  15   with primarily.  And most of those sales are completed

02:38  16   in that way, not on microchipdirect.com, the e-commerce

02:38  17   website.

02:38  18       Q.    Thanks for that.  And I am going to come right

02:38  19   back to that, but I've got an interim question for you.

02:38  20             The interim question is:  The kind of sales

02:38  21   you just described, they're not even in this damages

02:38  22   case at all.  They're totally excluded and Microchip

02:38  23   keeps all of it, right?

02:38  24       A.    Well --

02:38  25       Q.    Right?

1246

02:38   1           A.    I don't necessarily agree with that,

02:38   2    Mr. Devlin.

02:38   3           Q.    So the damages case here is based on what

02:38   4    microchip.com -- sorry -- what Microchip said

02:38   5    microchip.com drives through the e-commerce portal,

02:38   6    right?

02:38   7           A.    Mr. Blok's analysis is based on this one

02:38   8    document.

02:38   9           Q.    That's my point.  And so that's the damages

02:38   10   base here.  The revenue base is stuff that went through

02:38   11   the e-commerce portal according to Microchip itself in

02:38   12   this business document, right?

02:38   13          A.    Again, Mr. Blok's analysis is based almost

02:39   14   solely on this document.  It doesn't factor in the

02:39   15   other items that we discussed earlier today.

02:39   16          Q.    And what doesn't factor in is the major sale

02:39   17   that you just talked about, if someone calls up a

02:39   18   salesperson and orders something for $5 million.

02:39   19   Because that's not through the e-commerce portal.  And

02:39   20   so Microchip keeps all that revenue, right?

02:39   21          A.    Again, it's my understanding that there is a

02:39   22   direct sales channel where there are salespeople

02:39   23   working with these customers.  That would not be part

02:39   24   of microchipdirect.com.

02:39   25          Q.    And it's not part of the damages base here,

02:39 1   correct?

02:39 2       A.    Again, I don't necessarily agree with that.

02:39 3   This $215,000 number, as we've talked about in great

02:39 4   detail, is not a reliable number.  It is an amount that

02:39 5   was in one presentation-- or I'm sorry -- two different

02:39 6   versions of this presentation.  It's inconsistent with

02:40 7   the other facts that are in evidence.

02:40 8       Q.    Sir, I have limited time here, and so I'm

02:40 9   hoping you can answer my questions and we can get

02:40 10  there.

02:40 11          According to Microchip's own document, whether

02:40 12  you consider it reliable or not, according to this

02:40 13  document, the revenue that is being discussed in this

02:40 14  case is revenue driven from microchip.com through the

02:40 15  e-commerce portal.  And that's it, right?

02:40 16      A.    That is what this document states.

02:40 17      Q.    And that's what the analysis is of Mr. Blok.

02:40 18  It's limited to that revenue.  That's my point, right?

02:40 19      A.    Well, and that's my point as well.

02:40 20      Q.    Great.  So then --

02:40 21      A.    He focused solely on this one number in this

02:40 22  spreadsheet.

02:40 23      Q.    Then it sounds like we agree, fair?

02:40 24      A.    Fair.

02:40 25      Q.    All right.  Thank you.

—1248—

02:40  1          And what's excluded then are -- according to
02:41  2     Microchip's own document, what is excluded is revenue
02:41  3     that comes through a channel other than the e-commerce
02:41  4     portal.  According to Microchip's own document that
02:41  5     we're staring at on the screen, right?
02:41  6          A.    Again, if you're isolating it to this one
02:41  7     document, this document -- that is what this one
02:41  8     document says.
02:41  9          Q.    All right.  Thank you.
02:41 10               MR. DEVLIN:  Let's go to Defendant's
02:41 11     Exhibit 465.
02:41 12     BY MR. DEVLIN:
02:41 13          Q.    Let's look at the these spreadsheets that you
02:41 14     did rely on.  Now, let me ask you a couple of questions
02:41 15     as we're getting there, and the screen's going to
02:41 16     change.  But I'm just talking to you right now, sir.
02:41 17          So the spreadsheets that we were looking at
02:41 18     earlier, they were -- I thought they might have come
02:41 19     from discussions.  Did you request those spreadsheets
02:41 20     from Dr. Wolf or no?
02:41 21          A.    I don't believe that's correct.
02:41 22          Q.    Did you have any input into the analysis, the
02:41 23     framework, the consideration that he took regarding
02:41 24     what would go into those spreadsheets and what would
02:42 25     not?

—1249—

02:42  1      A.    I don't believe so.

02:42  2      Q.    So you just relied totally on him?

02:42  3      A.    That's correct.

02:42  4      Q.    All right.  We're looking at --

02:42  5      A.    Well, I want to be clear.  I relied on

02:42  6  Microchip.

02:42  7      Q.    Thank you.  May have been others that helped

02:42  8  Mr. -- or Dr. Wolf, but everyone -- from Microchip is

02:42  9  what you're saying?

02:42  10      A.    Correct.

02:42  11      Q.    Thanks.  All right.

02:42  12            Now, keeping this document on here, when we --

02:42  13  and thinking a moment back at the document we were just

02:42  14  looking at where it talks about driving revenue,

02:42  15  remember that quote we just had there for a little bit?

02:42  16      A.    Yes.

02:42  17      Q.    Nothing in that quote said anything about "two

02:42  18  clicks," right?

02:42  19      A.    That quote did not include that language.  No.

02:42  20      Q.    Okay.  And I don't think anybody that we've

02:42  21  heard testify here has explained exactly how Microchip

02:42  22  came up with that $215,000 number, right?

02:42  23      A.    It's my understanding that the person who

02:43  24  inserted that number into the presentation is no longer

02:43  25  with Microchip.

1250

02:43   1        Q.    Did you try to reach out to her?

02:43   2        A.    I did not.

02:43   3        Q.    One of the pages we saw from this was, I

02:43   4   believe, Page 19.

02:43   5              MR. DEVLIN:  If we could go to Page 019,

02:43   6   Mr. Gooden.

02:43   7              Thank you.

02:43   8   BY MR. DEVLIN:

02:43   9        Q.    I think this was something that we saw earlier

02:43  10   with Dr. Wolf.

02:43  11              And you were here for that testimony, right?

02:43  12        A.    Yes.  I was.

02:43  13        Q.    Okay.  And the issue here, remember, there was

02:43  14   a bunch of data starting in February of '21 and going

02:43  15   down, where there's just -- there's nothing.

02:43  16              Do you see that?

02:43  17        A.    That's correct.

02:43  18        Q.    Okay.  And the testimony was that there's just

02:43  19   no revenue then; is that right?

02:43  20        A.    That was Dr. Wolf's testimony.  Yes.

02:43  21        Q.    Okay.  So you -- and this is what you relied

02:43  22   on, the spreadsheet here and other information, not

02:43  23   that $215,000-a-day number, right?

02:44  24        A.    This is one of the spreadsheets that I did

02:44  25   rely on.  Yes.

02:44   1          Q.    And you didn't rely on the $215,000-a-day

02:44   2    number?

02:44   3          A.    That's correct.

02:44   4          Q.    Thanks.  Okay.

02:44   5                So you relied on a spreadsheet made by an

02:44   6    employee of Microchip made for the purposes of this

02:44   7    litigation that you didn't guide whatsoever for

02:44   8    purposes of it fitting into the overall structure of a

02:44   9    damages case in a patent infringement lawsuit.

02:44  10                And then you rejected a document that was made

02:44  11    in the ordinary course of business in the -- in the

02:44  12    process of making important business decisions and had

02:44  13    a number in there.

02:44  14                That's what happened?

02:44  15          A.    Well, that was a long question --

02:44  16          Q.    It was, but that's what happened?

02:44  17          A.    That's not how I would characterize it.

02:44  18          Q.    I bet.

02:44  19          A.    At all.

02:44  20          Q.    Okay.  But that's what happened?

02:44  21          A.    I disagree with that.

02:44  22          Q.    All right.  We're going to agree to disagree

02:45  23    on that one for time purposes.

02:45  24                MR. DEVLIN:  Let's look at Defendant's

02:45  25    Exhibit 467.

```
02:45   1    BY MR. DEVLIN:
02:45   2        Q.    This is the other spreadsheet, and I want to
02:45   3    talk about this one a little bit with you.
02:45   4              Okay.  467, here's this U.S. versus foreign,
02:45   5    right?
02:45   6        A.    Yes.
02:45   7        Q.    Okay.  Now, you're not a patent expert or a
02:45   8    technical expert, right?
02:45   9        A.    Fair.  I'm not a technical patent expert.
02:45   10       Q.    Okay.  So you don't know -- well, I want to
02:45   11   say it differently.
02:45   12             You're assuming, I think, when you're breaking
02:45   13   out U.S. sales that if the sale was made in a foreign
02:45   14   country, then that doesn't count for infringement.
02:45   15             Do I have that right?
02:45   16       A.    That's correct.
02:45   17       Q.    Great.  Thank you.
02:45   18             There was some testimony about the gradual
02:45   19   changeover from the original version, the main website
02:45   20   earlier version, versus the redesigned version.
02:45   21   Remember that?
02:45   22       A.    Yes.  The burndown chart.
02:45   23       Q.    That was around -- from June 2020 to June 2021
02:46   24   or so.
02:46   25             Did I have that right?
```

—1253—

02:46   1       A.    I think it was earlier than June of 2020.

02:46   2       Q.    Maybe May or April?

02:46   3       A.    Maybe even earlier.

02:46   4       Q.    Okay.  Well, let's look at it real quick.

02:46   5             MR. DEVLIN:  Joint 115 at Page 2.  Next

02:46   6   page, Mr. Gooden.

02:46   7   BY MR. DEVLIN:

02:46   8       Q.    Okay.  So they're sort of done here; it's

02:46   9   actually 4/1?

02:46   10      A.    Yes.

02:46   11      Q.    And then it goes kind of into May and they're

02:46   12  still finishing up.

02:46   13            Do you see that?

02:46   14      A.    That's correct.

02:46   15      Q.    And they're roughly halfway done by February,

02:46   16  give or take; is that fair?

02:46   17      A.    Yeah.  February of 2021.

02:46   18      Q.    2021.  Okay.

02:46   19            MR. DEVLIN:  Let's go back to 467,

02:46   20  please.

02:46   21            Thanks.  Okay.  So let's pull that up

02:46   22  again, Mr. Gooden.

02:46   23  BY MR. DEVLIN:

02:46   24      Q.    And let's highlight maybe June 2020 to

02:47   25  May 2021; is that fair, sir?

02:47  1      A.    You can highlight --

02:47  2      Q.    Well, I'm asking if that's a fair time range

02:47  3  given the document we just looked at?

02:47  4            MR. DEVLIN:  Down to May, Mr. Gooden.

02:47  5      A.    We can absolutely talk about that time range.

02:47  6  BY MR. DEVLIN:

02:47  7      Q.    Okay.  Great.  Thank you.

02:47  8            All right.  Now, I guess the issue -- the

02:47  9  premise is there's this gradual change and addition of

02:47  10 the redesigned pages replacing the older pages

02:47  11 throughout this time period, right?

02:47  12     A.    That's correct.

02:47  13     Q.    And then we heard testimony that when that

02:47  14 happened, the sales increased, right?

02:47  15     A.    I believe that was part of Ms. Mahar's

02:47  16 testimony.

02:47  17     Q.    Okay.  And I guess the -- sorry -- the

02:47  18 implication being that the redesign is way better and

02:47  19 that that's causing all these sales to go up.

02:47  20           I guess that feels like the implication that's

02:47  21 being drawn there.

02:47  22           You don't feel that way?

02:47  23     A.    I'm not sure if she was -- that was her

02:47  24 testimony.

02:47  25     Q.    Okay.  But what do you think?  Do you think

—1255—

02:47   1    there's an implication there?

02:47   2        A.    I don't believe so.  I think there is an

02:48   3    explanation based on my conversations with Microchip

02:48   4    regarding the increase in revenues, especially when you

02:48   5    get into the March '21 time period.

02:48   6        Q.    Okay.  Great.  I just want to confirm some

02:48   7    numbers here for people.

02:48   8              So as we start in June, sure enough they go up

02:48   9    the next few months, 2 million, 3, 5, 7.

02:48   10             See that?

02:48   11       A.    Well, the U.S. sales --

02:48   12       Q.    No.  I'm asking you, worldwide, just do you

02:48   13   see those numbers?

02:48   14       A.    Oh, okay.  On the second column?

02:48   15       Q.    Yeah.

02:48   16       A.    Those numbers do increase on these

02:48   17   spreadsheets.

02:48   18       Q.    Okay.  Great.

02:48   19             And then they go down for a few months.  They

02:48   20   kind of dip for a little while.

02:48   21             Do you see that?

02:48   22       A.    Yes.  And then November to January --

02:48   23   November 2020 to January '21 time period, they do.

02:48   24       Q.    And then they skyrocket in one month, four

02:48   25   times the increase, right, and go on from there?

—1256—

02:48  1       A.    They do increase from February '21 to

02:48  2   March '21, yes.

02:48  3       Q.    Okay.  All right.  And so we'll just leave it

02:48  4   at that.

02:48  5                 MR. DEVLIN:  Now, keeping this here,

02:48  6   Mr. Gooden.

02:48  7   BY MR. DEVLIN:

02:48  8       Q.    Now, as of December '21, at that point and

02:48  9   time periods around that, so we got, you know, roughly

02:48 10   30 days in a month, $20 million.  We've got 21, we've

02:49 11   got 16, so forth, around those time periods.

02:49 12                 Now, you're looking at 500,000; 600,000;

02:49 13   $700,000 per month in revenue worldwide, right, just

02:49 14   division?

02:49 15       A.    I don't believe it's -- that's the right

02:49 16   number per month.

02:49 17       Q.    Okay.  $20 million divided by 30 days?

02:49 18       A.    Well, you said per month.  I'm sorry.

02:49 19       Q.    I'm sorry.  Per day.  Thank you so much, sir.

02:49 20               5, 6, $700,000 per day depending on the month,

02:49 21   right?

02:49 22       A.    And, again, you're talking about the

02:49 23   worldwide --

02:49 24       Q.    Exactly.

02:49 25       A.    -- sales in that column?

−1257−

02:49  1          Q.    Yes.

02:49  2          A.    Yes.  That math -- again, I'm trusting that

02:49  3   your math is right.  Then yeah.  That's correct.

02:49  4          Q.    Okay.  Thanks.

02:49  5                And then the last point on this document, we

02:49  6   heard from Dr. Wolf the way he did this, it had to do

02:49  7   with what people had in a shopping cart, and then they

02:49  8   would click in and it would go to Microchip Direct.

02:49  9                Did I get that right?

02:49  10         A.    I don't think that accurately summarizes his

02:50  11  testimony.

02:50  12         Q.    Okay.  Thank you.  I may have misheard him on

02:50  13  that.  So we'll let that go.

02:50  14               Let's talk about the Forums for a second.

02:50  15               Without going to it, you had a Slide 56 that

02:50  16  had, say, $400 a year, and then they only make $75 a

02:50  17  year on the Forums?

02:50  18         A.    That was the amount that could be attributed

02:50  19  to the Forums.

02:50  20         Q.    Okay.  So, I mean, if they're just losing the

02:50  21  325 a year, why don't they just shut the Forums down?

02:50  22         A.    That's a question for Microchip.

02:50  23         Q.    Okay.  But you and I both know probably it's

02:50  24  because there's other value there.

02:50  25         A.    Yes.  There could be.

02:50   1          Q.    All right.  Thanks.

02:50   2                You ever hear of somebody called a "super

02:50   3    user" for a company?

02:50   4          A.    I think I've heard that term.  Yes.

02:50   5          Q.    That's someone who's really engaged, uses a

02:50   6    lot of the products and so forth, right?

02:50   7                That's what that means generally?

02:50   8          A.    Could be.  Yes.

02:50   9          Q.    That's generally?

02:50   10         A.    Generally.

02:50   11         Q.    Those are the kind of people who go to Forums

02:51   12   and talk about things and engage, right?

02:51   13         A.    I don't haven't any specialized knowledge

02:51   14   around that.

02:51   15         Q.    Do you think -- okay.  Fair enough.

02:51   16               Let's talk about the rate side.

02:51   17         A.    Okay.

02:51   18         Q.    All right.  So we did that as the base.  Now

02:51   19   we're going to talk about the rate, this 5 percent.

02:51   20   We're all here.

02:51   21               So you -- I think you said that Mr. Blok

02:51   22   ignored real-world results; is that right?

02:51   23         A.    Correct.

02:51   24         Q.    Tell me if you agree with this:  If the jury

02:51   25   gets to the damages issue in this case, they'll be

—1259—

02:51  1    the first group of people that sit around a table that

02:51  2    talk about what a reasonable royalty is for the patents

02:51  3    who have all collectively determined that the patents

02:51  4    are both valid and infringed; isn't that right?

02:51  5        A.   I think what you're pointing to is some of the

02:51  6    language in the license agreements about the -- no

02:52  7    acknowledgement of liability or anything like that.

02:52  8            And if you can factor that into that question,

02:52  9    that's fair.

02:52  10       Q.   All right.  And that's a pretty big deal,

02:52  11   right?

02:52  12       A.   Not in the context of all the rest of the

02:52  13   evidence, including the lump-sum amounts in each one of

02:52  14   these license agreements and the noninfringing

02:52  15   alternatives, like the Forumbee.

02:52  16       Q.   Well, let's just talk about the lump-sum

02:52  17   amounts.

02:52  18            I mean, those lump-sum amounts reflect the

02:52  19   fact that the counterparty, the licensee, did not agree

02:52  20   that the patents were valid and did not agree that they

02:52  21   were infringed, right?

02:52  22       A.   Well, I don't recall the specific language in

02:52  23   the ■ agreement, but what I do know about that is

02:52  24   that the vast majority of those companies had not been

02:52  25   accused of infringement.

02:52  1        Q.    Thanks.

02:52  2              And you know what, we can look at that

02:52  3   evidence about what the ███ agreement says about that

02:52  4   question of liability.  I can do that later so we can

02:52  5   move on from there.

02:52  6              The ███ deal, you were using this $███

02:53  7   number per licensee.  That's just the math, that's just

02:53  8   the division between the total amount and all of the

02:53  9   people, the members who got the license, right?

02:53  10       A.    That's right.  As I explained earlier, it's

02:53  11  the $█████████████ different licensees.

02:53  12       Q.    Okay.  But you know that that license deal

02:53  13  resolved four litigations that were going on between

02:53  14  Caddo and █████████████, right?

02:53  15       A.    That's my understanding, is that ████████

02:53  16  ██ companies.

02:53  17       Q.    Okay.  And you heard Mr. Loudermilk's

02:53  18  testimony, that they did diligence and didn't see

02:53  19  anyone else that was using the technology.

02:53  20              You heard that, right?

02:53  21       A.    I know I was here, but I don't recall his

02:53  22  specific testimony around that.

02:53  23       Q.    Okay.  Thanks.

02:53  24              The ███ license that -- you would agree that

02:53  25  that was entered into for purposes of settlement also,

—1261—

02:53    1    right?

02:53    2         A.    My understanding is that that was not a

02:54    3    litigation license.

02:54    4         Q.    Right.  But it was entered into for purposes

02:54    5    of settlement though.  You know that?

02:54    6         A.    I believe that's what it says.

02:54    7         Q.    It says purposes of settlement.

02:54    8              And the notice -- you know, sometimes after an

02:54    9    agreement's signed, you usually have notice provisions.

02:54   10    So if somebody has to provide some information to the

02:54   11    other party later on, they know who to send it to,

02:54   12    right?

02:54   13         A.    Yes.  I generally understand what you're

02:54   14    talking about.

02:54   15         Q.    Great.  And the notice provision here goes to

02:54   16    the litigation department at Microchip, right?

02:54   17         A.    I don't recall what the notice section -- who

02:54   18    it was addressed to.  I'm sorry.

02:54   19         Q.    Okay.  No problem.  We'll look at that

02:54   20    sometime else maybe also.

02:54   21              Let's talk about the ███████████  license.

02:54   22              MR. DEVLIN:  And let's pull that up.

02:54   23    That's Joint Exhibit 18, please.

02:54   24    BY MR. DEVLIN:

02:54   25         Q.    While that's getting pulled up, I'll ask you a

—1262—

02:55  1    couple of things.  Now, you said that it's a big

02:55  2    company.  They have a lot of stuff, fair?

02:55  3        A.    I wouldn't characterize it like that.  But it

02:55  4    is a large company.  We heard Mr. Blok talk about how

02:55  5    it acquired ███ right around this time period or

02:55  6    shortly thereafter.

02:55  7        Q.    Let's talk about ████ ██████████ is

02:55  8    owned -- the website is owned by a subsidiary of

02:55  9    ██████████, right?

02:55  10       A.    I don't know that one way or the other.

02:55  11       Q.    Why don't you look at your binder real quick

02:55  12   at Tab 12.  I gave you a binder.  There's something

02:55  13   called Tab 12.

02:55  14             Let me know when you're there.

02:55  15       A.    I'm on Tab 12.

02:55  16       Q.    You see where it says "About ████  It looks

02:55  17   like a printout of the web page.

02:55  18             Does it look fair?

02:55  19       A.    It does appear to be a printout from a ████

02:55  20   website.

02:55  21       Q.    And you know how, when you scroll down to the

02:56  22   bottom of a lot of web pages, there's a copyright

02:56  23   notice and it says who owns the copyright for the web

02:56  24   page, right?

02:56  25       A.    Generally.  Yes.

02:56  1        Q.    All right.  Look at the one here.  It's Page 3

02:56  2   of 3 right in the middle.  Tell me if I read this

02:56  3   right.  2005 to 2022, ██████████.  All rights reserved.

02:56  4        Do you see that?

02:56  5        A.    That's what it says.

02:56  6        Q.    That LLC's a company, correct?

02:56  7        A.    Yes.  LLC stands for limited liability

02:56  8   company.

02:56  9        Q.    Great.  And in our parlance here with respect

02:56  10  to ███████████████████████████ sort of owns it,

02:56  11  then it's an affiliate of ████████████, right?

02:56  12        A.    I don't know that one way or another.  I'm not

02:56  13  an attorney.

02:56  14        Q.    Well, let me ask you this:  The ██████████

02:56  15  ██████ license only goes to ████████████ directly

02:56  16  and not anything that could be called affiliates.

02:56  17        You know that, right?

02:56  18        A.    Again, I'm not a patent license attorney.  I'm

02:56  19  a patent damages expert.  That does require to analyze

02:57  20  license agreements, but I don't -- I'm not here to

02:57  21  render a legal opinion on what is in and what is out.

02:57  22        Q.    Well, you relied on this license, sir, right?

02:57  23        A.    Yes.  Again, that's my understanding --

02:57  24        Q.    Okay.

02:57  25        A.    -- that there's ████ companies have the right

—1264—

| | | |
|---|---|---|
| 02:57 | 1 | to use that patented technology. |
| 02:57 | 2 | Q.   I think you're talking about ███   This is -- |
| 02:57 | 3 | A.   Oh, I'm sorry.  I'm sorry. |
| 02:57 | 4 | Q.   This is █████████. |
| 02:57 | 5 | You relied on the ████████ license, |
| 02:57 | 6 | right? |
| 02:57 | 7 | A.   That's correct. |
| 02:57 | 8 | MR. DEVLIN:  Let's pull up that top |
| 02:57 | 9 | paragraph, Mr. Gooden. |
| 02:57 | 10 | BY MR. DEVLIN: |
| 02:57 | 11 | Q.   And you see how it says in that top -- the |
| 02:57 | 12 | first paragraph, about five lines, around the third one |
| 02:57 | 13 | down, it says ███████ and then it says |
| 02:57 | 14 | licensee. |
| 02:57 | 15 | Do you see that? |
| 02:57 | 16 | A.   Yes.  I do see that. |
| 02:57 | 17 | Q.   Did you look through this license to see if |
| 02:57 | 18 | any other company other than the actual thing called |
| 02:57 | 19 | ████████. is licensed? |
| 02:57 | 20 | A.   Again, it's my understanding that ████ |
| 02:57 | 21 | ███ has a license -- |
| 02:57 | 22 | Q.   Right. |
| 02:57 | 23 | A.   -- to those patents. |
| 02:57 | 24 | Q.   Did you look in the license to see whether the |
| 02:58 | 25 | company that owns ████ was licensed? |

—1265—

02:58  1        A.    Again, I'm not the attorney in the room.  I
02:58  2   don't understand, nor do I have an opinion about the
02:58  3   corporate structure of whether or not this license
02:58  4   gives ███████ the right to use the patents.
02:58  5        Q.    Yeah.  Okay.  So that's my point.
02:58  6              But somehow we're hearing testimony about how
02:58  7   ████████████████████████████████.  But you don't
02:58  8   actually know whether ██████ the website, is licensed?
02:58  9        A.    I know that █████████████████████████████████
02:58 10   ██████.
02:58 11        Q.    But you don't know whether ██████ the website,
02:58 12   is licensed?
02:58 13        A.    I can't sit here today and tell you legally
02:58 14   one way or the other.  No.
02:58 15        Q.    So you don't know?
02:58 16        A.    Again, I can't tell you, one way or the other,
02:58 17   from a legal perspective.
02:58 18        Q.    Well, from any perspective, from the economic
02:58 19   perspective that we're talking about here.
02:58 20              I'm not trying to talk legal niceties here.  I
02:58 21   want to ask you about your opinion.  You don't know --
02:59 22   even though we've talked about ██████ a lot in this
02:59 23   trial -- you don't know, as the damages expert for
02:59 24   Microchip, whether ██████ is actually licensed?
02:59 25        A.    I don't know, one way or another, from a legal

02:59  1    perspective.  No.

02:59  2        Q.    Okay.  A few more things in this ███████

02:59  3    ████████  license.

02:59  4                MR. DEVLIN:  Let's go to the next page,

02:59  5    please.  And the amount of payment.  Settlement

02:59  6    payment.  Thank you.

02:59  7    BY MR. DEVLIN:

02:59  8        Q.    All right.  Now, here, if we look on the

02:59  9    fourth line down, it says "gross revenues."

02:59  10               Do you see that?

02:59  11       A.    Yes.  It does say "gross revenues."

02:59  12       Q.    So the ████████████  license -- and by the

02:59  13   way, do you know who was accused of -- I'm sorry.  It

02:59  14   says "gross revenues."  And what you were saying before

02:59  15   is that you have to do this all apportionment and stuff

02:59  16   like that.

02:59  17               Do you remember?

02:59  18       A.    Yes.  You do need to apportion.

03:00  19       Q.    And you heard Mr. Blok talk about incremental

03:00  20   value and that being his way of dealing with this

03:00  21   apportionment issue, right?

03:00  22       A.    I don't believe Mr. Blok properly apportioned

03:00  23   his royalty base.

03:00  24       Q.    I get that.  But you heard him talk about

03:00  25   incremental value.  That's my point, right?

—1267—

```
03:00    1         A.    I did hear him tell -- say that you did need

03:00    2    to identify the incremental value of the accused

03:00    3    breadcrumb --

03:00    4         Q.    Okay.  And I just want to --

03:00    5         A.    -- just for the patents, which is what -- I

03:00    6    agree with that.

03:00    7         Q.    All right.  And what he's saying is because

03:00    8    the ███████████ license is on gross revenue, if

03:00    9    you're going to use that number, you can port it over

03:00   10    to here to revenue, to gross revenue, because it's

03:00   11    apples to apples, right?

03:00   12         A.    I disagree with that.

03:00   13         Q.    You disagree that that's a good analysis, but

03:00   14    that's what he did.  That's what I'm trying to say,

03:00   15    right?

03:00   16         A.    Yes.  That is what he is attempting to say

03:00   17    that he did.

03:00   18         Q.    Thank you.

03:00   19         A.    He did say that.

03:01   20         Q.    Thank you.  Okay.

03:01   21               Now, it also says that -- down three or four

03:01   22    lines from the top, it says:  Revenues for licensee's

03:01   23    use as alleged by licensors in the litigation.

03:01   24               Do you see that?

03:01   25                    MR. DEVLIN:  It's the third line from the
```

—1268—

03:01  1    bottom, Mr. Gooden, starting on the left.

03:01  2                 Thank you.

03:01  3    BY MR. DEVLIN:

03:01  4        Q.    Do you see that, sir?

03:01  5        A.    I do see that.

03:01  6        Q.    Okay.  And do you know what was accused in the

03:01  7    litigation?

03:01  8        A.    Yes.  I believe it was a website.

03:01  9        Q.    Remember the name of it?

03:01  10       A.    Something with travel -- it's a travel

03:01  11   website.  I don't remember the exact name.

03:01  12       Q.    Not a big well-known one though, fair?

03:01  13       A.    That's fair.

03:01  14       Q.    All right.  Thank you.

03:01  15                 THE COURT:  Mr. Devlin, it's time to wrap

03:01  16   up.

03:01  17                 MR. DEVLIN:  Thank you, Your Honor.

03:01  18                 Make sure, I may be complete.

03:02  19                 No further questions.  Thank you.

03:02  20                 Thank you, Your Honor.

03:02  21                       REDIRECT EXAMINATION

03:02  22   BY MR. BREWER:

03:02  23       Q.    Mr. Jordan, you talked a little bit just a

03:02  24   moment ago with Mr. Devlin about how microchip.com has

03:02  25   extensive product information, right?

1269

03:02  1      A.    Yes.

03:02  2      Q.    Do you know whether Microchip Direct, the

03:02  3   e-commerce site, also has product information?

03:02  4      A.    I believe it does.

03:02  5      Q.    Do you recall earlier in this case some of the

03:02  6   witnesses testifying about all these PDF pages?

03:02  7      A.    Yes.

03:02  8      Q.    Do you know, what types of PDF pages were

03:02  9   those?

03:02 10      A.    I believe they were product specification,

03:03 11   product details, information about the products and how

03:03 12   to integrate them with other types of devices.

03:03 13      Q.    Do you know whether those PDFs are available

03:03 14   on Microchip Direct?

03:03 15      A.    I believe that they are.

03:03 16      Q.    You also talked a little bit -- or he also

03:03 17   talked a little bit about these -- Purchaser Penny, I

03:03 18   believe, was one of them --

03:03 19      A.    The fictitious --

03:03 20            (Simultaneous speakers.)

03:03 21   BY MR. BREWER:

03:03 22      Q.    -- Sam.  Yeah.  We talked about them.  I think

03:03 23   some other witnesses talked about those.

03:03 24            Is it your understanding that engineers who

03:03 25   want to buy Microchip products can't use Google to do

-1270-

03:03   1   their research?

03:03   2       A.   They absolutely could.

03:03   3               MR. BREWER:  Can we pull up Plaintiffs'

03:03   4   96, please?

03:03   5               And let's turn to Page -- I believe it's

03:03   6   36.

03:03   7               Right.  And can you highlight that

03:04   8   language that we, I think, all have seen a lot of times

03:04   9   in this case?

03:04  10   BY MR. BREWER:

03:04  11       Q.   That slide says that microchip.com drives

03:04  12   revenue through the e-commerce portal, correct?

03:04  13       A.   Yes.

03:04  14       Q.   That slide doesn't say a breadcrumb drives

03:04  15   revenue through the e-commerce portal, does it?

03:04  16       A.   It does not.

03:04  17       Q.   Your analysis was based on comparable

03:04  18   licenses, right?

03:04  19       A.   Yes.  That's one of the things I based my

03:04  20   analysis on.

03:04  21       Q.   And those spreadsheets that Dr. Wolf prepared

03:04  22   and you discussed with Mr. Devlin, did you use those to

03:04  23   come up with your royalty -- reasonable royalty?

03:04  24       A.   No.

03:04  25       Q.   What did you use them for?

—1271—

03:04  1      A.    I used them, as we talked about earlier today,

03:04  2   for adjustments that would need to be made to

03:04  3   Mr. Blok's analysis to properly apportion it to

03:05  4   identify the incremental value associated with the

03:05  5   patents or the accused breadcrumb.

03:05  6      Q.    And Mr. Devlin said that ███ has been talked

03:05  7   a lot about in this case.  I'm not quite sure I agree

03:05  8   with that.

03:05  9            But setting aside ████████████████

03:05  10  ████████████████████████████████ has got

03:05  11  to be a pretty big company, right?

03:05  12     A.    That's fair.

03:05  13     Q.    Do you know, generally speaking, how much

03:05  14  revenue ███████████ has?

03:05  15     A.    I know it's more than $50 million.  And if

03:05  16  you're purchasing companies of that size, it's likely

03:05  17  even higher.

03:05  18     Q.    And ██████████ is licensed for these

03:05  19  patents, right?

03:05  20     A.    Correct.

03:05  21     Q.    And how much did they pay for that license?

03:05  22     A.    $█████

03:05  23     Q.    You and Mr. Devlin talked about those recent

03:05  24  sales, right, the bigger numbers in basically, roughly,

03:06  25  the last -- last year?

| | | |
|---|---|---|
| 03:06 | 1 | A.    Yes. |
| 03:06 | 2 | Q.    Those big numbers were what, 2021, 2022? |
| 03:06 | 3 | A.    Yeah. |
| 03:06 | 4 | Q.    Recent. |
| 03:06 | 5 | The accused breadcrumb has been on the website |
| 03:06 | 6 | for how many years? |
| 03:06 | 7 | A.    According to the plaintiff, since 2018 on the |
| 03:06 | 8 | microchip.com website. |
| 03:06 | 9 | Q.    And on the Forum website since? |
| 03:06 | 10 | A.    2014. |
| 03:06 | 11 | Q.    And by 2021, the breadcrumb was disappearing |
| 03:06 | 12 | on microchip.com, wasn't it? |
| 03:06 | 13 | A.    Yes.  That's what that burndown chart |
| 03:06 | 14 | indicates. |
| 03:06 | 15 | Q.    Have you seen any evidence to indicate that |
| 03:06 | 16 | the breadcrumb was driving any of that revenue |
| 03:06 | 17 | increase? |
| 03:06 | 18 | A.    No. |
| 03:06 | 19 | MR. BREWER:  No further questions. |
| 03:06 | 20 | THE COURT:  Thank you, sir. |
| 03:06 | 21 | MR. DEVLIN:  Nothing further, Your Honor. |
| 03:06 | 22 | THE COURT:  Thank you, sir. |
| 03:07 | 23 | You may step down. |
| 03:07 | 24 | Ladies and gentlemen of the jury -- once |
| 03:07 | 25 | you get down, I'll... |

```
03:07   1                    THE WITNESS:  Thank you.

03:07   2                    THE COURT:  Who's your next witness?

03:07   3                    MR. JENSEN:  Your Honor, that concludes

03:07   4    Microchip's presentation of evidence.

03:07   5                    THE COURT:  Thank you, sir.

03:07   6            Do you rest?

03:07   7                    MR. JENSEN:  The defense rests its case.

03:07   8                    THE COURT:  Okay.  Ladies and gentlemen

03:07   9    of the jury, that means all the evidence is in.  We're

03:07   10   going to take a very short break and make sure that

03:07   11   there are no tiny snafus with the charge being prepared

03:07   12   for me.

03:07   13                   As soon as we have that done, we'll bring

03:07   14   you back in, I will read you the jury charge, we'll be

03:07   15   done for the day, and then you will come back tomorrow

03:07   16   morning at 9:00 for closing arguments.

03:07   17                   So we'll stand in recess for just a few

03:07   18   minutes.

03:07   19                   THE BAILIFF:  All rise.

03:07   20                   (Jury exited the courtroom.)

03:08   21                   THE COURT:  Thank you.  You may be

03:08   22   seated.

03:08   23                   Do y'all have a copy for us?

03:08   24                   MR. DEVLIN:  Not yet, Your Honor.

03:08   25                   We -- the agreement that we worked out on
```

—1274—

03:08  1   that last thing is in my head, and my head also had my

03:08  2   cross of Mr. Jordan.  So if -- I know Your Honor just

03:08  3   said a few minutes, if we could run back, we'll get

03:08  4   that typed up, double-check it with them and get that

03:08  5   to Your Honor with all the rest of the instructions,

03:08  6   which should be complete as well.

03:08  7                And then, Your Honor, we also have our

03:08  8   preverdict JMOLs to put on the record and so forth.

03:08  9                THE COURT:  Why don't you go do that and

03:08  10  someone else can make whatever motions you have and put

03:08  11  on the record whatever objections you have to the

03:08  12  charge?

03:08  13               MR. DEVLIN:  Thank you, Your Honor.

03:08  14               And, in fact, we're all set up to have

03:08  15  someone else do the rest of those.

03:08  16               THE COURT:  Let's go ahead and get that

03:08  17  done.

03:08  18               MR. DEVLIN:  Okay.  Great.

03:09  19               THE COURT:  At your office, can you --

03:09  20  when you finish, can you send by e-mail the copy to

03:09  21  Jeff so we can start, or are you all --

03:09  22               MR. DEVLIN:  We should be able to get it

03:09  23  done here in our attorney room, so I'm hoping it won't

03:09  24  take that long, Your Honor.  But it just, you know, if

03:09  25  it wasn't a couple of minutes, I wanted to mention it

03:09  1    to you.

03:09  2                      Thank you.

03:09  3                      THE COURT:  Mr. Devlin, you need to send

03:09  4    it to Jeff so we can print it.

03:09  5                      MR. DEVLIN:  Absolutely.  Yeah.  Thank

03:09  6    you.

03:09  7                      THE COURT:  I'll hear first from the

03:09  8    plaintiff any motions they have.  And then if you want

03:09  9    to take up any objections you have to the charge, you

03:09  10   can do that at the same time.

03:09  11                     MS. MCCARTY:  Thank you, Your Honor.

03:09  12                     Plaintiffs have six motions for judgment

03:09  13   as a matter of law.

03:09  14                     First is judgment as a matter of law to

03:10  15   preclude the defense of license and release as defenses

03:10  16   to infringement, judgment as a matter of law to

03:10  17   preclude the defense of noninfringement, judgment as a

03:10  18   matter of law to find willfulness, judgment as a matter

03:10  19   of law or motion to preclude the assertion that the

03:10  20   preamble is limiting -- is a limiting claim element in

03:10  21   the jury instructions, judgment as a matter of law to

03:10  22   drop the assertion of the invalidity defense, and

03:10  23   judgment as a matter of law on noninfringing

03:10  24   alternatives.

03:10  25                     The first judgment as a matter of law to

03:10   1    preclude the license -- to preclude the defense of

03:10   2    license and release as defenses to infringement.

03:10   3                Defendant has not properly raised and has

03:10   4    not provided any evidence in support of its defense of

03:10   5    release from liability as the beneficiary of the

03:10   6    license agreement between plaintiffs and Microsoft.

03:10   7                In order to properly raise this defense,

03:10   8    defendants would need to, first, establish facts that

03:10   9    would support an argument that the accused method is

03:10   10   somehow interrelated with the use of a covered

03:11   11   Microsoft product; two, present expert testimony as to

03:11   12   what products of Microsoft are and are not covered

03:11   13   products; three, present testimony from a licensing

03:11   14   expert to opine that the accused activity is covered by

03:11   15   some release contained in the Microsoft license

03:11   16   settlement -- in the Microsoft settlement and license

03:11   17   agreement; and, four, provide evidence or testimony

03:11   18   that Microchip's accused activity does not fall within

03:11   19   the scope of the exceptions or exclusions set forth

03:11   20   within the Microsoft agreement.

03:11   21               Defendant has not presented substantial

03:11   22   fact evidence as to any relationship between the

03:11   23   accused method, i.e., a set of method steps performed

03:11   24   by defendant's website and any Microsoft product.

03:11   25               Defendant failed to identify to the trier

—1277—

03:11   1    of fact which, if any, clause of the Microsoft

03:11   2    settlement and license agreement provides any release

03:11   3    to defendant.

03:11   4             Defendant has also never named any

03:11   5    licensing expert to provide testimony from which a

03:11   6    trier of fact could determine if the Microsoft

03:11   7    settlement and license extended to release defendant's

03:12   8    website from patent infringement, nor has Microchip

03:12   9    provided any evidence to show Microchip has the rights

03:12   10   it asserts under the Microsoft license are outside the

03:12   11   specific exceptions to such rights.

03:12   12             The fact that the jury has never even

03:12   13   seen a single substantive provision of the license is

03:12   14   telling.  Any attempt to fill in the missing gaps in

03:12   15   evidence through lawyer argument, in closing or

03:12   16   otherwise, should be rejected.

03:12   17             The law requires expert testimony on at

03:12   18   least some of these points, and Microchip has presented

03:12   19   none.

03:12   20             And for that proposition, Your Honor,

03:12   21   we'd point to Genband U.S. LLC v. Metaswitch Networks,

03:12   22   221 F.Supp.3d 858, Eastern District of Texas,

03:12   23   September 29th, 2016 which found a technical expert

03:12   24   must opine that the accused technology --

03:12   25             THE COURT:  I don't need the law.

1278

03:12  1   Just --

03:12  2              MS. MCCARTY:  Thank you, Your Honor.

03:12  3              THE COURT:  -- make your motion.  Thank

03:12  4   you.

03:12  5              MS. MCCARTY:  Plaintiff seeks a judgment

03:13  6   as a matter of law finding that defendants have failed

03:13  7   to establish defendant's accused activity is covered by

03:13  8   a licensed and released under the license agreement

03:13  9   between plaintiffs and Microsoft.

03:13  10             JMOL No. 2 to preclude the defense of

03:13  11  noninfringement.

03:13  12             Defendant's assertion of noninfringement

03:13  13  as expressed through its expert witness Dr. Tittel is

03:13  14  improper because Mr. Tittel makes two fundamental

03:13  15  mistakes.  First, Mr. Tittel insisted on using his own

03:13  16  claim construction of the term "Active Path"; and, two,

03:13  17  Mr. Tittel insisted that the preamble is limiting

03:13  18  without establishing the basis for a limiting preamble

03:13  19  and without defendant raising this issue in the claim

03:13  20  construction proceedings.

03:13  21             For the "Active Path" term, defendant's

03:13  22  assertion of noninfringement is illustrated by the

03:13  23  demonstratives Mr. Tittel presented in court and

03:13  24  through his direct testimony.

03:13  25             In order to present infringement or

03:13  1    noninfringement, an opinion must be based on the claim
03:13  2    construction of the Court.  However, Mr. Tittel based
03:13  3    his opinions on his own redefinition of the term
03:14  4    "Active Path," which differs significantly and
03:14  5    meaningfully from the Court's claim construction.
03:14  6              Mr. Tittel adds "active" to the links,
03:14  7    changes "as a menu system is navigated" to "as items
03:14  8    are selected" and adds in a new limitation, "one-to-one
03:14  9    correspondence."
03:14  10             Mr. Tittel confirmed this improper
03:14  11   construction during his testimony at trial.  Defendant
03:14  12   was already on notice of its attempts to ignore the
03:14  13   Court's claim construction --
03:14  14             THE COURT:  Counsel, I just need for you
03:14  15   to make the points of what you -- I don't need the
03:14  16   attorney argument.  I just want you to make -- you can
03:14  17   submit all that in writing.
03:14  18             All I want you to do is give me the
03:14  19   headlines of what you want me to grant the motion on.
03:14  20   I'm going to deny it.  And then I'm going to hear from
03:14  21   the defendant, and I'm going to deny what they want.
03:14  22             I just need you to get through this as
03:14  23   quickly as possible.
03:14  24             MS. MCCARTY:  Thank you, Your Honor.
03:14  25             THE COURT:  You can submit anything you

—1280—

03:14  1   want in writing.

03:14  2              MS. MCCARTY:  Thank you, Your Honor.

03:15  3   I'll speed up.

03:15  4              JMOL on willfulness.  Plaintiffs have

03:15  5   established -- this is JMOL No. 3 on willfulness.

03:15  6              Plaintiffs have established that

03:15  7   Microchip's narrative of a global website redesign and

03:15  8   that the timing of the redesign are incomplete, at

03:15  9   best, and suspect, at worst.

03:15 10              According to the testimony, Microchip's

03:15 11   multiple witnesses, multiple pages of the accused

03:15 12   functionalities were retained up until at least

03:15 13   December 2021.  Defendant has withdrawn the assertion

03:15 14   of invalidity and defendant has provided no evidence to

03:15 15   rebut this evidence to establish reasonableness.

03:15 16              JMOL No. 4, motion to preclude that the

03:15 17   preamble is a limiting claim element in the jury

03:15 18   instructions.  Caddo moves for a partial JMOL as the

03:15 19   rule permits, rejecting defendant's noninfringement

03:15 20   defense based on the preambles.

03:15 21              I have further argument, but I'm assuming

03:15 22   Your Honor would like me to move on.

03:15 23              THE COURT:  Correct.

03:15 24              MS. MCCARTY:  JMOL No. 5, motion to

03:16 25   compel defendant to withdraw its invalidity defense.

03:16  1   Defendant has withdrawn its invalidity -- its defense

03:16  2   of invalidity.  And plaintiffs request that the

03:16  3   withdrawal be formalized on the record.

03:16  4              JMOL No. 6, noninfringing alternatives.

03:16  5   Caddo moves for a judgment as a matter of law that

03:16  6   defendant has failed to put on the evidence that any of

03:16  7   the purported noninfringing alternatives are, in fact,

03:16  8   noninfringing.

03:16  9              Thank you, Your Honor.

03:16  10             THE COURT:  Your motions are overruled.

03:16  11             Do you also have the objections with

03:16  12  respect to the jury charge?

03:16  13             MR. LENNON:  Your Honor?

03:16  14             THE COURT:  Yes, sir.

03:16  15             MR. LENNON:  I will also endeavor to be

03:16  16  brief as possible, Your Honor.

03:16  17             And just preservation for the record, as

03:16  18  I appreciate it's probably all you need us to do right

03:16  19  now.  Your Honor, I'm only addressing the preamble

03:16  20  issue.  And, specifically, that the question of the

03:17  21  preamble and whether a preamble is limiting is an issue

03:17  22  of claim construction.

03:17  23             Claim construction is a question of law.

03:17  24  The Court's to decide questions of law.

03:17  25             The Federal Circuit has recognized as a

03:17  1    general rule the preamble language is limiting and not

03:17  2    treated as -- that preamble language is generally not

03:17  3    treated as limiting.  To the extent it's supposed to be

03:17  4    construed as limiting, it needs to be given a

03:17  5    construction.

03:17  6                And the Federal Circuit has also said

03:17  7    that where there's a disputed term, that the Court is

03:17  8    to guide the jury and not allow the jury to endeavor to

03:17  9    construe disputed claim terms themselves.

03:17  10               So I can give Your Honor case cites to

03:17  11   all the cases, but that's the preservation of our

03:17  12   argument for the preamble issue.

03:17  13               Thank you, Your Honor.

03:17  14               MS. MCCARTY:  I'm sorry, Your Honor.  I

03:17  15   just have one last question.

03:17  16               Would you like me to submit the JMOLs

03:17  17   through paper or file through the ECF?

03:17  18               THE COURT:  I don't know.  ECF?

03:17  19               MS. McCARTY:  ECF?  Thank you, Your

03:17  20   Honor.

03:17  21               THE COURT:  Are there any other

03:17  22   objections to the Court's charge from the plaintiff?

03:18  23               MR. LENNON:  No further objections, Your

03:18  24   Honor.

03:18  25               THE COURT:  Thank you, sir.

03:18   1                    For defendants?

03:18   2              MR. QUILICI:  Thank you, Your Honor.  In

03:18   3   regard to the jury charge, we -- the defense objects to

03:18   4   Your Honor's ruling.  I understand that we have been

03:18   5   instructed not to argue the issue of -- counsel has

03:18   6   been instructed generally not to argue the issue of the

03:18   7   limiting nature of the preamble.

03:18   8              We object to that ruling from the Court.

03:18   9              Do you want to hear objections to the

03:18   10  verdict form as well at this time?

03:18   11             THE COURT:  I do.  And also, if you have

03:18   12  a motion -- any motions to make --

03:18   13             MR. QUILICI:  Yes.  We would re-urge the

03:18   14  JMOLs we filed with the Court this morning, including

03:18   15  the JMOL regarding willfulness in particular.

03:18   16             And in connection with the verdict form,

03:19   17  defendants object to the inclusion of the question

03:19   18  regarding running royalty versus the lump sum.

03:19   19             THE COURT:  Anything else?

03:19   20             MR. QUILICI:  No, Your Honor.

03:19   21             THE COURT:  Okay.  We're all done with

03:19   22  everything you want on the record?

03:19   23             MR. LENNON:  Yes, Your Honor.

03:19   24             THE COURT:  Okay.  Very good.

03:19   25             As soon as we get that and have it

```
03:19    1    printed, I'll come out, I'll read the charge, and then
03:19    2    we will be done for the day.
03:19    3                    THE BAILIFF:  All rise.
03:19    4                    (Recess taken.)
03:54    5                    THE BAILIFF:  All rise.
03:54    6                    THE COURT:  Please remain standing for
03:54    7    the jury.
03:54    8                    (Jury entered the courtroom.)
03:54    9                    THE COURT:  Thank you.  You may be
03:54   10    seated.
03:55   11                    Ladies and gentlemen of the jury, thank
03:55   12    you for your patience.
03:55   13                    What you have in front of you are the
03:55   14    Court's final jury instructions.  This is the law that
03:55   15    you must use and administer when you are applying the
03:55   16    facts to the case in doing your deliberations.
03:55   17                    Members of the jury, it is my duty and
03:55   18    responsibility to instruct you on the law that you are
03:55   19    to apply in this case.  The law contained in these
03:55   20    instructions is the only law that you may follow.
03:55   21                    It is your duty to follow what I instruct
03:55   22    you the law is, regardless of any opinion that you
03:55   23    might have as to what the law ought to be.
03:55   24                    Each of you is going to have your own
03:55   25    printed copy of these final jury instructions that I'm
```

1285

03:55 1  giving now, so there's no need for you to take notes

03:55 2  unless you want to.

03:55 3  If I have given you the impression during

03:56 4  the trial that I favor either party, disregard that

03:56 5  impression.  If I've given you the impression during

03:56 6  the trial that I have any opinion about the facts of

03:56 7  this case, disregard that impression.  You are the sole

03:56 8  judges of the facts in this case.

03:56 9  Other than my instructions to you on the

03:56 10  law, you should disregard anything I may have said or

03:56 11  done during the trial in arriving at your verdict.

03:56 12  You should consider all of the

03:56 13  instructions about the law as a whole, and regard each

03:56 14  instruction in light of the others without isolating a

03:56 15  particular statement or paragraph.

03:56 16  The testimony of the witnesses and other

03:56 17  exhibits introduced by the parties constitutes the

03:56 18  evidence.  The statements of counsel are not evidence.

03:56 19  They are only arguments.  It is important for you to

03:56 20  distinguish between arguments of counsel and the

03:56 21  evidence upon which those arguments rest.

03:56 22  What the lawyers say or do is not

03:56 23  evidence.  You may, however, consider their arguments

03:56 24  in light of the evidence that has been admitted and

03:57 25  determine whether the evidence submitted in this trial

```
03:57   1    supports their arguments.
03:57   2                    You must determine the facts from the
03:57   3    testimony that you've heard and the other evidence that
03:57   4    I have admitted.  You are the judges of the facts, but
03:57   5    in finding those facts, you must apply the law as I
03:57   6    instruct you.
03:57   7                    You are required by law to decide the
03:57   8    case in a fair, impartial, and unbiased manner, based
03:57   9    entirely on the law and on the evidence presented to
03:57  10    you here in this courtroom.  You may not be influenced
03:57  11    by passion, prejudice, or sympathy you might have
03:57  12    either for the plaintiff or defendant in arriving at
03:57  13    your verdict.
03:57  14                    After the remainder of these
03:57  15    instructions -- actually, you'll hear the closing
03:57  16    arguments tomorrow, as I've told you.  Tomorrow when
03:57  17    you hear the closing arguments, the statements and
03:57  18    arguments of the attorneys are not evidence, and they
03:57  19    are not instructions to you on the law.  They are
03:57  20    intended only to assist you in understanding the
03:58  21    evidence and their contentions.
03:58  22                    Tomorrow you will have a verdict form
03:58  23    that's been prepared for you.  They'll be back in the
03:58  24    jury room for you.  You are to take the verdict form,
03:58  25    and when you've reached a unanimous decision or
```

—1287—

03:58  1    agreements as to the verdict, you are to have your

03:58  2    foreperson fill in the blanks in the verdict form, sign

03:58  3    it, and date it.

03:58  4              Answer each question in the verdict form

03:58  5    from the facts as you find them to be.  Do not decide

03:58  6    who you think should win the case and answer the

03:58  7    questions to reach that result.  Your answers and your

03:58  8    verdict must be unanimous.

03:58  9              Allow me to summarize the issues you must

03:58  10   decide now.  You must decide the following three main

03:58  11   issues:  Whether plaintiff has proven that defendant

03:58  12   infringed Claims 1 and 2 of the '411 patent;

03:58  13                  1, 2, and 3 of the '301 patent;

03:58  14                  1 and 4 of the '517 patent;

03:58  15                  1, 2, 5, and 8 of the '836 patent;

03:58  16                  1 and 8 of the '880 patent;

03:59  17                  And 14, 16, 17, and 18 of the '127

03:59  18   patent.

03:59  19              If any asserted claims are infringed, you

03:59  20   will then have to decide what amount of damages, if

03:59  21   any, the plaintiff has proven.

03:59  22              The evidence you are to consider consists

03:59  23   of the testimony of witnesses, the documents, and any

03:59  24   exhibits admitted into evidence, any stipulations to

03:59  25   which the lawyers have agreed, and any fair inference

—1288—

03:59   1   and reasonable conclusions that you can draw from the

03:59   2   facts and circumstances that you believe have been

03:59   3   proven.  Nothing else is evidence.

03:59   4                Generally speaking, there are two types

03:59   5   of evidence.  One is direct such as the testimony of an

03:59   6   eyewitness.  The other is indirect or circumstantial

03:59   7   which is evidence that proves a fact from which you can

03:59   8   logically conclude another fact exists.

03:59   9                As a general rule, the law makes no

03:59   10  distinction between direct and circumstantial evidence,

03:59   11  but simply requires that you find the facts from a

04:00   12  preponderance of all of the evidence in the case,

04:00   13  whether direct, circumstantial, or a combination.

04:00   14                In judging the facts, you must consider

04:00   15  all the evidence, direct and circumstantial.  It does

04:00   16  not mean you have to believe all the evidence.  It is

04:00   17  entirely and exclusively up to you to give the evidence

04:00   18  you will receive in this case whatever weight you

04:00   19  individually believe it deserves.

04:00   20                It'll be up to you to decide which

04:00   21  witnesses to believe or not believe, the weight you

04:00   22  give any testimony that you've heard, and how much of

04:00   23  any witness' testimony you alone choose to accept or

04:00   24  reject.

04:00   25                You should never have been influenced by

—1289—

04:00   1    my ruling on any objection.  If I sustained an

04:00   2    objection, pretend it wasn't asked.  If there was an

04:00   3    answer, ignore it.

04:00   4              If I overruled the objection, act like it

04:00   5    was never made.

04:00   6              If I gave you an instruction that some

04:00   7    item of evidence was received for a limited purpose,

04:00   8    follow it.  If I gave any limiting instructions during

04:00   9    the trial, follow them.

04:00   10             Any testimony I tell you to exclude or

04:01   11   disregard or told you to is not evidence.  You cannot

04:01   12   consider it.  You must not conduct any independent

04:01   13   research or investigation.  Make your decisions

04:01   14   exclusively on the evidence.

04:01   15             You alone are here to determine the

04:01   16   credibility and truthfulness of the witnesses.  In

04:01   17   weighing the testimony of the witnesses, you may

04:01   18   consider their manner and demeanor, any feelings or

04:01   19   interest in the case, any prejudice or bias about the

04:01   20   case that he or she might have had, the consistency or

04:01   21   inconsistency of their testimony, considered in light

04:01   22   of all the circumstances.

04:01   23             Was the witness contradicted by credible

04:01   24   evidence?  Has he or she made statements at other times

04:01   25   or places contrary to those given to you on the witness

—1290—

04:01  1    stand?

04:01  2                    You must give the testimony of each

04:01  3    witness the credibility that you alone believe it

04:01  4    deserves.

04:01  5                    Even though a witness may be a party to

04:01  6    the action and therefore interested in its outcome, the

04:01  7    testimony may be accepted if it is not contradicted by

04:01  8    direct evidence or by any inference that may be drawn

04:02  9    from the evidence, if you believe the testimony.

04:02  10                   In determining the weight to give the

04:02  11   testimony of the witness, consider whether there was

04:02  12   evidence at some other time the witness said or did

04:02  13   something or failed to say or do something that was

04:02  14   different from the testimony given by that witness at

04:02  15   trial.

04:02  16                   A simple mistake by the witness does not

04:02  17   necessarily mean that that witness did not tell the

04:02  18   truth as he or she remembered it.  We're people.

04:02  19   People forget things.  They remember things

04:02  20   inaccurately.

04:02  21                   If a witness made a misstatement,

04:02  22   consider whether it was an intentional falsehood or

04:02  23   just a mistake.  The significance of that may depend on

04:02  24   whether it had to do with an important fact or an

04:02  25   unimportant detail.

—1291—

04:02  1          Regardless, it is exclusively in your

04:02  2  province as the judges to believe every word that any

04:02  3  witness said or to disregard anything said.  You are

04:02  4  the exclusive judges of the facts in this case.

04:02  5          You are not to decide this case by

04:03  6  counting the number of witnesses who testified on each

04:03  7  side.  Witness testimony is weighed; witnesses are not

04:03  8  counted.  The test is not the relative number of

04:03  9  witnesses, but the relative convincing force of the

04:03  10  evidence.

04:03  11          The testimony of a single witness is

04:03  12  sufficient to prove any fact, even if a greater number

04:03  13  of witnesses testified to the contrary, if after

04:03  14  considering all the evidence, you believed a witness.

04:03  15          Certain testimony was presented to you

04:03  16  through a deposition, which is a sworn recorded set of

04:03  17  answers to questions a witness was asked in advance of

04:03  18  trial.  Under some circumstances, if a witness cannot

04:03  19  be present to testify from the witness stand, that

04:03  20  witness' testimony may be presented under oath or in

04:03  21  the form of a deposition.

04:03  22          Sometime before this trial, attorneys

04:03  23  representing the party in this case questioned this

04:03  24  witness under oath.  A court reporter was present.  He

04:03  25  or she recorded the testimony.  The questions and the

—1292—

04:03  1   answers have been shown to you.  The testimony in the

04:04  2   deposition is entitled to the same consideration and

04:04  3   weighed and otherwise considered by you in the same way

04:04  4   as if that witness had been present and had testified

04:04  5   from the witness stand here in court.

04:04  6              In addition, certain testimony -- I'm

04:04  7   going to skip that.  There was no live video in this

04:04  8   case.

04:04  9              Some of the video recordings and live

04:04  10  remote video of witnesses you have seen may have been

04:04  11  lower quality because witnesses had their depositions

04:04  12  taken from their home or office.  Never hold the

04:04  13  quality of the video itself or the location of the

04:04  14  witness against them or any other circumstances arising

04:04  15  from travel restrictions against the witness or any

04:04  16  party in the case.

04:04  17             Regardless of whether presented by

04:04  18  deposition or live remote video, the testimony is

04:04  19  entitled to the same consideration and is to be weighed

04:04  20  and otherwise considered by you in the same way as if

04:04  21  the witness had been present and testified to you here

04:04  22  in court.

04:04  23             You heard testimony from experts.  Expert

04:04  24  testimony is testimony from a person who has special

04:05  25  skill or knowledge in a science or profession or

04:05  1    business.  The skill or knowledge is not common to the

04:05  2    average person but has been acquired by the expert

04:05  3    through special study and/or experience.

04:05  4                In weighing expert testimony, consider

04:05  5    the expert's qualifications, the reason for the

04:05  6    opinions, the reliability of the information supporting

04:05  7    the opinions, as well as the factors I already have

04:05  8    told you about with respect to weighing testimony of

04:05  9    the other witnesses.

04:05  10               Expert testimony should receive whatever

04:05  11   weight and credit you think it deserves, given all the

04:05  12   evidence in the case.  You are not required to accept

04:05  13   opinions.  Rather, you are free to accept or reject the

04:05  14   testimony of experts just like any witness.

04:05  15               When testimony or an exhibit is admitted

04:05  16   for a limited purpose, you may consider that testimony

04:05  17   or exhibit only for the specific limited purpose for

04:05  18   which it was admitted.

04:05  19               Certain charts and summaries were shown

04:05  20   to you solely to help explain or summarize the facts

04:05  21   disclosed by books, records, and other documents that

04:06  22   are in evidence.  These charts and summaries are not

04:06  23   evidence or proof of any facts.

04:06  24               You must determine facts in this case

04:06  25   solely from the evidence.  Certain exhibits shown to

—1294—

04:06  1   you, such as PowerPoint presentations or posters or

04:06  2   models or illustrations of evidence, they're not

04:06  3   themselves evidence.  It is a party's description,

04:06  4   picture, or model used to describe something involved

04:06  5   in this trial.

04:06  6              It is your -- if your recollection of the

04:06  7   evidence differs from the exhibit, rely on your

04:06  8   recollection.

04:06  9              Do not let bias or prejudice or sympathy

04:06  10  play any part in your deliberation.

04:06  11             A corporation and all persons, whether a

04:06  12  corporation or not, are equal before the law.  They

04:06  13  must be treated as equals here in a court of justice.

04:06  14             The fact that a person brought a lawsuit

04:06  15  and is here in court seeking damages creates no

04:06  16  inference the person is entitled to a judgment in his

04:06  17  favor.

04:06  18             Anyone may make a claim.  Anyone can file

04:06  19  a lawsuit.  The act of making a claim in a lawsuit, by

04:07  20  itself, does not in any way tend to establish that that

04:07  21  claim is not evidence.

04:07  22             In any legal action, the facts must be --

04:07  23  let me start over.  Sorry.

04:07  24             In any legal action, facts must be proved

04:07  25  by a required amount of evidence known as the burden of

04:07  1    proof.  The plaintiff has the burden of proving patent

04:07  2    infringement and damages by a preponderance of the

04:07  3    evidence.

04:07  4            A preponderance of the evidence means

04:07  5    evidence that persuades you the claim is more probably

04:07  6    true than not true.

04:07  7            If you find that the plaintiff has failed

04:07  8    to prove any element of its claim by a preponderance of

04:07  9    the evidence, it may not recover on that claim.

04:07  10            As I did at the start of the case, I will

04:07  11    give you a summary of each side's contentions.  I will

04:07  12    then provide you with detailed instructions on what

04:07  13    each side must do to win its contentions.

04:07  14            As I previously told you, the plaintiff

04:07  15    filed suit in this Court seeking money damages from the

04:07  16    defendant for allegedly infringing the six asserted

04:07  17    patents by using or performing methods that the

04:08  18    plaintiff argues are covered by Claims 1 and 2 of the

04:08  19    '411 patent; 1 through 3 of the '301; Claims 1 and 4 of

04:08  20    the '517; Claims 1, 2 and 5 and 8 of the '836; Claims 1

04:08  21    and 8 of the '880; and Claims 4, 16, 17, and 18 of the

04:08  22    '127 patent, known as the "Asserted Claims."

04:08  23            The plaintiff alleges that defendant

04:08  24    infringed the asserted claims when certain web pages of

04:08  25    Microchip's websites are used.  Specifically, the

—1296—

04:08  1    plaintiff alleges that defendant infringed when certain

04:08  2    pages of www.microchip.com, the Microchip website, and

04:08  3    www.microchip.com/forums, the Forum website or the

04:08  4    Forum section, are used.

04:08  5                There are two versions of the Microchip

04:08  6    website.  The first is known as the old website,

04:08  7    original version, or coat of paint version of the

04:08  8    Microchip website, released initially in September of

04:09  9    2018.

04:09  10               A second version is known as the

04:09  11   redesigned website or partially updated version.  It

04:09  12   was first launched in 2020 to gradually replace web

04:09  13   pages of the old, original version of the Microchip

04:09  14   website.

04:09  15               The plaintiff accuses the old

04:09  16   website/original version of the Microchip website of

04:09  17   infringement and the Forum website/Forum section of

04:09  18   infringement.

04:09  19               The plaintiff does not accuse the

04:09  20   redesigned website or partially updated version of

04:09  21   infringement.

04:09  22               Microchip, the defendant, denies it has

04:09  23   infringed any of the asserted claims of any of the

04:09  24   asserted patents.

04:09  25               It's your job to be the judges and decide

—1297—

04:09  1    whether or not any asserted claims have been infringed.

04:09  2    If you decide that any asserted claims have been

04:09  3    infringed, you will then need to decide the amount of

04:09  4    money damages to be awarded to plaintiff to compensate

04:09  5    it for infringement.

04:09  6              Before you can decide many of the issues

04:09  7    in this case, you will need to understand the role of

04:10  8    patent claims.  Patent claims are the numbered

04:10  9    sentences at the end of each patent.  The claims are

04:10  10   important because it is the words of the claim that

04:10  11   define what a patent covers.

04:10  12             The figures and text in the rest of the

04:10  13   patent provide a description and/or examples of the

04:10  14   invention and provide a context for the claims, but it

04:10  15   is the claims that define the breadth of the patent's

04:10  16   coverage.  Therefore, what a patent covers depends, in

04:10  17   turn, on what the claim covers.

04:10  18             To know what a claim covers, a claim sets

04:10  19   forth in words a set of requirements.  Each claim sets

04:10  20   forth its requirements in a single sentence.  The

04:10  21   requirements of a claim are often referred to as claim

04:10  22   elements or limitations.

04:10  23             The coverage of a patent is assessed

04:10  24   claim by claim.  When a thing such as a product or

04:10  25   process meets all of the requirements of a claim, it is

—1298—

04:10  1  said to cover that thing.  That thing is said to fall

04:10  2  within the scope of the claim.

04:11  3          In other words, a claim covers a product

04:11  4  or process when each of the claim elements or

04:11  5  limitations is present in that product or process.  If

04:11  6  a system or method is missing even one limitation or

04:11  7  element of a claim, the system or method is not covered

04:11  8  by the claim.

04:11  9          You will first need to understand what

04:11  10  each claim covers in order to decide whether or not

04:11  11  there's infringement of the claim and decide whether or

04:11  12  not the claim is invalid.

04:11  13          The first step is to understand the

04:11  14  meaning of words used in the patent claim.  The law

04:11  15  says that it is my role to define the terms of the

04:11  16  claim, and it is your role to apply my definitions of

04:11  17  the terms I've construed to the issues that you are

04:11  18  asked to decide in the case.

04:11  19          Therefore, as I explained to you at the

04:11  20  start of the case, I've determined the meaning of

04:11  21  certain claim terms.  I've provided you my definition

04:11  22  of certain claim terms.  You must accept my definitions

04:11  23  of these words or phrases in the claims as being

04:12  24  correct.

04:12  25          It is your job to take these definitions

04:12  1    and apply them to the issues you're deciding, including

04:12  2    issues of infringement and invalidity.

04:12  3                    Could I have one counsel from each side

04:12  4    up here for a second?

04:12  5                    (Bench conference.)

04:12  6                    THE COURT:  That's -- I thought that was

04:12  7    out.

04:12  8                    (Off-the-record bench conference.)

04:12  9                    THE COURT:  Go back on the record.

04:12  10                   Ladies and gentlemen, I made a mistake

04:12  11   when I was preparing this.  As you can tell, it's a

04:12  12   long document and occasionally mistakes will be made.

04:12  13                   I've told you twice now that the issue of

04:12  14   the validity of the patent is something that you will

04:12  15   have to decide.  It is not.

04:12  16                   The only questions that you will have

04:12  17   before you are whether the plaintiff established that

04:12  18   there was infringement of the asserted claims and, if

04:12  19   you find that there was infringement of any of the

04:13  20   claims, what the appropriate amount of damages will be.

04:13  21                   This will be clear to you when you see

04:13  22   the verdict form because it only has those questions.

04:13  23   I didn't want you to be confused as to why I had

04:13  24   mentioned validity and there's nothing on the verdict

04:13  25   form about that.

—1300—

04:13  1           I apologize.  That was my mistake.

04:13  2           I think I remember where I was.  Y'all

04:13  3  can grade me.  I'm going to start with "the beginning

04:13  4  portion of a claim."  I think that's where I was.

04:13  5  Okay.

04:13  6           Beginning portion of a claim, also known

04:13  7  as the preamble of a claim, often uses the word

04:13  8  "comprising."  The word "comprising," when used in the

04:13  9  preamble means including but not limited to or

04:13 10  contained but not limited to.  When "comprising" is

04:13 11  used in the preamble, if you decide that an accused

04:13 12  product includes all the requirements of a claim, that

04:13 13  claim is infringed.

04:13 14           This is true even if the accused product

04:13 15  contains other elements not listed in the claim.  For

04:13 16  any words in the claim for which I have not given you a

04:13 17  definition, simply apply the ordinary meaning of those

04:14 18  terms in the field of the patent.

04:14 19           Do not take my definition of the language

04:14 20  of the claims as an indication that I have a view

04:14 21  regarding how you should decide the issues you're being

04:14 22  asked to decide, such as infringement only.  These

04:14 23  issues are yours to decide.

04:14 24           But with respect to certain claim terms,

04:14 25  my claim constructions are as follows:

—1301—

04:14  1          First, Active Path.  I construed it as a

04:14  2   matter of law to mean:  A sequence of links dynamically

04:14  3   created as a menu system is navigated.

04:14  4          With respect to the claim term providing

04:14  5   a means for navigating the multilevel hierarchical

04:14  6   website, I construed it as a matter of law to mean:

04:14  7   Navigating the multilevel hierarchical website, and

04:14  8   their structure must be the graphical user menu system

04:14  9   as shown in Figure 6A and 6B of the '836 patent.

04:14  10          Ladies and gentlemen of the jury, Claim 8

04:14  11   of the '836 patent is what's known in patent law as a

04:15  12   means-plus-function claim.  The '836 patent uses the

04:15  13   phrase:  Providing a means for navigating the

04:15  14   multilevel hierarchical website.

04:15  15          This "means for" phrase has a special

04:15  16   meaning in patent law.  It's called a

04:15  17   means-plus-function requirement.  It does not cover all

04:15  18   the structures that could perform functions set forth

04:15  19   in the claim, namely, navigating the multilevel

04:15  20   hierarchical website.

04:15  21          Instead, it covers a structure that

04:15  22   performs that function and that is either identical to

04:15  23   or equivalent to the structure described in the patent

04:15  24   for performing a function.

04:15  25          The issue of whether two structures are

—1302—

04:15  1  identical or equivalent is for you to decide.  I will

04:15  2  explain to you later how to determine whether the two

04:15  3  structures or two sets of structures are equivalent to

04:15  4  each other.

04:15  5          But for purposes of this case, I've

04:16  6  identified the structure described in the '836 patent

04:16  7  that performs the function navigating the multilevel

04:16  8  hierarchical website.

04:16  9          As reflected by claim construction

04:16  10  documents, the structure is the graphical user menu

04:16  11  system as shown in Figure 6A and 6B.  You must apply my

04:16  12  definition of the function and the structures described

04:16  13  in a patent for performing it as you would apply my

04:16  14  definition of any other claim term.

04:16  15          This case involves two types of patent

04:16  16  claims.  One is independent and one is dependent.

04:16  17  Let's talk first about independent claims.

04:16  18          Independent claims set forth all the

04:16  19  requirements that must be met in order to be covered by

04:16  20  that independent claim.  Thus, it is not necessary to

04:16  21  look at any other claim in the patents to determine

04:16  22  what an independent claim covers.

04:16  23          In this case the following asserted

04:17  24  claims are independent claims:

04:17  25          The '411 patent, Claim 1;

04:17  1                    '301 patent, Claim 1;

04:17  2                    '517 patent, Claim 1;

04:17  3               The '836 patent, Claims 1 and 8;

04:17  4               The '880 patent, Claim 1;

04:17  5               The '127 patent, Claim 14.

04:17  6               The remainder of the asserted claims in

04:17  7   this case from the asserted patents are what are known

04:17  8   as dependent claims.  A dependent claim does not recite

04:17  9   within the claim itself all the requirements of the

04:17 10   claim.  It refers to another different claim for some

04:17 11   of its requirements.  In this way this claim depends on

04:17 12   a different or other claim.

04:17 13               A dependent claim incorporates all the

04:17 14   requirements of the claim to which it refers.  The

04:17 15   dependent claim then adds its own additional

04:17 16   requirements.  To determine what a dependent claim

04:17 17   covers, it is necessary to not only look at the

04:18 18   dependent claim, but also the other claim or claims to

04:18 19   which it refers.

04:18 20               A product or process that meets all the

04:18 21   requirements of both the dependent claim and the claims

04:18 22   to which it refers to is covered by that dependent

04:18 23   claim.  If any requirement of a dependent claim is not

04:18 24   met, or if any requirement of a claim from which the

04:18 25   dependent claim depends is not met, then the product is

04:18  1    not covered by that asserted dependent claim.

04:18  2                Let me talk to you now about

04:18  3    infringement.  Here's how you decide whether or not the

04:18  4    plaintiff has proven that the defendant has infringed

04:18  5    the asserted claims of the asserted patents.

04:18  6                Infringement is assessed one at a time on

04:18  7    a claim-by-claim basis.  Therefore, there might or

04:18  8    might not be infringement as to one claim but no

04:18  9    infringement as to other claims.

04:18  10               In this case the plaintiff has alleged

04:18  11   defendant directly infringes the asserted patents.  In

04:19  12   order to prove their case of infringement, plaintiffs

04:19  13   must prove that the requirements for infringement are

04:19  14   met by a preponderance of the evidence.  That is, more

04:19  15   likely than not that all the requirements of

04:19  16   infringement have been proved.

04:19  17               In reaching your decision, keep in mind

04:19  18   that only the claims of a patent can be infringed.  You

04:19  19   must compare the asserted patent claims as I've defined

04:19  20   each of them to the accused system or process and then

04:19  21   determine whether or not there's infringement.

04:19  22               Do not compare the accused system or

04:19  23   process with any specific example set out in the patent

04:19  24   itself or with prior art in reaching your decision on

04:19  25   the issue of infringement.

04:19  1          The only correct comparison is between

04:19  2  the accused products on the one hand, and the language

04:19  3  of the claim itself on the other hand, as I've

04:19  4  explained them to you.

04:19  5          You must reach your decision as to each

04:19  6  assertion of infringement based on my instructions

04:19  7  about the meaning and scope of the claims, the legal

04:19  8  requirements for infringement, and the evidence that

04:20  9  you've heard in this courtroom.

04:20  10         To prove direct infringement, plaintiff

04:20  11  must prove by a preponderance of the evidence, i.e.,

04:20  12  more likely than not, that defendant used or performed

04:20  13  each and every step of the asserted method claims

04:20  14  within the United States and did so without the

04:20  15  permission of plaintiff during the time the asserted

04:20  16  patents were enforced.

04:20  17         You must compare the accused methods and

04:20  18  processes with each and every one of the requirements

04:20  19  of the claims to determine whether all the requirements

04:20  20  of that claim are met.  A party can directly infringe a

04:20  21  patent without knowing of the patent or without knowing

04:20  22  that what the party is doing is infringement of that

04:20  23  patent.

04:20  24         You must determine separately for each

04:20  25  asserted claim whether or not there is infringement.

—1306—

04:20  1    For independent claim -- I'm sorry.  For dependent

04:20  2    claims, if you find that a claim to which a dependent

04:20  3    claim refers is not infringed, there cannot be

04:20  4    infringement of the dependent claim.

04:20  5              So, again, think of it if there is an

04:21  6    independent claim and you find it is not infringed,

04:21  7    then any dependent claim that depends from the

04:21  8    independent claim cannot be infringed.

04:21  9              On the other hand, if you find that an

04:21  10   independent claim has been infringed, you must still

04:21  11   then separately decide and determine whether the

04:21  12   accused method or process meets the additional

04:21  13   requirements of any dependent claims or claims that

04:21  14   depend from the independent claim to determine whether

04:21  15   those dependent claims have also been infringed.  This

04:21  16   is because a dependent claim includes not only the

04:21  17   requirements of any of the claims to which it refers;

04:21  18   it has additional requirements of its own.

04:21  19             Allow me to describe the separate rules

04:21  20   that apply to a means-plus-function requirement used in

04:21  21   one of the claims.  Claim 8 in the '880 patent contains

04:21  22   means-plus-function requirements.

04:21  23             A means-plus-function requirement only

04:21  24   covers the specific structure disclosed in a patent

04:22  25   specification for performing the claimed function and

04:22    1    the equivalence of that specific structure that

04:22    2    performs the claimed function.  A means-plus-function

04:22    3    requirement does not cover all possible structures that

04:22    4    could be used to perform the claimed function.

04:22    5            As an example, the term "means for

04:22    6    processing data" might be understood to encompass a

04:22    7    variety of different ways of making a calculation,

04:22    8    including not only a computer or calculator, but a

04:22    9    pencil and paper, or even the human brain.  But because

04:22   10    the phrase is a means-plus-function requirement, we

04:22   11    interpret that phrase not to cover every possible means

04:22   12    for processing data, but instead to cover the actual

04:22   13    means disclosed in the patent or, in this case, in

04:22   14    the -- just in this one patent -- and for processing

04:22   15    data and other means that are equivalent to it.

04:22   16            For purposes of this trial, I've

04:22   17    interpreted each means-plus-function requirement for

04:22   18    you and identified the structure in the patent

04:23   19    specification that corresponds to the

04:23   20    means-plus-function requirements, specifically, the

04:23   21    graphical user menu system as shown in Figures 6A and B

04:23   22    in the structure that performed the function of

04:23   23    navigating the multilevel hierarchical website.

04:23   24            In deciding if plaintiff has proven the

04:23   25    defendant's accused instrumentality includes structure

—1308—

04:23  1    covered by a means-plus-function requirement, first

04:23  2    decide whether the accused instrumentality has any

04:23  3    structure that performs the function I just described

04:23  4    to you.  If not, the claim containing the

04:23  5    means-plus-function requirement is not infringed.

04:23  6            If you find that defendant's accused

04:23  7    instrumentality does have structure that performs claim

04:23  8    function, then you must determine whether that

04:23  9    structure is the same as or equivalent to the structure

04:23  10   I've identified in the specification.  If they're the

04:23  11   same or equivalent, the means-plus-function requirement

04:23  12   is satisfied by that structure of the accused

04:24  13   instrumentality.  If all the other requirements of the

04:24  14   claim are satisfied, the accused instrumentality

04:24  15   infringes the claim.

04:24  16           In order to prove that a structure in the

04:24  17   accused instrumentality is equivalent to the structure

04:24  18   in the '880 patent, Caddo must show that a person of

04:24  19   ordinary skill in the field would have considered that

04:24  20   the differences between the structure described in the

04:24  21   '880 patent and the structure in the accused

04:24  22   instrumentality are not substantial.

04:24  23           Plaintiff must also show the structure

04:24  24   was available on the date the '880 patent was granted.

04:24  25           In deciding what the level of ordinary

-1309-

04:24  1  skill in the field of the invention is, you can

04:24  2  consider all the evidence introduced at trial,

04:24  3  including but not limited to:  One, the level of

04:24  4  education, experience of the inventor, and other

04:24  5  persons actively working in the field; the types of

04:24  6  problems encountered in the field of prior art

04:24  7  solutions to those problems; the rapidity with which

04:24  8  the innovations are made; and the sophistication of the

04:24  9  technology.

04:24 10              The defendant asserts that the plaintiffs

04:25 11  cannot recover damages for defendant's old website or

04:25 12  Forum website, even if those websites infringe, because

04:25 13  the websites were built using Microsoft technology and

04:25 14  plaintiffs already granted a license to Microsoft.

04:25 15              A license or sublicense is a contractual

04:25 16  agreement that grants someone, other than the

04:25 17  patentholder -- called the licensee or sublicensee --

04:25 18  the right to make, use, or sell the claimed invention.

04:25 19              If Microsoft's license extends to

04:25 20  Microchip, there can be no liability for infringement.

04:25 21              On April 18, 2017 plaintiff entered into

04:25 22  a license agreement with Microsoft.  Under the terms of

04:25 23  the agreement, plaintiff licensed the asserted patents

04:25 24  to Microsoft.

04:25 25              Microchip contends that its old website

-1310-

04:25   1   and Forum website are therefore licensed, which means

04:25   2   they were within the scope of the Microsoft license and

04:25   3   not with any of the exceptions set forth within that

04:26   4   license.

04:26   5          You must determine whether plaintiff --

04:26   6   I'm sorry -- whether defendant has shown by a

04:26   7   preponderance of the evidence that defendant's Forum

04:26   8   website and old website are, in fact, licensed.

04:26   9          If you find that the old website is

04:26   10  licensed, then the plaintiff cannot recover damages for

04:26   11  the old website.  If you find that the Forum website is

04:26   12  licensed, then, again, plaintiff cannot recover damages

04:26   13  for the Forum website.

04:26   14         Or that should be plaintiffs.

04:26   15         Let's turn to damages.

04:26   16         I'm now going to instruct you about the

04:26   17  measure of damages.  Understanding that by instructing

04:26   18  you on damages, I am not suggesting which party should

04:26   19  win the case.

04:26   20         As on any issue, if you find that the

04:26   21  defendant infringed any asserted claim of any asserted

04:26   22  patent and you do not find the same claim is invalid --

04:26   23  you're not going to be asked that question -- you must

04:26   24  then consider what amount of damages to award to Caddo.

04:27   25         So let me start over and read it like

—1311—

04:27   1   this:  If you find that Microchip infringed any
04:27   2   asserted claim of the asserted patents, you must then
04:27   3   consider what amount of damages to award to Caddo.
04:27   4           If you find that Microchip has not
04:27   5   infringed any valid claim of a patent, then Caddo is
04:27   6   not entitled to any damages.
04:27   7           If you award damages, they must be
04:27   8   adequate to compensate the plaintiff for any
04:27   9   infringement you find.  Remember, this is not meant to
04:27   10  punish an infringer.
04:27   11          Your damages award, if reached in this
04:27   12  issue -- if you reach the issue, should put plaintiff
04:27   13  in approximately the same financial position it would
04:27   14  have been had the infringement not occurred.
04:27   15          The plaintiff has the burden to establish
04:27   16  the amount of damages by a preponderance of the
04:27   17  evidence.  In other words, you must award only those
04:27   18  damages that the plaintiff establishes more likely than
04:27   19  not they have suffered.
04:27   20          While Caddo is not required to prove the
04:27   21  amount of its damages with mathematical precision, it
04:28   22  must prove them with reasonable certainty.  You may not
04:28   23  award damages that are speculative or only possible or
04:28   24  guesswork.
04:28   25          In this case, plaintiffs seek a

-1312-

04:28  1    reasonable royalty.  A reasonable royalty is defined as

04:28  2    the amount of money plaintiff and defendant would have

04:28  3    agreed to as a fee for use of the invention or, in this

04:28  4    case, inventions, at the time just prior to when

04:28  5    infringement began.

04:28  6                You must be careful to ensure that the

04:28  7    award is no more but no less than the value of the

04:28  8    patented invention.  I'm about to give you more

04:28  9    detailed instructions, but note that the plaintiff is

04:28  10   entitled to recover no less than a reasonable royalty

04:28  11   for any act of infringement that you find.

04:28  12               A royalty is simply a payment made to a

04:28  13   patentholder in exchange for the right to make, use, or

04:28  14   sell the claimed invention.

04:28  15               A reasonable royalty is the amount of

04:29  16   royalty payment that a patentholder and the alleged

04:29  17   infringer would have agreed to in what we call a

04:29  18   hypothetical negotiation taking place at a time prior

04:29  19   to when the infringement first began.

04:29  20               In considering this hypothetical

04:29  21   negotiation, you should focus on the expectations of

04:29  22   both the plaintiff, the patentholder, and the

04:29  23   defendant, alleged infringer, would have been in had

04:29  24   they entered into an agreement at that time and had

04:29  25   they acted reasonably throughout their negotiations.

-1313-

04:29  1                      To determine this, you must assume that

04:29  2     both parties believed the patent was valid, that it was

04:29  3     infringed, and that both parties were willing to enter

04:29  4     into an agreement.

04:29  5                      The reasonable royalty you determine must

04:29  6     be one that would have resulted from the hypothetical

04:29  7     negotiation and not simply a royalty that either party

04:29  8     would have wanted or preferred.

04:29  9                      Evidence of things that happened after

04:29  10    the infringement first began can be considered by you

04:29  11    in evaluating what the reasonable royalty should be,

04:30  12    but only to the extent that the evidence aids in

04:30  13    assessing what royalty would have resulted from the

04:30  14    hypothetical negotiation itself, which would've

04:30  15    occurred immediately prior to the first infringement.

04:30  16                      In determining a reasonable royalty, you

04:30  17    may also consider evidence concerning the availability

04:30  18    and cost of an acceptable noninfringing substitute to

04:30  19    the patented invention.  An acceptable substitute must

04:30  20    be a product or method that does not infringe the

04:30  21    patent and is equally acceptable to customers.

04:30  22                      In determining the amount of a reasonable

04:30  23    royalty, consider all facts known and available to the

04:30  24    party at the time the infringement began.

04:30  25                      Allow me to list a few of the factors to

04:30   1   consider:

04:30   2                    The value the claimed invention

04:30   3   contributes to the accused product;

04:30   4                    The value of that factor, other than the

04:30   5   claimed invention, contributes to the accused product;

04:30   6                    Comparable license agreements or other

04:30   7   transactions, such as those covering the use of the

04:31   8   claimed invention or similar technology.

04:31   9                    Remember, no one factor is dispositive.

04:31   10  You can and should consider the evidence that has been

04:31   11  presented to you in this case on each of these factors.

04:31   12  You may also consider any other factors which in your

04:31   13  mind might have increased or decreased the royalty the

04:31   14  alleged infringer would have been willing to pay on the

04:31   15  one hand, and the patentholder would have been willing

04:31   16  to accept on the other, acting, as they must, as

04:31   17  normally prudent business people.

04:31   18                    Let's turn to the Georgia-Pacific

04:31   19  factors:

04:31   20                    First, royalties received by the patentee

04:31   21  for the licensing of the asserted patents, proving or

04:31   22  tending to prove an established royalty;

04:31   23                    The rates paid by the licensee for the

04:31   24  use of other patents comparable to the asserted

04:31   25  patents;

—1315—

04:31   1                    The nature and scope of the license, as

04:31   2    exclusive or nonexclusive, or restricted or

04:31   3    non-restricted in terms of territory or with respect to

04:31   4    whom the manufactured product may be sold;

04:31   5                    The licensor's established policy and

04:31   6    marketing program to maintain his or her patent

04:31   7    monopoly by not licensing others to use the invention

04:32   8    or by granting licenses under special conditions

04:32   9    designed to preserve the monopoly;

04:32   10                   The commercial relationship between the

04:32   11   licensor and the licensee:  Are they competitors in the

04:32   12   same territory in the same line of business, or are

04:32   13   they inventor and promoter;

04:32   14                   The effect of selling the patented

04:32   15   product and method in promoting sales of other products

04:32   16   of the licensee, the existing value of the invention to

04:32   17   the licensor as a generator of sales of non-patented

04:32   18   items, and the extent of such derivative or convoyed

04:32   19   sales;

04:32   20                   Seven, the duration of the patent and the

04:32   21   term of the license;

04:32   22                   Next, the established profitability of

04:32   23   the product made under the patents, its commercial

04:32   24   success, its current popularity;

04:32   25                   Next, the utility and advantages of the

04:32  1    patented property over the old modes or devices, if

04:32  2    any, that have been used for working out similar

04:32  3    results;

04:32  4              Next, the nature of the patented

04:32  5    invention, the character of the commercial embodiment

04:32  6    as it is owned and produced by the licensor, and the

04:33  7    benefits to those who have used the invention;

04:33  8              Next, the extent to which the infringer

04:33  9    has made use of the invention and any evidence

04:33  10   probative of the value of its use;

04:33  11             Next, the portion of the profit or the

04:33  12   selling price that may be customary in a particular

04:33  13   business or in comparable businesses to allow for the

04:33  14   use of the invention or an analogous invention;

04:33  15             Next, the portion of the realizable

04:33  16   profits that should be credited to the invention as

04:33  17   distinguished from non-patented elements, the

04:33  18   manufacturing process, business risks, or significant

04:33  19   features or improved (sic) added by the infringer;

04:33  20             Next, the opinion and testimony of

04:33  21   qualified experts;

04:33  22             Next, the amount that a licensor, such as

04:33  23   the patentee, and a licensee, such as the infringer,

04:33  24   would have agreed upon at the time the infringement

04:33  25   began if both had been reasonably and voluntarily

—1317—

04:33  1    trying to reach an agreement; that is, the amount which

04:33  2    a prudent licensee, who desires as a business

04:34  3    proposition to obtain a license to manufacture and sell

04:34  4    a particular article embodying the patented invention,

04:34  5    would have been willing to pay as a royalty and yet be

04:34  6    able to make a reasonable profit, which amount would

04:34  7    have been acceptable by a prudent patentee who is

04:34  8    willing to grant a license.

04:34  9              Comparable license agreements are one

04:34  10   factor that may inform your decision as to the proper

04:34  11   amount and form of the reasonable royalty award.

04:34  12   Similar to the way in which the value of the house is

04:34  13   determined relative to comparable houses sold in a same

04:34  14   neighborhood, whether a license agreement is comparable

04:34  15   to the license under the hypothetical license scenario

04:34  16   depends on many factors, such as whether they involve

04:34  17   comparable technologies, comparable economic

04:34  18   circumstances, comparable structure, comparable scope.

04:34  19              If there are differences between a

04:34  20   license agreement and the hypothetical license, take

04:34  21   those into account when you make your reasonable

04:34  22   royalty determination.

04:34  23              The hypothetical license is deemed to be

04:34  24   a voluntary agreement.  When determining if a license

04:35  25   agreement is comparable to the hypothetical license,

04:35 1    you may consider whether the license agreement is

04:35 2    between parties to a lawsuit and whether the license

04:35 3    agreement was a settlement influenced by the desire to

04:35 4    avoid further litigation.

04:35 5              According to the entire market value

04:35 6    rule, a royalty based on the total value of a

04:35 7    multicomponent product is only proper where the entire

04:35 8    value of the product comes from the patented feature.

04:35 9              Plaintiffs are not permitted to recover

04:35 10   damages based on the entire market value of the accused

04:35 11   products unless plaintiffs prove that the claimed

04:35 12   patent features are the sole driving factors for

04:35 13   customer demand.

04:35 14             It is not enough for plaintiffs to show

04:35 15   that the patented feature is viewed as valuable,

04:35 16   important, or even essential to the use of the accused

04:35 17   product.  It is also not enough for the plaintiffs to

04:35 18   show the accused product is commercially unviable

04:35 19   without the patented feature.

04:35 20             Unless you find that the claimed

04:35 21   invention is the sole driving factor for the demand for

04:35 22   the accused product, plaintiff may not use the value of

04:35 23   the entire product to calculate its reasonable royalty.

04:36 24             If the claimed patented features are not

04:36 25   the sole driving factor for customer demand of the

04:36    1    accused infringing product, you must perform what is

04:36    2    called apportionment.

04:36    3              When damages must be apportioned, that

04:36    4    means the amount you find as damages must be based on

04:36    5    the value attributable to the patented invention as

04:36    6    distinct from unpatented features of the accused

04:36    7    product or other factors such as marketing or

04:36    8    advertising or the patentholder's size or market

04:36    9    position.

04:36   10              Put differently, when apportionment is

04:36   11    required, a royalty compensating the patentholder for

04:36   12    damages must reflect the value attributable to the

04:36   13    infringing features of the product and no more.

04:36   14              On the other hand, if demand for the

04:36   15    entire accused product depends only on the claimed

04:36   16    features, then apportionment is unnecessary, even

04:36   17    though the accused product includes non-patented

04:36   18    features.

04:36   19              Tomorrow after you hear the closing

04:37   20    arguments, it will be your duty to deliberate and

04:37   21    consult with one another in an effort to reach a

04:37   22    verdict.  Each of you must decide the case for yourself

04:37   23    but only after an impartial consideration of the

04:37   24    evidence with your fellow jurors.

04:37   25              During your deliberations, don't hesitate

04:37  1  to reexamine your own opinions.  Change your mind if

04:37  2  you are convinced that you're wrong.  But don't give up

04:37  3  on your honest beliefs because other jurors disagree or

04:37  4  simply to finish the case.

04:37  5          At all times you are the judges of the

04:37  6  facts.  You've been allowed to take notes during the

04:37  7  trial.  Any notes that you took during the trial are

04:37  8  only aids to your memory.  If your memory differs from

04:37  9  your notes, rely on your memory.  Not the notes.

04:37  10  They're not evidence.

04:37  11          If you did not take notes, rely on your

04:37  12  independent recollection of the evidence.  Don't be

04:37  13  unduly influenced by the fact other jurors did take

04:37  14  notes.  Notes are not entitled to greater weight than

04:37  15  the recollection or impression that each jury has --

04:37  16  each juror has about the testimony.

04:38  17          When you go into the jury room to

04:38  18  deliberate, you'll take a copy of this charge.  We will

04:38  19  provide you a copy of all the exhibits -- actually, I

04:38  20  think they're electronic now.  And you will take your

04:38  21  notes.

04:38  22          The very first thing you do is -- I'm

04:38  23  going to go a little off script here.  The very first

04:38  24  thing you're going to do is sit down and pick a jury

04:38  25  foreperson.  You cannot start deliberating until you

04:38    1   pick a foreperson and fill out the note and hand it to

04:38    2   one of my favorite people wearing a blue jacket, who

04:38    3   will come out and let us know who the jury foreperson

04:38    4   is.

04:38    5           Once you have the exhibits, which I think

04:38    6   is now automated, and we know who the foreperson is,

04:38    7   you can then begin your deliberations.

04:38    8           If it hasn't been made clear to you yet,

04:38    9   your verdict will have to be unanimous.  After you have

04:38   10   reached a unanimous verdict, your jury foreperson must

04:38   11   fill out the answers to all the written questions on

04:38   12   the verdict form that are necessary.

04:38   13           There are some -- I believe I'm right --

04:39   14   there's some answers that are contingent on answers to

04:39   15   prior questions.  So when I say answers to all

04:39   16   questions, you must consider all the questions and

04:39   17   follow my instructions in the verdict form.  And if you

04:39   18   follow those instructions, answer all the ones that you

04:39   19   believe are necessary.

04:39   20           After you have concluded your service and

04:39   21   I discharge you, you'll not be -- I'll go into this

04:39   22   after I get your verdict back.

04:39   23           Throughout the day, if you need to

04:39   24   communicate with me, it's easy.  The foreperson will

04:39   25   write a note and sign it and hand it, again, to

04:39  1    whoever's sitting outside the door who will bring it to

04:39  2    me.  I will then deliver the message and question to

04:39  3    the lawyers.

04:39  4              But I will make the decision about how to

04:39  5    respond to your question.  And I will do so -- and we

04:39  6    usually do it very quickly.

04:39  7              This is very important.  When you send me

04:39  8    a note, the question must be as pure as possible.  What

04:40  9    I mean by that is, for example, you can't say, five of

04:40  10   us want to know this or three of us feel this way.

04:40  11   You're never to disclose to us any division.  We don't

04:40  12   get anything from you until we get the verdict form

04:40  13   which is unanimous.

04:40  14             You should do nothing that indicates

04:40  15   where you're at -- I've had juries send something back

04:40  16   and say, we've decided X.  How do we move forward on

04:40  17   this?  Until we get your final verdict form, it just

04:40  18   has to be a question without any preface, if that's

04:40  19   clear.

04:40  20             Very important.  Once you begin

04:40  21   deliberating tomorrow, I think we -- I don't know if we

04:40  22   collect your phones or not.  I think we may.  But you

04:40  23   may not communicate with anyone other than other jurors

04:40  24   while you are deliberating.

04:40  25             Now, occasionally -- I don't know if we

| | | |
|---|---|---|
| 04:40 | 1 | have smokers or vapers or whatever it is. |
| 04:41 | 2 | Occasionally, we have people who want to go outside and |
| 04:41 | 3 | take a short break by themselves.  If that's one of |
| 04:41 | 4 | you, you'll have to go with one of the marshals and -- |
| 04:41 | 5 | or CSOs.  And there'll be no deliberations while that |
| 04:41 | 6 | person is missing from the group. |
| 04:41 | 7 | And so the entire purpose of this is, we |
| 04:41 | 8 | want 100 percent of your deliberations to take place |
| 04:41 | 9 | only among the seven of you within the four walls of |
| 04:41 | 10 | the jury room. |
| 04:41 | 11 | You may not access the Internet while |
| 04:41 | 12 | you're deliberating.  You may not post anything.  The |
| 04:41 | 13 | one exception -- I don't know if, again, this |
| 04:41 | 14 | applies -- occasionally, we have people who are driven |
| 04:41 | 15 | here by a spouse or a family member who need to |
| 04:41 | 16 | communicate with that person to make arrangements for |
| 04:41 | 17 | travel.  Again, if that applies to any of you, let us |
| 04:41 | 18 | know, and we'll make those communications for you. |
| 04:41 | 19 | So that's all we have today.  If you all |
| 04:41 | 20 | would be so kind as to be back here tomorrow morning by |
| 04:42 | 21 | 8:45, we'll do the closing arguments at 9:00.  When we |
| 04:42 | 22 | finish closing arguments, then we will turn it over to |
| 04:42 | 23 | you all. |
| 04:42 | 24 | And I've been telling you all week you're |
| 04:42 | 25 | the judges.  Tomorrow you'll actually feel like judges. |

—1324—

04:42   1          So remembering my instructions, do not
04:42   2   discuss -- I know we're long into the case.  Please
04:42   3   don't discuss the case with anyone or do any research
04:42   4   or post anything on social media.  But we're almost
04:42   5   done.
04:42   6          So I very much appreciate the hard work
04:42   7   you all have put in this week, your patience on us when
04:42   8   we may not have gotten things done as quickly as I've
04:42   9   tried to.  That's been my fault.  But we look forward
04:42   10  to seeing you all tomorrow.
04:42   11                  THE BAILIFF:  All rise.
04:42   12                  (Jury exited the courtroom.)
04:42   13                  THE COURT:  You may be seated.
04:42   14          I'll ask you all -- I do my best to read
04:43   15  it accurately, but in one charge I said invalid or
04:43   16  valid when I got it backwards.  If I messed anything
04:43   17  up, let me know.  I did my best, but if you heard me
04:43   18  say anything that I need to correct, please let me
04:43   19  know.
04:43   20                  MR. DEVLIN:  Nothing from plaintiff, Your
04:43   21  Honor.
04:43   22                  THE COURT:  Okay.  Good.
04:43   23                  MR. QUILICI:  There may be one issue that
04:43   24  we should take up to avoid any delays in the morning.
04:43   25  If I could have 60 seconds to confer with opposing

04:43  1   counsel?

04:43  2                   THE COURT:  Sure.  Yes.  Of course.  No,

04:43  3   no.  Let's wait till tomorrow.

04:43  4                   (Laughter.)

04:43  5                   (Conference between counsel.)

04:44  6                   MR. DEVLIN:  Your Honor, I think we've

04:44  7   agreed to try to keep working together.  There may be

04:44  8   one final issue and we're going to keep working on it,

04:44  9   and we will let the Court know by the normal process of

04:44  10  sending an early e-mail, if that's okay?

04:44  11                  THE COURT:  Sure.

04:44  12                  MR. DEVLIN:  Thank you, Your Honor.

04:44  13                  Your Honor, one other point of

04:44  14  housekeeping, if I may?  I think when we preserved our

04:44  15  objections to the jury instructions, because of the

04:44  16  movement of myself in and out of the courtroom, I don't

04:44  17  know if we formally made our objection to reservation

04:44  18  of rights on willfulness.  So I'll just note for the

04:44  19  record that we --

04:44  20                  THE COURT:  I don't think you did.  But I

04:44  21  think it's not a surprise to defendant that you have

04:44  22  them.  So please go ahead and make whatever you want

04:45  23  to.

04:45  24                  MR. DEVLIN:  Just straightforward, Your

04:45  25  Honor.  We -- plaintiff objects to the directed verdict

04:45  1   to the JMOL initial willfulness, and objects to the

04:45  2   exclusion of willfulness instructions in the jury

04:45  3   instructions, as were generally placed in the proposed

04:45  4   form that was submitted with the Court.

04:45  5           THE COURT:  And I'll note for the

04:45  6   record -- I think I did earlier, that's why I did on

04:45  7   the record.  I think, but just in case, I'll note that

04:45  8   plaintiff had submitted a jury -- both an instruction

04:45  9   and also something -- obviously in the verdict form.

04:45  10           And so -- that's in whatever -- just make

04:45  11  sure that we have a -- in the record a copy of the

04:45  12  final proposal that you had of your jury charge.

04:45  13           MR. DEVLIN:  We will do that, Your Honor.

04:45  14  And if there's anything -- any issue, we'll confer with

04:45  15  them.  And we may submit something that formalizes it.

04:45  16           Thank you, Your Honor.

04:45  17           THE COURT:  Anything else?

04:45  18           MR. DEVLIN:  Nothing from plaintiff.

04:45  19           THE COURT:  I'll see you tomorrow morning

04:45  20  at 8:30.

04:45  21           THE BAILIFF:  All rise.

04:46  22           (Hearing adjourned.)

       23

       24

       25

1   UNITED STATES DISTRICT COURT )

2   WESTERN DISTRICT OF TEXAS      )

3

4      I, Kristie M. Davis, Official Court Reporter for the

5   United States District Court, Western District of

6   Texas, do certify that the foregoing is a correct

7   transcript from the record of proceedings in the

8   above-entitled matter.

9      I certify that the transcript fees and format comply

10   with those prescribed by the Court and Judicial

11   Conference of the United States.

12      Certified to by me this 2nd day of July 2022.

13

14                              /s/ Kristie M. Davis
                                KRISTIE M. DAVIS
15                              Official Court Reporter
                                800-Franklin Avenue
16                              Waco, Texas 76701
                                (254) 340-6114
17                              kmdaviscsr@yahoo.com

18

19

20

21

22

23

24

25

04:46